# UNITED STATES COURT OF INTERNATIONAL TRADE

## PUBLIC VERSION

| | |
|---|---|
| INVENERGY RENEWABLES LLC, </br></br> Plaintiff, </br></br> v. </br></br> UNITED STATES OF AMERICA, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, UNITED STATES TRADE REPRESENTATIVE ROBERT E. LIGHTHIZER, U.S. CUSTOMS AND BORDER PROTECTION, and ACTING COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION MARK A. MORGAN, </br></br> Defendants. | Case No. 19-00192 |

## COMPLAINT

Plaintiff Invenergy Renewables LLC ("Invenergy") brings this action against Defendants United States of America, Office of the United States Trade Representative ("USTR") and United States Trade Representative Robert E. Lighthizer, and U.S. Customs and Border Protection ("CBP") and Acting Commissioner Mark A. Morgan, (collectively, the "Government"), which challenges, and seeks injunctive and other relief from, the Government's "Withdrawal" of its grant of a regulatory "Exclusion" for bifacial solar modules from the Section 201 safeguard measures on crystalline silicon photovoltaic ("CSPV") cells, noticed on October 9, 2019,[1] with

---

[1] *See Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54,244 (Oct. 9, 2019) ("Withdrawal") Exhibit (Ex.) K.

1

an effective date of October 28, 2019, only 19 days after the withdrawal notice was published.

USTR's action violated the APA because it was taken with no advance notice to affected parties or an opportunity for them to comment on the proposed withdrawal and because USTR failed to explain adequately its reasons for its Withdrawal of the Exclusion. That action also violated Section 201, and the regulatory process established thereunder in February 2018 for establishing exclusions from the President's safeguard measure. Finally, USTR's unilateral withdrawal of the CSPV exclusion also violated the procedural due process requirements of the Fifth Amendment.

## JURISDICTION AND STANDING

1. The Court of International Trade ("CIT") has subject matter jurisdiction over this matter under 28 U.S.C. § 1581(i)(2)-(4), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704, & 706.

2. Section 1581 provides, in relevant part, that "the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for

   * * *
   (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

   (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

   (4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section."

   28 U.S.C. § 1581(i)(2)-(4).

3. Plaintiff's suit arises out of Section 201 of the Trade Act, which is a law providing for such "tariffs" and "duties" imposed for reasons other than raising revenue. It also

involves the "administration and enforcement" of these matters. *See Silfab Solar, Inc. v. United States*, 296 F. Supp. 3d 1295, 1299 (CIT Int'l Trade), *aff'd*, 892 F.3d 1340 (Fed. Cir. 2018). *See also Corus Grp. PLC v. Bush*, 26 C.I.T. 937, 949 (2002), *aff'd in part sub nom. Corus Grp. PLC. v. Int'l Trade Comm'n.*, 352 F.3d 1351 (Fed. Cir. 2003) (concluding that section 1581(i) grants jurisdiction over a challenge to the President's proclamation under section 201 of the Trade Act).

4. An action under 28 U.S.C. § 1581(i) must be commenced within two years after the cause of action first accrues.

5. On June 13, 2019, USTR granted certain product exclusion requests with a determination in the Federal Register. Ex. G, Exclusion.

6. Invenergy sources imported bifacial solar modules that are directly subject to the challenged Withdrawal, to be used in the development of its solar projects. Ex. L, Fletcher Aff., ¶¶ 9-11. These bifacial modules were included in the Exclusion. Ex. G; Ex. L, Fletcher Aff., ¶¶ 9-11.

7. On October 9, 2019, the USTR published in the Federal Register a notice of withdrawal of the exclusion for bifacial solar panels from application of the safeguard measure. *See* Ex. K, Withdrawal. Plaintiff Invenergy is directly affected by re-imposition of the Section 201 tariffs on their bifacial CSPV modules and thus is "adversely affected" by the Withdrawal. The Federal Register notice indicates that the withdrawal of the exclusion would apply as of October 28, 2019. Ex. K, Withdrawal. The claims asserted by Plaintiff's, accrued at the earliest, twelve days ago on October 9, 2019, the date on which the USTR published the Withdrawal. Ex. K. This action is therefore timely filed.

8. Article III of the United States Constitution provides that "judicial Power shall extend to

Case 1:19-cv-00192-N/A   Document 13   SEALED   Filed 10/21/19   Page 4 of 20

[certain] Cases . . . [and] Controversies . . . ." U.S. Const. art. III, § 2, cl. 1; cf. 28 U.S.C. § 251 (establishing the CIT as an Article III court). Courts require that every pending matter before an Article III Court be a "case" or "controversy." *See Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). The inquiry is whether the complaining party has standing to raise their claims. *Canadian Lumber Trade Alliance v. United States*, 30 CIT 391, 402 (2006).

9. Article III standing requires Plaintiff to demonstrate:

   (1) that they have suffered some injury-in-fact;

   (2) a causal connection between the defendant's conduct and this injury-in-fact; and

   (3) that this injury is redressable by the court.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiff must demonstrate that they have suffered an injury-in-fact "which is (a) concrete and particularized, [and] (b) 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149 (1990)).

10. Plaintiff has standing because it is directly and imminently injured by the Withdrawal of the Exclusion, as well as "adversely affected" and "aggrieved" within the meaning of the APA. *See* 5 U.S.C. § 702.

11. Courts "routinely recognize probable economic injury resulting from [governmental actions] that alter competitive conditions [are] sufficient to satisfy the [Article III injury-in-fact requirement]." *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (quoting III Kenneth Kulp Davis & Richard J. Pierce, Administrative Law Treatise 13-14 (3d ed. 1994)). Accordingly, courts have held that parties may suffer constitutional injury in fact

4

when agencies . . . allow increased competition' against them. *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002); see, e.g., *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002); *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 506 (9th Cir. 1988) (injury caused by a tax which upset comparative advantage).

12. Invenergy's bifacial CSPV modules are directly subject to the Proclamation, the Exclusion and the Withdrawal. Ex. L, Fletcher Aff., ¶¶ 9-13. In further reliance on the Exclusion, [

].

Ex. L, Fletcher Aff., ¶¶ 14-21; *see* Ex. 4, [

]. Further, it is in the process of [                                ]. It is thus "adversely affected" and "aggrieved" within the meaning of the APA. *See* 5 U.S.C. § 702. It has standing to bring this case.

13. The increased tariffs on bifacial products will increase the cost of doing business and reduce profits and business opportunities. Plaintiff Invenergy is "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). Invenergy sources and distributes bifacial CSPV products covered by the safeguard action. Ex. L, Fletcher Aff., ¶¶ 9-11. Moreover, in determining what action, if any, to take after the ITC finds serious injury, the President is directed to weigh whether the action will "provide greater economic and social benefits and costs." Trade Act of 1974, § 203(a)(1), 19 U.S.C.

§ 2253(a)(1). The statute specifically directs the President to consider the "effect of the implementation of actions under this section on consumers and on competition in domestic markets for articles." Trade Act of 1974, § 203(a)(2)(F)(ii), 19 U.S.C. § 2253(a)(2)(F)(ii). Thus, Plaintiff Invenergy is within the zone of interests to be protected . . . by the statute."

## PARTIES

14. Plaintiff Invenergy Renewables LLC is the world's leading independent and privately-held renewable energy company. Its home office is located in Chicago, Illinois and it has regional development offices throughout the United States, Mexico, Canada, Europe and Japan. Invenergy develops, owns and operates large-scale renewable and other clean energy generation facilities in the Western Hemisphere, Europe and Japan. Ex. L, Fletcher Aff., ¶¶ 6-7.

15. Defendant United States is the Federal Defendant and the actions complained of in this case were undertaken by its agency, Defendant USTR. An injunction is also sought against Defendant CBP from enforcing the safeguard action against bifacial CSPV modules.

16. Defendant Office of the United States Trade Representative is an executive agency of the United States Government and a component of the Executive Office of the President. It is headquartered at 600 17th Street, NW, Washington, DC 20508. Robert E. Lighthizer is the United States Trade Representative. He is sued in his official capacity.

17. Defendant CBP is an executive agency of the U.S. Government and a component of the Department of Homeland Security. It is headquartered at 1300 Pennsylvania Avenue, NW, Washington, DC 20229. Acting Commissioner Mark A. Morgan is the

Commissioner of U.S. Customs and Border Protection. He is sued in his official capacity.

18. Plaintiff Invenergy Renewables LLC ("Invenergy"), including its affiliated companies, is the world's leading independent and privately-held renewable energy company. Invenergy develops, owns and operates large-scale renewable and other clean energy generation facilities in Western Hemisphere, Europe and Japan and is committed to clean power alternatives and continued innovation in electricity generation. More specific to the present matter, Invenergy is also one of the leading solar energy developers in the United States. Exhibit (Ex.) L, Affirmation of Arthur S. Fletcher, ("Fletcher Aff."), ¶¶ 5-8.

## BACKGROUND

19. Invenergy has sourced bifacial CSPV modules from [

]. *Id.*, ¶¶ 9-11. CSPV cells are products that convert the energy of the sun into electricity. *See* Ex. A, ITC Report, *Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products)*, Vol. II: Information Obtained In The Investigation at i-11, Inv. No. TA-201-75, USITC Pub. 4739 (Nov. 2017) ("ITC Report"). CSPV cells are the essential elements in solar modules. *Id.* at I-12. CSPV modules are used for energy generation in residential, non-residential, and utility markets. *Id.* Such solar modules may be either "bifacial" or "monofacial." *Id.*

20. On May 23, 2017, the U.S. International Trade Commission (ITC) initiated an investigation to determine whether imported CSPV cells, whether or not partially or fully assembled into other products, are a substantial cause of serious injury to the U.S. solar industry. *See Crystalline Silicon Photovoltaic Cells' (Whether or Not Partially or Fully*

*Assembled Into Other Products); Institution and Scheduling of Safeguard Investigation and Determination That the Investigation Is Extraordinarily Complicated*, 82 Fed. Reg. 25,331 (Int'l Trade Comm'n June 1, 2017).

21. Section 201 of the Trade Act of 1974 authorizes the President to impose tariffs under Section 201 if the ITC determines that

> an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article, the President, in accordance with this part, shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs.

19 U.S.C. § 2251(a).

22. The ITC concluded that global imports of CSPV products were a substantial cause of a serious injury to domestic CSPV manufacturers. *See* Ex. A, ITC Report.

23. On January 23, 2018, President Trump issued Proclamation 9693, which imposed a safeguard measure pursuant to a Section 201 investigation on imports of crystalline silicon photovoltaic (CSPV) cells, whether or not partially or fully assembled into other products such as modules *See* Ex. B, *To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes*, Proclamation No. 9693, 83 Fed. Reg. 3,541 (Jan. 25, 2018) (the "Proclamation").

24. President Trump then imposed Section 201 duties on CSPV modules at the following ad valorem rates:

- Entered from February 7, 2018 through February 6, 2019 . . . . . . 30%
- Entered from February 7, 2019 through February 6, 2020 . . . . . . 25%

- Entered from February 7, 2020 through February 6, 2021 . . . . . . 20%
- Entered from February 7, 2021 through February 6, 2022 . . . . . . 15%

*See* Ex. B., 83 Fed. Reg. 3,541 (Jan. 25, 2018). These temporary duties are to remain in effect for a four-year period that began on February 7, 2018.

25. Invenergy sources imported bifacial solar modules which are directly subject to the challenged Proclamation, to be used in the development of its solar projects. Ex. L, Fletcher Aff., ¶¶ 9-11.

26. Presidential Proclamation 9693 also provided that

> "[w]ithin 30 days after the date of this proclamation, the USTR shall publish in the *Federal Register* procedures for requests for exclusion of a particular product from the safeguard measure established in this proclamation. If the USTR determines, after consultation with the Secretaries of Commerce and Energy, that a particular product should be excluded, the USTR is authorized, upon publishing a notice of such determination in the *Federal Register*, to modify the HTS provisions created by Annex I to this proclamation to exclude such particular product from the safeguard measure . . . ."

*See* Ex. B, 83 Fed. Reg. 3,541 (Jan. 25, 2018).

27. On February 14, 2018, the USTR issued a notice setting out the procedure to request product exclusions for CSPV Products and opened a public docket for the submission of exclusion requests and comments regarding submitted requests on the Federal eRulemaking Portal, http://www.regulations.gov. *See* Ex. C, *Procedures to Consider Additional Requests for Exclusion of Particular Products From the Solar Products from the Solar Products Safeguard Measure.* 83 Fed. Reg. 6,670 (Feb. 14, 2018) ("Exclusion Notice").

28. The Exclusion Notice indicated that requests for exclusion of CSPV Products were to identify the particular product in terms of its physical characteristics, such as dimensions,

9

wattage, material composition, or other distinguishing characteristics, that differentiate it from other products that are subject to the Section 201 safeguard measure. Ex. C, Exclusion Notice. The Exclusion Notice also provided that the USTR would not consider requests identifying the product at issue in terms of the identity of the producer, importer, or ultimate consumer; the country of origin; or trademarks or tradenames. And the Exclusion Notice indicated that the USTR would only grant exclusions that did not undermine the objectives of the safeguard measure. Exclusion Notice.

29. Submissions requesting an exclusion for CSPV Products were required to be filed no later than March 16, 2018. *Id.* The deadline for the submission of comments in response to requests for exclusion of a particular product from the safeguard measure was April 16, 2018 at 11:59 p.m. EST. *Id.*

30. By March 16, 2018, the USTR received 48 product exclusion requests for certain CSPV Products. *See* Ex. G, *Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27,684 (June 13, 2018) (the "Exclusion"); Exs. D, E, F, G.

31. By April 16, 2018, the USTR had received 213 subsequent comments responding to various CSPV Products exclusion requests. Ex. G, Exclusion.

32. On June 13, 2019, following the Exclusion Notice and the 218 comments received, and after over a year of consideration, USTR granted certain product exclusion requests with a determination in the Federal Register. Ex. G, Exclusion.

33. Bifacial CSPV modules sourced by Plaintiff to be used in the development of its solar projects were included in the Exclusion. Ex. L, Fletcher Aff., ¶¶ 9-11.

34. On October 9, 2019, more than 18 months after comments responding to various exclusion requests were due, USTR published in the Federal Register a notice withdrawing the Exclusion granted to bifacial CSPV modules without notice and comment. *See* Ex. K, *Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54,244 (Oct. 9, 2019) ("Withdrawal").

35. This action challenges, and seeks injunctive and other relief from, the Government's sudden Withdrawal of its prior grant of a regulatory Exclusion for CSPV bifacial modules. That action violated the APA because that action was taken with no advance notice to affected parties or an opportunity for them to comment on the proposed withdrawal, and because USTR failed to explain adequately its reasons for withdrawing the exclusion. That action also violated Section 201, and the regulatory process established thereunder in February 2018 for establishing exclusions from the President's safeguard measure. Finally, USTR's unilateral withdrawal of the CSPV exclusion also violated the procedural due process requirements of the Fifth Amendment.

## STATEMENT OF FACTS

36. CSPV cells are products that convert the sun's energy into electricity. Ex. A, ITC Report at i-11. Bifacial solar modules expose both the front and backside of the solar cells thus allowing solar power to be produced from both sides, which increases total energy production. Ex. L, Fletcher Aff., ¶ 10. Bifacial modules are the [     ] type of CSPV modules that Invenergy has [                              ] since [       ]. *Id.*, ¶ 11. Monofacial Solar modules traditionally have an opaque backsheet and can therefore only produce solar power from one side. *Id.*, ¶ 10. Because of their structure, a single bifacial module increases energy output somewhere between five and

20%, which means for the same project, using monofacial modules increases the cost because a solar company needs more panels, more racking, more land, and more foundation.

37. Invenergy develops, owns and operates large-scale renewable and other clean energy generation facilities in the Western Hemisphere, Europe and Japan. *Id.*, ¶ 7. It is committed to clean power alternatives and continued innovation in electricity generation. *Id.* More specific to the present matter, Invenergy is also one of the leading solar energy developers in the United States. Invenergy and its affiliated companies have developed more than 23 gigawatts ("GW") of clean energy projects that are in operation, construction, or under contract to be constructed. *Id.* Invenergy's operations have reduced $CO_2$ emissions by 25.7 million tons annually, the equivalent of taking 4.9 million cars off the road. *Id.*

38. Invenergy's projects, which typically range in cost from a hundred million to over a billion dollars, take years to develop and require multiple layers of coordination to complete. *Id.*, ¶ 8. Everything has to come together at the right time in order for a project to be successful. *Id.* This means timely supply and pricing of equipment, obtaining requisite permits, project financing, interconnection to the electric grid, power agreements with utilities, etc. *Id.* Because solar modules are the primary components of a solar project, any variation in their price or an inability to procure modules will drastically impact the viability of the solar project and/or threatens the project altogether. *Id.*

39. On January 23, 2018, President Trump issued Proclamation 9693, which imposed a safeguard measure pursuant to a Section 201 investigation on imports of CSPV products.

12

The safeguard action included additional tariffs at an initial rate of 25% on CSPV modules. Ex. B, the Proclamation.

40. On June 13, 2019, following an over a yearlong public notice and comment process, the USTR excluded bifacial CSPV products from safeguard action. Ex. G, Exclusion.

41. The Exclusion dramatically reduced the price of [                ], which are the [            ] CSPV modules that Invenergy has purchased for its solar development projects since [        ]. Ex. L, Fletcher Aff., ¶ 11.

42. At that time, with the duties on bifacial modules still in place, [










                                                                                                                    ]

and, therefore, responsible for the duties resulting from the President's Proclamation in [                                                                                      ].
*Id.*

43. On July 2, 2019, however, within a few weeks of and in direct reliance on the Exclusion that resulted from the public notice and comment process, [





                                                                                                                    ].
*Id.*, ¶ 13.

44. In further reliance on the Exclusion, and the reduced price of bifacial modules, Invenergy entered into [

]. *Id.*, ¶¶ 14-21.

45. The [                    ] during the period the Exclusion was in effect total roughly [          ], which based on conservative estimates, would power [                    ]. *See id.*, ¶ 22. At approximately 2.5 people per home, those [            ] could supply the power needs of roughly [          ]. *See id.*

46. The CSPV modules required for Invenergy to fulfill the [          ] that we entered into in reliance on the Exclusion—[

    ]. *Id.*, ¶ 24.

47. Because Invenergy is not the [




    ] *Id.*, ¶ 27.

48. Certainly, the fact that Invenergy [




    ] by certain dates. *Id.*, ¶ 28.

    [


    ] *Id.*

49. Invenergy's failure to perform under the [          ] would also cause irreparable harm to its reputation and goodwill with its corporate customers that contracted for solar energy. *Id.*, ¶ 29. What is more, because the [

14

], Invenergy's [

] would result in irreparable harm to its reputation and customer goodwill in the industry more broadly, affecting Invenergy's [

] *Id.* Indeed, Invenergy currently boasts the #1 brand reputation of 1,500 North American renewable industry participants, a significant competitive advantage that would be irreparably negatively affected if Invenergy failed to perform. *Id.*, ¶29.

50. Invenergy is but one example of companies harmed by the Withdrawal. The increased tariffs on bifacial CSPV products will increase the cost of doing business and reduce profits, restrict business opportunities, cause reputational harm to Invenergy and generally impede the development of solar power in the United States. *See generally, id.*, ¶¶ 9-47.

51. Beyond the harm to the solar companies directly impacted by the Withdrawal; it will lead to a number of negative economic and social repercussions. For example, [


]. *Id.*, ¶ 30; *see also id.*, ¶¶ 40-47.

## STATEMENT OF CLAIMS

### COUNT I – Violation of the APA's Procedural Requirements

52. Paragraphs 1 through 51 of this Complaint are restated and incorporated by reference as though fully set forth herein.

53. The Withdrawal published on October 9, 2019, is a substantive rule that imposes a new restriction on the importation of goods into the United States, changing the applicable rate of duty for all persons intending to import bifacial CSPV products into the United States.

*See* Ex. K. Thus, it is a substantive "rule" for purposes of the Administrative Procedure Act, 5 U.S.C. § 551(4), as a "statement of general or particular applicability and future effect designed to implement . . . or prescribe law."

54. The Administrative Procedure Act (APA), 5 U.S.C. § 553(b), provides in pertinent part:

General notice of proposed rulemaking shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

1. a statement of the time, place, and nature of public rule making proceedings;

2. reference to the legal authority under which the rule is proposed; and

3. either the terms or substance of the proposed rule or a description of the subjects and issues involved.

55. The APA further provides, at 5 U.S.C. § 553(c) and (d), that:

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

56. USTR violated the APA when it did not provide advance notice of and an opportunity for interested parties to comment on the Withdrawal, as required by 5 U.S.C. § 553(b).

16

57. The USTR also did not incorporate into the Withdrawal a concise statement of its basis and purpose, as required by 5 U.S.C. § 553(c). *See* Ex. K.

58. The USTR also did not publish the Withdrawal 30 days before the effective date set forth therein, as required by 5 U.S.C. § 553(d), nor did the agency invoke any of the exceptions to that requirement. *See* Ex. K.

59. Thus, the USTR's Withdrawal was adopted in violation of the APA's procedural requirements, and must be set aside under 5 U.S.C. § 706(2)(D).

**COUNT II – Arbitrary and Capricious Action in Violation of the APA**

60. Paragraphs 1 through 51 of this Complaint are restated and incorporated by reference as though fully set forth herein.

61. In the October 9, 2019 Withdrawal notice, USTR entirely failed to explain the rationale behind its conclusion that the Exclusion undermines the safeguard measure and should be withdrawn. *See* Ex. K.

62. USTR stated that it had received comments and criticisms regarding the Exclusion, and also referenced "newly submitted information" as underlying its decision to withdraw the Exclusion, but did not identify the sources or substance of those comments, criticisms, or "newly submitted information." *See* Ex. K.

63. Because USTR failed to provide the reasoning behind the Withdrawal, and identify the facts on which it based its conclusion that the Exclusion should be withdrawn, the notice is arbitrary, capricious, an abuse of discretion, and otherwise not otherwise in accordance with law, and must be set aside under 5 U.S.C. § 706(2)(A).

**COUNT III - Violation of Sections 203 and 204 of the Trade Act of 1974**

64. Paragraphs 1 through 51 of this Complaint are restated and incorporated by reference as though fully set forth herein.

65. Section 203 of the Trade Act of 1974, 19 U.S.C. § 2253(g), sets procedural requirements and requires the President establish regulations for the efficient and fair administration of Section 201 proceedings. The Withdrawal of the Exclusion was done in violation of this statutory requirement and must be set aside as contrary to law under that provision as well as 5 U.S.C. § 706.

66. Section 204 of the Trade Act of 1974, 19 U.S.C. § 2254(b), sets procedural requirements and requires certain findings to be made by the President before a safeguard action can be modified. The Exclusion was issued pursuant to the process specifically authorized by the President's original safeguard action. USTR's Withdrawal, however, was not authorized in the original safeguard action and thus it effectively amended the safeguard action. In withdrawing the safeguard measure, USTR did not follow nor even purport to rely on the statutory provisions governing the modification of safeguard actions.

67. The Withdrawal modified the safeguard action in violation of the requirements of Section 204 of the Trade Act and must be set aside as contrary to law under that provision as well as 5 U.S.C. § 706.

**COUNT IV - Violation of Plaintiff's' Procedural Due Process Rights**

68. Paragraphs 1 through 51 of this Complaint are restated and incorporated by reference as though fully set forth herein.

69. The Fifth Amendment requires that no person be deprived of their property without due process of law. *Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976); *see also Young v. Dep't of Housing and Urban Development*, 706 F.3d 1372, 1376 (Fed. Cir. 2013).

70. Procedural due process requires that certain substantive rights, such as a property interest, cannot be deprived unless constitutionally adequate procedures are followed. *See 2910*

*Georgia Avenue LLC v. District of Columbia*, 234 F.Supp.3d 281 (D.D.C. 2017).

71. To assert a procedural due process claim, a plaintiff needs to show that there has been (1) a deprivation of (2) life, liberty, or property (3) without due process of law). *Id.*

72. Plaintiff had a protected property right in the Exclusion. See *Goldberg v. Kelly*, 397 U.S. 254 (1970) (holding that, where benefits are a matter of statutory entitlement for persons qualified to receive them, and the loss or reduction of a benefit or privilege was conditioned upon specified grounds, the recipient had a property interest entitling him to proper procedure before termination or revocation).

73. Defendant USTR withdrew the Exclusion without providing any advance notice of that intended regulatory action to Plaintiff or other affected parties, or allowing them an opportunity to comment, thereby depriving Plaintiff of its property interest.

74. Due process requires that the party being deprived of their property have a meaningful opportunity to be heard by the decision-maker, at a meaningful time, and in a meaningful manner. *Matthews*, 424 U.S. at 332-33; *Kelley v. District of Columbia*, 893 F.Supp.2d 115, 123 (D.D.C. 2012). The Federal Circuit has explained that notice and an opportunity to be heard are the essential requirements of due process. *Young*, 706 F.3d at 1376;

75. By failing to provide advance notice of the Withdrawal or permit interested parties, including Plaintiff, to comment on that action, USTR violated Plaintiff's procedural due process rights in violation of the Fifth Amendment of the U.S. Constitution.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court will provide it relief from USTR's unlawful Withdrawal, by:

1. Holding that the Withdrawal published in the Federal Register on October 9, 2019

is unlawful and therefore vacating that action; and

2. Permanently and preliminarily enjoining Defendants, their agencies, officers, employees and agents from enforcing the Withdrawal; and

3. Permanently and preliminarily enjoining USTR from modifying the Harmonized Tariff Schedule of the United States ("HTSUS") to place Section 201 safeguard duties on bifacial CSPV products;

4. Permanently and preliminarily enjoining United States Customs and Border Protection from enforcing or making effective any modifications to the HTSUS pursuant to the Withdrawal; and

5. Providing Plaintiff such further and additional relief as may be just.

Respectfully submitted,

John Brew
Robert LaFrankie
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500

October 22, 2019

/s Frances Hadfield
CROWELL & MORING LLP
590 Madison Ave, 20th Floor
New York, NY 10022
Tel: (212) 803-4040
Email: fhadfield@crowell.com