Slip Op. 19-153

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| INVENERGY RENEWABLES LLC,<br><br>　　　　　　Plaintiff,<br><br>　　and<br><br>SOLAR ENERGY INDUSTRIES ASSOCIATION, CLEARWAY ENERGY GROUP LLC, EDF RENEWABLES, INC. and AES DISTRIBUTED ENERGY, INC.,<br><br>　　　　　　Plaintiff-Intervenors,<br>　　v.<br><br>UNITED STATES OF AMERICA, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, UNITED STATES TRADE REPRESENTATIVE ROBERT E. LIGHTHIZER, U.S. CUSTOMS AND BORDER PROTECTION, and ACTING COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION MARK A. MORGAN,<br><br>　　　　　　Defendants,<br><br>　　and<br><br>HANWHA Q CELLS USA, INC.,<br><br>　　　　　　Defendant-Intervenor. | Before: Judge Gary S. Katzmann<br>Court No. 19-00192 |

## OPINION AND ORDER

[Plaintiffs' motion for a preliminary injunction is granted.]

Dated: <u>December 5, 2019</u>

<u>John Brew</u>, <u>Kathryn L. Clune</u>, and <u>Amanda Berman</u>, Crowell & Moring LLP, of Washington, DC and New York, NY, argued for plaintiff, *Invenergy Renewables LLC* and plaintiff-intervenors,

*Clearway Energy Group LLC* and *AES Distributed Energy, Inc.*  With them on the brief were Larry Eisenstat, Robert LaFrankie, and Frances Hadfield.

Matthew R. Nicely and Daniel M. Witkowski, Hughes Hubbard & Reed LLP, of Washington, DC, argued for plaintiff-intervenor, *Solar Energy Industries Association.*  With them on the brief were Dean A. Pinkert and Julia K. Eppard.

Kevin M. O'Brien and Christine M. Streatfeild, Baker & McKenzie LLP, of Washington, DC, argued for plaintiff-intervenor, *EDF Renewables, Inc.*

Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendants.  With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director.

John M. Gurley, Jackson Toof, and Friederike S. Görgens, Arent Fox LLP, of Washington, DC, argued for defendant-intervenor.  With them on the brief was Diana Dimitriuc Quaia.

Katzmann, Judge:  This case, generated by the American solar industry, raises fundamental questions of adherence by the Government to procedures for decision making required by statute. Through Presidential Proclamation 9693 on January 23, 2018, the President imposed safeguard duties, designed to protect domestic industry, on imported monofacial and bifacial solar panels but delegated authority to the Office of the U.S. Trade Representative ("USTR") to exclude products from the duties.  83 Fed. Reg. 3,541–49 ("Presidential Proclamation").  After a lengthy process, USTR decided to exclude bifacial solar panels from safeguard duties.  Exclusion of Particular Products From the Solar Products Safeguard Measure, 84 Fed. Reg. 27,684–85 (June 13, 2019) ("Exclusion").  Four months later, however, USTR reversed course.  It announced the Withdrawal, which reinstituted safeguard duties on certain bifacial solar panels, with only 19 days' notice to the public, without an opportunity for affected and/or interested parties to comment, and without a developed public record on which to base its decision.  Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure, 84 Fed. Reg. 54,244–45 (USTR Oct. 9, 2019) ("Withdrawal").  Because this court instituted, and once renewed, a temporary restraining order ("TRO"), the Withdrawal has not yet gone into effect.

The question now before this court is whether a preliminary injunction ("PI") should issue where Plaintiffs allege that the United States ("the Government") violated the Administrative Procedure Act ("APA"), Title II-Relief From Injury Caused By Import Competition of the Trade Act of 1974 (herein "Section 201"),[1] and constitutional due process under the Fifth Amendment by failing to follow requisite procedures in withdrawing an exclusion to safeguard duties on solar products previously granted through notice-and-comment rulemaking. Plaintiff Invenergy Renewables LLC -- a renewable energy company-- ("Invenergy"),[2] joined by Plaintiff-Intervenors Solar Energy Industries Association ("SEIA"), Clearway Energy Group LLP ("Clearway"), EDF Renewables, Inc. ("EDF-R"), and AES Distributed Energy, Inc. ("AES DE") (collectively, "Plaintiffs"), challenges the Withdrawal by the Government.  Plaintiffs ask the court to enjoin the Government from reversing, without adequate process, its decision to exclude bifacial solar panels[3] from safeguard duties; that is, Plaintiffs ask the court to implement a PI to maintain the status quo until such time as the lawfulness of the Withdrawal is determined by final judgment.

This case emerges from a debate within the American solar industry between entities that rely on the importation of bifacial solar panels and entities that produce predominantly monofacial solar panels in the United States.  Plaintiffs here, who include consumers, purchasers, and importers of utility-grade bifacial solar panels, argue that the importation of bifacial solar panels

---

[1] Section 201 is the first section of this title as published in the United States Public Laws.  Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975) (codified as amended at 19 U.S.C. §§ 2251−54 (2012)).  Commonly, safeguard duties are referred to as "Section 201 duties," regardless of the specific section of the Trade Act of 1974 being invoked.  Where applicable, this opinion cites the appropriate section of the U.S. Code.

[2] Invenergy describes itself as "the world's leading independent and privately-held renewable energy company." Invenergy's Compl. at ¶ 14, Oct. 21, 2019, ECF No. 13.

[3] For the purposes of this opinion, the terms "solar panels" and "solar modules" are used interchangeably.

does not harm domestic producers because domestic producers do not produce utility-scale bifacial solar panels; they thus oppose safeguard duties that they contend increase the cost of these bifacial solar panels. Domestic producers, however, contend that solar project developers can use either monofacial or bifacial solar panels, and thus safeguard duties are necessary to protect domestic production of solar panels. Both sides contend that their position better supports expanding solar as a source of renewable energy in the United States.

Invenergy, however, also makes clear that this suit does not call upon the court to decide the future of the solar industry. Instead, before the court is its challenge to the <u>Withdrawal</u> on process grounds. Invenergy's Mot. for PI at 14, Nov. 1, 2019, ECF No. 49. The soundness of the safeguard duties and whether they should apply to bifacial solar panels are not the subject of this suit. Rather, at stake here is whether USTR undertook reasoned decision making to implement the <u>Withdrawal</u>, as required by the APA, including provision for meaningful participation by interested parties. The Government must follow its own laws and procedures when it acts, and the court finds it likely that it did not do so in withdrawing the <u>Exclusion</u> without adequate process. The court thus determines that a PI is warranted. The court now grants Invenergy's motion for a PI to enjoin the United States, USTR, U.S. Trade Representative Robert E. Lighthizer, U.S. Customs and Border Protection ("CBP"), and CBP Acting Commissioner Mark A. Morgan (collectively "the Government") from implementing the <u>Withdrawal</u>.

## BACKGROUND

### I.      *Statutory Overview*

Through Section 201, Congress provided a process by which the executive branch could implement temporary safeguard measures to protect a domestic industry from the harm associated with an increase in imports from foreign competitors. Trade Act of 1974 §§ 201−04, 19 U.S.C.

§§ 2251–54 (2012). Section 201 dictates that, upon petitions from domestic entities or industries,

the International Trade Commission ("ITC") may make an affirmative determination that serious

injury or a threat of serious injury to that industry exists. 19 U.S.C. § 2252. The President may

then authorize discretionary measures, known as "safeguards," to provide a domestic industry

temporary relief from serious injury. 19 U.S.C. § 2253. The statute vests the President with

decision making authority based on consideration of ten factors.[4]  19 U.S.C. § 2253(a)(2).

---

[4] 19 U.S.C. § 2253(a)(2) provides:

In determining what action to take under paragraph (1), the President shall take into account--
    (A) the recommendation and report of the Commission;
    (B) the extent to which workers and firms in the domestic industry are--
        (i) benefitting from adjustment assistance and other manpower programs, and
        (ii) engaged in worker retraining efforts;
    (C) the efforts being made, or to be implemented, by the domestic industry (including the efforts included in any adjustment plan or commitment submitted to the Commission under section 2252(a) of this title) to make a positive adjustment to import competition;
    (D) the probable effectiveness of the actions authorized under paragraph (3) to facilitate positive adjustment to import competition;
    (E) the short- and long-term economic and social costs of the actions authorized under paragraph (3) relative to their short- and long-term economic and social benefits and other considerations relative to the position of the domestic industry in the United States economy;
    (F) other factors related to the national economic interest of the United States, including, but not limited to--
        (i) the economic and social costs which would be incurred by taxpayers, communities, and workers if import relief were not provided under this part,
        (ii) the effect of the implementation of actions under this section on consumers and on competition in domestic markets for articles, and
        (iii) the impact on United States industries and firms as a result of international obligations regarding compensation;
    (G) the extent to which there is diversion of foreign exports to the United States market by reason of foreign restraints;
    (H) the potential for circumvention of any action taken under this section;
    (I) the national security interests of the United States; and
    (J) the factors required to be considered by the Commission under section 2252(e)(5) of this title.

Safeguard measures have a maximum duration of four years, unless extended for another maximum of four years based upon a new determination by the ITC. 19 U.S.C. § 2253(e)(1). The statute also outlines certain limits on the President's ability to act under this statute, including to limit new actions after the termination of safeguard measures regarding certain articles. See 19 U.S.C. § 2253(e). Further, the safeguard statute mandates that the President "shall by regulation provide for the efficient and fair administration of all actions taken for the purpose of providing import relief." 19 U.S.C. § 2253(g)(1).

The President issued the Presidential Proclamation on January 23, 2018, announcing a safeguard measure against imports of solar products after an affirmative determination of injury by the ITC. See also U.S. Int'l Trade Comm'n, Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products), Inv. No. TA-201-75, USITC Pub. 4739 (Nov. 2017) ("ITC Report"). The details of this proclamation are discussed further below. Notably, the Presidential Proclamation delegated the process of "exclusion of a particular product from the safeguard measure" to USTR. Presidential Proclamation at 3,541. Subsequently, USTR issued procedures for parties to follow in seeking exclusions from the safeguard measure. Procedures to Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure, 83 Fed. Reg. 6,670–72 (USTR Feb. 14, 2018) ("Exclusion Procedures"). These procedures were silent as to the revision, reconsideration, or withdrawal of exclusions once issued.

Through its Exclusion Procedures, USTR invited requests for exclusions and comments from interested persons. Id. at 6,671. The parties dispute whether this process constituted agency rulemaking pursuant to the APA. See Invenergy's Mot. for PI at 17; SEIA's Resp. to Invenergy's Mot. for PI at 7, Nov. 8, 2019, ECF No. 83; Def.'s Resp. to Invenergy's Mot. for PI at 2, Nov. 8,

2019, ECF No. 74; Q Cells' Resp. to Invenergy's Mot. for PI at 12, Nov. 8, 2019, ECF No. 84.

Relevant here are the APA's requirements for notice-and-comment rulemaking by government

agencies, which dictate the procedures to be followed by agencies when making certain legal or

policy decisions.  See, e.g., 5 U.S.C. §§ 551, 701 (2012).  Furthermore, the APA provides broad

judicial review of agency actions brought by "person[s] suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action within the meaning of a relevant

statute."  5 U.S.C. § 702.  The APA states that courts will "hold unlawful and set aside" agency

action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  5 U.S.C. § 706(2)(a).

## II.    *Factual Background*

The facts necessary for the court to decide the motion for a PI are not in dispute.  In May

2017, pursuant to 19 U.S.C. § 2252(a), Suniva, Inc. ("Suniva"), a domestic solar cell producer

filed an amended petition with the ITC alleging that certain solar panel cells "are being imported

into the United States in such increased quantities as to be a substantial cause of serious injury, or

threat thereof, to the domestic industry producing an article like or directly competitive with the

imported article."  ITC Report at 6; Def.'s Resp. at 4; Invenergy's Mot. for PI at 3.  The ITC then

instituted an investigation pursuant to 19 U.S.C. § 2252.  Exclusion Procedures at 6,670(citing 19

U.S.C. § 2252).  The scope of its investigation covered certain crystalline silicon photovoltaic

("CSPV") cells,

> whether or not partially or fully assembled into other products, of a thickness equal
> to or greater than 20 micrometers, having a p/n junction (or variant thereof) formed
> by any means, whether or not the cell has undergone other processing, including,
> but not limited to cleaning, etching, coating, and addition of materials (including,
> but not limited to metallization and conductor patterns) to collect and forward the
> electricity that is generated by the cell.  The scope of the investigation also included
> photovoltaic cells that contain crystalline silicon in addition to other materials, such

as passivated emitter rear contact cells, heterojunction with intrinsic thin layer cells,
and other so-called "hybrid" cells

("certain CSPV cells").  Exclusion Procedures at 6,670.  The ITC held a hearing on injury on

August 15, 2017, voted on injury on September 22, 2017, held a hearing on remedy on October 3,

2017, voted on remedy on October 31, 2017, and referred its findings and recommendations to the

President on November 13, 2017.  ITC Report at 7.  The ITC reached an affirmative determination

that certain CSPV cells "are being imported into the United States in such increased quantities as

to be a substantial cause of serious injury, or threat of serious injury, to the domestic industry

producing a like or directly competitive article."  Presidential Proclamation at 3,541.  See also ITC

Report at 1.

Pursuant to the statutory framework of safeguard procedures, 19 U.S.C. §§ 2253, the

President issued a proclamation, imposing temporary safeguard duties of 30% on certain CSPV

cells, to decrease by five percent each year until 2022, at which point they end.  Id. at 3541−49.

The safeguard duties applied to the bifacial solar panels used by Invenergy.  See Invenergy's Mot.

for PI at 7–8.  The President also instructed USTR to publish within thirty days "procedures for

requests for exclusion of a particular product" from the safeguard duties in the Federal Register

and authorized USTR to make such exclusions after consultation with the Secretaries of Commerce

and Energy and publishing a notice in the Federal Register.  Presidential Proclamation at 3543−44.

The safeguard duties went into effect on February 7, 2018.  Id. at 3545−49.

USTR then published procedures for exclusion requests in the Federal Register in February

2018.  Exclusion Procedures.  The notice summarized the scope of the ITC's investigation, the

scope of the products covered by the Presidential Proclamation, and the procedure to request the

exclusion of solar products.  Id.  USTR invited "interested persons to submit comments identifying

a particular product for exclusion from the safeguard measure and providing reasons why the

product should be excluded." Id. at 6671. Moreover, USTR indicated that "[a]ny request for

exclusion clearly should identify the particular product in terms of physical characteristics . . . that

distinguish it from products that are subject to the safeguard measures" and that it would not

"consider requests that identify the product at issue in terms of the identity of the producer,

importer, or ultimate consumer" or "products using criteria that cannot be made available to the

public." Id. The notice made clear that exclusions would become effective upon publication in

the Federal Register. Id. The notice further outlined the process for comments on exclusion

requests, noting that "[a]fter the submission of requests for exclusion of a particular product,

interested persons will have an opportunity to comment on the requests, indicate whether they

support or oppose any of them, and provide reasons for their view" and directing parties to

regulations.gov to comment. Id. USTR required interested parties to submit written comments by

March 16, 2018 and responses by April 16, 2018 to guarantee consideration. Id. at 6,672. The

notice did not provide a method for withdrawing an exclusion during the four-year safeguard

period. See id. at 6,670–72.

      The safeguard duties applied to both monofacial and bifacial solar panels. Monofacial

solar panels have CSPV cells on one side and opaque backing on the reverse side, allowing them

to produce power from only one side. Invenergy's Mot. for PI at 3; Def.'s Resp. to Invenergy's

Mot. for PI at 7. Bifacial solar panels have CSPV cells on both sides, thus allowing them to

produce about ten percent more power than monofacial solar panels. See id. Plaintiffs argue the

Withdrawal will increase the cost of solar energy and harm the development of the solar industry

in the United States because domestic manufacturers do not produce utility-scale bifacial solar

panels. See, e.g., SEIA's Compl. ¶ 16, Oct. 24, 2019, ECF No. 21 (citations omitted).

Three solar companies, Pine Gate Renewables, Sunpreme, Inc., and SolarWorld Industries GmBH, submitted requests for USTR to exclude the bifacial solar panels at issue here.  Invenergy's Compl., Oct. 21, 2019, ECF No. 13, Ex. D, Letter from Pine Gate Renewables to Edward Gresser (March 16, 2018); Invenergy's Compl. Ex. E, Letter from Sunpreme, Inc. to Edward Gresser (March 16, 2018); Invenergy's Compl. Ex. F, Letter from SolarWorld Industries GmBH to USTR (undated); Invenergy's Mot. for PI at 5; Def.'s Resp. to Invenergy's Mot. for PI at 8.  USTR received forty-eight product exclusion requests and 213 comments responding to these requests.  Exclusion at 27,684.  USTR considered the exclusion requests, granted certain product exclusions in a previous Federal Register notice, and "[b]ased on an evaluation of the factors set out in the February 14 notice" granted additional product exclusions, including bifacial solar panels, effective June 13, 2019.  Id. at 27,684−85.  The notice did not provide a method for or otherwise indicate that the exclusions could be withdrawn during the safeguard period.  Id.

Shortly after USTR granted the exclusion request for bifacial solar panels, on June 26, 2019, Suniva, First Solar Inc., and Hanwha Q Cells USA, Inc. ("Q Cells") wrote to USTR to ask it to reconsider its decision, arguing that the Exclusion would, "in a very short period of time, undermine the relief afforded by the Section 201 tariffs as imposed by the President on January 23, 2018."  Invenergy's Compl. Ex. H, Letter from Suniva, First Solar, and Q Cells to Ambassador Gerrish, Deputy U.S. Trade Representative (June 26, 2019).  The letter referenced a meeting between the parties less than a week prior and included eighteen attachments for USTR's consideration.  Id.  On October 3, 2019, based on alleged rumors that USTR was considering rescinding the Exclusion, Invenergy's CEO and thirteen other solar industry executives wrote to USTR expressing their desire to be heard should USTR plan to take any additional actions

regarding the <u>Exclusion</u>.  Invenergy's Mot. for PI at 5–6; Def.'s Resp. to Invenergy's Mot. for PI at 9; Invenergy's Compl. Ex. J, Letter to USTR re: Solar Safeguard Bifacial Module Exclusion.

On October 9, 2019, USTR published a notice in the Federal Register announcing its decision to withdraw the exclusion for bifacial solar panels, effective October 28, 2019. <u>Withdrawal</u>; Invenergy's Mot. for PI at 6; Def.'s Resp. to Invenergy's Mot. for PI at 9.  The notice explained that, "[s]ince publication of [the <u>Exclusion</u>] notice, the U.S. Trade Representative has evaluated this exclusion further and, after consultation with the Secretaries of Commerce and Energy, determined it will undermine the objectives of the safeguard measure."  <u>Withdrawal</u> at 54,244.  The Government subsequently moved for, and the court allowed, USTR to delay the effective date of the <u>Withdrawal</u> to November 8, 2019.  Nov. 25, 2019, ECF Nos. 23, 29. As addressed below, the court subsequently issued a TRO, and the <u>Withdrawal</u> has not yet gone into effect.

### III.    Procedural History

Invenergy initiated this action against the Government on October 21, 2019 by filing its summons, complaint, and a motion for a TRO.  Summons, ECF No. 1; Invenergy's Compl.; Invenergy's Mot. for TRO, ECF No. 14.  The court held a teleconference with Invenergy and the Government on October 23, 2019.  ECF No. 18.  The Government filed its response in opposition to Invenergy's motion for a TRO on October 24, 2019.  Def.'s Resp. to Invenergy's Mot. for TRO, ECF No. 19.  Pursuant to the court's order permitting Invenergy to respond to the Government's arguments raised during the teleconference, Invenergy filed a supplemental brief on October 24, 2019.  Invenergy's Supp. Br. in Resp. to Order, ECF No. 20.  That same day, SEIA filed a motion to intervene as plaintiff-intervenor.  SEIA's Mot. to Intervene, Oct. 24, 2019, ECF No. 21.

On October 25, 2019, the court ordered Invenergy and the Government to file briefs regarding the issue of security, should the court grant Invenergy's motion for a TRO. ECF No. 22. Invenergy and the Government filed letters with the court, as well as their respective responses. Def.'s Letter in Resp. to Order, Oct. 25, 2019, ECF No. 25; Invenergy's Resp. to Order, Oct. 25, 2019, ECF No. 26; Def.'s Letter in Resp. to Invenergy's Resp. to Order, Oct. 25, 2019, ECF No. 27; Invenergy's Resp. to Order, Oct. 25, 2019, ECF No. 28. The Government simultaneously moved for leave to defer implementation of the Withdrawal until November 8, 2019, thirty days after the notice announcing the Withdrawal was published in the Federal Register, to which Invenergy consented. Def.'s Mot. to Defer Implementation, Oct. 25, 2019, ECF No. 23; Invenergy's Resp. to Def.'s Mot. to Defer Implementation, Oct. 25, 2019, ECF No. 24. The court then granted the Government's motion, thus delaying the effective date of the Withdrawal to November 8, 2019, ordered the Government to respond to SEIA's motion to intervene, Oct. 25, 2019, ECF Nos. 29, 30, and ordered an expedited briefing schedule based on Invenergy's representations during the October 23, 2019 teleconference that it intended to move for a PI, Oct. 25, 2019, ECF No. 31.

On October 28, 2019, the Government filed its response to SEIA's motion to intervene noting its position that SEIA lacked constitutional and statutory standing, and, pursuant to the court's order, SEIA replied on October 29, 2019. Def.'s Resp. to SEIA's Mot. to Intervene, Oct. 28, 2019, ECF No. 34; Order on SEIA's Reply on Mot. to Intervene, Oct. 28, 2019, ECF No. 35; SEIA's Reply to SEIA's Mot. to Intervene, Oct. 29, 2019, ECF No. 38. The following day, the court granted SEIA's motion to intervene, designating SEIA as a plaintiff-intervenor. Oct. 30, 2019, ECF No. 39. SEIA's complaint against the Government was then deemed filed. SEIA's Compl., Oct. 30, 2019, ECF No. 43.

On October 31, 2019, the court ordered additional briefing on the issue of security in the event the court should issue a TRO, ECF No. 45, and Invenergy, SEIA, and the Government filed their respective briefs and responses.  Invenergy's Resp. to Order, Nov. 4, 2019, ECF No. 53; Def.'s Resp. to Order, Nov. 4, 2019, ECF No. 56; SEIA's Resp. to Order, Nov. 5, 2019, ECF No. 61; Def.'s Reply to Order, Nov. 5, 2019, ECF No. 62; Invenergy's Reply to Order, Nov. 5, 2019, ECF No. 63; SEIA's Reply to Order, Nov. 5, 2019, ECF No. 65.  The court instituted a TRO on November 7, 2019, requiring nominal security based on the procedural harms alleged.  ECF No. 68.

The court also granted Q Cells' unopposed motion to intervene as defendant-intervenor. Q Cells' Mot. to Intervene, Nov. 4, 2019, ECF No. 54.  Clearway and EDF-R moved to intervene as plaintiff-intervenors on November 4, 2019 and November 7, 2019, respectively.  Clearway's Mot. to Intervene, Nov. 4, 2019, ECF No. 58; EDF-R's Mot. to Intervene, Nov. 7, 2019, ECF No. 69. The Government did not oppose EDF-R's intervention as an importer of bifacial solar cells, "subject to Defendants' objections in its opposition to SEIA's intervention."  EDF-R's Mot. to Intervene at 2.  Clearway's motion stated that "Defendants' counsel indicated that the Government opposes this motion."  Clearway's Mot. to Intervene at 4.  Therefore, as ordered by the court, ECF No. 66, the Government responded to Clearway's motion claiming that Clearway lacked standing. Def.'s Resp. to Clearway's Mot. to Intervene, Nov. 8, 2019, ECF No. 72.  The court granted Clearway's and EDF-R's motions to intervene on November 8, 2019.  ECF Nos. 76, 78. Clearway's and EDF-R's previously filed respective complaints against the Government were then deemed filed.  Nov. 8, 2019, ECF Nos. 77, 79.  AES DE filed a partial consent motion to intervene on November 13, 2019.  AES DE's Mot. to Intervene, ECF No. 90.  The Government responded on November 27, 2019 stating its opposition to AES DE's standing for the same reasons it opposed

Clearway's intervention.  Def.'s Resp. to AES DE's Mot. to Intervene, Nov. 27, 2019, ECF No.

109.  The court granted AES DE's motion and its complaint was deemed filed. Nov. 27, 2019,

ECF Nos. 110, 111.

Invenergy filed a motion for a PI on November 1, 2019.  Invenergy's Mot. for PI, ECF No.

49.  The Government filed its response in opposition to Invenergy's motion for a PI and a motion

to dismiss on November 8, 2019.  Def.'s Resp. to Invenergy's Mot. for PI, ECF No. 74.  SEIA

filed a response in support of Invenergy's motion for a PI.  SEIA's Resp. to Invenergy's Mot. for

PI, Nov. 8, 2019, ECF No. 83.  Q Cells filed a response in opposition to Invenergy's motion for a

PI.  Q Cells' Resp. to Mot. for PI, Nov. 8, 2019, ECF No. 84.  The court held a hearing on

Invenergy's motion for a PI on November 13, 2019 and permitted the parties to file post-hearing

memoranda.  ECF No. 96 ("Hearing").  The Government, Q Cells, EDF-R, Clearway, Invenergy,

AES DE and SEIA filed supplemental briefs on November 19, 2019.  Def.'s Supp. Resp. to

Invenergy's Mot. for PI, ECF No. 100; Q Cells' Supp. Resp. to Invenergy's Mot. for PI, ECF No.

101; EDF-R's Supp. Resp. to Invenergy's Mot. for PI, ECF No. 102; AES DE, Clearway, and

Invenergy's Supp. Resp. to Mot. for PI, ECF No. 104; SEIA's Supp. Resp. to Invenergy's Mot.

for PI, ECF No. 104.  The court extended the TRO by fourteen days on November 28, 2019.  ECF

No. 108.

## JURISDICTION AND STANDING

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(i), which provides

that the court "shall have exclusive jurisdiction of any civil action commenced against the United

States, its agencies, or officers, that arises out of any law of the United States providing for . . .

[the] administration and enforcement" of tariffs and duties.  As a threshold, the court addresses

whether Invenergy, or in the alternative Invenergy joined by the Plaintiff-Intervenors, has

constitutional standing to sue the Government to challenge the implementation of the Withdrawal.

See Canadian Lumber Trade All. v. United States, 517 F.3d 1319, 1330–31 (Fed. Cir. 2008).  In

addition to constitutional standing, a plaintiff must also have statutory standing to bring a claim.

Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 126 (2014).  The court

addresses each in turn.  The Government argues that Invenergy has neither constitutional standing

nor statutory standing, thus barring the court's exercise of jurisdiction over this case.[5]  Def.'s Resp.

to Invenergy's Mot. for PI at 11–19.  Invenergy and Plaintiff-Intervenors argue that Invenergy

independently meets the requirements of both constitutional and statutory standing.  Invenergy's

Mot. for PI at 7; SEIA's Resp. to Invenergy's Mot. for PI at 2–4; EDF-R's Supp. Resp. to

Invenergy's Mot. for PI at 1–3. The court concludes that Invenergy both independently and once

joined by Plaintiff-Intervenors has standing to challenge the Withdrawal.

## I.    *Invenergy Has Constitutional and Statutory Standing to Sue.*

Because Invenergy has suffered an actual, imminent injury that is fairly traceable to the

Withdrawal and that can be redressed by injunctive relief, and Invenergy falls within the zone of

interests of Section 201, Invenergy independently has constitutional and statutory standing.

### A. *Invenergy Has Constitutional Standing.*

To invoke the jurisdiction of a federal court, a party must meet the case or controversy

requirements of Article III of the Constitution.  See U.S. Const. art. III, § 2.  "The essence of the

standing question, in its constitutional dimension, is whether the plaintiff has alleged such a

personal stake in the outcome of the controversy (as) to warrant [its] invocation of federal-court

---

[5] The Government also opposed Clearway's and AES DE's intervention as plaintiffs on this
ground.  Def.'s Resp. to Clearway's Mot. to Intervene, Nov. 8, 2019, ECF No. 72; Def.'s Resp.
to AES DE's Mot. to Intervene, Nov. 27, 2019, ECF No. 109.  For the same reasons provided
regarding Invenergy's standing, these arguments are not persuasive.

jurisdiction and to justify exercise of the court's remedial powers on [its] behalf." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 260–61 (1977) (internal citations and quotations omitted). Specifically, a plaintiff must show: (1) "that it has suffered a concrete and particularized injury that is either actual or imminent," (2) "that the injury is fairly traceable to the defendant," and (3) "that a favorable decision will likely redress that injury." Massachusetts v. EPA, 549 U.S. 497, 517 (2007) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). The injury may be indirect so long as it is fairly traceable to defendants' conduct. Vill. of Arlington Heights, 429 U.S. at 261. See also Nat. Res. Def. Council, Inc. v. Ross, 42 CIT __, __ 331 F. Supp. 3d 1338, 1357, 1361 (2018).

    The Government and Q Cells argue that Invenergy has not alleged an imminent and particularized injury, and that any injury suffered by Invenergy has been caused by third party action; therefore, those injuries are not sufficiently traceable to the Withdrawal and not redressable by this court. Def.'s Resp. to Invenergy's Mot. for PI at 11–13; Q Cells' Resp. to Invenergy's Mot. for PI at 4, 6–7. Furthermore, the Government alleges that, insofar as there may have been procedural violation, a "procedural violation alone is insufficient to confer standing." Def.'s Resp. to Invenergy's Mot. for PI at 13. See also Q Cells' Resp. to Invenergy's Mot. for PI at 6–7.

    Invenergy responds that it does not merely allege a procedural injury, but also other concrete harms is sufficient to confer Article III standing. Invenergy's Mot. for PI at 9. In addition to the procedural harm, Invenergy alleges that it will suffer economic harms, lost business opportunities, and reputational harm. Invenergy's Mot. for PI at 7–9, 35–37. Invenergy alleges it will suffer a procedural harm of loss of an opportunity to be heard by USTR on the Withdrawal, extensive economic harms as a result of higher duties on bifacial solar panels, lost business opportunities in the form of foregone tax credit qualification, and reputational harm in the failure

of its ability to fulfill its obligations and souring business relationships.  Id.  Invenergy also disagrees that its harm is dependent upon third party action: "Invenergy is not attempting to rely on injuries sustained by others to show its standing, nor to redress them; it seeks only to prevent the impending harm to its business."  Invenergy's Mot. for PI at 12.  Therefore, Invenergy alleges that it has shown sufficient injury, causation, and redressability in order to meet the Article III constitutional standing requirement.

The court determines that Invenergy has standing to challenge the Withdrawal as required by Article III of the Constitution.

### 1. Invenergy Has a Concrete and Particularized Injury That Is Actual or Imminent.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (quoting Lujan, 504 U.S. at 560.  A particularized injury "affect[s] the plaintiff in a personal and individual way." Id. (quoting Lujan, 504 U.S. at 560 n.1).  A concrete injury need be real, but not necessarily tangible.  Id. at 1549.  "[T]he injury-in-fact requirement. . .  ensure[s] that the plaintiffs have a stake in the fight and will therefore diligently prosecute the case while, at the same time, ensuring that the claim is not abstract or conjectural so that resolution by the judiciary is both manageable and proper." Canadian Lumber, 517 F.3d at 1332–33 (citations and quotations omitted).  The constitutional standing requirement of "[i]njury-in-fact is not Mount Everest."  Id. at 1333. (internal citation omitted).  While a bare procedural violation alone may be insufficient to confer standing where the violation does not result in harm to the plaintiff, it is sufficient where that procedural harm results in other concrete harms.  See Spokeo, 136 S. Ct. 1549.  Furthermore, as the Federal Circuit recognized in Gilda Industries, Inc. v. United States, 446 F.3d 1271, 1279 (Fed.

Cir. 2006), lack of procedure can constitute sufficient injury even where there exists the possibility that the agency's final decision taken in accordance with the proper procedures may not be in plaintiff's favor.  Id. ("[T]he failure to conduct review and revision of the list injured Gilda by depriving it of at least an opportunity to have those products removed.  That is a sufficient injury to be cognizable under the test for Article III standing.") (citations omitted).

Here, Invenergy has alleged a procedural harm and additional economic, business, and reputational harms to show an actual or imminent concrete and particularized injury.  Responding to the Government's characterization of its harm as a "bare procedural violation," Invenergy states that its injuries are instead "concrete harms that will result and have resulted to its business" from the procedurally deficient Withdrawal.  Invenergy's Mot. for PI at 9.  The court agrees that these harms are not speculative but are concrete and imminent.  The harms to Invenergy's business and reputation are also particular to Invenergy.  See Discussion infra Section III.

The Government and Q Cells focus on allegations of harm to Invenergy stemming from price increases that impact existing and future projects which would use bifacial solar panels.  See Def.'s Resp. to Invenergy's Mot. for PI at 12–14; Q Cells' Resp. to Invenergy's Mot. for PI at 4–6.  The Government argues that "Invenergy's alleged harm is thus based on an assumption" and Invenergy's own "business decisions."  Def.'s Resp. to Invenergy's Mot. for PI at 12 (citations omitted).  Furthermore, the Government and Q Cells contend that these harms were voluntarily assumed by Invenergy and depend on relationships with and decisions of third parties.  Id. at 12–13; Q Cells' Resp. to Invenergy's Mot. for PI at 6–8.  They argue that because Invenergy is not an importer of bifacial solar panels, Invenergy cannot rely on third party standing to bring this challenge itself.  Def.'s Resp. to Invenergy's Mot. for PI at 12–11–15; Q Cells' Resp. to Invenergy's Mot. for PI at 5, 7.  Therefore, they contend, any increase in price or economic impact

is speculative and depends on the rights of third parties and is not sufficient to create Article III standing. Def.'s Resp. to Invenergy's Mot. for PI at 12–14; Q Cells' Resp. to Invenergy's Mot. for PI at 5–8. Finally, Q Cells argues that even if Invenergy suffered a procedural harm, failure to comment on the <u>Withdrawal</u> does not make its injury actual or imminent. Q Cells' Resp. to Invenergy's Mot. for PI at 6.

However, the Government and Q Cells fail to recognize that Invenergy's claims hinge on a procedural violation that is accompanied by harms other than the allegations of economic impacts alone. First, Invenergy alleges a harm from USTR's lack of proper procedure in implementing the <u>Withdrawal</u>. Analogous to the procedural injury at issue in <u>Gilda</u>, 446 F.3d at 1271, here Plaintiffs allege that USTR has failed to provide sufficient notice and opportunity to comment and provide information to USTR so for USTR to make a reasoned decision regarding the <u>Withdrawal</u>. Invenergy alleges economic, business, and reputational harms stemming from this procedural violation which are concrete and particularized to Invenergy. <u>See, e.g.</u>, Invenergy's Mot. for PI at 7–10, 35–37.

Invenergy alleged sufficient claims of economic harm to constitute injury-in-fact. <u>See</u> Invenergy, Clearway, and AES DE's Supp. Resp. to Mot. for PI at 2–3. These economic harms can be shown through "economic logic." <u>See</u> <u>Canadian Lumber</u>, 517 F.3d at 1333. In <u>Canadian Lumber</u>, the Federal Circuit affirmed this court's holding that the Canadian Wheat Board, a wheat seller -- not an importer or exporter -- had Article III standing because it was "likely" to suffer "economic injury" as a result of duties imposed on wheat from Canada, the proceeds of which were distributed to an entity promoting North Dakotan wheat. <u>Id</u>. at 1334. The Federal Circuit agreed with this court's reliance on "economic logic" to reach that conclusion. <u>Id.</u> at 1333–34. The court determines that this "economic logic" applies here: the duty on bifacial panels will

increase -- and, with it, likely Plaintiffs' costs -- if the Withdrawal goes into effect. See Invenergy, Clearway, and AES DE's Supp. Resp. to Mot. for PI at 1–2. Plaintiffs, however, do not rely on "economic logic" alone. Both "economic logic" and detailed testimony show that, because of the Withdrawal, the price of bifacial panels will rise, causing substantial economic injuries to Invenergy's solar energy projects and larger business. See Invenergy, Clearway, and AES DE's Supp. Resp. to Mot. for PI at 3; Invenergy's Mot. for PI. Therefore, Invenergy has alleged a package of procedural, economic, business, and reputational harms that in combination are sufficiently concrete, imminent, and particularized to satisfy the injury requirement.[6]

### 2. *Invenergy's Injury Is Fairly Traceable to the Government's Withdrawal and Is Redressable by the Court.*

The second and third criteria of constitutional standing are that the injury is fairly traceable to the challenged conduct of the defendant and that a judicial decision is likely to redress the injury. Lujan, 540 U.S. at 561–62. These prongs of constitutional standing can be established even if the injury is indirect. Nat. Res. Def. Council, 331 F. Supp. 3d at 1357 (citing Vill. Of Arlington Heights, 429 U.S. at 260–61; Lujan, 540 U.S. at 561–62). In Nat. Res. Def. Council, the court found redressability where "[p]laintiffs . . . show[ed] that the third parties in question [were] likely to respond to a United States import ban in a way that reduces danger . . . ." Id. at 1359. In sum, that actions of third parties may redress part of the alleged injury is not a conclusive bar to standing.

Invenergy argues that a PI and ultimate resolution of this issue will provide "Invenergy, its suppliers, and its customers with the business certainty they need to go forward with their pending

---

[6] Non-economic harms referenced in this section are discussed further below in the context of irreparable harm. See Discussion infra Section III. While Article III injury-in-fact and irreparable harm analyses may overlap, they are not identical. Therefore, the economic harms that are sufficient to constitute injury-in-fact for constitutional purposes are analyzed in a different light under the irreparable harm standard.

and upcoming projects." Invenergy's Mot. for PI at 10. It contends that injunctive relief will maintain the status quo until a final decision can be reached, which if favorable would redress Invenergy's procedural injury, "giving it the opportunity to provide its views to USTR, have them considered, and obtain an explanation for USTR's decision . . . " Invenergy's Supp. Resp. for TRO at 7. In sum, the injuries, at least in that respect, do not depend upon the actions of third parties.

The Government and Q Cells argue that Invenergy's injuries are not fairly traceable to the Withdrawal because Invenergy's harm arises from relationships with third parties and not from the Government's own actions. Def.'s Resp. to Invenergy's Mot. for PI at 12–13; Q Cells' Resp. to Invenergy's Mot. for PI at 7. The Government contends that "there is no basis, other than speculation, to conclude that enjoining USTR's determination would redress Invenergy's claimed injury." Def.'s Resp. to Invenergy's Mot. for PI at 13. Similarly, Q Cells argues that "[t]he problem with this speculative claim is that even if this [c]ourt reversed the Withdrawal, it would have no control over what the suppliers decide to do with their pricing models." Q Cells' Resp. to Invenergy's Mot. for PI at 7.

The court concludes that Invenergy's injury stems directly from the Withdrawal, even if some of the specific harms it alleges involve relationships with third parties. Invenergy provides evidence that injuries would not exist but for the implementation of the Withdrawal because its economic and reputational harms stem from reliance on the Exclusion and attempt to adjust to the Withdrawal, respectively. Invenergy's Mot. for PI at 31–33. Furthermore, Invenergy's procedural injury is directly traceable to the Withdrawal announced without sufficient notice or opportunity for comment as required by the APA. See, e.g., ThyssenKrupp Acciai Speciali Terni S.P.A. v. United States, 32 CIT 728, 735–36, 572 F. Supp. 2d 1323, 1331 (2008). This procedural injury is

also redressable by a decision from this court favorable to Invenergy because, if it succeeds on the

merits, the court would order USTR to provide additional process in its decision to reconsider the

Exclusion.  See Lujan, 504 U.S. at 561–62.  Moreover, the redressability prong can be met where

a judicial decision would result in a remand or order to an agency to follow process rather than

directing a specific outcome.  See, e.g., Gilda, 446 F.3d at 1279 (deprivation of opportunity for

agency to exercise discretionary review is sufficient injury to satisfy Article III standing);

ThyssenKrupp, 572 F. Supp. 2d at 1331 ("Providing such an opportunity for review would

sufficiently redress ThyssenKrupp's injury and satisfy Article III standing").  In short, Invenergy

has shown that it has or will imminently suffer a package of concrete and particularized injuries,

including a procedural injury, that is fairly traceable to the Withdrawal and can be redressed by a

favorable decision of the court.  Therefore, Invenergy has shown that it meets the constitutional

standing requirements.

### B.  Invenergy Has Statutory Standing Under Section 201 To Bring This Suit.

In addition to the constitutional requirements of standing under Article III, courts have

adopted an additional standing requirement, sometimes referred to in decisions as the prudential

standing requirement, but that the Supreme Court has clarified is simply a statutory "zone of

interests" analysis.  Lexmark, 572 U.S. at 126, 128 n.4 ("[P]rudential standing is a misnomer as

applied to the zone-of-interests analysis," and "We have on occasion referred to this inquiry as

'statutory standing'" (citations omitted)).  See also Lone Star Silicon Innovations LLC v. Nanya

Tech. Corp., 925 F.3d 1225, 1235 (Fed. Cir. 2019) (adopting non-jurisdictional "statutory

standing" post-Lexmark).  Unlike constitutional standing, statutory standing is not jurisdictional.

Gilda, 446 F.3d at 1280 ("the zone of interest tests is not jurisdictional") (citations omitted); Lone

Star Silicon, 925 F.3d at 1235–36.  The court nevertheless must consider it as integral to the

likelihood of success before granting injunctive relief.  U.S. Ass'n of Importers of Textiles and Apparel v. United States, 413 F.3d 1344, 1348 (Fed. Cir. 2005).

"[C]ourts applying the judicial review standards of the [APA], 5 U.S.C. § 702, determine whether the plaintiff has standing to seek review under that statute based on 'whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"  Gilda, 446 F.3d at 1279–80 (quoting Ass'n of Data Processing Serv. Orgs. Inc. v. Camp, 397 U.S. 150, 153 (1970)).  The zone of interests analysis "asks whether this particular class of persons ha[s] a right to sue under this substantive statute" using "traditional principles of statutory interpretation."  Lexmark, 572 U.S. at 127–28 (citations and quotations omitted).  The purpose of this analysis is to limit parties who may sue under statutorily granted causes of action to those who have actually been injured.  Id. at 129.  This requirement stems from a need to limit the APA's "generous review provisions" with a "broad[] remedial purpose."  Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 394–95 (1987); see also Lexmark, 572 U.S. at 129.  The courts consider the "overall context" of the relevant statutory framework in deciding which interests are arguably protected.  Clarke, 479 U.S. at 401.  See also Lexmark, 572 U.S. at 130 ("In [the APA] context we have often conspicuously included the word arguably in the test to indicate that the benefit of any doubt goes to the plaintiff" (citations and quotations omitted)).  "[W]e then inquire whether the plaintiff's interests affected by the agency action in question are among them."  Nat'l Credit Union Admin. v. First Nat'l Bank, 522 U.S. 479, 492 (1998).  The Supreme Court has explained that, "[i]n applying the 'zone of interests' test, we do not ask whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff."  Id.  Further, in the context of the APA, this zone of interests test "is not meant to be especially demanding," and, "[i]n cases where the plaintiff is not itself the subject of

the contested regulatory action," the test is satisfied unless the "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke, 479 U.S. at 399. "We have made clear, however, that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes." Lexmark, 572 U.S. at 130–31 (internal citations and quotations omitted).

Invenergy claims that it falls within the zone of interests of "Section 201 and the entire safeguard statutory scheme." Invenergy's Mot. for PI at 14. SEIA, in support of Invenergy's motion for a PI, argues that "[t]he [c]ourt should take into account [the] assessments by the Congress and the President regarding the causal relationship between the imposition (or removal) of safeguard duties on an imported product and the harm to consumers of that product" in analyzing Invenergy's statutory standing under Section 201. SEIA's Resp. to Invenergy's Mot. for PI at 4. See also Invenergy's Mot. for PI at 13 (arguing that Invenergy is within the zone of interests of Section 201).

The Government claims that Invenergy "falls far outside the 'zone of interests' of [S]ection 201 and, thus, lacks prudential standing." Def.'s Resp. to Invenergy's Mot. for PI at 16. Because the Government claims that the APA does not apply to actions of USTR, Id. at 2, the Government's briefs do not discuss statutory standing in connection with the APA. The Government and Q Cells focus on Invenergy's standing under Section 201 to argue that Invenergy as a consumer of bifacial solar panels does not fall within Section 201's zone of interests. Id. at 15–19; Q Cells' Resp. to Invenergy's Mot. for PI at 9. They argue that "the inclusion of 'consumers' within the 10 non-

exhaustive factors guiding the President's discretion to impose a remedy, does not confer standing to sue." Def.'s Resp. to Invenergy's Mot. for PI at 18. The Government asserts that "Section 201 is not intended to provide protection for domestic consumers, who seek to purchase injurious goods at the expense of an industry that faces serious injury and the prospect of economic extinction." Id. at 19 (citations and quotations omitted). See also Q Cells' Resp. to Invenergy's Mot. for PI at 9.

The court determines that Invenergy's interests are "arguably within the zone of interests to be protected or regulated by the statute . . . in question." See Ass'n of Data Processing, 397 U.S. at 153. The zone of interests of Section 201 includes "the effect of the implementation of actions under this section on consumers and on competition in domestic markets for articles," 19 U.S.C. § 2253 (a)(2)(F)(ii), and the "efficient and fair administration of all actions taken for the purpose of providing import relief," 19 U.S.C. § 2253 (g)(1) (emphasis added). Thus, the text of the statute itself shows that Congress wanted to ensure that the underlying Section 201 safeguard measures and implementation of those measures reflect consideration of the interests of purchases and users, here Invenergy, placing them within the "zone of interests" of the entire statutory scheme. Furthermore, in these provisions, Congress has shown a concern for the fairness of procedures administering safeguard duties that may impact consumers and domestic competition for articles at issue. These explicit interests arguably include Invenergy's interest in participating in and being subject to fair and efficient administration of the Exclusion process and USTR's own procedures in implementing that process. This is particularly where, as is the case here, the plaintiff "is not challenging the underlying Section 201 proceedings at the ITC, which authorized the President to impose safeguard duties to protect domestic producers," but instead is challenging

the Withdrawal as violating the APA and USTR's own procedures.  See Invenergy's Mot. for PI at 14.

Contrary to the Government's and Q Cells' arguments, the zone of interests analysis is not limited to the purpose or intended beneficiaries of the statute.  The zone of interests is broad enough to include a party's interests directly implicated by Government action pursuant to the statute even though that action intends to indirectly disadvantage that very party.  See Nat'l Credit Union, 522 U.S. at 492–94.  This is especially true in the context of an alleged APA violation.  Plaintiffs challenge USTR's attempt to modify the Exclusion with no notice and no opportunity for interested persons to participate.  For that reason, USTR's own regulatory actions regarding bifacial modules confirm that purchasers and users of imported products have statutory standing to challenge the lack of procedures.  Whether the original Section 201 safeguard measure was intended to protect the domestic industry, USTR set forth Exclusion Procedures under which interested persons have rights, and these interested persons include consumers, purchasers, and importers who did not file or otherwise participate in the exclusion process. Exclusion Procedures at 6,670 (Feb. 14, 2018) (repeatedly referencing "interested persons" – not importers).[7]  Therefore, the court concludes that Invenergy, as an interested person, has properly asserted standing to challenge the Withdrawal.  See 5 U.S.C. § 702; 19 U.S.C. §§ 2251–54.

## II.    Alternatively, Invenergy, Joined by Plaintiffs-Intervenors, Collectively Have Constitutional and Statutory Standing.

In the alternative, Invenergy, joined by the Plaintiff-Intervenors, collectively have sufficient constitutional and statutory standing to establish conclusive jurisdiction by the court.

---

[7]  For these reasons, the Government's reliance on McKinney, 799 F.2d 1544 (Fed. Cir. 1986) is not persuasive.  The McKinney court focused on the fact that consumers had only an abstract interest in the statute, id., whereas here Invenergy participated in and is concretely affected by USTR's Withdrawal.

"For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, co-plaintiff, or an intervenor as of right."  Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017).  "To obtain injunctive or declaratory relief, it is sufficient that there be at least one plaintiff with standing."  Citizens United for Free Speech II v. Long Beach Twp. Bd. of Comm'rs, 802 F. Supp. 1223, 1231 (D.N.J. 1992).  Because Plaintiffs (or Plaintiffs' constituent members) include consumers, users, and importers of bifacial solar panels, at least one of the plaintiffs has standing to bring this challenge to the Withdrawal.

The intervention of SEIA and EDF-R, both of which represent interests of importers in this case, moots the Government's standing argument regarding Invenergy, Clearway, and AES DE. SEIA is the national trade association for the U.S. solar industry whose members include importers, manufacturers, distributors, installers, and project developers.  SEIA Resp. to Invenergy's PI at 1.  "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Biotech. Indus. v. District of Columbia, 496 F.3d 1362, 1369 (Fed. Cir. 2007) (quoting United Food & Com. Workers v. Brown Group, 517 U.S. 544, 553 (1996)).  Members of SEIA would have standing to sue in their own right and are adversely affected or aggrieved by agency action.  SEIA's members include importers, purchasers, and users of the imported bifacial products subject to the safeguard action.  The Withdrawal will subject importers to safeguard duties, thus likely increasing the cost of importing bifacial solar products into the United States, increase their cost of doing business and reduce their profits and business opportunities.  SEIA's organizational interests include growing the solar energy industry for its importer-members and members using imported utility-

grade panels.  See SEIA Resp. to Invenergy's PI at 1.  Finally, although Invenergy, Clearway, AES

DE, and EDF-R are Plaintiffs in this action, the legal claims raised and the relief requested below

do not require the participation of individual SEIA members as plaintiffs because a broadly

applicable remedy to a procedural violation is sought.  EDF-R is "is a U.S. importer, purchaser,

and user of bifacial solar panels at issue in the exclusion and the challenged withdrawal."  EDF-

R's Mot. to Intervene at 2.  Therefore, as an importer, EDF-R also faces direct cost increases due

to the Withdrawal.

      SEIA and EDF-R moved to intervene prior to the issuance of the TRO, and the court

granted both motions prior to the hearing on Invenergy's motion for a PI and this decision, and

thus prior to any decision on the merits in this case.  The Government argues that a party may not

be added to a case to remedy a lack of standing, and thus a lack of jurisdiction.  Def.'s Resp. to

SEIA's Mot. to Intervene at 2.  The Government further claims that "[b]ecause the [c]ourt lacks

jurisdiction to entertain Invenergy's complaint, it likewise cannot grant intervention because

'intervention will not be permitted to breathe life into a nonexistent law suit.'"  Id. (citing

Aeronautical Radio Inc. v. FCC, 983 F.2d 275, 283 (D.C. Cir. 1993)).  However, the very case that

the Government cites to support this proposition also states that "an 'independent jurisdictional

basis' for [Intervenor's] challenge . . . might otherwise allow [Intervenor] to continue the action."

Aeronautical Radio, 983 F.2d at 283.  While it otherwise is true that "intervention cannot cure a

jurisdictional defect in the original suit," it is also true that in the cases establishing that

proposition, the intervenors did not or could not file complaints which could separately be the basis

of subject matter jurisdiction.  See Nucor Corp. v. United States, 31 CIT 1500, 1509–10, 516 F.

Supp. 2d 1348, 1356 (Ct. Int'l Trade 2007) (citing United States ex rel. Tex. Portland Cement Co.

v. McCord, 233 U.S. 157, 163–64 (1914); Simmons v. Interstate Com. Comm'n, 716 F.2d 40, 46 (D.C. Cir. 1983)).

Here, SEIA and EDF-R have filed separate and distinct complaints on their own behalf upon their intervention. See SEIA's Compl., Oct. 30, 2019, ECF No. 43; EDF-R's Compl., Nov. 8, 2019, ECF No. 79. SEIA and EDF-R thus would be entitled to challenge the Government's implementation of the Withdrawal independent of Invenergy's complaint. Therefore, SEIA and EDF-R do not depend on Invenergy's standing nor do they attempt to intervene in order to "breathe life into [the case.]" See Aeronautical Radio, 983 F.2d at 283. As analyzed further below, SEIA and EDF-R have standing to challenge the implementation of the Withdrawal. Therefore, even if Invenergy did not have standing, the court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(i).

### A. Plaintiff-Intervenors Have Constitutional Standing.

As discussed in more detail above, a party must show injury in fact, causation, and redressability to have constitutional standing. See supra Section I.a. SEIA and EDF-R allege concrete and particularized injuries that result from the implementation of the Withdrawal without process. SEIA alleges economic, business, and reputational harms to its members stemming from the Withdrawal, including that "SEIA members that import such products into the United States . . . will be directly responsible for paying the increased duties," "the resulting increased price for bifacial CSPV products" will harm non-importing members of SEIA, and the Withdrawal "will also adversely impact the development of solar energy in the United States by raising the cost of solar projects and solar energy, contrary to the interests of SEIA and its members." SEIA's Compl. ¶ 16. EDF-R alleges that its "injuries related to the payment of duties (regardless of importer), the impact on current and pending contractual relations, the loss of customer goodwill, and impacts

on consumers' ability to procure clean energy" constitute "injuries . . . sufficient to confer standing." EDF-R's Supp. Resp. to Invenergy's Mot. for PI at 3. These injuries result from a lack of domestic production of bifacial panels "at commercial volume suitable for utility-scale projects and can supply only a fraction of the projected demand for utility-scale solar projects overall." SEIA's Compl. ¶ 16. These injuries constitute concrete and particularized harms to SEIA members and to EDF-R directly.

As discussed extensively above, Plaintiffs' injuries stem from USTR's lack of process in implementing the Withdrawal, and Plaintiffs' corresponding requested relief is simply additional process. Furthermore, unlike some of Invenergy's alleged harms, SEIA and EDF-R face direct increased prices of imports that do not depend on any relationship with third parties. Therefore, SEIA and EDF-R's injuries are fairly traceable to the Withdrawal and can be redressed by a favorable decision from the court. In short, SEIA and EDF-R meet the requirements of constitutional standing.

### 1. Plaintiff-Intervenors Have Statutory Standing.

SEIA and EDF-R also have statutory standing to challenge the Withdrawal because their interests fall easily within the zone of interests of Section 201. In their complaints, SEIA and EDF-R argue that, for reasons similar to Invenergy's statutory standing, SEIA and its members are also "arguably within the zone of interests to be protected or regulated" by Section 201. See Ass'n of Data Processing, 397 U.S. at 153; SEIA's Compl. ¶ 24; EDF-R's Compl. ¶ 15.

Because Section 201 directs the President to consider the interests of consumers and domestic markets and the implementation of regulations that provide for the "efficient and fair administrations of all actions taken for the purpose of providing import relief," 19 U.S.C. § 2253(g)(1) (emphasis added), SEIA's members and EDF-R are arguably within the zone of

interests of Section 201.  See Lexmark, 572 U.S. at 130 ("In [the APA] context we have often

'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt

goes to the plaintiff'" (citations omitted)).  SEIA and EDF-R have interests as importers of bifacial

solar panels subject to duties that should be implemented through fair process of law.  Therefore,

SEIA and EDF-R have constitutional and statutory standing and have filed complaints that supply

independent subject matter jurisdiction.  Invenergy's standing and SEIA and EDF-R's standing

each, independently, provide the court with jurisdiction.

## DISCUSSION

The court now turns to Invenergy's motion for a PI to enjoin the Government from

implementing the Withdrawal.  A PI is an "extraordinary" remedy, Mazurek v. Armstrong, 520

U.S. 968, 972 (1997), and is "never awarded as of right," Winter v. Nat. Res. Def. Council, Inc.,

555 U.S. 7, 24 (2008) (citing Munaf v. Geren, 553 U.S. 674, 689−90 (2008)).  The court weighs

four factors in ruling on a motion for a PI: (1) whether the plaintiff is likely to succeed on the

merits; (2) whether the plaintiff would suffer irreparable harm without the PI; (3) whether the

balance of hardships favors the plaintiff; and (4) whether the PI would serve the public interest.

See, e.g., Winter, 555 U.S. at 20; Silfab Solar, Inc. v. United States, 892 F.3d 1340, 1345 (Fed.

Cir. 2018); Nat. Res. Def. Council, 331 F. Supp. 3d at 1362; Corus Grp. PLC v. Bush, 26 CIT 937,

942, 217 F. Supp. 2d 1347, 1353 (2002).  Upon consideration of the parties' briefs, accompanying

submissions, and witness testimony, the court concludes that all four factors weigh in favor of the

issuance of a PI.  The court thus grants the motion for a PI.

### I.    *Plaintiffs Have a Fair Likelihood of Prevailing on the Merits of the APA Claim*

The party seeking a PI must "demonstrate that it has at least a fair chance of success on the

merits for a preliminary injunction."  Silfab Solar, 892 F.3d at 1345 (quoting Wind Tower Trade

Coal. v. United States, 741 F.3d 89, 96 (Fed. Cir. 2014)). See also Nat. Res. Def. Council, 331 F.

Supp. 3d at 1362.  Invenergy sets forth three claims for which it argues it has a strong likelihood

of success.  Invenergy's Mot. for PI at 16.  First, Invenergy argues that USTR's <u>Withdrawal</u>, "with

no advance notice or opportunity for affected parties to provide their views, was a clear violation

of the APA's requirements. . ."  <u>Id.</u> at 16–17.  Second, Invenergy argues that the <u>Withdrawal</u>

violated Section 201 and USTR's own written procedures.[8]  <u>Id.</u> at 23.  Third, Invenergy contends

that the <u>Withdrawal</u> violated its constitutional due process rights under the Fifth Amendment.  <u>Id.</u>

at 28.  Finding that Invenergy has established with a fair likelihood of success that USTR violated

notice-and-comment rulemaking requirements under the APA, the court need not now reach

Invenergy's Section 201 and constitutional claims.

### A. USTR Likely Violated APA Rulemaking Requirements.

To establish that USTR violated the APA in implementing the <u>Withdrawal</u>, Invenergy,

joined by SEIA, contends that (1) USTR is an agency under the terms of the APA; (2) the

<u>Withdrawal</u> constituted agency rulemaking, not an adjudication; (3) the <u>Withdrawal</u> violated APA

rulemaking requirements; (4) the <u>Withdrawal</u> was arbitrary and capricious; and (5) the <u>Withdrawal</u>

does not fall within the APA's foreign affairs exception.  <u>See</u> Invenergy's Mot. for PI at 17−23;

Invenergy, Clearway, and AES DE's Supp. Resp. to Mot. for PI at 7−8.  <u>See also</u> SEIA's Resp. to

Invenergy's Mot. for PI at 7−9.  The court addresses each in turn.

### 1. USTR Is an Agency Covered by the APA.

---

[8] Invenergy argues that USTR violated Section 201 and its own written procedures.  According to
Invenergy, "USTR's written procedures only authorize it to <u>grant</u> exclusions, not <u>withdraw</u> them.
USTR 'withdrew' the Exclusion in violation of these procedures."  Invenergy's Mot. for PI at
23.  Invenergy further contends that "USTR [] violated several safeguard statutory procedures,
including those restricting its authority to 'modify' any safeguard measure."  <u>Id.</u> (citing 19 U.S.C.
§§ 2253(g), 2254(a)–(b)).  Invenergy argues that the statutory language "mandates that no such
safeguard action may be 'reduced, modified, or terminated' unless the President first receives
the [ITC's] report issued as part of its statutory 'mid-term' review."  <u>Id.</u> at 27 (citing 19 U.S.C.
§ 2254(a)–(b)).

To prove a likelihood of success on its claim that USTR violated the APA, Invenergy must first establish that USTR is in fact an agency bound by the APA here. Invenergy contends that USTR meets the definition of agency set forth in the APA: "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." Invenergy's Mot. for PI at 17 (quoting 5 U.S.C. § 701(a)(1)). See also SEIA's Resp. to Invenergy's Mot. for PI at 7. Invenergy cites, moreover, the Federal Register's description of USTR, which states that "[t]he Trade Act of 1974 . . . established [USTR] as an agency of the Executive Office of the President charged with administering the trade agreements program." Invenergy's Mot. for PI at 17 (quoting Trade Representative, Office of United States, Federal Register, https://www.federalregister.gov/agencies/trade-representative-office-of-united-states (last visited Dec. 4, 2019)). Invenergy also notes that USTR refers to itself as an agency on its website. Id. (citing About Us, Office of the U.S. Trade Representative, https://ustr.gov/about-us (last visited Dec. 4, 2019) ("USTR Website") (stating that USTR "is an agency of more than 200 committed professionals with decades of specialized experience in trade issues and regions of the world.")). Invenergy, moreover, contends that the court has recognized USTR as an agency subject to the APA. Id. (citing Tembec, Inc. v. United States, 30 CIT 958, 959, 1002, 441 F. Supp. 2d 1302, 1306, 1343 (2006)).

The Government disputes Invenergy's contention that USTR is an agency bound by APA requirements. The Government instead argues that "because the USTR is acting pursuant to the President's delegation of authority when administering exclusions to the [S]ection 201 safeguard measure, the USTR is not acting as an agency for APA purposes." Def.'s Supp. Resp. to Invenergy's Mot. for PI at 2 (citing Gilda, 446 F.3d 1271). The Government then argues that because the President is not bound by the APA, USTR is not bound. Id. (citing Franklin v.

Massachusetts, 505 U.S. 788, 800−01 (1992), Motion Sys. Corp. v. Bush, 437 F.3d 1356, 1359

(Fed. Cir. 2006) (en banc) (per curiam)).

The court concludes that, with respect to the APA claim under review, USTR constitutes

an agency.  USTR defines itself as a government agency.  USTR Website, supra.  See also

Organization, Office of the U.S. Trade Representative, https://ustr.gov/about-us/organization (last

visited Dec. 4, 2019).  The Federal Register, moreover, includes in USTR's description that it was

created as an "agency."  Trade Representative, Office of United States, Federal Register, supra.

The Trade Act of 1974 itself describes USTR's "interagency" role, as well as how it should work

with "other Federal agencies."  19 U.S.C. § 2171.  The plain language of the APA also makes clear

that it applies to "each authority of the Government of the United States, whether or not it is within

or subject to review by another agency."  5 U.S.C. § 701(b)(1).  The Trade Act of 1974 repeatedly

refers to the "authority" given to USTR.  19 U.S.C. § 2171.  Even Defendant-Intervenor Q Cells

describes USTR as an administrative agency.  Q Cells' Supp. Resp. to Invenergy's Mot. for PI at

9 (noting that "[a]dministrative agencies possess inherent authority to reconsider their decisions .

. . [and] [t]here is nothing in the statute that clearly deprives the USTR of that default authority.")

(emphasis added) (citations omitted)).

The court has also previously held that it has jurisdiction over a plaintiff's APA claims

against USTR challenging its implementation of an ITC affirmative determination of threat of

injury from imports.  Tembec, 441 F. Supp. 2d at 1318.  There, the court held that "this case

fundamentally concerns the authority of the USTR under section 129(a)—a question of domestic

administrative and trade law that lies within this Court's subject matter jurisdiction."  Tembec, 441

F. Supp. 2d at 1326.  Safeguard measures under Section 201, moreover, are intended to protect

domestic industry from injury or threat of injury from increased imports.  See 19 U.S.C. §§
2251−54.

The Government's contention that USTR is exempt from APA requirements because the
President delegated to USTR the authority to implement exclusions is unavailing.    The
Government states that it is "well established that the President is not an 'agency' within the
meaning of the APA."  Def.'s Supp. Resp. to Invenergy's Mot. for PI at 2 (citing Franklin v.
Massachusetts, 505 U.S. at 800−01; Motion Sys., 437 F.3d at 1359).  The court agrees with the
Government that the President is not bound by the APA.  The facts before the court, however,
require no such finding for Invenergy to establish that the APA applies to USTR.  Here, it is
undisputed that Section 201 gave the President the authority to implement the safeguard measure.
See 19 U.S.C. §§ 2253.  Pursuant to this authority, the President issued the Presidential
Proclamation, which delegated authority to USTR to design and implement a process for requests
for exclusions.  Unlike the process for implementing the safeguard duties, which required final
action by the President, the President fully delegated authority of the exclusion process to USTR.
See Presidential Proclamation (providing that "the USTR shall publish . . . procedures for requests
for exclusion [and] [i]f the USTR determines, after consultation with the Secretaries of Commerce
and Energy, that a particular product should be excluded, the USTR is authorized . . . to modify
the [Harmonized Tariff Schedule of the United States ("HTSUS")] provisions . . . to exclude such
particular product. . .").  USTR then issued its own procedures, Exclusion Procedures, excluded
the bifacial solar panels at issue here from safeguard duties, Exclusion, and issued the Withdrawal.
USTR's actions thus eliminated and then attempted to reinstate (blocked by this court's TRO)
safeguard duties, without any additional action required by the President or Congress.

The cases cited by the Government are inapposite because, unlike here, they do not involve final agency action.  In <u>Franklin</u>, the Supreme Court held that the APA did not apply because the statutory scheme required that the President, not the Secretary of Commerce, take the final action by submitting a statement to Congress.  505 U.S. at 800−01.  In <u>Motion Systems</u>, moreover, the Federal Circuit made clear that while the President's actions could not be challenged under the APA, the "Trade Representative's actions cannot be challenged because they were <u>not final</u>," 437 F.3d at 1362 (emphasis added), thus suggesting that, by contrast, a final action by USTR could be challenged under the APA.  In neither case did the courts suggest the APA would not apply where "an authority of the Government," 5 U.S.C. § 701(b)(1) other than the President took final action, and the Government has not argued that USTR's <u>Exclusion</u> and subsequent <u>Withdrawal</u> were not final.  The court is thus unpersuaded by the Government's argument and concludes that USTR is, for the purposes of the <u>Exclusion</u> and the <u>Withdrawal</u>, an agency bound by the requirements of the APA.

### 2. The <u>*Exclusion*</u> *Was a Rulemaking, Not an Adjudication, and the* <u>*Withdrawal*</u> *Is Thus Also a Rulemaking.*

The parties next dispute whether USTR conducted a rulemaking or an adjudication.  The APA provides that a "rule":

> . . . means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing . . .

5 U.S.C. § 551(4).  "Rulemaking," moreover, "means agency process for formulating, amending, or <u>repealing</u> a rule."  5 U.S.C. § 551(5) (emphasis added).

Invenergy contends that USTR's <u>Withdrawal</u> constitutes a rule subject to notice-and-comment requirements under the APA. Invenergy's Mot. for PI at 18. <u>See also</u> SEIA's Resp. to Invenergy's Mot. for PI at 7. Invenergy argues that the <u>Withdrawal</u> falls within the APA's definition of a rule and notes that the APA provides that rescinding a prior rule is rulemaking. Invenergy's Mot. for PI at 17–18, 21 (citing 5 U.S.C. § 706; 5 U.S.C. § 551(4)−(5); <u>Perez v. Mortg. Bankers Ass'n</u>, 135 S. Ct. 1199, 1206 (2015)). Citing to <u>International Custom Products, Inc. v. United States</u>, 32 CIT 302, 312, 549 F. Supp. 2d 1384, 1395−96 (2008), which discusses the difference between rulemaking and adjudication,[9] Invenergy notes that adjudication "involves the application of regulatory requirements to not only specific products, but to specific parties." Invenergy, Clearway, and AES DE's Supp. Resp. to Mot. for PI at 7. The <u>Withdrawal</u>, Invenergy asserts, does not apply to a specific party, but instead applies broadly and prospectively. <u>Id.</u> Invenergy warns that "[i]f an agency could avoid APA requirements by simply relabeling its action as an 'adjudication' or 'interpretation,' that would render the APA dead letter." <u>Id.</u>

SEIA, likewise, contends that USTR undertook rulemaking, not an adjudication. In addition to Invenergy's arguments, SEIA also notes that the "[E]xclusion prospectively changed the applicable tariff rate for all bifacial solar modules and was effectuated through modification to

---

[9] "Rulemaking is defined as the 'agency process for formulating, amending, or repealing a rule,' and a rule is further defined as 'an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy. . . .'" <u>Int'l Custom Prod.</u>, 549 F. Supp. 2d at 1395 (quoting 5 U.S.C. § 551(4)–(5)). "The term 'rulemaking' is used in contrast to an 'adjudication,' to which section 553 does not apply. 'Two principle characteristics distinguish rulemaking from adjudication. First, adjudications resolve disputes among specific individuals in specific cases . . . . Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals . . . . Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied.'" <u>Id.</u> at 1395–96 (quoting <u>Yesler Terrace Comm'y Council v. Cisneros</u>, 37 F.3d 442, 448 (9th Cir. 1994)).

the notes of the HTSUS resulting in a change of classification for the imported modules." SEIA's Resp. to Invenergy's Mot. for PI at 8 (citing Exclusion). SEIA notes that there were no determinations regarding individual parties and no retroactive decisions for either the exclusions or Withdrawal. Id. (citing Exclusion Procedures). SEIA also highlights the fact that USTR opened the docket on the "Federal eRulemaking Portal" for the first and second round of exclusions and the Withdrawal, where it had a choice between a rulemaking and non-rulemaking docket on regulations.gov. Id.

   The Government disputes Invenergy's characterization of the Withdrawal as a rule and instead states that it was an informal adjudication. The Government asserted that, "USTR's determination that a specific product is ineligible for an exclusion is not 'rulemaking' for purposes of 5 U.S.C. § 553's notice and comment requirements" because "the 'fact that an order rendered in adjudication may affect agency policy and have general prospective application does not make it rulemaking subject to APA section 553 notice and comment.'" Def.'s Resp. to Invenergy's Mot. for PI at 22 (quoting POM Wonderful, LLC v. FTC, 777 F.3d 479, 497 (D.C. Cir. 2015) (internal citations omitted)). The Withdrawal, the Government argued, "expressed no new rule of law, but only applied the facts to [S]ection 201 and the President's guidance to determine that bifacial solar products not be excluded from [S]ection 201 safeguards." Id. Furthermore, the Government responds to SEIA's argument that the amendment of the HTSUS through the Exclusion and the Withdrawal indicates that those are rulemakings by stating that "modifications to the HTSUS are routinely made without notice and comment" and to hold these modifications as rulemakings "would require the President to employ APA notice and comment rulemaking procedures for every modification to the HTSUS." Def.'s Supp. Resp. to Invenergy's Mot. for PI at 1−2.

Q Cells, likewise, rejects Invenergy's argument that the Exclusion or the Withdrawal were rulemaking and argues the Withdrawal was an informal adjudication.[10]  According to Q Cells, Invenergy "'fails to recognize the time-honored distinction between rulemaking and adjudication, the former based on legislative facts and the latter based on adjudicative facts.'"  Q Cells' Resp. to Invenergy's Mot. for PI at 12 (quoting Heartland Reg'l Med. Ctr. v. Leavitt, 511 F. Supp. 2d 46, 52 (D.D.C. 2007)).  The Withdrawal, Q Cells contends, did not "promulgat[e] policy-based standards of general import," did not fill any "statutory gaps," excluded "particular products," and acted within its discretion in choosing "adjudication for this effort."  Id. at 13−14 (citations omitted).

The court concludes that the Exclusion constituted agency rulemaking.  Repealing the rule, therefore, also requires rulemaking subject to APA notice and comment.  Perez, 135 S. Ct. at 1206.  The President delegated the authority to USTR to decide its procedures for the implementation of exclusions.  Presidential Proclamation.  USTR then published its procedures in the Federal Register, inviting "interested persons to submit comments identifying a particular product for exclusion from the safeguard measure and providing reasons why the product should be excluded."  Exclusion Procedures at 6671.  USTR provided a deadline for the exclusion requests and a deadline for comments on those requests.  Id. at 6,672.  In other words, USTR outlined the process for its notice-and-comment rulemaking.  USTR, moreover, opened a docket on the "Federal eRulemaking Portal," choosing a rulemaking docket over a non-rulemaking docket.  Before the

---

[10] Q Cells contends that, "[t]o the extent the APA applies at all here, the Withdrawal constituted an informal adjudication . . . ."  Q Cells' Resp. to Invenergy's Mot. for PI at 12.  Because the statute did not mandate a hearing, Q Cells argues that USTR could "define its own procedures for conducting an informal adjudication."  Id. (citing PBGC v. LTV Corp., 496 U.S. 633, 655−56 (1990)).  As the court addresses, however, USTR did adopt its own procedures -- rulemaking procedures -- and thus informal adjudication cannot be used to excuse USTR's failure to follow the APA process it adopted.

court is not whether USTR could have, in the first instance, adopted a procedure for adjudication of the exclusions, as Q Cells contends. See Q Cells' Resp. to Invenergy's Mot. for PI at 14 (quoting POM Wonderful, 777 F.3d at 497 ("[T]he choice between rulemaking and adjudication lies in the first instance within the agency's discretion.")). Regardless of whether USTR could have set forth procedures for adjudication in the first instance, it did not. Instead, it made clear in the Exclusion Procedures its adoption of notice-and-comment rulemaking.

Additionally, that the Exclusion and Withdrawal required an accompanying modification to the HTSUS is indicative of the determination that these actions are rulemakings. See Int'l Custom Prod., 549 F. Supp. 2d at 1395−96 ("Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied." (citations omitted)). The modification of the HTSUS underlines the prospective nature of these decisions and has the force of law. See 5 U.S.C. § 551(4) (defining a rule as having "future effect" and "prescrib[ing] the law"). Unlike specifically and retroactively applicable adjudications, here, the Exclusion and Withdrawal constitute broadly applicable, prospective changes to the tariff schedule that impact all future imports of solar products by any and all importers. See Int'l Custom Prod., 549 F. Supp. 2d at 1395−96. Finding that USTR's modification of the HTSUS was undertaken through notice-and-comment rulemaking, moreover, does not mean that all future modification of the HTSUS will require notice-and-comment rulemaking, as the Government contends. Def.'s Supp. Resp. to Invenergy's Mot. for PI at 2. As noted above, USTR must follow notice-and-comment rulemaking because the President gave USTR the discretion to design the Exclusion process, and USTR chose prospective, generally applicable, notice-and-comment rulemaking. See Pom Wonderful, 777 F.3d at 497.

The product-specific nature of the Exclusion and subsequent Withdrawal, moreover, did not make USTR's actions adjudicatory, as Q Cells contends. See Q Cells' Resp. to Invenergy's Mot. for PI at 13. Underlining that the Exclusion was not specific to one party, USTR instructed parties requesting an exclusion not to "identify the product at issue in terms of the identity of the producer, importer, or consumer." Exclusion Procedures at 6,671. Thus, the process was not designed "to resolve disputes among specific individuals in specific cases," as an adjudication would. Int'l Custom Prod., 549 F. Supp. 2d at 1395. Instead, it was designed to apply to particular products, regardless of the producer, importer, or consumer.

The court, moreover, is unpersuaded by the Government's efforts to analogize the case before it to the adjudication in POM Wonderful, 777 F.3d 478. See Def.'s Resp. to Invenergy's Mot. for PI at 22. In POM Wonderful, the Federal Trade Commission ("FTC") filed an administrative complaint alleging "false, misleading, and unsubstantiated representations in violation of the Federal Trade Commission Act." 777 F.3d at 484. The FTC then conducted administrative proceedings, including an administrative trial at which an administrative law judge made findings of fact. Id. at 488. POM Wonderful bears little resemblance to the facts before us. The Government has made no showing of administrative proceedings below, much less of one involving an administrative trial and administrative law judge. Here, by contrast, based on the exclusion requests and comments, USTR granted the Exclusion for bifacial solar panels, without indicating how, if at all, it could withdraw the Exclusion. Exclusion at 27,684−85. Because USTR implemented the Exclusion through notice-and-comment rulemaking, the APA requires that USTR "use the same procedures when [it] amend[s] or repeal[s] a rule as [it] used to issue the rule in the first instance." Perez, 135 S. Ct. at 1206 (citing FCC v. Fox Television Stations, 556 U.S. 502, 515 (2009) (noting that "the APA 'make[s] no distinction . . .between initial agency action

and subsequent agency action undoing or revising that action'"")).  Thus, the process for repealing

a rule made through notice-and-comment rulemaking is more notice-and-comment rulemaking.

See Hou Ching Chow v. Att'y Gen., 362 F. Supp. 1288, 1292 (D.D.C. 1973); Clean Air Council

v. Pruitt, 862 F.3d 1, 8–9 (D.C. Cir. 2017).  Because the Exclusion process constituted rulemaking,

so too must the Withdrawal.  In sum, the court concludes, based on the procedures set forth in

USTR's notice in the Federal Register, the prospective and broadly applicable nature of the

Exclusion, and the lack of evidence of an adjudication below, that the Withdrawal constituted

agency rulemaking.

### 3. *The Withdrawal Likely Violated APA Rulemaking Requirements.*

Invenergy next contends that the Withdrawal violated the APA's rulemaking requirements

because the Withdrawal "was taken with no advance notice or an opportunity for affected parties

to comment."  Invenergy's Mot. for PI at 17.  As Invenergy argues, "[t]he APA requires an agency

to give advance notice of a proposed rulemaking and an opportunity for all 'interested persons' to

comment.  But USTR did not publish advance notice of the Withdrawal in the Federal Register or

provide any opportunity for affected parties to comment before it was made final."  Id. at 20 (citing

5 U.S.C. §§ 553(b)−(c)).  SEIA, likewise, argues that because "[t]he APA requires notice-and-

comment procedures to be followed . . . when [rules] are amended or repealed . . . USTR's failure

to follow notice-and-comment rulemaking to withdraw the bifacial exclusion was therefore

unlawful."  SEIA's Resp. to Invenergy's Mot. for PI at 7.  Invenergy and SEIA both cite

Association of Private Sector Colleges and Universities v. Duncan, 681 F.3d 427, 462−63 (D.C.

Cir. 2012), for the proposition that an "agency violates the APA when it does not give notice of a

regulation, thus depriving the public of the chance to comment on those provisions."  Invenergy's

Mot. for PI at 20; SEIA's Resp. to Invenergy's Mot. for PI at 9.  Invenergy underlines the

importance of notice-and-comment rulemaking in our regulatory system, as it "ensure[s] that agency regulations are tested via exposure to diverse public comment," "ensure[s] fairness to affected parties," and "give[s] affected parties an opportunity to develop evidence . . . to support their objections to the rule and thereby enhance judicial review."  Invenergy's Mot. for PI at 20 (quoting Envtl. Integrity Project v. EPA, 425 F.3d 992, 996 (D.C. Cir. 2005)).

The Government, for its part, focuses its argument on its position that APA rulemaking requirements do not apply to USTR's Withdrawal.  Def.'s Resp. to Invenergy's Mot. for PI at 21–22; Def.'s Supp. Resp. to Invenergy's Mot. for PI at 2.  Q Cells makes a different argument.  It contends that SEIA, of which Invenergy is a member, "did not treat the written notice-and-comment period as the exclusive opportunity to present its views to USTR regarding the bifacial exclusion request, but rather as one step in an extended process with multiple, meaningful opportunity to present its views."  Q Cells' Resp. to Invenergy's PI at 17.  Q Cells quotes SEIA's statement that it "relentlessly lobbied the Administration to grant additional exemptions, with a particular focus on bifacial modules," and notes additional letters from SEIA to USTR.  Id. at 17–18.

As established above, the Withdrawal constituted agency rulemaking.  The APA sets forth agency rulemaking requirements in 5 U.S.C. § 553.  It requires notice of proposed rulemaking in the Federal Register and the opportunity for interested persons "to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. 553(c).[11]  At this preliminary stage in the litigation, the Government does

---

[11] "The required publication or service of a substantive rule shall be made not less than 30 days before its effective date."  5 U.S.C. § 553(d).  Plaintiffs initially challenged USTR's failure to comply with the 30-day notice requirement.  Invenergy's Compl. ¶ 58.  The Government then moved the court for leave to defer the implementation date of the Withdrawal to 30 days after

not refute Invenergy's contention that USTR did not engage in notice-and-comment procedures to implement the Withdrawal, and as the court addressed above, USTR was required to follow such procedures.  Q Cells argument, moreover, that SEIA's engagement in lobbying after USTR implemented the Exclusion undercuts the need for notice-and-comment rulemaking is not a legal argument, and Q Cells provides no legal authority for this contention.  See Hearing; Q Cells' Resp. to Invenergy's Mot. for PI at 17–18.  The purpose of the APA is, in part, "to ensure that agency regulations are tested via exposure to diverse public comment." Envtl. Integrity Project, 425 F.3d 992, 996 (D.C. Cir. 2005) (emphasis added) (citations omitted).  Whether some or all the parties in this matter also communicated outside of a formal process with USTR to share their opinions on the Exclusion and the Withdrawal has no bearing on whether USTR was required to follow notice-and-comment rulemaking procedures.  The court concludes that, at this preliminary stage, USTR was so required, and Invenergy has shown that USTR likely did not follow such procedures.

### *4. The Withdrawal Was Likely Arbitrary and Capricious.*

In addition to its argument that USTR violated APA rulemaking procedure in implementing the Withdrawal, Invenergy also contends that the Withdrawal was arbitrary and capricious in violation of the APA's substantive requirements: the Withdrawal lacks "any supporting reasoning or rationale" and thus should be "'[held] unlawful and set aside.'" Invenergy's Mot. for PI at 21 (quoting 5 U.S.C. § 706(2)(a)).  Invenergy characterizes USTR's explanation for the Withdrawal as conclusory, quoting USTR's Withdrawal language that "'maintaining the exclusion will undermine the objectives of the safeguard measure.'"  Id. at 22 (quoting Withdrawal).  This language, Invenergy asserts, does not show "reasoned decision-

---

the publication of the rule. Def.'s Mot. to Defer Implementation.  The court granted the motion, thus mooting this issue.

making, which requires the agencies to show the connection between 'facts found' and the 'choice made,' and 'articulate a satisfactory explanation for its action.'" Id. (quoting Motor Vehicle Mfrs., 463 U.S. at 43).

Q Cells rejects Invenergy's contention that the Withdrawal substantively violated the APA because such position "ignore[s] the special, limited standard of review in global safeguard cases." Q Cells' Resp. to Invenergy's Mot. for PI at 10. Given that the President imposed the global safeguard measure pursuant to Section 201, Q Cells claims that the court's review is "highly circumscribed," id. at 11, and limited to "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority," id. (quoting Corus, 217 F. Supp. 2d at 1352). Q Cells notes that the Federal Circuit has found its limited review of the President's actions was "'equally applicable to the [ITC] in its 'escape clause' functioning.'" Id. (quoting Maple Leaf Fish Co. v. United States, 762 F.2d 86, 90 (Fed. Cir. 1985)). The Government does not address Invenergy's arbitrary and capricious argument, instead maintaining that the APA does not apply.

The APA requires the court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). As the November 13, 2019 PI hearing and the Withdrawal itself make clear, the facts on which USTR relied to implement the Withdrawal remain unknown to all but USTR; they are neither publicly available nor available to this court. USTR has not explained the facts on which it relied or the reasoning behind its decision. See FCC v. Fox, 556 U.S. at 515. Nor did USTR "'display awareness that it is changing position and show that there are good reasons for the new policy.'" Invenergy's Mot. for PI at 23 (quoting Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2126 (2016)). Corus, moreover, prescribed limited

judicial review of the ITC's decision where Section 201 granted the ITC and the President substantial discretion.  217 F. Supp. 2d at 1352.  Corus does not stand for the proposition that USTR, with delegated authority from the President, can choose to take a final action through reasoned decision making under the APA but then divest itself of APA obligations to undo the action.  See id.  The court thus concludes that Invenergy has a fair likelihood of success on the merits of its claim that the Withdrawal was arbitrary and capricious.[12]

### 5.  The Withdrawal Does Not Fall Within the APA's Foreign Affairs Exception.

Q Cells argues in the alternative that "[i]f the [c]ourt disagrees . . .  that the Withdrawal was an adjudicatory action . . . and . . . that the Withdrawal is subject to review only under the limited conditions . . . in Corus, . . . Invenergy's claims nonetheless fail because USTR's action qualifies under the 'foreign affairs function' exemption" of 5 U.S.C. § 553(a)(1).  Q Cells' Resp. to Invenergy's PI at 20.  Q Cells contends that the global safeguard actions are of a "highly discretionary kind -- involving the President and foreign affairs."  Id. (quoting Maple Leaf, 762 F.2d at 89).  Def.'s Resp. to Invenergy's Mot. for PI at 21–22.  According to Q Cells, the Exclusion and Withdrawal "clearly fall[] within the scope of the foreign affairs exemption," without citing caselaw to support this proposition.  Id. at 21.  The Government makes no similar argument.  Invenergy counters that Q Cells is "not the appropriate party to assert that an action falls within the United States' 'foreign affairs function,'" but that regardless, the Withdrawal does not fall within the APA's exception.  Invenergy, Clearway, and AES DE's Supp. Resp. to Mot. for PI at 8.  Invenergy notes that "agency actions imposing or changing tariffs and duties are subject to

---

[12] The court offers no view as to whether, ultimately, with appropriate notice and comment, USTR could implement the Withdrawal through "reasoned decisionmaking."  See Motor Vehicle Mfrs., 463 U.S. at 52.

judicial challenge, including under the APA," and distinguishes cases cited by Q Cells as agency

actions taken pursuant to treaty obligations.  Id. (comparing Canadian Lumber, 517 F.3d 1319 with

Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States, 751 F.2d 1239 (Fed. Cir.

1985)).

A rulemaking is exempt from the procedural requirements of the APA where it "involved

. . . a . . . foreign affairs function of the United States."  5 U.S.C. § 553(a)(1).  The foreign affairs

exception, like all similar exceptions to the APA's notice-and-comment requirements, is quite

narrow.  See also New Jersey Dept. of Envtl. Protection v. EPA, 626 F.2d 1038, 1045 (D.C. Cir.

1980); City of New York v. Permanent Mission of India to United Nations, 618 F.3d 172, 201 (2d

Cir. 2010) ("We have stated that exceptions to [section] 553 should be narrowly construed and

only reluctantly countenanced." (citations omitted)).  The legislative history provides:

> The phrase "foreign affairs functions," used here and in some other provisions of the
> bill, is not to be loosely interpreted to mean any agency operation merely because it
> is exercised in whole or part beyond the borders of the United States but only those
> "affairs" which so affect the relations of the United States with other governments
> that, for example, public rule-making provisions would provoke definitely
> undesirable international consequences.

H.R. Rep. No. 79-1980, at 257 (1946).  The foreign affairs function "the exception applies 'only

'to the extent' that the excepted subject matter is clearly and directly involved' in a 'foreign affairs

function.'"  Mast Industries v. Regan, 8 CIT 214, 231, 596 F. Supp. 1567, 1582 (1984) (citing to

H.R. Rep. No. 79-1980, at 275).  "For the exception to apply, the public rulemaking provisions

should provoke definitely undesirable international consequences."  Zhang v. Slattery, 55 F.3d

732, 744 (2d Cir. 1995) (citation omitted).  "The courts in analyzing the section 553 exemptions,

have continually stated that any claims of exemption from rulemaking procedures will be

construed narrowly and granted reluctantly."  Mast, 596 F. Supp. At 1582 (citations omitted).  As

the Mast court stated, "[t]he exception cannot apply to functions merely because they have impact

beyond the borders of the United States." Id. at 1581 ("In our complex world there are very few purely internal affairs" (citing Briehl v. Dulles, 248 F.2d 561, 591 (D.C. Cir. 1957))).

Unlike previous uses of the foreign affairs function exception, here, the Government did not explicitly rely on this exception nor does this rulemaking involve diplomatic functions, military functions, or other sensitive areas of foreign policy. Instead, the Exclusion and Withdrawal constitute a routine change to the tariff rates imposed on imported goods by the United States as reflected in the HTSUS. The Government, moreover, has not raised this argument, and the cases cited by Q Cells are inapposite because they involve agency action pursuant to treaty obligations and not agency action pursuant to a U.S. statutory authority. See, e.g., Am. Ass'n of Exps. & Imps., 751 F.2d at 1239.

### III.    Invenergy Is Likely to Suffer Irreparable Harm Without a PI.

The court now considers whether Plaintiffs are likely to suffer irreparable harm in the absence of a PI enjoining the Government from implementing the Withdrawal. A harm is irreparable when "no damages payment, however great, could address [it.]" Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 992, 930 (Fed. Cir. 2012). The standing inquiry focuses on whether the court must act now to prevent a loss that cannot later be remedied. See, e.g., CPC Int'l Inc. v. United States, 19 CIT 978, 979, 896 F.Supp. 1240, 1242–44 (1995) (irreparable harm includes "costs, expenditures, business disruption or other financial losses" that plaintiff has "no legal redress to recover in court"). To determine whether an injury is irreparable, the court analyzes the magnitude and immediacy of the injury, and the inadequacy of future relief. Queen's Flowers de Colombia v. United States, 20 CIT 1122, 1125, 947 F.Supp. 503 (1996). Harm such as "loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." Celsis In Vitro, 664 F.3d at 930.

Furthermore, unlike injury for constitutional standing purposes, a procedural injury can itself constitute irreparable harm. A procedural violation can give rise to irreparable harm justifying injunctive relief because lack of process cannot be remedied with monetary damages or post-hoc relief by a court. Permitting "the submission of views after the effective date of a regulation is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way." Am. Fed'n of Gov't Emp v. Block, 655 F.2d 1153, 1158 (D.C. Cir. 1981) (internal citation omitted); see also New Jersey Dept. of Envtl. Protection, 626 F.2d at 1049 ("Section 553 is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas.").  Once the regulatory change "has begun operation as scheduled . . . [the Agency] is far less likely to be receptive to comments."  N. Mariana Islands v. United States, 686 F. Supp. 2d 7, 18 (D.D.C. 2009). A failure to comply with APA procedural requirements therefore itself causes irreparable harm because "the damage done by [the Agency's] violation of the APA cannot be fully cured by later remedial action."  Id.

Invenergy argues that it has suffered and faces irreparable harm from USTR's procedural violation of the APA in implementing the Withdrawal without the notice-and-comment procedures afforded in issuing the initial Exclusion.  Invenergy's Mot. for PI at 30–31.  As discussed more extensively above in the context of injury for standing purposes, Invenergy has alleged economic harm in the increased price of bifacial panels because of the Withdrawal, which it also claims causes irreparable harm. Id.  In addition, Invenergy alleges business and reputational harms that are irreparable.  Invenergy, Clearway, and AES DE's Supp. Resp. to Mot. for PI at 4.  "If the Withdrawal is not enjoined, Invenergy will suffer irreparable harm in the form of unrecoverable

financial losses, lost business opportunities, and other business disruption." Invenergy's Mot. for PI at 32 (citing Fletcher Aff. ¶¶ 8–40; Supp. Fletcher Aff., ¶¶ 3–24). "USTRs [sic] unlawful action has already caused and will continue to cause irreparable harm to Invenergy's outstanding brand, reputation and good will." Invenergy's Mot. for PI at 35 (citing Fletcher Supp. Aff., ¶¶ 16–24).

The Government argues that Invenergy's harm is not specific. Def.'s Resp. to Invenergy's Mot. for PI at 24. The Government also claims that Invenergy's harm depend upon third parties which "amounts to 'speculation and unsupported' claims of harm that are insufficient to meet the requirement of showing immediate irreparable harm." Def.'s Resp. to Invenergy's Mot. for PI at 24. Q Cells further argues that Invenergy cannot demonstrate irreparable harm because its harm depends on voluntary relationships and business decisions with unrelated third parties. Q Cells' Supp. Resp. to Invenergy's Mot. for PI at 4–7.

Q Cells characterizes Invenergy's alleged irreparable harm as simple. Q Cells' Resp. to Invenergy's Mot. for PI at 27. The court concludes that Invenergy's alleged harm is indeed simple, but not for the reasons that Q Cells states. It is simple in that Invenergy has suffered a procedural harm flowing from a likely violation of the APA. This claim does not depend upon the subsequent economic harms that flow therefrom. As in Northern Mariana Islands, "if the [Withdrawal] is not enjoined prior to its effective date," Invenergy "will never have an equivalent opportunity to influence" USTR's decision as to its imposition. See 686 F. Supp. 2d at 18–19. Invenergy would thereby lose any opportunity for meaningful judicial review. See Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983) (finding "the abrogation of effective judicial review" to constitute "sufficient irreparable injury" justifying preliminary injunctive relief). The Government does not appear to dispute this reality. See Def.'s Resp. to Invenergy's Mot. for TRO at 17–20 (only addressing some of Invenergy's economic, but not procedural, harms). If the court were to

issue a decision on the merits ordering USTR to undertake a notice and comment process for reconsideration of the Exclusion without first issuing a PI, the Withdrawal would become the new status quo and USTR may be less likely to consider other views. As Invenergy explains, "[a]t the same time, Invenergy and other affected industry players will have to adjust their business plans and behavior accordingly to reflect the imposition of significant additional duties, resulting in lost business opportunities, cancelled or significantly reduce projects, and a reduction in available clean solar energy." Invenergy's Mot. for PI at 31.

Therefore, the court concludes that this likely procedural harm is irreparable, and thus merits preliminary injunctive relief because they cannot be remedied after the Withdrawal goes into effect. The alleged violation of the APA should be further enjoined to avoid the business uncertainty that flows from such a procedural violation. The Withdrawal causes irreparable harm by eliminating the business certainty required by the solar industry to plan and develop future projects. As Plaintiffs explain, "Invenergy reasonably relied on USTR's Exclusion, which was the product of a rulemaking that took over a year and contained no indication that it could be reversed, when conducting its business." Invenergy, Clearway, and AES DE's Supp. Resp. to Mot. for PI at 5. As Invenergy explains, it "will thus not qualify for the Investment Tax Credit ("ITC") safe harbor [ . . . ]. Invenergy's inability to qualify for that 30% ITC tax credit will severely disadvantage these projects to the points where some likely will not be developed as planned (e.g., their size and other elements would have to change) and others might not be developed at all." Invenergy's Mot. for PI at 37. A PI is therefore needed to maintain the status quo and avoid the losses in connection with a lack of business certainty that may cause irreparable harm. See Am. Signature, Inc., 598 F.3d at 828–29. In short, Article III injury is demonstrated through the likely increase of the price of bifacial panels, and therefore Plaintiffs' costs in purchasing and producing

energy with bifacial panels, should the Withdrawal go into effect.  SEIA's Resp. to Invenergy's

Mot. for PI at 4, 10; Invenergy, Clearway, and AES DE's Supp. Resp. to Mot. for PI at 1.

Distinctly, Invenergy's business, reputational, and procedural harms are irreparable because they

cannot be remedied if the Withdrawal is implemented.  Injunctive relief is thus warranted.

### IV.    The Balance of Hardships Weighs in Favor of Plaintiffs.

The court "must balance the competing claims of injury and consider the effect" of granting

Invenergy's motion for a PI.  Winter, 555 U.S. at 24 (quoting Amoco Prod. Co. v. Vill. of Gambell,

AK, 480 U.S. 531, 542 (1987)).  See also Nat. Res. Def. Council, Inc. 331 F. Supp. 3d at 1369.

Invenergy contends that it will suffer irreparable harm absent a PI, while "there is little to no

prejudice to the Government or any other interested parties in delaying the onset of these increased

tariffs" pending adjudication on the merits.  Invenergy's Mot. for PI at 38.  Invenergy further

argues that (1) the Government's contention that it will be harmed by lost revenue does not

comport with the intention of Section 201 tariffs, "to alter trading partners and address specific

trade practices," and not to raise revenue; (2) CBP can extend liquidation and collect lost revenue

should the Government prevail; and (3) the Government has made no showing that the domestic

industry would face existential harm without the Withdrawal.  Id. at 39−40.  See also SEIA's Resp.

to Invenergy's Mot. for PI at 11–12.  The Government instead contends that its hardship, "in the

form of administrative burden and potential lost revenue," outweighs Invenergy's harm.  Def.'s

Resp. to Invenergy's Mot. for PI at 27−28.  The Government argues that "CBP has no reliable or

ready way to track the subject entries during the period covered by the injunction," and the

domestic industry faces "existential harm," unlike the "speculative" harm alleged by Invenergy.

Id. At 28.  Q Cells posits that without the implementation of the Withdrawal, the "bifacial loophole

poses a devastating threat to the U.S. industry" and characterizes Invenergy's assertions to the

contrary as "misleading." Q Cells' Resp. to Invenergy's Mot. for PI at 37–40. Q Cells further argues that "fairness dictates that the exclusion or [should] be withdrawn" and that the court should weigh heavily in favor of domestic producers relying on Section 201 relief. Id. at 44–45.

The court determines that the balance of hardships weighs in favor of granting a PI to preserve the status quo. The court does not doubt that the imposition of the PI will increase the administrative burden on the Government. The APA mandates such a burden. The PI, moreover, may incur revenue losses for the Government, at least in the short term, and may negatively affect the domestic producers of bifacial solar panels. As addressed under the public interest prong below, however, whether bifacial solar panels should be excluded from Section 201 safeguard duties is not a question for this court. Instead, before the court is a question of process, and the harms alleged are a direct result of the failure to follow process. "Had the agency released the [Withdrawal rule] earlier in the year and provided the public with notice and an opportunity for comment, the current quandary never would have arisen. [USTR] should not now expect to excuse its violation of the APA by pointing to the problems created by its own delay." See N. Mariana Islands, 686 F. Supp. 2d at 21. See also Washington v. United States Dep't of State, 318 F. Supp. 3d 1247, 1263 (W.D. Wash. 2018). USTR undertook rulemaking pursuant to the APA in implementing the Exclusion. It then attempted to withdraw the Exclusion for bifacial solar panels, without following rulemaking procedures. The Plaintiffs acted in reliance on USTR's rules. Any harms suffered by the Government, and domestic producers, are a direct result of USTR's failure to follow the APA. The balance of equities, therefore, tips decidedly in favor of the Plaintiffs.

## V.    The PI Is in the Public Interest.

Lastly, the court considers whether granting a PI would be in the public interest. Silfab Solar, 892 F.3d at 1345 (citing Winter, 555 U.S. at 20). See also Nat. Res. Def. Council, Inc., 331

F. Supp. 3d at 1371. The parties dispute, at considerable length, the effect that the Withdrawal would have on the future of the solar energy in the United States. Hearing; Invenergy's Mot. for PI at 40−42; SEIA's Resp. to Invenergy's Mot. for PI at 12; Def.'s Resp. to Invenergy's Mot. for PI at 29; Q Cells' Resp. to Invenergy's Mot. for PI at 46. Invenergy also argues that "the public interest favors faithful execution of the laws, and the provision of the rights granted by Congress in the APA to regulated parties," and that "the public interest is not negatively affected when a preliminary injunction is entered for the purpose of preserving the status quo." Invenergy's Mot. for PI at 40, 42 (citing Assoc. Dry Goods Corp. v. United States, 515 F. Supp. 775, 780−81 (1981)). SEIA, likewise, argues that the public interest is best served by preserving the status quo "until USTR follows the proper procedures and makes the determinations required by law to do so." SEIA's Resp. to Invenergy's Mot. for PI at 11−12. The Government contends that the public interest is served by "effective enforcement of section 201," a "viable [domestic] solar industry," and the avoidance of a PI that would give Plaintiffs the same advantages as a final adjudication. Def.'s Resp. to Invenergy's Mot. for PI at 29. Q Cells argues that a PI is not in the public interest because it would "overturn the policy analysis and the difficult choices performed by the President and USTR." Q Cells' Resp. to Invenergy's Mot. for PI at 47.

The parties all acknowledge the importance of the solar energy industry to the public interest, but they dispute how best to achieve this policy goal. Hearing. The court agrees, as Q Cells contends, that this requires "policy analysis" and "difficult choices," both of which USTR undertook in implementing the Exclusion. See Q Cells' Resp. to Invenergy's Mot. for PI at 47. Whether the best means to protect and advance the solar industry in the United States, however, is through the continuation of the Exclusion or the resumption of safeguard duties on imported

bifacial solar panels through the Withdrawal is a policy question ill-suited for this court to decide.[13]
And so, it does not.

      The public interest at stake before the court is instead one of process and fidelity to the law.
Congress delegated the authority to impose safeguard measures to the President.  19 U.S.C. § 2253.
The President directed USTR to adopt an exclusion process.  Presidential Proclamation.  USTR
then decided on and announced notice-and-comment rulemaking procedures, accepted exclusion
requests and comments, and announced the Exclusion, pursuant to APA rulemaking requirements.
Four months after implementing the Exclusion, USTR summarily rescinded it without notice and
comment.  "The public interest is served by ensuring that governmental bodies comply with the
law[.]"  Am. Signature., 598 F.3d at 830.  The public interest thus weighs in favor of the Plaintiffs,
as USTR must comply with the APA.

**CONCLUSION**

      The court grants Invenergy's motion for a PI barring the implementation.


                                         */s/   Gary S. Katzmann*
                                       Gary S. Katzmann, Judge

 Dated: December 5, 2019
       New York, New York

---

[13] As Invenergy rightly notes, "the [c]ourt is in no position to assess the validity of, for example,
[Q Cells'] hyperbolic claim that the U.S. solar panel industry will 'die on the operating table' if
the [c]ourt does not sustain the Withdrawal."  Invenergy, Clearway, and AES DE's Suppl. Resp.
to Mot. for PI at 10.  Nor can the court say Invenergy would suffer the same fate should the
Withdrawal go into effect.  USTR understood that the decision to implement the Exclusion
required reasoned decision making, considering competing policy interests.  A decision to
withdraw the Exclusion requires the same.

# APPENDIX A

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| INVENERGY RENEWABLES LLC,<br><br>            Plaintiff,<br><br>    and<br><br>SOLAR ENERGY INDUSTRIES ASSOCIATION, CLEARWAY ENERGY GROUP LLC, EDF RENEWABLES, INC. and AES DISTRIBUTED ENERGY, INC.,<br><br>           Plaintiff-Intervenors,<br><br>    v.<br><br>UNITED STATES OF AMERICA, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, UNITED STATES TRADE REPRESENTATIVE ROBERT E. LIGHTHIZER, U.S. CUSTOMS AND BORDER PROTECTION, and ACTING COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION MARK A. MORGAN,<br><br>           Defendants,<br><br>    and<br><br>HANWHA Q CELLS USA, INC.,<br><br>           Defendant-Intervenor. | Court No. 19-00192<br><br>**Order on Plaintiffs' Motion for Preliminary Injunction** |

On consideration of all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that Invenergy Renewables LLC's Motion for Preliminary Injunction, ECF

No. 49, is **GRANTED** because Invenergy is likely to succeed on the merits, will suffer irreparable

harm, and the public interest will be negatively affected if Defendants are not enjoined from making effective and enforcing the <u>Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure</u>, 84 Fed. Reg. 54,244 (USTR Oct. 9, 2019) ("<u>Withdrawal</u>"); and it is further

**ORDERED** that Defendants, Office of the United States Trade Representative and the United States Trade Representative, Robert E. Lighthizer, together with its delegates, officers, agents, servants, and employees, shall be preliminarily enjoined from entering the <u>Withdrawal</u> into effect; and it is further

**ORDERED** that Defendants, Office of the United States Trade Representative and the United States Trade Representative, Robert E. Lighthizer, together with its delegates, officers, agents, servants, and employees, shall be preliminarily enjoined from making any modification to the Harmonized Tariff Schedule of the United States that includes or reflects the <u>Withdrawal</u>; and it is further

**ORDERED** that Defendants, U.S. Customs and Border Protection, its delegates, officers, agents, and employees, including Defendant Acting Commissioner Mark A. Morgan, are hereby preliminarily enjoined from enforcing or making effective the <u>Withdrawal</u> or any modifications to the Harmonized Tariff Schedule of the United States reflecting or including the <u>Withdrawal</u>; and it is further

**ORDERED** that, pursuant to USCIT Rule 65(c), during the pendency of the preliminary injunction, Plaintiff shall continue the bond with the court, in the amount of $1.00; and it is further

**ORDERED** that Defendants are so enjoined effective from the date of issuance of this order until entry of final judgment as to Plaintiffs' claims against Defendants in this case; and it is further

       **ORDERED** that the parties shall confer and submit a proposed further schedule in this action by Friday, December 19, 2019.

       **SO ORDERED.**

Dated:  <u>December 5, 2019</u>
          New York, New York

                                 <u>/s/   Gary S. Katzmann</u>
                                 Gary S. Katzmann, Judge