## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| INVENERGY RENEWABLES LLC,<br><br>       Plaintiff,<br><br>    and<br><br>SOLAR ENERGY INDUSTRIES ASSOCIATION, CLEARWAY ENERGY GROUP LLC, EDF RENEWABLES, INC., and AES DISTRIBUTED ENERGY INC.,<br><br>       Plaintiff-Intervenors,<br><br>    v.<br><br>UNITED STATES, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, UNITED STATES TRADE REPRESENTATIVE ROBERT E. LIGHTHIZER, U.S. CUSTOMS AND BORDER PROTECTION, and ACTING COMMISSIONER MARK A. MORGRAN,<br><br>       Defendants,<br><br>    and<br><br>HANWHA Q CELLS USA, INC., and AUXIN SOLAR,<br><br>       Defendant-Intervenors. | Before: Judge Gary S. Katzmann<br>Court No. 19-00192 |

## PLAINTIFF-INTERVENOR SOLAR ENERGY INDUSTRIES ASSOCIATION'S RESPONSE TO MOTION TO DISSOLVE PRELIMINARY INJUNCTION

On behalf of Plaintiff-Intervenor Solar Energy Industries Association ("SEIA"), we hereby submit SEIA's response Defendants' Motion to Dissolve Preliminary Injunction, filed on April 16, 2020 (ECF No. 156).  For the reasons stated in the attached memorandum, Defendants' motion should be denied.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski

**HUGHES HUBBARD & REED LLP**
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4750
matthew.nicely@hugheshubbard.com

*Counsel to SEIA*

Dated: May 7, 2020

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| INVENERGY RENEWABLES LLC,<br><br>Plaintiff,<br><br>and<br><br>SOLAR ENERGY INDUSTRIES ASSOCIATION, CLEARWAY ENERGY GROUP LLC, EDF RENEWABLES, INC., and AES DISTRIBUTED ENERGY INC.,<br><br>Plaintiff-Intervenors,<br><br>v.<br><br>UNITED STATES, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, UNITED STATES TRADE REPRESENTATIVE ROBERT E. LIGHTHIZER, U.S. CUSTOMS AND BORDER PROTECTION, and ACTING COMMISSIONER MARK A. MORGRAN,<br><br>Defendants,<br><br>and<br><br>HANWHA Q CELLS USA, INC., and AUXIN SOLAR,<br><br>Defendant-Intervenors. | Before: Judge Gary S. Katzmann<br>Court No. 19-00192 |

## PLAINTIFF-INTERVENOR SEIA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISSOLVE PRELIMINARY INJUNCTION

Matthew R. Nicely
Daniel M. Witkowski
**HUGHES HUBBARD & REED LLP**

*Counsel to SEIA*

May 7, 2020

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 3

    I.   The Withdrawal of the Bifacial Module Exclusion Remains Arbitrary and Capricious Because USTR Failed to Address Substantial Comments Bearing on Its Determination. ......... 3

        A.     USTR Failed to Address Proposed Modifications to the Scope of the Bifacial Module Exclusion .................................................................................................................................... 4

        B.     USTR Failed to Address the Impact of Withdrawing the Exclusion on the Downstream Industry and the Broader Economy. ............................................................... 10

    II.   The Withdrawal of the Bifacial Module Exclusion Remains Arbitrary and Capricious Because Key Findings and Conclusions in the April Notice Do Not Reflect Reasoned Decision-Making and Lack Factual Support. ....................................................................... 14

    III.   USTR's Reliance on the ITC's March 2020 Report Was Arbitrary and Capricious. .... 18

CONCLUSION ............................................................................................................................ 22

96765620

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama Aircraft Indus., Inc.-Birmingham v. United States*,
  586 F.3d 1372 (Fed. Cir. 2009).................................................................................................4

*Allentown Mack Sales and Service, Inc. v. Nat'l Labor Relations Bd.*,
  522 U.S. 359 (1998).....................................................................................................................14

*Carlson v. Postal Reg. Comm'n*, 938 F.3d 337 (D.C. Cir. 2019) ...............................................4, 10

*Chamber of Commerce of U.S. v. Sec. & Exch. Comm'n*,
  443 F.3d 890 (D.C. Cir. 2006) .................................................................................................20

*Disabled Am. Veterans v. Gober*, 234 F.3d 682 (Fed. Cir. 2000)...............................................4, 10

*Hines on Behalf of Sevier v. Sec'y of Dep't of Health and Human Servs.*,
  940 F.2d 1518 (Fed. Cir. 1991)..................................................................................................3

*Motor Veh. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins Co.*,
  463 U.S. 29 (1983).........................................................................................................3, 10, 14, 16

*Mozilla Corp. v. Fed. Commc'n Comm'n.*, 940 F.3d 1 (D.C. Cir. 2019).......................................3

*In re Sang Su Lee*, 277 F.3d 1338 (Fed. Cir. 2002) ....................................................................14

## Statutes

19 U.S.C. § 2251(a) ....................................................................................................................11

19 U.S.C. § 2253(a)(2)(E),(F)(ii)................................................................................................10

19 U.S.C. § 2253(a)(1)(A) ..........................................................................................................11

## Administrative Decisions

*Determination on the Exclusion of Bifacial Solar Panels From the Safeguard
  Measure on Solar Products*, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020)......................*passim*

*Procedures To Consider Retention or Withdrawal of the Exclusion of Bifacial
  Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg.
  4756 (USTR Jan. 27, 2020) .............................................................................................*passim*

96765620

## INTRODUCTION

Plaintiff-Intervenor Solar Energy Industries Association ("SEIA") submits this memorandum in response and opposition to Defendants' Motion to Dissolve Preliminary Injunction, filed on April 16, 2020 (ECF No. 156).  SEIA is the national trade association for the U.S. solar industry.  SEIA Compl. Ex. 1, Smirnow Decl. ¶ 3 (ECF No. 21-2).  SEIA has hundreds of member companies throughout the solar value chain, including manufacturers, importers, distributors, installers, and project developers.  *Id.*  The preliminary injunction issued by this Court on December 5, 2019 (ECF No. 114) is necessary to protect a number of SEIA's members, including Plaintiff and the other Plaintiff-Intervenors in this action, who will suffer economic harm and business reputational harm if the bifacial module exclusion from the safeguard measures on crystalline silicon photovoltaic ("CSPV") products is withdrawn. *See* SEIA Compl. Ex. 1, Smirnow Decl. ¶¶ 11-12.  The withdrawal of the bifacial module exclusion will also adversely impact the development of solar energy in the United States, contrary to the interests of SEIA, its members, and the public.  *Id*. ¶ 12.  SEIA urges the Court to maintain the preliminary injunction "until entry of final judgment as to Plaintiffs' claims against Defendants in this case," consistent with the Court's original preliminary injunction order.  ECF No. 114.

Defendants' motion is premised on the U.S. Trade Representative ("USTR") having "cured" the reason for which injunctive relief was granted by inviting notice and comment regarding the bifacial module exclusion and publishing a new Federal Register notice on April 17, 2020 again deciding to withdraw the bifacial module exclusion.  *See* ECF No. 156 at 1-2 (citing *Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) (the "April Notice")).  Defendants claim that the April Notice "is an intervening changed circumstance that negates the necessary

condition for injunctive relief that plaintiffs are likely to succeed on the merits." *Id.* at 7 (internal quotation marks omitted).  Defendants are wrong.  The April Notice has not in fact "cured" all of the reasons for which the Court granted the preliminary injunction, one of which included a finding that Plaintiffs were likely to succeed on the merits of their claim that USTR's withdrawal determination was arbitrary and capricious.  Furthermore, Plaintiffs are also likely to succeed on the merits of the other claims, including their challenges to USTR's authority to withdraw the bifacial module exclusion, which the Court did not reach when it issued its opinion granting the motion for a preliminary injunction.  Because Plaintiffs are still likely to succeed on the merits in this case, there is no basis to dissolve the preliminary injunction.

SEIA understands that Plaintiff Invenergy Renewables LLC ("Invenergy") and Plaintiff-Intervenors Clearway Energy Group LLC ("Clearway") and AES Distributed Energy Inc. are filing a robust response to Defendants' motion.[1]  SEIA understands that Plaintiff-Intervenor EDF Renewables, Inc. ("EDF-R") will also be filing a response to Defendants' motion.  SEIA does not wish to require the Court to read largely duplicative arguments.  SEIA therefore adopts and incorporates by reference the arguments raised by Invenergy and EDF-R instead of repeating those arguments below.  SEIA focuses its discussion in this response on the failure of USTR's April Notice to address certain comments raised by SEIA and others opposing withdrawal of the exclusion and the lack of any explanation or factual support for certain findings contained in the April Notice.  These failures by USTR (and similar failures addressed by Invenergy and EDF-R) demonstrate that USTR's decision to withdraw the bifacial module exclusion remains arbitrary and capricious.

---

[1] For ease of reference, SEIA will refer to this submission as the "Invenergy Response Brief."

## ARGUMENT

For the following reasons, and those explained in the response briefs filed by Invenergy and EDF-R, the withdrawal of the bifacial module exclusion remains arbitrary and capricious. We first address two issues that were raised in comments by SEIA and others to USTR that USTR appears to have completely ignored in issuing the April Notice: (1) potential modifications to the scope of the bifacial exclusion designed to eliminate any adverse impact on the domestic module industry; and (2) the negative impact of withdrawing the exclusion on the downstream industry and the broader economy.  We then address several conclusions in the April Notice that exhibit a lack of reasoned decision-making or are based on speculation instead of facts on the record.  Finally, we address USTR's reliance on an International Trade Commission ("ITC") report regarding a potential modification to the tariff rate quota on CSPV *cells* as support for completely withdrawing the bifacial exclusion.

**I.      The Withdrawal of the Bifacial Module Exclusion Remains Arbitrary and Capricious Because USTR Failed to Address Substantial Comments Bearing on Its Determination.**

An agency action is arbitrary and capricious where the agency fails to consider all "relevant factors." *Hines on Behalf of Sevier v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 1518, 1527 (Fed. Cir. 1991) (the arbitrary and capricious standard assesses "whether the decision was based on a consideration of the relevant factors"); *Mozilla Corp. v. Fed. Commc'n Comm'n.*, 940 F.3d 1, 49 (D.C. Cir. 2019) (arbitrary and capricious standard "asks whether the agency examined the relevant data . . . and whether the decision was based on a consideration of the relevant factors . . . ." (internal quotation marks and alterations omitted)).  An agency may not ignore "an important aspect of the problem." *Motor Veh. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins Co.*, 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if

the agency . . . entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency"); *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) ("Courts have found an agency's decision to be arbitrary and capricious when the agency entirely failed to consider an important aspect of the problem . . . ." (internal quotation marks omitted)).  This means that an agency must consider and address comments that raise significant issues with respect to the agency's proposed action.  *See Disabled Am. Veterans v. Gober*, 234 F.3d 682, 692 (Fed. Cir. 2000) (agency must "respond, in a reasoned manner, to any comments received by the agency that raise significant issues with respect to a proposed rule"); *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) ("An agency also violates [the APA] standard if it fails to respond to significant points and consider all relevant factors raised by the public comments." (internal quotation marks omitted)).

USTR's April Notice suggests that its consideration of the comments in support of retaining the bifacial module exclusion was largely limited to counting the number of comments it received.  The April Notice fails to even reference, let alone address, many of the issues raised by SEIA and others supporting retention of the bifacial module exclusion.  We highlight two of those issues below and note that the Response Briefs of Invenergy and EDF-R highlight other issues that USTR completely ignored in the April Notice.

### A.     USTR Failed to Address Proposed Modifications to the Scope of the Bifacial Module Exclusion.

As the Court is well aware, USTR published a notice in the Federal Register on January 27, 2020 establishing procedures to consider the withdrawal of the bifacial module exclusion.  *Procedures To Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels*

*From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 4756 (USTR Jan. 27, 2020)

("January Withdrawal Procedures").  In that notice, USTR stated the following:

> USTR is concerned that: (1) The bifacial solar panel exclusion will result in significant increases in imports of bifacial solar panels and therefore will undermine the objectives of the safeguard measure; (2) *the precise definition of bifacial solar panels excluded from the safeguard measure may require clarification*; and (3) the *exclusion in the June 2019 notice is broader than the category of products described in the exclusion requests submitted as of March 16, 2018*.
>
> For these reasons, USTR is seeking public comment on whether the U.S. Trade Representative should maintain the exclusion of bifacial solar panels from the safeguard measure, withdraw the exclusion, or *take some other action* within his authority with respect to this exclusion.

*Id.* at 4756 (emphases added).  In other words, two of three main concerns USTR expressed regarding the bifacial module exclusion related to the possibility that the exclusion was overbroad.  As such, USTR specifically invited comments regarding what action USTR should take in light of those concerns, and USTR expressly included the possibility that it might do something other than maintain the exclusion "as is" or withdraw it completely.

Given the concerns expressed by USTR in the January Withdrawal Procedures, SEIA and certain of its members offered specific suggestions to USTR as to potential modifications to the bifacial exclusion that would eliminate, or at least significantly reduce, any adverse impact of the exclusion on domestic module producers.[2]  In its initial comments, which were accompanied by an economic analysis prepared by Rutgers University Economist Dr. Thomas Prusa, SEIA proposed that the scope of the exclusion be modified so that it tracked the original exclusion

---

[2] SEIA explained that although it was offering possible modifications to the exclusion, its proposals were aimed at reaching an amicable conclusion to the dispute regarding the bifacial module exclusion and should not be understood as a waiver as to any claim that USTR lacks authority to withdraw the exclusion.  SEIA Comments at 1 n.2 (included as **Attachment A** to this submission).  SEIA adopts the arguments of Invenergy and EDF-R regarding USTR's lack of authority to withdraw the bifacial module exclusion.

request submitted by Pine Gate Renewables.  SEIA Comments at 1 (included as **Attachment A**

to this submission).  This would have limited the exclusion to bifacial panels rated to 1500 volts

DC, with 72 cells or more, weighing more than 47 pounds, and with a surface area of 1.9 square

meters or more.  *Id.*  This proposal, or very similar proposals, was also supported in comments

by Invenergy, Clearway, LONGi Solar Technology (U.S.) Inc. ("LONGi"), Swinerton

Renewable Energy ("Swinerton), and many others.[3]  In its response comments, SEIA further

indicated that it would be open to USTR imposing a minimum weight requirement of greater

than 51 lbs., which would require two people to lift the panels during installation according to

OSHA's recommended lift limits.  SEIA Responsive Comments at 11 (included as **Attachment**

**B** to this submission).  SEIA additionally suggested that USTR could further modify the

exclusion by removing black-framed modules from the exclusion's coverage.  *Id.* at 12 n.40.

SEIA and certain SEIA members also suggested that USTR impose a minimum "bifacialiaty"

factor requirement, which would require the module to absorb a certain amount of light on its

backside before it could be considered "bifacial" for purposes of the exclusion.[4]  SEIA

Comments at 1; LONGi Comments at 8.

The purpose of these modifications was to effectively limit the exclusion to only panels

that would be used in the utility-scale segment of the market.  The standard module in

commercial and residential applications is 60-cell, 1000 V, black-framed, and black-backed.  *See*

---

[3] LONGi's Comments are included with this submission as **Attachment C**.  Swinerton's
Comments, which were submitted to USTR as a response to the initial comments filed by other
interested parties, are included as **Attachment D**.  SEIA also refers in this memorandum to the
initial and/or response comments submitted to USTR by Invenergy, Clearway, and EDF-R.  We
understand that those comments are being submitted as attachments to the Invenergy and EDF-R
briefs, and therefore we have not included those comments as attachments to this submission.

[4] Specifically, SEIA proposed a bifaciality requirement of 60 percent or greater based on
International Electrotechnical Commission Technical Specification 60904-1-2:2019.  LONGi
supported a bifaciality rating over 65 percent.

SEIA Comments at 14 and Exhibit 30; Prusa Report (Appendix A to SEIA Comments) at 4-7, 13.  The large, heavy, high-voltage, and unattractive modules that would meet SEIA's modified exclusion would not be attractive for use in residential rooftop applications.  The extra size would make it difficult to fit the panels into rooftop configurations, the extra weight would drive up the labor costs for installation and the engineering costs in order to ensure that the roof can bear the additional weight, and the voltage requirement is different from the standard 1000 V used in typical residential systems.  SEIA's proposals to require a minimum bifaciality requirement, which would effectively preclude black-backed modules from being excluded from the safeguard, and to remove black-framed modules from the exclusion's coverage would also limit the exclusion to modules that do not meet the prevailing aesthetic tastes in the residential segment, where black-backed black-framed modules are the norm.  Furthermore, panels meeting the revised bifaciality requirement would likely be even *less* efficient than monofacial panels in many rooftop settings because the bifacial panel would lose some of its front-side efficiency while it would be mounted to close to the roof to absorb any significant amount of reflected light on its backside.  SEIA Comments at 18-19; Prusa Report at 4-7.  Invenergy and Clearway also submitted comments demonstrating that bifacial modules meeting SEIA's proposed modifications to the exclusion would not be suitable for residential use.  Invenergy Feb. 27, 2020 Response Comments at 8-9; Clearway Comments at 16-18.

The U.S. module industry primarily focuses on residential and commercial modules, because those modules tend to be more profitable than 72-cell utility-scale modules and the volume requirements of utility-scale projects are such that only very large module producers are able to serve that segment.  SEIA Comments at 11-14; *see also* Invenergy Feb. 17, 2020 Comments at 3-5.  U.S. module producers currently can produce about 4 GW of modules for the

residential and commercial segments (i.e., 60-cell modules) but only about 1 GW of utility-scale

modules (i.e., 72-cell modules).  SEIA Comments at 12; Prusa Report at 13; Swinerton

Comments at 2.  Meanwhile, U.S. demand for utility-scale modules in 2020 is projected to be 14

GW, meaning that the U.S. utility-scale segment will need to source roughly 13 GW of modules

from foreign producers.[5]  SEIA Comments at 13 n.20; Swinerton Comments at 2.  As such, there

is little participation by U.S. modules producers and a significant shortage of modules in the

utility-scale segment.  Moreover, to the extent that there is any production of bifacial modules in

the United States, it is limited to 1000 V panels that would be used in residential or commercial

applications instead of the utility-scale segment.  SEIA Comments at 10-11 and Exhibit 27 at

212-13.

      SEIA's proposals were intended to limit the exclusion to the utility-scale segment and

prevent excluded bifacial panels from competing with U.S.-produced 60-cell panels used in the

residential and commercial segments, which are the focus of the U.S. module industry.  SEIA

submitted evidence that prices for 72-cell utility-scale modules and 60-cell residential modules

differ, which is not surprising given the different characteristics of the panels and the customer

bases.  SEIA Responsive Comments at 7 n.21 (noting Solar Market Insight report reflecting a

43% premium on modules for residential use on a per-watt basis).  SEIA's Comments also

included a report from Dr. Thomas Prusa of Rutgers University analyzing the economic effect, if

any, the prices of utility-scale modules have had on prices of residential or commercial modules.

---

[5] References to demand forecasts reflect the forecasts that were placed on the record before
USTR.  We understand that certain 2020 demand forecasts have been revised downward slightly
in light of the COVID-19 pandemic, reducing likely demand in the utility-scale market from 14
GW to 13.2 GW.  Wood Mackenzie Power and Renewables, *Coronavirus: Disruption Will
Reduce 2020 Global Solar PV Additions by 18%* (Apr. 2020).  This slight reduction does not
change the fact that there is a significant shortage of utility-scale modules in the United States.

*See generally* Prusa Report.  Dr. Prusa applied a common econometric tool developed by a

Nobel Prize winning economist and concluded that there is no relationship between the price of

modules in these sectors – that is, the price of utility-scale modules does not influence the price

of residential and commercial modules.  *Id.*  This was evidence that any change in utility-scale

module pricing caused by a modified exclusion limited to utility-scale bifacial panels would not

adversely impact the U.S. industry's sales and profits in the residential and commercial segments

of the market.[6]

By modifying the exclusion's scope, SEIA sought to alleviate some of the significant

supply shortage in the utility-scale segment while also protecting the U.S. module industry's core

interests, which are in the residential and commercial segments of the market.  These proposals

were directly responsive to the concerns raised by USTR in the January Withdrawal Procedures

as well as a number of USTR's specific requests for comments and information (e.g.,

substitutability between bifacial and monofacial panels, impact of withdrawing the exclusion on

the broader economy, price differential between monofacial and bifacial solar panels).

The April Notice fails to mention, much less address, the modifications that SEIA and

others proposed to the scope of the bifacial module exclusion.  The April Notice similarly fails to

---

[6] SEIA also responded to comments raised by other parties that a publication by Wood
Mackenzie revised its forecast of module prices downward following the announcement of the
bifacial module exclusion.  SEIA Responsive Comments at 8-9.  SEIA pointed out the fact that a
reduction in the *average* price for modules sold in the United States does equate to a drop in
price for *all* modules.  *Id.*  A reduction in price that applied only to imported bifacial solar
modules and did not impact the price of any U.S.-produced modules whatsoever would still
noticeably reduce the average price for modules in the United States based purely on basic
principles of mathematics.  *Id.*  We further note that any downward revisions to U.S. price
forecasts were based on USTR's decision to exclude *all* bifacial panels, and thus they did not
account for SEIA's proposals to limit the exclusion to utility-scale modules.  Finally, a review of
the Wood Mackenzie forecasts cited by opponents of the exclusion shows that the price is for a
*Chinese-produced* module and *not* an estimate of the price for U.S.-produced modules.  *See*
Suniva Comments at Attachment 27 (included as **Attachment E**).

mention or address the analysis conducted by Dr. Prusa showing the lack of a causal relationship between prices for utility-scale modules and residential and commercial modules.  In fact, the April Notice fails to even mention the comments or information demonstrating that the U.S. industry's focus is on the residential and commercial segments of the market and that there is huge shortage of utility-scale modules in the United States.  By failing to address and respond in a reasoned manner to the proposals to modify the exclusion, USTR acted arbitrarily and capriciously.  *See Disabled Am. Veterans*, 234 F.3d at 692; *Carlson*, 938 F.3d at 344.  More generally, by failing to consider the potential pros and cons of modifying the exclusion before withdrawing the exclusion in its entirety, USTR engaged in action that the Supreme Court has found to be arbitrary and capricious.  *See State Farm*, 463 U.S. at 46-49 (holding that agency's rescission of rule was arbitrary and capricious when it had failed to consider the alternative of amending the rule).

### B.   USTR Failed to Address the Impact of Withdrawing the Exclusion on the Downstream Industry and the Broader Economy.

In the January Withdrawal Procedures, USTR specifically asked for comments and information regarding "[t]he potential impact, if any, on the domestic workforce and economy in general should the exclusion be withdrawn."  85 Fed. Reg. at 4757.  The safeguard statute itself requires a consideration of the impact of a safeguard measure on consumers of the product under investigation and the broader economy.  Section 203 requires the President to take into account "the short- and long-term economic and social costs of the actions authorized . . . relative to their short- and long-term economic and social benefits" and "the effect of the implementation of actions under this section on consumers and on competition in domestic markets for articles" in deciding an appropriate action under the safeguard statute.  19 U.S.C. § 2253(a)(2)(E),(F)(ii). Section 201 and Section 203 also direct the President to take "all appropriate and feasible action

within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition ***and*** *provide greater economic and social benefits than costs*." 19 U.S.C. §§ 2251(a), 2253(a)(1)(A) (emphasis added). This statutory directive is phrased in the conjunctive, not the disjunctive. An action is appropriate under the safeguard statue only if it *both* facilitates efforts by the domestic industry to make a positive adjustment to import competition *and* provides greater economic and social benefits than costs.

SEIA and certain of its members submitted comments explaining that withdrawing the bifacial exclusion would make solar energy projects less competitive to other projects using other forms of energy, potentially imperil projects for which developers had planned to use bifacial panels that were free of safeguard duties, and destroy a meaningful amount of demand for solar projects. *See, e.g.*, SEIA Comments at 22-23; LONGi Comments at 7-8 (noting limited substitutability between bifacial and monofacial modules and explaining "performance difference makes bifacial panels a more competitive solution for certain utility-scale projects"). Relying on estimates by Wood Mackenzie regarding the volume of utility-scale modules installed in 2018 and the Solar Foundation's estimates regarding the number of installation, project development, and other solar industry jobs in 2018, SEIA estimated that withdrawal of the exclusion and the corresponding reduction in solar projects would cost about 19,500 total solar jobs in 2021. SEIA Comments at 22-23. As noted in the Invenergy and EDF-R Response Briefs being filed today, Invenergy, Clearway, and EDF-R also submitted comments regarding the negative impact that withdrawing the bifacial exclusions would likely have on solar jobs.

SEIA and others also remarked on the lack of utility-scale bifacial module production in the United States and the relative lack of utility-scale module production in the United States more generally. SEIA explained that there is currently less than 300 MW of capacity to produce

bifacial modules in the United States, that none of this capacity was directed to the utility scale

segment, and that SEIA was unaware of any plans by domestic module assembler to produce

utility-scale bifacial panels in the near future.  SEIA Comments at 10-11.  SEIA and others

further remarked that there is very little utility-scale CSPV module production of any kind in the

United States at all.  *Id.* at 11; Invenergy Feb. 17, 2020 Comments at 3-5; Invenergy Feb. 27,

2020 Response Comments at 4-6; Clearway Comments at 6-9.  There is currently about 5 GW of

CSPV module production capacity in the United States, and SEIA estimated that only 1 GW of it

is geared toward the utility-scale segment.  SEIA Comments at 12-13; SEIA Responsive

Comments at 6.  Moreover, because of bankability and production-scale requirements for utility-

scale solar projects, only three U.S. CSPV module producers (LG, JinkoSolar, and Hanwha) are

even capable of supplying the utility-scale segment, and a significant percentage of their

production goes to serving the residential and commercial segments.   SEIA Comments at 11-13;

Invenergy Comments at 3-4.

Meanwhile, demand for utility-scale modules is projected to be 14 GW in 2020.  SEIA

Comments at 11.  The increased energy efficiency of bifacial modules makes them attractive to

the utility-scale segment, and SEIA estimated that there would be 3-5 GW of demand for bifacial

panels if they were free of the safeguard tariffs and only 1-3 GW of demand for bifacial panels if

the safeguard tariffs were re-imposed.  SEIA Comments at 9.

These facts demonstrate a significant shortage of utility-scale modules generally and

bifacial utility-scale modules specifically in the United States.  With the current allocation of

U.S. module production capacity, utility-scale project developers must source 13 GW of the 14

GW demanded from sources other than U.S. CSPV module producers.  Even if the entire U.S.

CSPV module industry switched to producing only utility-scale modules (which is at odds with

the current reality and completely unrealistic) and operated at full capacity, utility-scale

developers would still need to source 9 GW of the 14 GW demanded (roughly 65 percent) from

sources other than U.S. CSPV module producers.  And again, no U.S. producer currently offers

bifacial utility-scale modules, so the entirety of the demand for bifacial utility-scale modules

must be met from sources outside the United States.  The reality is that utility-scale project

developers have no choice but to source a significant percentage of the utility-scale modules they

need from foreign countries.  SEIA explained in its comments that "[g]iven these undisputed

facts, re-imposition of Section 201 tariffs on such bifacial panels would serve merely as

consumption taxes with no remedial effect."  SEIA Comments at 3.

 All of the comments above were responsive to USTR's request for comments and

information regarding "[t]he potential impact, if any, on the domestic workforce and economy in

general should the exclusion be withdrawn."  85 Fed. Reg. at 4757.  They also addressed one of

the two main criteria reflected in the safeguard statute itself—whether the safeguard action

provides greater economic and social benefits than costs.  The comments pertaining to the supply

shortage were also responsive to USTR's request for comments and information regarding

"[p]rojections of demand for bifacial solar panels by companies building or planning to build

solar facilities or otherwise to install bifacial solar panels" and "[d]omestic production and

production capacity of bifacial solar cells or bifacial solar panels in the United States."  *Id.*  They

thus addressed topics that either USTR itself or Congress explicitly recognized as important

aspects of the problem.

 The April Notice does not address, or even acknowledge the possibility of, the adverse

impacts of withdrawing the bifacial exclusion.  There is no discussion of the potential impact on

the domestic workforce.  There is no discussion of the potential impact on the economy in

general, whether it be project developers or energy consumers.  There is no discussion of the

current lack of utility-scale bifacial module production in the United States or any discussion of

actual plans by the U.S. industry to produce such modules in the near term.  And there is no

discussion of the severe shortage of utility-scale modules in the United States more generally.  It

is apparent that USTR failed to consider an important aspect of the problem, so its April 2020

decision to withdraw the bifacial module exclusion remains arbitrary and capricious.

II.     **The Withdrawal of the Bifacial Module Exclusion Remains Arbitrary and
        Capricious Because Key Findings and Conclusions in the April Notice Do Not
        Reflect Reasoned Decision-Making and Lack Factual Support.**

Certain findings and conclusions in the April Notice are not the product of reasoned

decision-making or supported by evidence in the factual record.  These deficiencies in USTR's

findings also render the April Notice arbitrary and capricious.  *See State Farm*, 463 U.S. at 43

("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its

action including a rational connection between the facts found and the choice made." (internal

quotation marks omitted))*; Allentown Mack Sales and Service, Inc. v. Nat'l Labor Relations Bd.*,

522 U.S. 359, 374 (1998) ("The Administrative Procedure Act, which governs the proceedings

of administrative agencies and related judicial review, establishes a scheme of reasoned decision

making." (internal quotation marks omitted)); *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir.

2002) ("The agency . . . must set forth its findings and the grounds thereof, as supported by the

agency record, and explain its application of the law to the found facts.").  SEIA focuses on three

findings or conclusions by USTR: (1) USTR's dismissal of a tariff rate quota for bifacial panels;

(2) USTR's conclusion that the exclusion would discourage the production of bifacial modules in

the United States; and (3) USTR's finding that the exclusion would prevent U.S. solar panel

manufacturers from competing in the utility-scale segment of the market.

14

In the January Withdrawal Procedures, USTR requested information and comments regarding "[w]hether the U.S. Trade Representative should modify the exclusion to implement a tariff-rate quota (TRQ) on the importation of bifacial solar panels that enter with no additional duty and, if so, the level (e.g., in megawatts) of that TRQ." 85 Fed. Reg. at 4757.  In response to this request, SEIA argued that if USTR were not inclined to grant a full exclusion for bifacial solar panels, even with SEIA's proposed modifications to the scope of the exclusion, then USTR should grant a TRQ.  SEIA Comments at 2. 5, 22.  As to the appropriate level of the TRQ, SEIA advocated that 8 GW of bifacial panels be allowed to entered free of safeguard duties.  *Id.* at 2, 22; SEIA Responsive Comments at 3-4.  SEIA explained that this would help alleviate the serious shortage of utility-scale modules in the United States while continuing to provide significant opportunities for the U.S. industry to compete and grow.  SEIA Response Comments at 3-4.  Even assuming that an 8 GW TRQ would fill in 2020 (and SEIA projected that it would not), that would still leave 6 GW of utility-scale demand that would need to be met by either the U.S. industry or by modules subject to safeguard duties.  Considering the U.S. industry currently produces only 1 GW of utility-scale modules, the 6 GW of remaining demand would still represent a robust opportunity for the U.S. producers to maintain and even expand their sales to the utility-scale market.  *See also* Swinerton Response Comments at 3 (also advocating for 8 GW TRQ as a "compromise position" and explaining "8 GW represents less than 60% of the total annual utility-scale market of 14 GW.  Thus, 6 GW of utility scale panels would still be subject to the Section 201 tariffs, even though domestic producers can produce only 1 GW of utility-scale panels."); Invenergy Feb. 27, 2020 Response Comments at 4-6, 11 (addressing limited availability of utility-scale modules from U.S. producers and supporting 8 GW TRQ as potential alternative to complete exclusion).

In its findings in the April Notice, USTR included a conclusory statement that "[t]he proposed TRQ for bifacial solar panels would allow importation of massive quantities of bifacial solar panels and therefore would duplicate the negative effects of the bifacial exclusion." 85 Fed. Reg. at 21,498. There was no further elaboration or discussion regarding the possibility of a TRQ, or even a mention of the specific level that was suggested. USTR failed to explain why a TRQ at the proposed amount failed to provide adequate protection and opportunity for growth in the U.S. utility-scale market for domestic producers, particularly in light of the shortage of utility-scale module that would remain even if a TRQ were granted and the U.S. industry's focus on the residential and commercial segments in any event. The statement also does not evidence any consideration by USTR as to the possibility that imposing a TRQ but setting it at a level lower than 8 GW would be appropriate. USTR found that 8 GW reflected a large volume of solar panels and jumped to the conclusion that any TRQ would be inappropriate without giving any consideration to the specifics of the U.S. market or possible alternatives in between SEIA's proposed 8 GW TRQ and no TRQ. USTR's failure to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" and to consider potentially valid alternatives to its proposed action was arbitrary and capricious. *State Farm*, 463 U.S. at 43, 46-49.

USTR similarly failed to engage in reasoned decision-making when it summarily concluded that "allowing import of bifacial solar panels free of safeguard tariffs disincentivizes U.S. producers from converting existing monofacial production to bifacial production or opening new bifacial production," which USTR then cited as a basis for its determination that the exclusion is "hindering the domestic industry's adjustment to import competition." 85 Fed. Reg. at 21,498-99. These findings, and the import given to them by USTR, all presume that the

domestic industry is actually interested in expanding production of bifacial modules, but are not able to because of the exclusion.  As stated above, SEIA's comments to USTR explained that there is currently very little bifacial module production in the United States, and it is all limited to residential or commercial modules (60-cell and/or 1000 V).  SEIA proposed to remove 60-cell and 1000 V bifacial panels from the coverage of the exclusion, which would protect the interests of U.S. producers of those modules.  SEIA further explained that it was unaware of any plans by the U.S. industry to produce utility-scale bifacial modules in the near term.  SEIA's comments also provided reasons for this lack of interest in producing utility-scale bifacial modules, including the bankability and production-volume requirements to serve the utility-scale segment generally, the fact that U.S. producers make more profit on residential and commercial modules, and the fact that companies are not interested in shutting down and retooling their production lines to produce bifacial modules because they are already oversold.  SEIA Comments at 13-14; *see also* Invenergy Feb. 17, 2020 Comments at 3-4.  Meanwhile, although USTR's January Withdrawal Procedures specifically directed interested parties to include "sufficient evidence to support a particular position" with their comments, 85 Fed. Reg. at 4756, SEIA is unaware of any specific proposals, plans, or affidavits that were placed on the record discussing a U.S. module assembler actually planning to produce, or even wanting, to produce utility-scale bifacial modules in the United States.  The supposed "disincentive" that USTR has cited is entirely theoretical and is not backed up by any evidence on the record regarding the realities of the U.S. industry and the U.S. market.

USTR's conclusion that the bifacial module exclusion is "interfering with [domestic producers'] ability to increase sales of monofacial and bifacial products into the utility segment" suffers from similar flaws.  85 Fed. Reg. at 21,498.  Regarding the interference with domestic

producers' ability to increase sales of bifacial products into the utility segment, as indicated above, there can be no such interference when the U.S. industry does not produce those modules and has shown no interest in doing so.  Regarding monofacial modules, despite the safeguard measure having been in place for nearly a year and a half before the bifacial exclusion was announced and for two years by the time USTR required comments, there is still very little production of utility-scale modules in the United States.  The domestic industry focuses on the residential and commercial segments of the market, and there are strong reasons for the industry to remain that way, given (a) the price premium in the residential and commercial markets and (b) the bankability and production-scale requirements in the utility-scale segment creating barriers to entry independent of imports.  SEIA is also unaware of any evidence having been submitted to USTR regarding specific plans or attempts by the U.S. industry to increase their sales to the utility segment.  Moreover, even if there were evidence showing that the U.S. industry had such a desire, USTR completely failed to discuss why a TRQ of 8 GW (or some lower level) would not provide the U.S. industry a sufficient opportunity to pursue that interest. Again, USTR has not cited to any evidence to support its conclusion and has not engaged in a reasoned analysis of the record that explains and connects the facts found to the decisions it has made.  USTR's determination is therefore arbitrary and capricious.

## III.    USTR's Reliance on the ITC's March 2020 Report Was Arbitrary and Capricious.

USTR's April Notice fails to cite or even generally describe any specific comment or piece of evidence that it received in response to the January Withdrawal Procedures.  The April Notice, however, does obliquely refer in several places to a March 2020 International Trade Commission report ("March Report") and claims that the report supports USTR's determination to withdraw the bifacial module exclusion.  As an initial matter, USTR's citation to the ITC

report and its findings are very general.  SEIA believes that the USTR is referring to USITC

Publication 5032, titled "Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully

Assembled Into Other Products: Advice on the Probable Economic Effect of Certain

Modifications to the Safeguard Measure."[7]  Assuming that to be the case, USTR's reliance on

the March Report to withdraw the bifacial exclusion was improper and unreasonable.

First, the March Report was issued for the purpose of advising USTR on "the effect of

increasing the level of the tariff-rate quota (TRQ) on CSPV *cells*."  *Id.* at ES-1 (emphasis added).

As such, the potential impact of the bifacial module exclusion or its modification or withdrawal

was not the subject or purpose of the ITC's report.

Second, USTR's reliance on the March Report was inconsistent with USTR's January

Withdrawal Procedures.[8]  The January Withdrawal Procedures stated that "[i]f the U.S. Trade

Representative determines *after receipt of comments pursuant to this notice* that it would be

appropriate to withdraw the bifacial exclusion or take some other action with respect to this

exclusion, the U.S. Trade Representative will request that the Court lift the injunction."  85 Fed.

Reg. at 4756 (emphasis added).  The January Withdrawal Procedures also contained a section

entitled "Consultation With Other Government Agencies."  That section explained that "the U.S.

Trade Representative *will consult with the Secretaries of Commerce and Energy regarding the*

*comments, responses, and supporting evidence received in response to this notice to determine*

*what, if any, action to take regarding the exclusion* of bifacial solar panels from the safeguard

---

[7] Further references to "March Report" in this submission should be understood as referring to this publication.

[8] For the reasons stated in the Invenergy Response Brief, SEIA also disputes USTR's authority to even establish a procedure for withdrawing an exclusion, and this argument should not be understood as any sort of acknowledgment that USTR has the legal authority to withdraw the bifacial module exclusion.

19

measure." *Id.* at 4757 (emphasis added).  Both statements indicate that USTR would make any

determination to withdraw or modify the exclusion based on the comments it received through

the notice-and-comment process.  The March Report, however, was issued after that notice-and-

comment process closed on February 27, 2020.  Unsurprisingly, a review of the rulemaking

docket (USTR-2020-0001) on regulations.gov reveals that the March Report was not placed on

the public rulemaking docket.  *See* **Attachment F** (Docket Printout for USTR-2020-0001,

*available at* https://www.regulations.gov/docket?D=USTR-2020-0001 (last visited May, 7,

2020)).  Moreover, the statement in the section titled "Consultation With Other Government

Agencies" states only that USTR would consult with the Department of Commerce and the

Department of Energy.  There is no indication that USTR also intended to consult with the ITC.

In fact, the ITC is not mentioned *anywhere* in the January Withdrawal Procedures.

Not only was reliance on the March Report inconsistent with the very procedures that

USTR set up to consider withdrawal of the bifacial module exclusion, it was unfair and

prejudicial to interested parties that had no opportunity to comment on or rebut the March

Report.  Because the March Report was issued after the close of the notice-and-comment period,

interested parties never had an opportunity to address the report in their comments to USTR.

This prejudice is amplified by the significant weight that USTR appears to have given the March

Report.  Interested parties should have been allowed to comment on the March Report before

USTR relied on that report in its decision-making.  *Chamber of Commerce of U.S. v. Sec. &

Exch. Comm'n* , 443 F.3d 890, 900–01 (D.C. Cir. 2006) ("[T]he most critical factual material

that is used to support the agency's position" must be "made public" and "subjected to informed

comment . . .  These considerations are no less relevant when an agency on remand considers

whether to modify a rule pending on appeal." (internal quotation and citations omitted)).

Finally, a review of the March Report discloses that it contains assumptions that render it of no independent utility in assessing whether the bifacial module exclusion should be retained or withdrawn. Most importantly, all of the statements in the March Report are based on the assumption that the bifacial module exclusion as originally formulated by USTR would be retained. The March Report actually states "bifacial modules are likely to account for a growing share of the market over the next few years and can substitute for monofacial products in all market segments." March Report at III-4. The March Report also makes a very aggressive assumption that bifacial panels will be used for *all* utility-scale and commercial segment installations by January 2022. March Report at D-8. However, such an assumption is undermined by the evidence presented to USTR that bifacial modules exhibit superior efficiency only in certain conditions and other projections of demand for bifacial modules. *See, e.g.*, SEIA Comments at 9, 19-20, and Exhibit 6 at 21, 27; Prusa Report at 7, 13. The March Report also incorrectly indicates that $1 billion in bifacial CSPV modules were purchased following the exclusion. March Report at II-17-18. Developers entered into contracts worth $1 billion for *projects* that involved the use of bifacial solar modules. *See* Jacqueline Toth, *Solar Firms Sought Senate Help on End of Bifacial Panel Tariff Exclusion*, Morning Consult (Nov. 6, 2019), https://morningconsult.com/2019/11/06/solar-firms-sought-senate-help-on-end-of-bifacial-panel-tariff-exclusion/ (cited by ITC as basis for finding that $1 billion in bifacial modules had been purchased following the exclusion) (included with this submission as **Attachment G**). The modules themselves are only part of the cost for a project, and the ITC's apparent assumption that the exclusion immediately led to the purchase of $1 billion of bifacial modules is erroneous. This error calls into question any statements or analysis by the ITC that may have been colored by its misunderstanding of the impact of the bifacial exclusion.

The March Report does not appear to contain analysis or modeling regarding the potential impact of the bifacial exclusion if it were narrowed to cover only utility-scale modules, if a TRQ for bifacial modules were imposed, or if the adoption of bifacial modules by the utility-scale and commercial segments is slower than the ITC's assumptions.  A finding that excluded bifacial modules would compete with domestically produced solar products based on the original exclusion, which applied to bifacial modules of any kind, would not necessarily apply to an exclusion that is limited to the utility-scale market.  Nor would such a finding necessarily apply to a situation in which a TRQ left a significant volume of demand to be filled by products not enjoying safeguard-duty-free treatment.  Simply put, the ITC did not consider the comments and evidence that were placed before USTR, and USTR's decision to heavily rely on the findings of the ITC means that USTR is effectively ignoring those comments and evidence.

## CONCLUSION

For the foregoing reasons, and for the reasons articulated in the Response Briefs of Invenergy and EDF-R, USTR's April Notice fails to "cure" one of the key deficiencies that the Court identified with USTR's original attempt to withdraw the bifacial module exclusion, namely that that the withdrawal determination is likely arbitrary and capricious.  As such, there has been no change of circumstances from when the Court originally issued the preliminary injunction in this case, and Defendants' motion to dissolve should be denied.  Moreover, Plaintiffs are likely to prevail on their merits with respect to their other challenges to the withdrawal of the bifacial module exclusion for the reasons articulated in Invenergy's Response Brief.  The preliminary injunction should be maintained on that basis as well.

96765620

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
**HUGHES HUBBARD & REED LLP**
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4750
matthew.nicely@hugheshubbard.com

*Counsel to SEIA*

Dated: May 7, 2020

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hughes Hubbard & Reed LLP hereby certifies that Plaintiff-Intervenor SEIA's Memorandum in Opposition to Defendants' Motion to Dissolve Preliminary Injunction, dated May 7, 2020, complies with the word-count limitation set forth in ¶ 2(B) of the Standard Chambers Procedures of this Court, as amended on October 3, 2016.  The motion contains 7,220 words according to the word-count function of the word-processing software used to prepare the motion.

/s/ Matthew R. Nicely
Matthew R. Nicely
**HUGHES HUBBARD & REED LLP**
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4750
matthew.nicely@hugheshubbard.com

*Counsel to SEIA*

Dated: May 7, 2020