**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| INVENERGY RENEWABLES LLC, | ) |
| | ) |
| Plaintiff, | ) |
| and | ) |
| | ) |
| SOLAR ENERGY INDUSTRIES | ) |
| ASSOCIATION, CLEARWAY ENERGY | ) |
| GROUP LLC, EDF RENEWABLES, INC., and | ) |
| AES DISTRIBUTED ENERGY INC., | ) |
| | ) Before: Judge Gary S. Katzmann |
| Plaintiff-Intervenors, | ) Court No. 19-00192 |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, OFFICE OF THE | ) |
| UNITED STATES TRADE | ) |
| REPRESENTATIVE, UNITED STATES | ) |
| TRADE REPRESENTATIVE ROBERT E. | ) |
| LIGHTHIZER, U.S. CUSTOMS AND BORDER | ) |
| PROTECTION, and ACTING COMMISSIONER | ) |
| MARK A. MORGAN, | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| HANWHA Q CELLS USA, INC., and AUXIN | ) |
| SOLAR, | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

**<u>PROPOSED ORDER</u>**

Upon consideration of Plaintiff Invenergy Renewables LLC, and Plaintiff-

Intervenors Clearway Energy Group LLC and AES Distributed Energy Inc.'s Response in

Opposition to Defendant's Motion to Dissolve Preliminary Injunction, and all the papers and

proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that Defendants Motion is DENIED.


Dated: _____         _____
New York, New York                                   Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| INVENERGY RENEWABLES LLC,<br><br>                  Plaintiff,<br>      and<br><br>SOLAR ENERGY INDUSTRIES<br>ASSOCIATION, CLEARWAY ENERGY<br>GROUP LLC, EDF RENEWABLES, INC., and<br>AES DISTRIBUTED ENERGY INC.,<br><br>              Plaintiff-Intervenors,<br><br>           v.<br><br>THE UNITED STATES, OFFICE OF THE<br>UNITED STATES TRADE<br>REPRESENTATIVE, UNITED STATES<br>TRADE REPRESENTATIVE ROBERT E.<br>LIGHTHIZER, U.S. CUSTOMS AND BORDER<br>PROTECTION, and ACTING COMMISSIONER<br>MARK A. MORGAN,<br>              Defendants,<br><br>         and<br><br>HANWHA Q CELLS USA, INC., and AUXIN<br>SOLAR,<br><br>              Defendant-Intervenors. | Before: Judge Gary S. Katzmann<br>Court No. 19-00192 |

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISSOLVE
PRELIMINARY INJUNCTION**

John Brew
Larry Eisenstat
Kathryn L. Clune
Amanda Shafer Berman
Frances Hadfield
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 3

I.      The President Issues the Solar Safeguard Measure under the 1974 Trade Act. ................. 3

II.     USTR Excludes Bifacial Panels From Safeguard Measure................................................ 4

III.    The PI Decision.................................................................................................................. 5

IV.   USTR Revisits its October Withdrawal of the Exclusion.................................................. 6

        A.     USTR announces it will reconsider withdrawing the Exclusion. .......................... 6

        B.     USTR again determines that it should withdraw the Exclusion. ........................... 7

STANDARD OF REVIEW ............................................................................................... 9

ARGUMENT .................................................................................................................. 11

I.      The April Notice is Not a Significant Change in Factual Circumstances that Warrants Dissolution of the Preliminary Injunction......................................................................... 11

II.     Plaintiffs Remain Likely to Succeed On Their Claims.................................................... 15

        A.     Defendants failed to address whether the April Notice is arbitrary and capricious. ................................................................................................................. 16

        B.     USTR's withdrawal remains arbitrary and capricious because USTR failed to explain and support its "findings" and conclusions. ............................................. 17

        C.     The April Notice is arbitrary and capricious because USTR failed to respond to significant, specific, and demonstrably relevant comments. ................................ 19

                1.     USTR failed to respond to comments that it lacks the legal authority to withdraw the Exclusion............................................................................. 21

                2.     USTR failed to respond to detailed comments as to why monofacial and bifacial panels are not interchangeable. .................................................. 25

3.      USTR failed to respond to comments regarding the negative impact the withdrawal of the Exclusion has on the domestic workforce and economy in general.................................................................................................. 27

4.      USTR failed to address multiple comments showing that Utility-Grade Modules are not commercially available in the United States.................. 29

D.      The April Notice is arbitrary and capricious because USTR failed to consider relevant factors, including social and economic costs and benefits...................... 32

E.      USTR's withdrawal decision remains arbitrary and capricious because USTR again failed to explain why its prior decision to issue the Exclusion was wrong. 34

F.      Plaintiffs remain likely to succeed on the merits of their challenge to withdrawal of the Exclusion because USTR lacks authority to take such action. .................. 35

III.    The Preliminary Injunction Should Remain in Place While This Court Considers USTR's Withdrawal of the Exclusion on the Merits. ................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*A.L. Pharma, Inc. v. Shalala*,
    62 F.3d 1484 (D.C. Cir. 1995)............................................................................17, 18

*Action on Smoking & Health v. C.A.B.*,
    699 F.2d 1209 (D.C. Cir. 1983)..................................................................................23

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    32 C.I.T. 666 (2008) ............................................................................................10, 11

*Ad Hoc Shrimp Trade Action v. U.S.*,
    34 C.I.T. 1275 (2010) ..................................................................................................13

*AIMCOR Alabama Silicon, Inc. v. United States*,
    23 C.I.T. 932, 83 F. Supp. 2d 1293 (1999)....................................10, 12, 13, 16, 40

*Alabama Aircraft Industries, Inc.-Birmingham v. U.S.*,
    586 F.3d 1372 (Fed. Cir. 2009).................................................................................33

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Commn.*,
    988 F.2d 146 (D.C. Cir. 1993)...................................................................................17

*Altera Corp. & Subs. v. Commissioner of IRS*,
    926 F.3d 1061 (9th Cir. 2019), *petition for cert. filed* ..........................................23

*Carlson v. Postal Reg. Commn.*,
    938 F.3d 337 (D.C. Cir. 2019)...................................................................................20

*Cement Kiln Recycling Coalition v. E.P.A.*,
    493 F.3d 207 (D.C. Cir. 2007)...................................................................................20

*Chamber of Commerce of U.S. v. S.E.C.*,
    443 F.3d 890 (D.C. Cir. 2006)...................................................................................18

*Concilio de Salud Integral de Loiza, Inc. v. Perez-Podomo*,
    551 F.3d 10 (1st Cir. 2008)...................................................................................10, 11

*Del. Dep't of Nat. Res. and Envt'l Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015), *as amended* (July 21, 2015)................................20, 21

*Disabled Am. Veterans v. Gober*,
    234 F.3d 682 (Fed. Cir. 2000)......................................................................20, 23, 27, 29

*Dist. Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015)................................................................21

*DUSA Pharm., Inc. v. River's Edge Pharm., LLC*,
No. 06-1843SRC, 2007 WL 748448 (D.N.J. Mar. 7, 2007)....................................14

*EAC Eng'g, Div. of E. Asiatic Co. v. United States*,
624 F. Supp. 569 (Ct. Int'l Trade 1985) ................................................39

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016)..................................................................5, 34, 35

*Eregli Demir Ve Celik Fabrikalari, V.A.S. v. United States*,
No. 18-180, Op. ........................................................................39

*FAG Italia S.p.A. v. United States*,
291 F.3d 806 (Fed. Cir. 2002)............................................................6

*FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)....................................5, 34, 35

*Hines on Behalf of Sevier v. Sec'y of Dep't of Health and Human Servs.*,
940 F.2d 1518 (Fed. Cir. 1991)..........................................................32

*Kreepy Krauly U.S.A. Inc., v. Sta-Rite Indus. Inc.*,
152 F.3d 949, 1998 WL 196750 (Fed. Cir. 1998) ..........................................9

*La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*,
336 F.3d 1075 (D.C. Cir. 2003) ..........................................................23

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985)............................................................38

*Merck Sharp & Dohme Corp., v. Albrecht*,
139 S. Ct. 1668 (2019)...............................................................21, 36

*Morita v. Application Art Laboratories Co., Ltd.*,
889 F.2d 1028, 1989 WL 83256 (Fed. Cir. 1989) ............................................2, 9

*Motor Veh. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins Co.*,
463 U.S. 29 (1983)...............................................................17, 18, 33

*NorAm Gas Transmission Co. v. FERC*,
148 F.3d 1158 (D.C. Cir. 1998) ..........................................................20

*PODS v. Porta-Stor Inc.*,
177 Fed Appx. 73 (Fed. Cir. 2006) ......................................................16

*In re Sang Su Lee*,
277 F.3d 1338 (Fed. Cir. 2002)..........................................................19

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)..................................................................................................19

*SKF USA Inc. v. U.S.*,
  28 C.I.T. 170 (2004) ........................................................................... 9-10, 14

*Soc Trang Seafood Joint Stock Company et al. v. United States*,
  No. 18-75, Op. and Order (Ct. Int'l Trade June 21, 2018). ...................................39

**Statutes**

5 U.S.C. § 553(c) ........................................................................................................20

5 U.S.C. § 706(2)(a)....................................................................................................17

19 U.S.C. § 2252-53 ......................................................................................................3

19 U.S.C. § 2253(a)(2)........................................................................................3, 9, 27

19 U.S.C. § 2253(e)(1)................................................................................................38

19 U.S.C. §§ 2253(g) and 2254 (b)............................................................................22

19 U.S.C. §§ 2254 (a) & (b)........................................................................................38

**Other Authorities**

83 Fed. Reg. 3,541 (Jan. 25, 2018) ................................................................. passim

83 Fed. Reg. 6,670 (Feb. 14, 2018) ........................................................4, 22, 23, 38

84 Fed. Reg. 27,684 (June 13, 2019)............................................................................1

84 Fed. Reg. 54,244 (Oct. 9, 2019)..............................................................................4

85 Fed. Reg. 4,756 (Jan. 27, 2020) ................................................................. passim

85 Fed. Reg. 21,497 (April 17, 2020) ............................................................. passim

Administrative Procedure Act.......................................................................... passim

H. Rep. No. 100-576 (1988) .......................................................................................22

USCIT Rule 1 .............................................................................................................41

Fed. R. Civ. P. 60(b)(5)...............................................................................................11

## INTRODUCTION

Defendants' Motion to Dissolve the Preliminary Injunction, ECF No. 156 ("Motion" or "Mot."), is based on a mistaken premise: that the United States Trade Representative ("USTR") has "cured the sole reason for which the injunctive relief was granted" by publishing notice and taking comment in advance of its most recent determination to again withdraw the Solar Safeguard Bifacial Module Exclusion ("Exclusion")[1] from the section 201 safeguard measure. Mot. at 1, 7. That is incorrect. Although USTR did seek comments,[2] its decision again to withdraw the Exclusion (the "April Notice")[3] did not address, much less redress, *all* of the grounds upon which this Court issued the preliminary injunction ("PI").

This Court entered the PI because it found that Invenergy was likely to succeed on its claim that the government had violated the Administrative Procedure Act ("APA") not only because it failed to "follow [the APA's notice and comment] procedures" before initially deciding to withdraw the Exclusion, but also because that decision was arbitrary and capricious in violation of the APA's substantive requirements. ECF No. 113 at 42-45 ("PI Op.").

This remains as true today as it was on the day the PI was issued. USTR's latest withdrawal decision is likewise arbitrary and capricious: it is explained in no more than a conclusory fashion; it is not supported by substantial evidence; and, perhaps most notably, it fails even to respond to, much less adequately consider, *any* of the comments submitted as to whether the Exclusion should be withdrawn. Indeed, USTR failed to cite to *any* of the 64 sets of comments that were submitted, 51 of which favored maintaining the Exclusion. USTR's withdrawal decision therefore remains arbitrary and capricious, and the PI should remain in place

---

[1] *See* 84 Fed. Reg. 27,684–85 (June 13, 2019).

[2] *See* 85 Fed. Reg. 4,756, 4,756 (Jan. 27, 2020) ("Withdrawal Procedures").

[3] *See* 85 Fed. Reg. 21,497 (April 17, 2020).

until the Court resolves that and the remainder of Plaintiffs' claims on the merits—as the PI itself

provides. ECF No. 114 at 2 (enjoining Defendants from withdrawing the Exclusion "until entry

of final judgment as to Plaintiffs' claims").

USTR's April Notice is arbitrary and capricious because the Agency inexplicably failed

to respond to comments challenging its purported authority to withdraw the Exclusion in the first

place—despite having represented to this Court that it would consider that threshold issue during

its administrative process. *See* ECF No. 139 at 13-14; "[T]his is a determination that should be

made by USTR in the first instance. . . . [T]his is exactly the sort of thing, whether the agency

has authority to take a particular action that an agency should look at in the first instance, and

that certainly is something that the [January] notice envisions parties providing." Ex. 3,

Transcript of Show Cause Hearing at 42:12-20. For this reason alone, Defendants have failed to

meet their burden of showing that a change in circumstances—the April Notice—"compel[s] the

district court to disturb its earlier finding as to likelihood of success." *Morita v. Application Art*

*Laboratories Co., Ltd.*, 889 F.2d 1028 (Table), 1989 WL 83256, at \*2 (Fed. Cir. 1989).

USTR's April Notice is also unlawful, arbitrary, and capricious because USTR failed to

address one of the two statutory considerations the President used to justify imposing a safeguard

measure in the first place: namely, whether it would provide greater economic and social benefits

than costs.[4] USTR also failed to address factors that USTR itself identified as being relevant, and

regarding which it specifically requested comments. *See* 85 Fed. Reg. at 4,756.

Accordingly, the government has not cured all of the infirmities on which this Court

based its decision to issue the PI. Plaintiffs remain likely to succeed on the merits of their APA

---

[4] *See* 83 Fed. Reg. 3,541–49 (Jan. 25, 2018) ("Presidential Proclamation").

challenges to USTR's withdrawal of the Exclusion. Defendants therefore have failed to meet their burden of showing that dissolving the PI is appropriate.

Furthermore, even if the Court finds that USTR's latest decision did cure the APA-based deficiencies of its initial withdrawal decision, the government has yet to address Plaintiffs' claim that USTR is without authority to withdraw the Exclusion because neither the Trade Act of 1974 nor the Presidential Proclamation delegating USTR authority to issue exclusions gives USTR the authority to *withdraw* an exclusion once granted. Plaintiffs thus will likely succeed on the merits of their challenge to USTR's authority to withdraw the Exclusion. Therefore, in accordance with the Court's PI Order, the PI should remain in place "until entry of final judgment as to Plaintiffs' claims"—all of them.  ECF No. 114 at 2.

## BACKGROUND

### I.     The President Issues the Solar Safeguard Measure under the 1974 Trade Act.

The Trade Act of 1974, 19 U.S.C. § 2251, *et seq.*, authorizes the President to impose discretionary measures, known as "safeguards," to provide relief from serious injury, or a threat of serious injury, to a domestic industry resulting from foreign imports. 19 U.S.C. § 2252-53. In doing so, the President must consider factors including the "short- and long-term economic and social costs of the actions . . . relative to their short- and long-term economic and social benefits," as well as "the effect of the implementation of actions under this section on consumers and on competition in domestic markets for articles." 19 U.S.C. § 2253(a)(2).

In January 2018, the President imposed a safeguard measure on crystalline silicon photovoltaic (CSPV) cells, "whether or not partially or fully assembled into other products," including monofacial and bifacial solar panel modules. Presidential Proclamation, 83 Fed. Reg. at 3,541. The President identified two core statutory considerations as supporting his decision to impose the safeguard measure:  the need to "facilitate efforts by the domestic industry to make a

3

positive adjustment to import competition," and a determination that the measure would "provide greater economic and social benefits than costs." *Id*. at 3,542. The President stated that, if he "determined that further action is appropriate and feasible" to serve those goals, he would "reduce, modify, or terminate the action . . . accordingly." *Id*. The President delegated the authority to establish procedures for the "exclusion of a particular product from the safeguard measure" to USTR (*Id*. at 3,541), and to grant such exclusions if "the USTR determines . . . that a particular product should be excluded." *Id*. at 3,543-44.

## II.   <u>USTR Excludes Bifacial Panels From Safeguard Measure.</u>

In February 2018, USTR published procedures for parties to seek exclusions from the safeguard measure. 83 Fed. Reg. 6,670-72 (Feb. 14, 2018) ("Exclusion Procedures"). "These procedures were silent as to the revision, reconsideration, or withdrawal of exclusions once issued." PI Op. at 6; *id*. at 9 ("The notice did not provide a method for withdrawing an exclusion . . . ."). After more than a year of deliberation, USTR excluded:

> bifacial solar panels [both utility-grade and non-utility grade] that absorb light and generate electricity on each side of the panel and that consist of only bifacial solar cells that absorb light and generate electricity on each side of the cells.

*See* Exclusion, 84 Fed. Reg. at 27,685.

Four months later, USTR reversed course and withdrew the Exclusion. *See* 84 Fed. Reg. 54,244 (Oct. 9, 2019) "October Notice"). In the October Notice, USTR stated it had received "comments" and "inquiries" critical of the Exclusion, and concluded that the Exclusion "will likely result in significant increases in imports of bifacial solar panels . . . [which] likely will compete with domestically produced monofacial and bifacial CSPV products in the U.S. market," and thereby "undermine the objectives of the safeguard measure." *Id*. at 54,245. USTR failed to identify the specific information on which it based its conclusion, or to explain why it

came to believe, contrary to its earlier conclusion, that the Exclusion would undermine the safeguard measure.

Because the import of bifacial panels is critical to Invenergy's ability to construct large scale solar projects, Invenergy Renewables LLC ("Invenergy") filed a complaint and motions for a temporary restraining order and preliminary injunction. Clearway Energy Group LLC ("Clearway"), the Solar Energy Industry Association ("SEIA"), AES Distributed Energy Inc. ("AES"), and EDF Renewables Inc. ("EDF") intervened as Plaintiffs, also requesting an injunction.  The Court granted a temporary restraining order on November 7, 2020. ECF No. 68.

## III.    The PI Decision.

The Court entered a preliminary injunction on December 5, 2019. PI Op., ECF. No. 113. The Court found Invenergy likely to succeed on the merits of its APA claims for *two* reasons. First, the Court found that USTR had likely violated APA procedural requirements because it failed to issue notice of its intention to withdraw the Exclusion and take comments thereon. *Id*. at 42-44. Second, the Court found that USTR's October Notice was likely arbitrary and capricious in violation of the APA's substantive requirements because:

> USTR has not explained the facts on which it relied or the reasoning behind its decision. *See FCC v. Fox*, 556 U.S. at 515. Nor did USTR "display awareness that it is changing position and show that there are good reasons for the new policy."

PI Op. at 45-46 (quoting *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).

Having concluded that the October Notice was likely unlawful for at least those reasons, the Court did not reach Plaintiffs' other bases for the PI, including Invenergy's claim that USTR lacks authority to withdraw the Exclusion under the 1974 Trade Act (PI Op. at 32) and the Presidential Proclamation. Doc. 113 at fn. 12 ("The court offers no view as to whether, ultimately, with appropriate notice and comment, USTR could implement the Withdrawal through 'reasoned decisionmaking.' *See Motor Vehicle Mfrs.*, 463 U.S. at 52.")

The Court enjoined USTR and the other Defendants from enforcing the October Notice, entering it into effect, or modifying the Harmonized Tariff Schedule to "include or reflect" withdrawal of the Exclusion "from the date of issuance of this order until entry of final judgment as to Plaintiffs' claims against Defendants in this case." Doc. 114 at 2.

## IV.  **USTR Revisits its October Withdrawal of the Exclusion.**

### A.  **USTR announces it will reconsider withdrawing the Exclusion.**

In January of this year, USTR initiated a new process and invited comments as to whether it should maintain, withdraw, or take other action regarding the Exclusion, 85 Fed. Reg. 4,756 ("Withdrawal Procedures"). USTR recognized, however, that the PI had to remain in place while USTR conducted that administrative process. *Id.* at 4,756 ("If the U.S. Trade Representative determines after receipt of comments pursuant to this notice that it would be appropriate to withdraw the bifacial exclusion or take some other action . . . the U.S. Trade Representative will request that the Court lift the injunction.").

The USTR solicited comment on the following topics:

• Global and United States production and production capacity for bifacial solar panels prior to and following the exclusion of these products in the June 2019 notice, along with any information on expected changes in production and production capacity for the remaining term of the safeguard measure (i.e., until February 6, 2022).

• Projections for the production and importation into the United States of bifacial solar panels for the remaining term of the safeguard measure.

• Import data and entry documentation to establish the level of bifacial solar panels imported into the United States prior to and following the exclusion of these products in the June 2019 notice.

• Projections of demand for bifacial solar panels by companies building or planning to build solar facilities or otherwise to install bifacial solar panels.

• Contracts, purchase orders, or other agreements that establish sales or other transactions, including those between suppliers and customers, regarding bifacial solar panels that have been or will be imported into the United States and such agreements regarding bifacial solar panels that have been or will be produced in the United States.

6

• Production cost and price differential between the manufacture and distribution of monofacial and bifacial solar panels.

• Substitutability or competitiveness between monofacial and bifacial solar panels in the United States.

• Domestic production and production capacity of bifacial solar cells or bifacial solar panels in the United States.

• Whether the U.S. Trade Representative should modify the exclusion to implement a tariff-rate quota (TRQ) on the importation of bifacial solar panels that enter with no additional duty and, if so, the level (e.g., in megawatts) of that TRQ.

• The potential impact, if any, on the domestic workforce and economy in general should the exclusion be withdrawn.

• Any other information or data that interested persons consider relevant to the U.S. Trade Representative's evaluation.

*Id*. at 4,757.

USTR allowed only 21 days for the initial submission of comments, and only 10 days for responses to those comments. *Id*. Despite the brevity of the comment period, 64 sets of comments were submitted in response to the Withdrawal Procedures, *see* Mot. at 4, including by Invenergy, Clearway, SEIA, and EDF. Of those 64 comments, 51 favored maintaining the Exclusion in whole or part.

**B.      USTR again determines that it should withdraw the Exclusion.**

On April 17, 2020, USTR published a Federal Register Notice announcing, again, its withdrawal of the Exclusion. 85 Fed. Reg. 21,497. USTR's explanation for its decision consisted of a list of nine bullet-point conclusory "findings":

1. Global capacity to produce bifacial solar panels is likely to increase significantly over the next three years.

2. As bifacial solar panel production currently is low in the United States, and the vast majority of bifacial solar panel capacity is foreign, allowing import of bifacial solar panels free of safeguard tariffs disincentivizes U.S. producers from converting existing monofacial production to bifacial production or opening new bifacial production.

3. Imports of bifacial solar panels were rising even before the bifacial exclusion

7

and continued to increase after the exclusion.

4. Demand both globally and domestically for bifacial solar panels is likely to increase significantly for at least the next three years.

5. The cost of producing bifacial solar panels is not more than 10 percent higher than the cost of producing monofacial panels.

6. Bifacial solar panels and monofacial solar panels are substitutes from the perspective of utilities planning solar generating facilities in locations where both are cost competitive with conventional forms of energy.

7. Bifacial solar panels are expected to offer a 5 to 10 percent improvement in energy output over a same-size monofacial panel, and removing the safeguard tariff will enable their sale for prices below those of monofacial panels, which will depress prices for monofacial panels.

8. The proposed TRQ for bifacial solar panels would allow importation of massive quantities of bifacial solar panels and therefore would duplicate the negative effects of the bifacial exclusion.

9. Competition from low-priced imports prevented domestic producers from selling significant quantities of solar panels in the utility segment during the ITC's original investigation period, and low-priced imports of bifacial solar panels due to the exclusion are likely to have a similar effect under current market conditions.

*Id*. at 21,498-99. Immediately after its "findings," and entirely without support, USTR stated:

By disincentivizing domestic producers' production of bifacial solar panels, interfering with their ability to increase sales of monofacial and bifacial products into the utility segment, and having a depressive effect on prices for monofacial solar panels, the bifacial exclusion is hindering the domestic industry's adjustment to import competition. Therefore, the U.S. Trade Representative has determined that the bifacial exclusion is undermining the objective of the safeguard measure on solar products, does not meet the criteria for a legitimate exclusion, and should be withdrawn. The U.S. Trade Representative has found further and additionally that the findings in the ITC March Report support the conclusion that the bifacial exclusion is undermining the objectives of the safeguard measure.

*Id*. at 21,499. That's it.

The USTR did not explain the reasoning behind its conclusory "findings" or its statements that the Exclusion is "hindering" the domestic industry. The Agency did not point to any of the comments submitted as supporting its conclusions, much less respond to (or

acknowledge) the many comments it received *opposing* Withdrawal of the Exclusion that provided information contrary to its "findings." Nor did the Agency respond to comments questioning whether the Agency has the authority to withdraw the Exclusion.

Finally, in its April Notice, USTR referred to the statutory objectives of the safeguard measure, including whether withdrawal of the Exclusion would "provide greater economic and social benefits than costs.'' *Id*. at 21,498; *see also* 19 U.S.C. § 2253(a)(2) (directing consideration of "short- and long-term economic and social costs of the actions . . . relative to their short- and long-term economic and social benefits" before imposing a safeguard measure). But USTR failed to address whether withdrawing the Exclusion will in fact provide greater economic and social benefits than costs, or explain the basis for any such statutorily-required conclusion. *See generally* 85 Fed. Reg. at 21,497-99.

## STANDARD OF REVIEW

This Court has significant discretion in determining whether it is appropriate to dissolve its preliminary injunction. *See Morita*, 1989 WL 83256, at *1 (Fed. Cir. 1989) (appellate review of denial of motion to dissolve preliminary injunction is "limited to determining . . . whether the district court abused its discretion"); *Kreepy Krauly U.S.A. Inc., v. Sta-Rite Indus. Inc.*, 152 F.3d 949 (Table), 1998 WL 196750, at *9-10 (Fed. Cir. 1998) (upholding denial of motion to dissolve preliminary injunction after defendant modified infringing product because district court was not "erroneous" in finding that product still fell within patent claim).

The party moving to dissolve a preliminary injunction bears the burden of showing that doing so is necessary. *See Morita*, 1989 WL 83256, at *1-*2 (noting that court must inquire as to "whether the movant has shown that changed circumstances warrant discontinuation of the preliminary relief," and declining to dissolve injunction because the defense's new allegations did not "compel the district court to disturb its earlier finding as to likelihood of success"); *SKF*

*USA Inc. v. U.S.*, 28 C.I.T. 170, 182 (2004) ("[I]t remains incumbent upon the Defendant to persuade the court that the injunction is unnecessary and should be reconsidered or dissolved.").

The movant also "bears the burden of showing that changed circumstances . . . make the continuation of the injunction *inequitable.*" *AIMCOR Alabama Silicon, Inc. v. United States*, 23 C.I.T. 932, 83 F. Supp. 2d 1293, 1299 (1999) (emphasis added); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 32 C.I.T. 666, 670 (2008) (the "change in circumstances" must "make continuation of the original preliminary injunction inequitable"). Defendants may not use their motion to dissolve the PI "to effectively shift the burden to the Plaintiff to reprove the factors for preliminary injunction that have previously been proven to the court's satisfaction." *Id.* at 669.

Finally, this Court should not grant the Defendants' motion to dissolve the PI without considering the other ground for injunctive relief that Invenergy raised in its PI motion, but which the Court did not reach – i.e., that Plaintiffs are likely to succeed on the merits because USTR lacks authority to withdraw the Exclusion. *See Concilio de Salud Integral de Loiza, Inc. v. Perez-Podomo*, 551 F.3d 10, 17 (1st Cir. 2008) (The "court erred in refusing to consider and resolve [other issues raised by plaintiff] before vacating the preliminary injunction . . . .").

## ARGUMENT

**I.** **The April Notice is Not a Significant Change in Factual Circumstances that Warrants Dissolution of the Preliminary Injunction.**

The government argues that dissolution of the PI is warranted under Rule 60(b)(5) because there has been a "significant change in factual conditions." Mot. at 7. But the fact that USTR published another Federal Register notice that unlawfully seeks to implement the very same rule that has been preliminarily enjoined – withdrawal of the Exclusion – does not warrant lifting the injunction. A Rule 60(b)(5) movant "must establish a change in circumstances . . . from the time the injunction was issued that would make the modification necessary," and also "would make continuation of the original preliminary injunction inequitable." *Ad Hoc Shrimp Trade Action Comm.*, 32 C.I.T. at 670. Yet Defendants do not even try to explain why it would be inequitable were the PI to be lifted pending a decision on the merits of Plaintiffs' claims. Indeed, it would be profoundly inequitable for this Court to dissolve the PI simply because USTR went through a sham proceeding to circumvent it. Defendants' failure to address the equities is all the more fatal given this Court's conclusion that "[t]he balance of equities [here] tips decidedly in favor of the Plaintiffs," PI Op. at 53, and that "[t]he public interest at stake [is] one process *and* fidelity to the law," which most decidedly continues to apply. *Id.* at 55 (emphasis added). For this reason alone, Defendants' motion should fail.

USTR's April Notice is also not a change in circumstances warranting dissolution of the PI because its issuance does not begin to resolve all of Plaintiffs' claims. So much is clear from *Concilio de Salud*, 551 F.3d at 10—a case cited by Defendants (Mot. at 6)—where the First Circuit rejected a similar argument. In *Concilio de Salud*, the court issued an injunction in connection with the defendant-agency's failure to make Medicaid "wraparound" payments to clinics serving underserved communities. After its issuance, the agency set up an office to

calculate and disperse wraparound payments, and the district court dissolved the injunction, reasoning that the agency had fulfilled its statutory obligations. *Id*. at 11. However, the First Circuit reversed because the agency's action had not resolved *all* of plaintiffs' claims and thus did not justify the injunction's dissolution. *Id*. at 17 ("[A] live and unresolved material controversy exists, *one which has been part of the case from the start*. . . . The district court erred in refusing to consider and resolve these issues before vacating the preliminary injunction and dismissing on grounds of mootness.") (emphasis added).

Lifting the PI is similarly inappropriate here, where USTR's mere issuance of the as yet unexamined April Notice plainly does not resolve all of Plaintiffs' claims regarding the withdrawal of the Exclusion. *See* Section II, *infra*. Defendants neither addressed Plaintiff's claim that the USTR acted without lawful authority, nor do they argue that the April Notice redresses the Court's finding that USTR's withdrawal of the Exclusion (the same Exclusion USTR again hopes to withdraw) was likely arbitrary and capricious for lack of substantial evidence, sound reasoning, and explanation as to why USTR flip-flopped within a span of only four months.

Dissolving the injunction simply because USTR now attempts to better support its withdrawal decision with new "findings" also would be contrary to this Court's precedent. In *AIMCOR Alabama Silicon, Inc.*, this Court rejected the government's assertion that new "factual findings of the ITC" made in the course of ITC's reconsideration of a previously enjoined determination, and the Agency's rescission of the underlying countervailing duty order constituted "changed circumstances" that merited the injunction's dissolution. 23 C.I.T. 932, 83 F. Supp. 2d at 1299. The Court explained that "a party moving for dissolution must make a very compelling demonstration, both of changed circumstances *and* resulting inequities for the moving party, to justify dissolution of the injunction prior to a final decision on the merits of the

action." *Id*. Accordingly, this Court found that the movant had failed to carry its burden, characterizing the agency's findings on reconsideration as "simply contested *administrative* findings" and concluding that "[u]ntil there has been an adjudication of the validity of the findings, proceedings, and action taken by the agencies, the court sees no basis for finding the injunction to be inequitable, or justification for dissolving the preliminary injunction." *Id*. (emphasis in original).

That conclusion applies even more so here, where the USTR's new "findings" did not result in it rescinding the challenged withdrawal, but in its affirmation. Furthermore, in *AIMCOR*, the court also noted that the injunction itself stated that it would continue until a final decision on the merits of the case, *id*. at 1298—again, just as the Court's Order here. *See* ECF No. 114 at 2 (enjoining withdrawal of the Exclusion "from the date of issuance of this order until entry of final judgment as to Plaintiffs' claims against Defendants in this case").

*Ad Hoc Shrimp Trade Action v. U.S.*, 34 C.I.T. 1275, 1279-80 (2010) is to the same effect. There, a Defendant-Intervenor moved to dissolve a preliminary injunction based on factual developments. The movant argued that the course of the litigation showed that the anti-dumping margin applicable to its products would not change pursuant to a remand even if the plaintiff were to prevail on appeal. However, the Court still declined to modify its injunction to allow Defendant-Intervenors' entries to liquidate even though it had already entered judgment against the plaintiff—explaining that the movant "ha[d] not carried its burden" in light of the substantial harm that would result were the entries to be liquidated, which could not be reversed if the Plaintiffs were to eventually prevail. *Id*. at 1279, 1281-82.

Lifting the PI here would be even more inappropriate here given that the Court has yet to address the merits of Plaintiffs' claims and issue a final decision as to the lawfulness of USTR's

withdrawal of the exclusion. Simply put, the mere fact that USTR chose (without requesting a remand) to reconsider and better support its initial withdrawal decision does not constitute the type of changed factual circumstances that merits the PI's dissolution before final resolution of Plaintiffs' claims.

Indeed, in *SKF USA Inc.*, this Court counseled against terminating a preliminary injunction before a final resolution of the case on the merits, which would have required Plaintiffs to file twice for the same preliminary relief. According to this Court:

> [T]he interests of judicial economy weigh against requiring the issuance of a second injunction predicated on the same grounds as the first, a challenge to Commerce's review determination. No meritorious reason has been put forth by the Government for judicial creation of an additional, procedural burden. To preserve the *status quo*, the preliminary injunction issued by this court will continue as long as it is necessary to preserve the parties' rights.

28 C.I.T. at 187. Here, the PI remains every bit as "necessary to preserve the parties' rights" pending resolution of Plaintiffs' claims as was the case when the PI first was issued. And "the interest of judicial economy" similarly "weigh[s] against requiring the issuance of a second injunction predicated on the same ground as the first." *Id*. Thus, it would be both inequitable *and* inefficient to require Plaintiffs to file for a new preliminary injunction to protect them from what for all intents and purposes is the very same agency determination.

Defendants cite one case, *DUSA Pharm., Inc. v. River's Edge Pharm., LLC*, No. 06-1843SRC, 2007 WL 748448, at *2 (D.N.J. Mar. 7, 2007), as supporting dissolution of the injunction. Mot. at 7. But *DUSA* is inapposite because, there, the court reassessed its view of the plaintiff's likelihood of success on the merits of its patent infringement action after the Patent and Trademark Office ("PTO") found that the subject patent was invalid. Plaintiff did not challenge *the agency's decision*; rather, it sought to enforce the invalid patent against a third-party. Obviously, and just as unremarkably for the Court's purposes here, the PTO's finding that

14

the patent was invalid went to the likelihood that plaintiff would succeed in its infringement claim. Here, in contrast, Plaintiffs challenge the Agency's own action—withdrawal of the Exclusion—and the April Notice simply reaffirms that decision, leaving intact Plaintiffs' claims that the withdrawal of the Exclusion was arbitrary, capricious, and unlawful.

In sum, the April Notice is *not* a significant change in factual circumstances that warrants dissolution of the PI as a matter of equity or for any other reason. USTR's April Notice seeks to implement the same agency action as did its October Notice: complete withdrawal of the Exclusion. There is no change in the scope of the challenged action and, as more fully discussed below, little change in the substance; USTR has simply added a list of conclusory and unsupported "findings." Thus, because the April Notice suffers from virtually all, if not entirely all, of the same fundamental legal flaws as did the October Notice, the later notice does not "cure" the defects in USTR's withdrawal of the Exclusion as USTR claims (Mot. at 7). To the contrary, Plaintiffs' claims that USTR's withdrawal action not only violates the APA's substantive requirements, but also constitutes an unlawful exercise of the agency's authority remain live and likely to succeed on their merits once heard.

## II.    Plaintiffs Remain Likely to Succeed On Their Claims

Defendants' motion to dissolve the PI is based solely on their claim that Plaintiffs are no longer likely to succeed on the merits of their suit because USTR has now fulfilled APA notice-and-comment requirements. Mot. at 7 ("The *Determination* has cured the sole basis – failure to comply with the notice and comment provisions of the APA – for the Court's finding that plaintiffs were likely to succeed in their challenge . . . ."). But this Court issued its PI on *two* grounds: (1) USTR's failure to conduct APA-compliant notice-and-comment procedures *and* (2) its failure to base its withdrawal decision on well-reasoned arguments based on substantial

evidence in satisfaction of the APA's substantive requirement that agency action not be arbitrary, capricious, and unlawful.

Defendants' failure to address or even acknowledge the second basis for the Court's injunction alone requires the Court to deny the pending motion. Regardless, the April Notice remains an arbitrary, capricious, and unlawful action because USTR has yet to adequately explain either the basis for its withdrawal decision or the basis for its about-face as to the Exclusion's merits. Thus, Plaintiffs remain likely to succeed on the merits of their claims, and the PI should be maintained pending their final adjudication.[5]

A. **Defendants failed to address whether the April Notice is arbitrary and capricious.**

Defendants must show that dissolving the PI is appropriate. *See AIMCOR*, 83 F. Supp. 2d at 1299 ("a party moving for modification bears the burden of showing that changed circumstances, legal or factual, make the continuation of the injunction inequitable"). Because Defendants failed to address the second basis for the PI, and did not demonstrate that that USTR's withdrawal is no longer arbitrary and capricious, they have not met their burden to dissolve the PI. *See PODS v. Porta-Stor Inc.*, 177 Fed Appx. 73, 75 (Fed. Cir. 2006) (affirming lower court's refusal to dissolve preliminary injunction where movant argued only that one of two patent infringement claims  was no longer likely to succeed). Their motion should be denied on this ground alone. But even if Defendants had tried to argue that USTR's April withdrawal is well-reasoned and not arbitrary and capricious, their argument would have been baseless.

---

[5] As the Court is aware, Plaintiffs have moved for leave to supplement their Complaints to expressly incorporate the April Notice into the APA and Trade Act claims.

**B.      USTR's withdrawal remains arbitrary and capricious because USTR failed to explain and support its "findings" and conclusions.**

As was true of its first effort, *see* PI Op. at 45-46 & n. 12, USTR's April Notice fails to meet the APA's standard for reasoned decision making, and therefore Plaintiffs are again likely to succeed in demonstrating that USTR's withdrawal action remains arbitrary and capricious.

The APA requires the court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). To survive review under this standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Veh. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted). An agency decision "cannot be viewed as reasoned decision-making" if the agency "nowhere explains how it was able to make this finding[,] does not so much as hint at [relevant] data[,] and does [not] explain" the basis for its decision. *Allied-Signal, Inc. v. U.S. Nuclear Reg. Commn.*, 988 F.2d 146, 150 (D.C. Cir. 1993).

Here, although USTR purports to have supported its decision with a list of nine "findings," and a bald assertion that the Exclusion is "hindering" the domestic industry from participating in the growing market for utility-grade solar panels, those statements are entirely conclusory. *See A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (agency's "conclusory response" was not "sufficient to enable [the court] to reach the independent conclusion that its decision was the 'product of reasoned decision making'") (quoting *State Farm*, 463 U.S. at 52). USTR put forth neither the factual nor analytic basis for any of those findings, much less "substantial" record evidence to support them—whether finding by finding, or in the aggregate. USTR does not say whether its "findings" are based on specific information

17

submitted by commenters, how it arrived at its decision, or why it acted reasonably in deciding to overturn the Exclusion. It thereby failed to "articulate a satisfactory explanation for its action." *Motor Veh. Ass'n*, 463 U.S. at 43.

The D.C. Circuit found a similarly conclusory and unsupported agency decision to be arbitrary and capricious in *A.L. Pharma, Inc.*, finding that "[t]he FDA ha[d] made no attempt to 'cogently explain'" its conclusion that the animal drug at issue was biologically equivalent to another drug approved by the FDA. 62 F.3d at 1492. The same is true here. No amount of deference to USTR's findings can overcome the fact that its decision does not provide enough information for the Court (and the public) to understand the bases for those findings, and to determine whether they are backed by substantial evidence and are the product of reasoned decision-making.

USTR cites only one document as support for its conclusion that the Exclusion undermines the objectives of the safeguard measure: "the ITC March Report." 85 Fed. Reg. at 21,499. But the ITC March Report addresses whether the TRQ on solar *cells*—not assembled modules—should be increased. Thus, it is irrelevant to the Exclusion on solar modules, and in any event does not support USTR's withdrawal decision. Furthermore, commenters on the January Withdrawal Procedures could not address that Report given that it was *published after the comment period closed*. It was therefore arbitrary and capricious for USTR to rely on the ITC March Report as a basis for the withdrawal when that report was not publicly available for comment. *Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890, 900–01 (D.C. Cir. 2006) ("[T]he most critical factual material that is used to support the agency's position" must be "made public" and "subjected to informed comment . . .  These considerations are no less relevant when an agency on remand considers whether to modify a rule pending on appeal.")

(quotation and citations omitted). If USTR now wishes to rely on that new information to support the withdrawal of the Exclusion, it should re-open the comment period so that Plaintiffs can address it.

USTR also asserted that the bifacial Exclusion "does not meet the criteria for a legitimate exclusion, and should be withdrawn." 85 Fed. Reg. at 21,499. But nowhere does USTR state exactly what the "criteria for a legitimate exclusion are," notwithstanding the Supreme Court's often repeated admonition that "the orderly functioning of the process of review requires that the grounds upon which the . . . agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

As the Federal Circuit has explained, "[f]or judicial review to be meaningfully achieved" under the APA, the agency "must present a full and reasoned explanation of its decision," by "set[ting] forth its findings and the grounds thereof, as supported by the agency record . . . . This standard requires that the agency not only have reached a sound decision, *but have articulated the reasons* for that decision." *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) (emphasis added). Hence, in *San Su Lee*, the Federal Circuit overturned the agency's decision to reject plaintiff's patent application for lack of specificity, noting that the agency's "[c]onclusory statements . . . [did] not fulfill the agency's obligation." *Id*. at 1344. The same applies here. Even if USTR's withdrawal decision were superficially sound (which it is not), the April Notice fails to adequately support that decision because, rather than articulate its reasons, USTR  instead offers only a series of "conclusory statements." *Id*.

### C.    The April Notice is arbitrary and capricious because USTR failed to respond to significant, specific, and demonstrably relevant comments.

In order for an agency's decision to survive attack under the APA's arbitrary and capricious standard, the agency must provide its specific reasoning in support of its conclusions

and findings, together with showing a logical nexus between each of those conclusions and findings and the evidence purportedly in their support. Additionally, and particularly critical as to USTR's withdrawal decision, the agency is required to respond (with more than lip service) to any significant comments raised by showing how the record evidence does or does not support those comments,[6] especially when the comments reflect competing policy interests. *See* PI Op. at fn. 13. Agency action must be overturned where the agency did not "engage the arguments raised before it." *NorAm*, 148 F.3d at 1165 (quoting *K N Energy, Inc. v. FERC,* 968 F.2d 1295, 1303 (D.C. Cir. 1992). Indeed, it is hornbook law that "an agency *must* 'demonstrate the rationality of its decision-making process by *responding to those comments that are relevant and significant*.'" *Cement Kiln Recycling Coalition v. E.P.A.*, 493 F.3d 207, 225 (D.C. Cir. 2007) (emphasis added) (quoting *Grand Canyon Air Tour Coal. v. FAA,* 154 F.3d 455, 468 (D.C. Cir. 1998)); *see also Carlson v. Postal Reg. Commn.*, 938 F.3d 337, 344 (D.C. Cir. 2019) ("An agency also violates [the APA] standard if it fails to respond to significant points and consider all relevant factors raised by the public comments." (internal quotations omitted)).

The Federal Circuit has explained that "the agency's need to respond, in a reasoned manner, to any comments received by the agency that raise significant issues with respect to a proposed rule" is "inextricably intertwined with the basis and purpose requirement of 5 U.S.C. § 553(c)." *Disabled Am. Veterans v. Gober*, 234 F.3d 682, 692 (Fed. Cir. 2000); *see also Del. Dep't of Nat. Res. and Envt'l Control v. EPA*, 785 F.3d 1, 13-15 (D.C. Cir. 2015), *as amended* (July 21, 2015) ("EPA cannot get away so easily from its obligations under the APA to respond to 'relevant and significant' comments." (internal quotation omitted)). While "an agency need not 'discuss every item of fact or opinion included in the submissions made to it,'" it "must

---

[6]  *NorAm Gas Transmission Co. v. FERC,* 148 F.3d 1158, 1165 (D.C. Cir. 1998).

respond sufficiently to enable us to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Del. Dep't of Nat. Res.*, 785 F.3d at 15 (internal quotations omitted). The agency's conclusions also must be grounded in the data before it. "If an agency fails to examine the relevant data . . . it has failed to comply with the APA." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015). Defendants acknowledge that there were 64 sets of comments, and "thousands of pages of evidence" (Mot. at 1-2), submitted during the recent administrative process—including the comments in support of maintaining the Exclusion filed by Invenergy, Clearway, SEIA, and EDF and others. Yet, USTR did not so much as identify a single one of these comments, much less respond to any of them. Instead, a simple review of the 2.5 page April Notice demonstrates that USTR's "findings" are as conclusory and lacking in support as those in the October Notice. This is yet another flaw that, standing alone, renders the withdrawal decision arbitrary and capricious.[7]

### 1. USTR failed to respond to comments that it lacks the legal authority to withdraw the Exclusion.

In their comments, Invenergy, Clearway, and EDF asserted that any withdrawal of the Exclusion by USTR would be unlawful because USTR has no authority under the President's Proclamation or the 1974 Trade Act to withdraw the Exclusion once granted.[8] Although these comments squarely raise this issue, and despite Defendants' representation to this Court that they would address this issue, the April Notice is silent as to the source of USTR's claimed authority.

---

[7] *See* SEIA and EDF's briefs in opposition to the Motion, summarizing additional comments submitted but ignored by USTR.

[8] *See* Ex. 1, Invenergy BC Comments, dated 2.17.2020, at 14-16; Ex. 2, Clearway BC Responsive Comments, dated 2.27.2020, at 22-24; *see also* EDF's Response to Motion at Ex. A.

Invenergy and Clearway's comments asserted that agencies have only such authority as has been delegated to them. *See Merck Sharp & Dohme Corp., v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.") (quoting *New York v. FERC*, 535 U.S. 1, 18, (2002)). Where that delegation (whether by Congress or the President) is narrow, the agency must hew to its bounds. *See id.* ("[W]hatever the means the [agency] uses to exercise its authority, those means must lie within the scope of the authority . . . lawfully delegated.").

Here, the Presidential Proclamation authorized USTR to adopt "procedures for *requests for exclusion* of a particular product" from the safeguard measures. Presidential Proclamation at ¶15(4) (emphasis added), and  to take specified actions "to exclude such particular product from the safeguard measure," but said nothing about withdrawing an exclusion once granted. Nor was USTR delegated the authority to define procedures for withdrawing an exclusion. Instead, USTR took it upon itself to issue Withdrawal Procedures. As this Court noted in its PI opinion, USTR's Exclusion Procedures "did not provide a method for withdrawing an exclusion during the four-year safeguard period," PI Op. at 9; nor did those Procedures "provide for a method for or otherwise indicate that the exclusions could be withdrawn during the safeguard period." *Id*. at 10 (citing Exclusion at 27,684-85).

Invenergy and Clearway also commented that because USTR's written procedures only authorized it t*o remove* safeguard tariffs, USTR may not now reinstate those tariffs. Nor does anything in the plain language of the Exclusion Procedures authorize or contemplate a tariff's *reinstatement* once removed. Invenergy and Clearway further commented that the withdrawal of the Exclusion violates statutory limits and procedures governing the "administration" of or "modification" to the safeguard actions, *see* 19 U.S.C. §§ 2253(g) and 2254 (b), and even

provided USTR with the legislative history confirming that safeguard measures may only be *reduced—not increased*—once imposed. *See*, *e.g.*, H. Rep. No. 100-576 at 687 (1988) (Conf. Rep.) (noting that "modify" in this context means "not increased").

Plaintiff-Intervenor EDF similarly commented on the USTR's lack of authority here – under the statute, the Presidential Proclamation, and the Agency's own regulatory procedures.[9]

In sum, and in dereliction of its obligation under the APA,[10] USTR's April Notice fails to mention, much less meaningfully address, Invenergy's, Clearway's or EDF's comments that USTR's withdrawal of the Exclusion was unauthorized and therefore unlawful. *See La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1080–81 (D.C. Cir. 2003) (holding that the agency was required to respond to a comment which argued that the agency "does not have the statutory authority to implement [the proposed rule]").[11]

In addition to failing to satisfy the APA's requirement that it respond to comments that it lacked authority to withdraw the Exclusion, USTR also failed to satisfy the APA's requirement to set forth its legal "basis" for its April Notice. *See Disabled Am. Veterans*, 234 F.3d at 692. As the Federal Circuit explained in *Disabled Am. Veterans*, "the purpose of requiring a statement of the basis and purpose is to enable courts, which have the duty to exercise review, to be aware of the legal and factual framework underlying the agency's actions." *Id.* (internal quotation omitted). Here, USTR failed to provide either the "legal framework" underlying its April Notice, or to explain its apparent belief that it was statutorily authorized to withdraw the Exclusion.

---

[9] *See* EDF's Response to Motion, Ex. A, 2.

[10] *See Action on Smoking & Health v. C.A.B.,* 699 F.2d 1209, 1216 (D.C. Cir. 1983).

[11] *See also Altera Corp. & Subs. v. Commissioner of IRS*, 926 F.3d 1061, 1082 (9th Cir. 2019), *petition for cert. filed*, Feb. 13, 2020 (No. 19-1009) (agency was required to respond to comments asserting that a proposed rule was inconsistent with the underlying statute's purpose).

USTR's failure is problematic given that Defendants represented to this Court during the hearing on the Motion to Show Cause that USTR would consider the "authority" issue during its withdrawal process, and argued that the Court should allow it to proceed with such a process precisely *so that it could address the issue as to its authority in the first instance*.

> Mr. Tosini: "[T]his is a determination that should be made by USTR in the first instance. . . . [T]his is exactly the sort of thing, whether the agency has authority to take a particular action that an agency should look at in the first instance, and that certainly is something that the [January] notice envisions parties providing." (Ex. 3, Tr. of Show Cause Hearing at 42:12-20).

> "[T]he [January] notice itself does not resolve [ ] USTR's analyses of any comments regarding authority to undertake this action. . . . *When USTR does issue a final decision, it will resolve that question one way or the other*." (*Id*. at 44:5-11) (emphasis added).

Similarly, Defendants asserted in their Motion to Vacate and Dismiss that the Court should not reach the merits of the authority issue in this case *because* "USTR should address any such issue regarding its authority to reconsider in the first instance. . . .[T]he determination whether the statute allows reconsideration of an exclusion is vested with USTR in the first instance. The public is free to raise any arguments regarding this issue with USTR pursuant to the invitation for comments."  ECF. No. 139 at 13-14.

By failing to identify the source of its claimed legal authority to withdraw the Exclusion, USTR failed to fulfill its APA obligation to respond to significant comments, and its repeated commitment to this Court to do so.  Plaintiffs are thus likely to succeed on their claim that USTR's withdrawal remains arbitrary and capricious because USTR entirely failed to address the critical issue of whether it even has authority to take a withdrawal action and explain why it believes it has such authority, thereby again rendering its action arbitrary and capricious.

24

       **2.**      **USTR failed to respond to detailed comments as to why monofacial and bifacial panels are not interchangeable.**

USTR solicited comments on the substitutability or competitiveness between monofacial and bifacial solar panels in the United States. 85 Fed. Reg. at 4,757. Invenergy and Clearway, among others, submitted comments as to the multiple reasons why monofacial modules are not an adequate substitute for bifacial modules—none of which USTR addressed.

Invenergy explained that unlike monofacial solar modules, whose cells produce power only from one side, bifacial solar modules produce power from both, which increases total energy production by approximately 5-10%. Ex. 1 at 10.[12] Thus, using bifacial modules permits solar developers to maximize their facilities' energy production in less useable land area than if they used the same amount of monofacial modules. *Id*. Invenergy submitted un-rebutted evidence that because of the difference in energy output, it "cannot simply replace planned bifacial modules with monofacial modules on large scale projects where offtake contracts have been entered into without significant changes to the project design, including the necessary acquisition of additional land, which in many cases may not be feasible." *Id*. Invenergy also submitted data to demonstrate that, because less bifacial panels are needed than monofacial panels to conduct the same electricity, using bifacial panels on large solar developments translates into significant project cost savings in the form of fewer expenses on cables, racking, and labor, thus making solar energy more competitive with alternative sources. *Id*. at 11, fn. 38**.** Bifacial modules also provide additional protection from the elements and better degradation

---

[12] While Invenergy's and Clearway's comments are attached in full, we have not included their voluminous supporting attachments. The full public submissions can be viewed at: https://www.regulations.gov/document?D=USTR-2020-0001-0017 (Invenergy initial public submission), https://www.regulations.gov/document?D=USTR-2020-0001-0054 (Invenergy reply submission), and https://www.regulations.gov/document?D=USTR-2020-0001-0058 (Clearway submission).

warranties, which owners can monetize through improved energy production. *Id*. at 11, fn. 39. Invenergy's comments concluded by stating, "simply put, monofacial modules are not an adequate substitute for bifacial ones."   *Id*. at 11. USTR failed to respond to Invenergy's comments or the data it submitted in support of its conclusion.

Clearway's comments likewise showed there are "certain benefits that only bifacial modules can provide in the utility sector, thus rendering monofacial modules inadequate as substitutes," and why redesigning a project to use monofacial modules might critically affect that project's viability:

> Bifacial modules increase total energy production at a minimum 4-9% over the equivalent monofacial modules, which is a significant increase. This allows developers to maximize energy production in the useable land area that has been obtained. As such, on large scale projects designed for bifacial modules, where offtake contracts have already been entered into, a redesign in order to use monofacial modules would require significant changes to the project design, which could affect the project's viability. *See* Ex. 2, Clearway's Comments at 15.

USTR also received comments relevant to this solicited factor from LONGi, a major manufacture of both monofacial and bifacial panels.  LONGi explained that the "technical and physical differences between bifacial and monofacial panels limit the substitutability between the two types of panels."[13] Scott Kosloski of Carlson Electrics also submitted comments in favor of maintaining the Exclusion based on the unique characteristics of bifacial modules.[14]

> [I]n states where it snows, [bifacial modules] offer higher production in the winter due to their ability to shed snow.  *. . . As this is unique benefit offered by bi-facial solar modules* that specifically helps solar energy production in states where it snows, exacting a tariff against bi-facial is punishing US consumers & businesses who benefit the most from these modules. *Id*. (emphasis added).

---

[13] *See* LONGi Initial Comments, 2.17.2020 at 8 (attached to SEIA's Response to Defendants' Motion to Dissolve the PI), https://www.regulations.gov/document?D=USTR-2020-0001-0007

[14] *See* Ex. 4, Carlson Electrics Comments, 2.25.2020 at 1.

In short, despite specifically requesting comments on this issue, USTR did not address or even mention any of the comments that were submitted as to why monofacial modules are not an adequate substitute for bifacial modules, particularly with respect to utility solar development. Ex. 1 at 11. USTR provided no support for its contrary conclusion that "bifacial solar panels and monofacial solar panels are substitutes from the perspective of utilities planning solar generating facilities in locations where both are cost competitive with conventional forms of energy." *See* 85 Fed. Reg. at 21,498. USTR thus violated the APA as it "fail[ed] to respond to significant points and consider all relevant factors raised by the public comments." *See Carlson,* 938 F.3d at 344; *Disabled Am. Veterans*, 234 F.3d at 692.

> ### 3. USTR failed to respond to comments regarding the negative impact the withdrawal of the Exclusion has on the domestic workforce and economy in general.

In its Withdrawal Procedures, USTR solicited comments as to the potential negative impact on the domestic workforce and economy should the Exclusion be withdrawn. USTR presumably requested this information to help determine whether the social and economic benefits of withdrawing the Exclusion outweighed the costs, as statutorily required. *See* 19 U.S.C. § 2253(a)(2) (directing consideration of "short- and long-term economic and social costs of the actions . . . relative to their short- and long-term economic and social benefits" before imposing a safeguard measure). Despite receiving detailed submissions related to this factor, USTR failed to include one reference to the impact of withdrawing the Exclusion on the domestic workforce or economy.[15]

---

[15] USTR failed to reference comments from 29 different chambers of commerce, construction companies, and consultants in support of the Exclusion based on the increased tax revenue, economic opportunity and construction jobs the solar projects bring to their communities. *See, e.g.,* https://www.regulations.gov/document?D=USTR-2020-0001-0031.

Invenergy and Clearway's comments on this issue were significant and numerous (*see* Ex. 1 at 12-14; Ex. 2 at 19); a few of which are included below:

- At a time when the solar industry is providing significant job growth, economic development opportunities and a new tax base for rural America, withdrawal of the exclusion will undoubtedly depress these gains. Renewable energy jobs are the new growth engine for rural Americans, providing farmers with a much needed source of stable supplemental income in the face of persistently unstable crop prices, uncertainty resulting from changing tariff policies and foreign competition. Ex. 1 at 12.

- For example, farmers renting part of their land to Invenergy for its Badger Hollow Solar Farm report that by doing so they can earn "more than two times" what they "can receive for cash rent for crop production."[16] The Badger Hollow Solar Farm is projected to power 77,100 homes annually and remove 370,000 tons of carbon, all while providing $59 million in landowner payments and $34 million in local taxes.[17]

- Invenergy's Yum Yum Solar Farm in Fayette County will result in $40 million in investment for the local community, create approximately 500 construction jobs, and provide nearly $4.5 million in property tax payments, in addition to numerous other community benefits.[18]

- Each one of Invenergy's solar projects creates hundreds of jobs.[19] Every 100-200 megawatt ("MW") solar farm requires approximately 350-400 outside contractors], on average. For example, Invenergy recently completed a 96 MW project (Wilkenson) that employed 340 contractors, and a 225 MW project (Southern Oak), which employed 420 contractors.[20] In other words, each MW developed creates two to three jobs.[21] If these projects are not built, those jobs are not created, which has a ripple effect in each community and on the economy as the workers live and work in a community that otherwise would not have influx of money into the economy. *Id*. at 13.

- U.S. tariffs on imports of CSPV products have slowed the ability of solar energy to reach grid parity with other energy products.[22] The Section 201 safeguard tariff

---

[16] *Id*.

[17] *Id*. at fn. 43.

[18] *Id*. at 14, fn. 49.

[19] *Id*. at 13.

[20] *Id*. at fn. 44.

[21] *Id*. at 14, fn. 47 (citing National Solar Jobs Census 2018 at 5).

[22] Ex. 2, Clearway's Responsive Comments at 19.

caused a slowdown in solar development projects in 2018 and 2019. Clearway and other developers found it challenging to procure domestically manufactured modules for our utility-scale development projects.  Those continued tariffs and possible withdrawal of the Exclusion will cause development to slow-down over the next few years.

- Based on [Clearway's] portfolio, for a utility-scale solar project, each megawatt of solar brings with it two full-time equivalent (FTE) jobs, primarily in construction; for distributed solar, the number is higher. Simply put, reduced deployment means lost jobs.[23] Reduced deployment impacts American companies and workers.

Both Invenergy and Clearway concluded their comments by stating that "withdrawing the exclusion will cause significant harm to the environment, U.S. developers … and all the many people and companies whose livelihoods are so connected to solar power development." Ex. 1 at 16; Ex. 2 at 24. They stated that the solar industry is creating hundreds of thousands of jobs and injecting billions of dollars into the U.S. economy. *Id*. At a time when the solar industry is providing significant job growth, economic development opportunities, and a new tax base for rural America, withdrawal of the exclusion will undoubtedly depress these gains. *Id*.

There is no dispute that USTR failed to respond to any of these "significant" comments and the substantial evidence offered in their support, given that the April Notice fails to mention *anything* about the potential harm to the domestic workforce or the economy in general were the Exclusion withdrawn. *See Disabled Am. Veterans*, 234 F.3d at 692 (agency must "respond, in a reasoned manner, to any comments received by the agency that raise significant issues with respect to a proposed rule"). This failure renders its April Notice arbitrary and capricious. *Id*.

### 4. USTR failed to address multiple comments showing that Utility-Grade Modules are not commercially available in the United States.

USTR solicited comments on the global and domestic capacity for manufacturing bifacial CSPV modules. Withdrawal Procedures at 4,757. Invenergy and Clearway, among many others,

---

[23] *Id*. at 19, fn 74.

submitted detailed comments indicating that the domestic industry does not manufacture utility grade CSPV modules of any type—bifacial or monofacial—in sufficient quantities for the utility-scale segment of the market. Ex. 1 at 3-5; Ex. 2 at 3-7; Ex. 5, Invenergy's Public Response to Comments, dated 2.27.2020, at 1-6. Because of that market reality, Invenergy and Clearway submitted comments in support of a narrowed exclusion from the safeguard measure on solar products, limited to 1,500 volt, 72-cell crystalline silicon photovoltaic ("CSPV") bifacial solar modules ("Utility-Grade Bifacial Modules").[24] Invenergy and Clearway commented that narrowing the current bifacial exclusion to cover only Utility-Grade Bifacial Modules would alleviate each of USTR's stated concerns in the Withdrawal Procedures, as the narrowed exclusion would: (1) not undermine the objectives of the safeguard measure; (2) clarify the precise definition of bifacial solar modules excluded from the tariffs; and (3) better conform the exclusion in the June 2019 notice to the narrower category of products described in the exclusion requests in March of 2018. Ex. 1 at 1; Ex. 2 at 1.

Plaintiffs argued that this narrowed exclusion from Section 201 tariffs is appropriate where, as here, Utility-Grade Bifacial Modules are not domestically available. In support of the narrowed Exclusion, Invenergy and Clearway, advised USTR that the domestic suppliers' comments confirm that Utility-Grade Bifacial Modules are not produced domestically. Ex. 2 at 4-5; Ex. 5 at 1-3. Invenergy and Clearway noted that the Defendant-Intervenors were unable to identify *any* domestic supplier that produces Utility-Grade Bifacial Modules. Ex. 5 at 1; Ex. 2 at 4. Defendant-Intervenors Hanwha and Auxin Solar identified Auxin Solar as the "one manufacturer of bifacial panels in the United States," Ex. 5 at 1, fn 5-7, yet they did not suggest that Auxin Solar's bifacial modules are 1,500 volt compatible, which are required for use in the

---

[24] Because Invenergy and Clearway maintain that USTR lacked authority to withdraw the Exclusion, they submitted their proposals subject to and without waiver of this claim.

utility sector. *Id*.

Invenergy and Clearway submitted evidence that very little domestic module production is directed at the utility sector. The evidence showed that, in March 2018 (a year after the safeguard measures was in place), Hanwha Q-Cells Korean Corporation submitted an exclusion request for utility grade modules, arguing that "[u]tility-scale electricity providers have no viable domestic source of modules to meet their demand given the U.S. domestic industry's (1) focus on the residential and commercial segments of the U.S. solar market and (2) inability to produce utility scale modules in sufficient quantities."[25]

Hanwha's 2018 description of the utility-scale domestic market remains true today. *See* Ex. 2 at 7, Ex. 5 at 4-5. The domestic suppliers' own comments established that the domestic industry is still primarily focused on residential and commercial applications, not utility-scale applications.[26] Even accounting for Hanwha and other companies entering the market, Invenergy and Clearway established that domestic suppliers would only be able to meet, at most, approximately 15% of total 2020 domestic utility-scale demand.[27] That best-case scenario would occur only *if they dedicated all of their manufacturing capacity to developing utility-grade panels*, which they have not indicated they intend or could do even if they wanted. *Id*. Despite the 201 tariffs having been in place for over the past two years, and despite the growing demand for utility-scale modules, the domestic manufacturers have yet to increase production in a meaningful way. *Id.*

---

[25] Ex. 5 at 4, fn. 24, citing Hanwha Q CELLS Korea Corporation's Comments Regarding Requests for Product Exclusions from the Solar Products Safeguard Measure, (Mar. 16, 2018), attached to comments at Ex. 31, 3-4.

[26] Ex. 5 at 4-6 (citing domestic suppliers' comments).

[27] Ex. 5 at 6; Ex. 2 at 9; *see also* SEIA Comments at 12-13 (attached as Ex. A to SEIA Response to Mot.) at 12-13.

There was no evidence cited in support of USTR's conclusion that the Exclusion "disincentiviz[ed] domestic producers' production of bifacial solar panels, [or] interfere[ed] with their ability to increase sales of monofacial and bifacial products into the utility segment." *See* 85 Fed. Reg. at 21,498-99.  Not only was there no evidence to support that conclusion, it is contrary to the evidence that was submitted.

In short, USTR failed both to respond to significant, substantial, and factually supported comments on the record, or otherwise connect its decision to the record evidence it had, again rendering its April Notice arbitrary and capricious. *See Carlson*, 938 F.3d at 344 ("An agency also violates [the APA] standard if it fails to respond to significant points and consider all relevant factors raised by the public comments.") (internal quotation marks omitted).

**D.      The April Notice is arbitrary and capricious because USTR failed to consider relevant factors, including social and economic costs and benefits.**

USTR's April Notice also arbitrarily and capriciously ignores relevant factors that USTR was legally required to assess. Most importantly, it did not even mention one of the two statutory considerations the President identified as being critical to assessing whether a safeguard measure is appropriate: its economic and social costs and benefits. 83 Fed. Reg. at 3,542 (basing safeguard measure on the need to "facilitate efforts by the domestic industry to make a positive adjustment to import competition," and determination that the measure would "provide greater economic and social benefits than costs").

An agency action is arbitrary and capricious where the agency fails to consider all "relevant factors." *Hines on Behalf of Sevier v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 1518, 1527 (Fed. Cir. 1991).[28] Similarly, the agency may not ignore "an important aspect of

---

[28] USTR recognizes the importance of this inquiry, stating: "Before concluding that the Determination is unlikely to be sustained, the Court 'must 'consider whether the decision was based on a consideration of the relevant factors . . . .'" Mot. to Dissolve at 8 (quoting *Co-Steel*

the problem." *Motor Veh. Mfrs. Ass'n*, 463 U.S. at 43; *Alabama Aircraft Industries, Inc.-Birmingham v. U.S.*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) ("Courts have found an agency's decision to be arbitrary and capricious when the agency entirely failed to consider an important aspect of the problem . . . .") (citation and internal quotation marks omitted).

The April Notice violates these APA mandates. USTR ignored an important aspect of the problem, and a highly relevant factor, by failing to address one of the two statutory considerations identified in the Presidential Proclamation as relevant to whether imposition of safeguard duties is appropriate: whether duties will "provide greater economic and social benefits than costs." 83 Fed. Reg. at 3,542. USTR acknowledges the central importance of this factor at the outset of the April Notice,[29] but then fails to address that important issue.[30] USTR thereby failed both to consider what is (by its own admission) a relevant factor required to be assessed in considering whether a safeguard measure should be imposed, and an "important aspect of th[at] problem," again leading to the ineluctable conclusion that the April Notice was arbitrary and capricious. *Alabama Aircraft Industries*, 586 F.3d at 1375.

USTR failed to address at least three of the ten factors that it identified in the Withdrawal Procedures as relevant to its analysis, further confirming its decision was arbitrary. Specifically, USTR asked for comment on, but then failed to address (even with a conclusory "finding"):

---

*Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1309 (Fed. Cir. 2004), and citing other cases for that proposition).

[29] *See* 85 Fed. Reg. at 21,498 (identifying providing "greater economic and social benefits than costs" as one of two statutory objectives underlying the safeguard measure, and stating that USTR had to consider, under its February 2018 procedures, whether an exclusion would "undermine the objectives of the safeguard measures").

[30] USTR notably did not consult with the Secretary of Labor—the agency head best able to advise USTR as to the costs of withdrawing the Exclusion on the workforce. *See* 85 Fed. Reg. at 21,497 (noting consultation with Secretaries of Commerce and Energy, but not Labor).

- Projections of demand for bifacial solar panels by companies building or planning to build solar facilities or otherwise to install bifacial solar panels.

- Contracts, purchase orders, or other agreements that establish sales or other transactions, including those between suppliers and customers, regarding bifacial solar panels that have been or will be imported into the United States and such agreements regarding bifacial solar panels that have been or will be produced in the United States.

- The potential impact, if any, on the domestic workforce and economy in general should the exclusion be withdrawn.

85 Fed. Reg. at 4,756.

Commenters addressed those issues,[31] but USTR inexplicably did not, thereby again ignoring its fundamental obligation to consider all "relevant factors." *Hines*, 940 F.2d at 1527.

### E.   USTR's withdrawal decision remains arbitrary and capricious because USTR again failed to explain why its prior decision to issue the Exclusion was wrong.

When an agency changes course, the APA requires that it "'display awareness that it is changing position" and "show that there are good reasons for the new policy.'" *F.C.C.* v. *Fox Television Stations,* 556 U.S. 502, 515 (2009); *see also Encino Motorcars*, 136 S. Ct. at 2120 ("[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'") (internal quotation omitted). Moreover, an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" where "its new policy rests upon factual findings that contradict those which underlay its prior policy," or "when its prior policy has engendered serious reliance interests that must be taken into account." *Fox Televisions*, 556 U.S. at 515-16 (noting that "[i]t would be arbitrary and capricious to ignore such matters").

---

[31] *See* Sections II(C)(2-4) supra (discussing Plaintiffs' comments on these and other issues); see also SEIA and EDF briefs in response to Motion (discussing those entities' comments).

It was on this basis, for example, that the Supreme Court concluded in *Encino Motorcars* that the Department of Labor's changed regulatory interpretation of "salesman" was arbitrary and capricious, explaining:

> In promulgating the 2011 regulation, the Department offered barely any explanation. A summary discussion may suffice in other circumstances, but here . . . the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position. . . . [W]hen it came to explaining the 'good reasons for the new policy,' . . . the Department said almost nothing.

136 S. Ct. at 2126-27 (quoting *Fox Television Stations,* 556 U.S. at 515).

USTR's April Notice is arbitrary and capricious for exactly the same reasons. The April Notice is but a "summary discussion," falling far short of explaining why it ostensibly was necessary to withdraw the Exclusion, *id*., or what the evidence was that lead it to adopt findings that directly "contradict those which underlay" the Exclusion. *Fox Television*, 556 U.S. at 515. The Agency likewise failed to address the serious "reliance interests" of solar energy developers and other industry participants who depend on imported bifacial panels.. *Id*.

By failing to explain what changed since June 2019, failing to adduce the evidence upon which it based its conclusion that the Exclusion for bifacial modules no longer was appropriate, and failing to explain why its about-face is appropriate despite the reliance interests created by the Exclusion's adoption, USTR again failed to engage in reasoned decision-making.

**F.**    **Plaintiffs remain likely to succeed on the merits of their challenge to withdrawal of the Exclusion because USTR lacks authority to take such action.**

As discussed above, and as explained in Invenergy's Motion for a Preliminary Injunction, USTR lacks the authority to withdraw a tariff exclusion once granted. *See* Doc. 49-2 at 24-26 & 28. Having already found that Plaintiffs had a likelihood of success on their two APA claims, the Court did not reach the authority issue in its PI Opinion. *See* Doc. 113 at 32 ("[T]he court need not now reach Invenergy's Section 201 and constitutional claims.").

Because USTR's withdrawal decision remains arbitrary and capricious, the Court could deny the pending motion to dissolve the PI without reaching the authority issue. But the Court also could deny that Motion because Plaintiffs are likely to succeed on the merits of their claim that USTR's lacks the authority to withdraw the Exclusion.

It is axiomatic that agencies have only the authority that has been delegated to them. *See Merck Sharp & Dohme Corp.*, 139 S. Ct. at 1679 ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it") (quoting *New York v. FERC,* 535 U.S. 1, 18, (2002)). Where a delegation is narrow, giving the agency specific instructions as to what actions to take (e.g., exclude products from the safeguard measure) and how (e.g., by establishing procedures), the agency may not stray beyond the bounds of that narrow authority. *See id.* ("[W]hatever the means the [agency] uses to exercise its authority, those means must lie within the scope of the authority . . . lawfully delegated.").

As the Federal Circuit explained in *FAG Italia S.p.A. v. United States,* 291 F.3d 806, 817-19 (Fed. Cir. 2002), where it found that the Commerce Department could not conduct a duty absorption inquiry whenever it chose because the statute provided for those inquiries at certain intervals: "The fact that [the agency] is empowered to take action in certain limited situations does not mean that [it] enjoys such power in other instances."

Here, the source of USTR's authority to consider exclusions from the solar safeguard measure—the Presidential Proclamation—does not delegate to USTR the authority to withdraw an exclusion once granted. The Proclamation authorized USTR to "exclude such particular product from the safeguard measure." 83 Fed. Reg. at 3,544. There is no delegation of authority for USTR to then withdraw an exclusion once granted, or to promulgate procedures to do so (as USTR attempted to do in its Withdrawal Procedures). Nor does anything in the plain language of

the Presidential Proclamation authorize or contemplate the *reinstatement* of tariffs once removed. The President is aware of how to draft a Proclamation to grant authority to an agency to both exclude and withdraw exclusions, but he expressly did not do so here. To the contrary, the President specifically stated that *he* would modify the safeguard measure if appropriate. 83 Fed. Reg. at 3,542 ("If I determine that further action is appropriate and feasible . . . I shall reduce, modify, or terminate the action established in this proclamation accordingly."). This makes it quite clear that USTR was not delegated that authority.

In contrast, other Presidential directives have included a specific grant of authority to withdraw or modify a delegated action. For example, in his very recent May 1, 2020 Executive Order on Securing the United States Bulk-Power System, the President delegated authority to "establish and publish criteria for recognizing particular equipment and particular vendors . . . as pre-qualified" to undertake certain transactions, but stated: "Nothing in this provision limits the Secretary's authority under this section to prohibit or otherwise regulate any transaction involving pre-qualified equipment or vendors."[32] The absence of similar language in the Proclamation, allowing USTR *both* to exclude products from the safeguard measure *and* withdraw exclusions, speaks volumes to the limited nature of the Agency's authority.

Not only did the President limit *what* USTR could do, but *when* USTR could do it. The Presidential Proclamation required USTR to adopt "procedures for requests for exclusion of a particular product" from the safeguard measure within 30 days. 83 Fed. Reg. at 3,543 (emphasis added). USTR did so when it promulgated the February 2018 Exclusion Procedures. But USTR was granted no further authority to define additional procedures for modifying or withdrawing an

---

[32] Executive Order at §1(d), https://www.whitehouse.gov/presidential-actions/executive-order-securing-united-states-bulk-power-system/. The President similarly delegated authority to the Secretary to prohibit transactions that might jeopardize grid security, but also to prescribe measures to mitigate such concerns and then permit the transactions in question. *Id*. § 1(d).

exclusion at some unspecified future time; the President did not contemplate USTR issuing withdrawal procedures *two years* after the Proclamation when he only authorized USTR to issue exclusion procedures *within 30 days*.

The Section 201 statutory scheme reinforces the conclusion that USTR lacks authority to withdraw an exclusion from a safeguard measure. The statute only allows the President to impose safeguard measures for a limited period (four years), 19 U.S.C. § 2253(e)(1), and contemplates that safeguard measures will be "phased down at regular intervals" over that period, *id.* § 2253(e)(5). The legislative history of the Trade Act confirms that any safeguard measures may only be *reduced,* not increased, once imposed. *See*, *e.g.*, H. Rep. No. 100-576 at 687 (1988) (Conf. Rep.) (noting that "modify" in this context means "not increased"). Again, there is simply no indication that the President has the authority—and thus could delegate the authority—to withdraw an exclusion once granted, and thereby re-impose a safeguard measure. Even the President may not take "action outside [his] delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).

USTR's withdrawal of the Exclusion also violates statutory limits on "modification" of a safeguard action. The Trade Act provides that no safeguard action may be "reduced, modified, or terminated" unless the President first receives the Commission's report issued as part of its statutory "mid-term" review. *See* 19 U.S.C. §§ 2254 (a) & (b). The President is required to make certain findings based on this report before a safeguard measure may be modified. *See id*. While the mid-term review was completed recently, the President has not made findings or taken action based on that review, nor has he delegated USTR authority to do so.

Thus, USTR's withdrawal of the Exclusion lies outside of the Agency's authority for at least three separate reasons: (1) USTR improperly "modified" the safeguard tariff outside the

mid-term report process, (2) USTR impermissibly increased rather than decreased the safeguard

measures; and (3) even if the President had authority to withdraw an Exclusion (a proposition

contrary to the statutory scheme), he has not delegated that authority to USTR. This is another

reason why Plaintiffs are likely to succeed on the merits of their claims, and the Court should

maintain the PI until it enters final judgment on those claims.

III.    **The Preliminary Injunction Should Remain in Place While This Court Considers USTR's Withdrawal of the Exclusion on the Merits.**

It is entirely appropriate for the preliminary injunction to remain in place until such time

as the Court resolves the lawfulness of the withdrawal. This Court routinely retains jurisdiction

while an agency action is reconsidered or altered on remand, and then considers the lawfulness

of that new action in the same suit in which it granted the remand.[33] By initiating a new

administrative process, USTR essentially acted as though it had been granted a remand to

reconsider the October Determination—even though it neither asked for, nor was granted,

permission to do so as is normal. USTR should not be allowed to avoid this Court's review of its

latest withdrawal determination by virtue of its having evaded the normal remand process. Thus,

the Court should not hesitate to press forward to decide whether the April Notice is arbitrary,

capricious, or otherwise unlawful for the reasons discussed in Section II above.

---

[33] *See, e.g., Soc Trang Seafood Joint Stock Company et al. v. United States*, No. 18-75, Op. and Order at 40 (Ct. Int'l Trade June 21, 2018) (Kelly, J.) (remanding parts of Commerce determination addressing duties on frozen shrimp and requesting parties' views on the lawfulness of the agency's action upon remand); *Eregli Demir Ve Celik Fabrikalari, V.A.S. v. United States*, No. 18-180, Op. and Order at 3-5 (Ct. Int'l Trade Dec. 27, 2018) (Barnett, J.) (describing agency process upon remand of duty determination and adjudicating challenges to the new determination after briefing); *EAC Eng'g, Div. of E. Asiatic Co. v. United States*, 624 F. Supp. 569 (Ct. Int'l Trade 1985) ("On remand of classification case . . . the Court . . . determined [it] would retain jurisdiction while Customs Service proceeded to determine proper classification of merchandise in order to permit classification issue, if it remained in dispute after Customs Service's redetermination, to be judicially decided without requiring parties to repeat normal or usual procedure formalities.").

It is also entirely appropriate for this Court to keep its preliminary injunction in place until issuing a final judgment as to the lawfulness of both the October and April Notices. That is exactly what this Court did in *AIMCOR*, where it declined to dissolve a preliminary injunction before final resolution of the case, even though the agency had *rescinded* the challenged actions (antidumping and countervailing duty orders). 83 F. Supp. 2d at 1299 ("Until there has been an adjudication of the validity of the findings, proceedings, and action taken by the agencies, the court sees no basis for finding the injunction to be inequitable, or justification for dissolving the preliminary injunction."). The *AIMCOR* preliminary injunction had remained in place through *three* remand proceedings before the agency's rescission of those orders. *See id*. at 1295-97. Hence, USTR's voluntary reconsideration of its October decision neither requires the Court to dissolve the PI, nor requires Plaintiffs to bring a new suit to challenge the results of USTR's new administrative process—particularly since USTR reached the same decision as it did last October, with no more evidentiary support then it offered the first time around.

There is no legal, practical or logical reason to require Plaintiffs to file a new suit to challenge what is essentially the same withdrawal.[34] That would be particularly inefficient and unfair given that Defendants would no doubt re-raise, and Plaintiffs would then be forced to re-litigate, all of the threshold issues that this Court decided when issuing the preliminary injunction:  that Plaintiffs have standing, that USTR is an "agency" subject to the APA, and that its withdrawal determinations are rulemakings subject to the APA's procedural and substantive requirements. *See* Doc. 113 at 15-42. So it is all the more appropriate for this Court to decide this

---

[34] Plaintiffs and Plaintiff-Intervenors have moved to supplement the Complaint under Rule 15(d) to incorporate the April Notice and events leading up to it. But even if the Court were to deny that motion, Plaintiffs' preexisting claims, which attack USTR's withdrawal of the Exclusion as arbitrary, capricious, and unlawful, apply equally to the April Notice and the October Notice.

case on the merits and enter a final judgment that would estop Defendants from rearguing the contrary. That course is most consistent with USCIT Rule 1, which encourages courts to proceed quickly and efficiently toward a final decision and resolve all claims before it. *See* USCIT R. 1 (The CIT's rules are to be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").

Keeping the injunction in place while the Court proceeds to decide the lawfulness of USTR's withdrawal of the Exclusion is also consistent with the Court's order on the show cause motion, where it found that USTR had not violated the preliminary injunction *precisely because* it had not yet taken another action to withdraw the Exclusion, but only had requested comments as to whether it should. Doc. 149 at 8 ( "[N]o new decision to implement a withdrawal is currently before the court" because "[t]he Notice does not constitute a final decision to implement the previous or any new withdrawal of the Exclusion of bifacial solar panels."). Now, USTR has done just that. Thus, the Court's PI squarely applies to the April Notice, and should remain in place pending a final decision as to the withdrawal's lawfulness. And that is, after all, what this Court anticipated when it ordered that the PI would remain in place until "entry of final judgment as to Plaintiffs' claims." Doc. 114 at 2.

Finally, contrary to Defendants' assertion, Plaintiffs' claims have not been "fully briefed" such that they are now "ripe for . . . final decision." Mot. at 8. While some of those claims have been addressed in the preliminary injunction briefs to demonstrate Plaintiffs' *likelihood of success* on the merits, that is not briefing on the merits.

## CONCLUSION

For all these reasons, the Court should deny Defendants' Motion to Dissolve the

Preliminary Injunction.

<div style="margin-left: 45%;">

Respectfully submitted,
John Brew
Larry Eisenstat
Kathryn L. Clune
Amanda Shafer Berman
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500

<u>/s Frances Hadfield</u>
**CROWELL & MORING LLP**
590 Madison Ave, 20th Floor
New York, New York 10022
(212) 803-4040

</div>

DATED: May 7, 2020

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO USCIT STANDARD CHAMBER PROCEDURE 2(B)</u>

I, Frances Hadfield at Crowell & Moring LLP, who is responsible for the foregoing brief, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with the type-volume limitation under USCIT Standard Chamber Procedure 2(B) and contains 13,515 words.

<u>/s  Frances Hadfield</u>


Dated: May 7, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of May, 2020, that I served a true copy of the foregoing in Court No. 19-00192 through the  Court's electronic filing system.

/s Frances Hadfield