Slip Op. 20-144

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| INVENERGY RENEWABLES LLC,<br><br>    Plaintiff,<br><br>    and<br><br>SOLAR ENERGY INDUSTRIES ASSOCIATION, CLEARWAY ENERGY GROUP LLC, EDF RENEWABLES, INC. and AES DISTRIBUTED ENERGY, INC.,<br><br>    Plaintiff-Intervenors,<br>    v.<br><br>UNITED STATES OF AMERICA, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, UNITED STATES TRADE REPRESENTATIVE ROBERT E. LIGHTHIZER, U.S. CUSTOMS AND BORDER PROTECTION, and ACTING COMMISSIONER OF U.S. CUSTOMS and BORDER PROTECTION MARK A. MORGAN,<br><br>    Defendants,<br><br>    and<br><br>HANWHA Q CELLS USA, INC. and AUXIN SOLAR, INC,<br><br>    Defendant-Intervenors. | Before: Judge Gary S. Katzmann<br>Court No. 19-00192 |

## OPINION

**[The court denies Defendants' motion to dissolve the PI, vacates the <u>First Withdrawal</u>, grants Plaintiffs' cross-motion to modify the PI, grants Plaintiffs' motion to complete the administrative record, and denies Plaintiffs' motion to stay pending appeal.]**

Dated:  October 15, 2020

<u>Amanda Shafer Berman</u>, <u>John Brew</u> and <u>Larry F. Eisenstat</u>, Crowell & Moring LLP, of Washington, DC and New York, NY, argued for plaintiff, *Invenergy Renewables LLC* and

plaintiff-intervenors, *Clearway Energy Group LLC* and *AES Distributed Energy, Inc.*  With them on the briefs were Kathryn L. Clune, Frances Hadfield and Leland P. Frost.

Matthew R. Nicely and Daniel M. Witkowski, Akin, Gump, Strauss, Hauer & Feld LLP, of Washington, DC, argued for plaintiff-intervenor, *Solar Energy Industries Association.*  With them on the prior briefs were Hughes Hubbard & Reed LLP, of Washington, D.C.

Christine M. Streatfeild and Kevin M. O'Brien, Baker & McKenzie LLP, of Washington, DC, argued for plaintiff-intervenor, *EDF Renewables, Inc.*

Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendants.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Ethan P. Davis, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director.

John M. Gurley, Dianna Dimitriuc-Quaia and Friederike S. Görgens, Arent Fox LLP, of Washington, DC, argued for defendant-intervenors, *Hanwha Q CELLS USA, Inc.* and *Auxin Solar Inc.*  With them on the briefs was Jessica R. DiPietro.

Katzmann, Judge:  The court returns to its order preliminarily enjoining the United States and the Office of the United States Trade Representative ("USTR") from withdrawing its previously granted exclusion from safeguard duties on imported bifacial solar modules, duties which the President imposed by proclamation to protect domestic industry.[1]  For the third time in this hotly contested litigation, the court is presented with a failure to comply with foundational principles of administrative law -- in this case, to act with transparency and to provide adequate, public explanation of agency decisions.  Consequently, the court is precluded once again from conducting a full and final review of the merits of the USTR claim that its effort to withdraw the exclusion from safeguard duties should be sustained.  The Defendants' renewed motion to dissolve the preliminary injunction ("PI") is denied.  In so holding, the court reiterates that it no way intimates a view as to the ultimate outcome of this litigation to exclude bifacial solar products from safeguard duties or to withdraw that exclusion.

---

[1] For the purposes of this opinion, the terms "solar modules" and "solar panels" are used interchangeably.

Plaintiff Invenergy Renewables LLC ("Invenergy"), a renewable energy company, joined by Plaintiff-Intervenors Solar Energy Industries Association ("SEIA"), Clearway Energy Group LLP ("Clearway"), EDF Renewables, Inc. ("EDF-R"), and AES Distributed Energy, Inc. ("AES DE") (collectively, "Plaintiffs"), filed a motion for a PI to enjoin the United States, USTR, U.S. Trade Representative Robert E. Lighthizer, U.S. Customs and Border Protection ("CBP"), and CBP Acting Commissioner Mark A. Morgan (collectively, "the Government") from implementing the Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure, 84 Fed. Reg. 54,244–45 (USTR Oct. 9, 2019) ("First Withdrawal").  Invenergy's Mot. for Prelim. Inj., Nov. 1, 2019, ECF No. 49.  Defendant-Intervenors Hanwha Q CELLS USA, Inc. ("Hanwha Q CELLS") and Auxin Solar Inc. ("Auxin Solar") (collectively, "Defendant-Intervenors") join the Government in this case.  Hanwha Q CELLS' Mot. to Intervene as Def.-Inter., Nov. 4, 2019, ECF No. 50; Order Granting Mot., Nov. 4, 2019, ECF No. 54; Auxin Solar's Mot. to Intervene as Def.-Inter., Feb. 7, 2020, ECF No. 136; Order Granting Mot., Feb. 10, 2020, ECF No. 141.  The court granted Plaintiffs' motion for a PI on December 5, 2019, observing that "[t]he Government must follow its own laws and procedures when it acts."    Prelim. Inj. Order and Op., Invenergy Renewables LLC v. United States, 43 CIT __, __, 422 F. Supp. 3d 1255, 1265 (2019), ECF No. 113 ("Invenergy I").  Invenergy I was followed by two more litigated motions and opinions.  See Order and Op. Denying Mot. to Show Cause, Invenergy Renewables LLC v. United States, 44 CIT __, 427 F. Supp. 3d 1402 (2020), ECF No. 149 ("Invenergy II"); Order and Op. Denying Mot. to Dissolve PI, Mots. to Dismiss, and Granting Mot. to Suppl. Compls., Invenergy Renewables LLC v. United States, 44 CIT __, 450 F. Supp. 3d 1347 (2020), ECF No. 185 ("Invenergy III").

The court's most recent decision in this case, Invenergy III, resolved several motions in light of USTR's second determination to withdraw the exclusion for bifacial solar modules from

safeguard duties.  <u>Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products</u>, 85 Fed. Reg. 21,497–99 (USTR Apr. 17, 2020) ("<u>Second Withdrawal</u>").  There, the court denied, <u>inter alia</u>, the Government's first motion to dissolve the PI and an earlier motion asking the court to vacate the PI and dismiss the case as moot.  <u>Invenergy III</u>, 450 F. Supp. 3d at 1351.  Thereafter, USTR issued a notice of rescission of the <u>First Withdrawal</u>.  <u>Rescission of the First Withdrawal of the Bifacial Solar Panels Exclusion From the Safeguard Measure on Solar Products</u>, 85 Fed. Reg. 35,975 (USTR June 12, 2020) ("<u>June 2020 Rescission</u>").  The Government then filed a renewed motion to dissolve the PI based on the <u>June 2020 Rescission</u>.  Def.'s Mot. to Dissolve PI, June 12, 2020, ECF No. 198 ("Def.'s Renewed Mot. to Dissolve PI").  Plaintiffs responded with a cross motion to amend the PI to include the <u>Second Withdrawal</u>, and also filed a motion to complete the administrative record.  Pls.' Resp. to Def.'s Mot. To Dissolve PI and Cross-Mot. To Modify PI, June 29, 2020, ECF No. 206 ("Pls.' Br.");  Pls.' Mot. to Complete A.R., June 19, 2020, ECF No. 201.  Without in any way reaching the merits of the Government's action seeking to withdraw the exclusion from safeguard duties, the court now denies the Government's renewed motion to dissolve the PI, vacates the <u>First Withdrawal</u>, modifies the PI to enjoin enforcement of the <u>Second Withdrawal</u>, grants Plaintiffs' motion to complete the record, in part, and denies Plaintiffs' motion to stay the case pending appeal.

## BACKGROUND

The court presumes familiarity with its previous opinions -- (1) <u>Invenergy I</u>, <u>supra</u>, (2) <u>Invenergy II</u>, <u>supra</u>, and (3) <u>Invenergy III</u>, <u>supra</u>, -- each of which provide additional information on the factual and legal background of this case.  Information pertinent to this decision follows.

As the court has noted:

This case emerges from a debate within the American solar industry between entities that rely on the importation of bifacial solar panels and entities that produce

predominately monofacial solar panels in the United States.  Plaintiffs here, who
include consumers, purchasers, and importers of utility-grade bifacial solar panels,
argue that the importation of bifacial solar panels does not harm domestic producers
because domestic producers do not produce utility-scale bifacial solar panels; they
thus oppose safeguard duties that they contend increase the cost of these bifacial
solar panels.  Domestic producers, however, contend that solar project developers
can use either monofacial or bifacial solar panels, and thus safeguard duties are
necessary to protect domestic production of solar panels.  Both sides contend that
their position better supports expanding solar as a source of renewable energy in
the United States.

Invenergy I, 422 F. Supp. 3d at 1264.

The statutory scheme for imposition of safeguard duties has been summarized by the court

as follows:

Through Section 201, Congress provided a process by which the executive branch
could implement temporary safeguard measures to protect a domestic industry from
the harm associated with an increase in imports from foreign competitors.  Trade
Act of 1974 §§ 201‑04, 19 U.S.C. §§ 2251–54 (2012).  Section 201 dictates that,
upon petitions from domestic entities or industries, the International Trade
Commission ("ITC") may make an affirmative determination that serious injury or
a threat of serious injury to that industry exists.  19 U.S.C. § 2252.  The President
may then authorize discretionary measures, known as "safeguards," to provide a
domestic industry temporary relief from serious injury. 19 U.S.C. § 2253.  The
statute vests the President with decision making authority based on consideration
of ten factors.  19 U.S.C. § 2253(a)(2).  Safeguard measures have a maximum
duration of four years, unless extended for another maximum of four years based
upon a new determination by the ITC.  19 U.S.C. § 2253(e)(1).  The statute also
outlines certain limits on the President's ability to act under this statute, including
to limit new actions after the termination of safeguard measures regarding certain
articles.  See 19 U.S.C. § 2253(e).  Further, the safeguard statute mandates that the
President "shall by regulation provide for the efficient and fair administration of all
actions taken for the purpose of providing import relief."  19 U.S.C. § 2253(g)(1).

Id. at 1265–66 (footnote omitted).

Through Presidential Proclamation 9693 issued on January 23, 2018, the President

imposed safeguard duties, designed to protect the domestic industry, on imported monofacial and

bifacial solar panels but delegated authority to USTR to exclude products from the duties.  83 Fed.

Reg. 3,541–51 ("Presidential Proclamation").  After a sixteen-month notice-and-comment process

through which USTR considered requests for exclusions, USTR decided to exclude bifacial solar panels from safeguard duties.  Exclusion of Particular Products From the Solar Products Safeguard Measure, 84 Fed. Reg. 27,684–85 (USTR June 13, 2019) ("June 2019 Exclusion").  Four months later, however, USTR published the First Withdrawal.  The First Withdrawal explained that, "[s]ince publication of [the June 2019 Exclusion] notice, the U.S. Trade Representative has evaluated this exclusion further and, after consultation with the Secretaries of Commerce and Energy, determined it will undermine the objectives of the safeguard measure."  First Withdrawal, 84 Fed. Reg. at 54,244.  Absent intervening court action, therefore, the First Withdrawal would have reinstituted safeguard duties on certain bifacial solar panels.

Plaintiff Invenergy initiated this case in response to the First Withdrawal.  Summons, Oct. 21, 2019, ECF No. 1; Invenergy's Compl., Oct. 21, 2019, ECF No. 13.  The court issued a temporary restraining order, Nov. 7, 2019, ECF No. 68, and later a PI, to enjoin USTR from reinstituting safeguard duties on certain bifacial solar panels through implementation of the First Withdrawal.  Invenergy I, 422 F. Supp. 3d at 1294.  The PI found that USTR made the decision with only nineteen days' notice to the public, without an opportunity for affected or interested parties to comment, and without reasoned explanation on a developed public record.  Id. at 1286–88.  The PI included enjoining USTR from amending the Harmonized Tariff Schedule of the United States ("HTSUS") to reflect withdrawal of the Exclusion, "until entry of final judgment as to Plaintiffs' claims against Defendants in this case."  Id. at 1295.  In so ruling, the court held that the First Withdrawal of the June 2019 Exclusion by the Government likely violated the Administrative Procedure Act ("APA") on two grounds: (1) the rulemaking occurred without notice and comment, id. at 1286–87; and (2) it was likely done in an arbitrary and capricious manner. Id. at 1287–88.

On January 24, 2020, the Government filed a status report notifying the court and the other parties of USTR's publication of "a notice in the Federal Register, requesting interested party comment regarding whether to withdraw the [June 2019 Exclusion] from the safeguard measure pursuant to section 201 of the Trade Act of 1974, 19 U.S.C. § 2251, et seq., for bifacial solar panels contained in [June 2019 Exclusion]."  Def.'s Status Report at 1, ECF No. 131.  USTR published the notice in the Federal Register three days later, thereby initiating the comment period. Procedures to Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products, 85 Fed. Reg. 4,756–58 (USTR Jan. 27, 2020) ("January 2020 Notice").  The January 2020 Notice acknowledged the court's PI "enjoining the U.S. Trade Representative from withdrawing the exclusion on bifacial solar panels from the safeguard measure," and noted that "[i]f the U.S. Trade Representative determines after receipt of comments pursuant to this notice that it would be appropriate to withdraw the bifacial exclusion or take some other action with respect to the exclusion, the U.S. Trade Representative will request that the [c]ourt lift the injunction."  Id. at 4,756.

In response, Plaintiffs Invenergy, Clearway, and AES DE filed their Motion to Show Cause as to Why the Court Should Not Enforce the Preliminary Injunction, Jan. 30, 2020, ECF No. 132, alleging that the Government's publication of the January 2020 Notice violated the PI.  The Government responded with a motion to dismiss and vacate the First Withdrawal as moot.  Def.'s Resp. to Invenergy's Mot. to Show Cause and Mot. to Vacate Withdrawal and Dismiss Case as Moot, Jan. 7, 2020, ECF No. 139.  The court ruled exclusively on the Plaintiffs' motion stating, "the Government's [January 2020 Notice] did not violate the text of [the PI] because the [January 2020 Notice] does not (1) implement the [First Withdrawal]; (2) modify the HTSUS; or (3) enforce or make effective the [First Withdrawal] or modifications to the HTSUS related to the [First

Withdrawal]." Invenergy II, 427 F. Supp. 3d at 1407.  The court further held that the January 2020

Notice alone did "not constitute a final decision to implement the previous or any new withdrawal

of the Exclusion of bifacial solar panels."  Id.  The court, moreover, made clear that "[it] retains

exclusive jurisdiction over the implementation, enforcement, or modification of the [First

Withdrawal] until such date as a final judgment is entered in this case."  Id.  The court did not rule

on the Government's motion to dismiss at that time because it required further briefing.  Id.

On April 14, 2020, the Government filed another status report to inform the court of the

issuance of USTR's Second Withdrawal.  Def.'s Status Report, ECF No. 155.  The Second

Withdrawal withdraws the Exclusion of bifacial solar panels from safeguard duties -- the same

conclusion as the First Withdrawal.  In that status report, the Government explained that "[i]n

response to the [c]ourt's preliminary conclusion that repealing the withdrawal of the exclusion

'requires rulemaking subject to . . . APA notice and comment,' USTR 'opened a public docket,'

and received 15 comments regarding the bifacial exclusion and 49 subsequent comments

responding to the initial comments."  Id. at 2 (citations omitted).  Further, the Government

explained that USTR "based the [Second Withdrawal] on the comments and evidence received."

Id.  Based on this new decision by USTR, the Government filed its first motion to dissolve the PI,

pursuant to USCIT Rule 60(b)(5).  Def.'s Mot. to Dissolve PI, Apr. 16, 2020, ECF No. 156.  The

Government argued that the Second Withdrawal "cured the sole reason for which the injunctive

relief was granted."  Id. at 1.  Plaintiffs argued that the Second Withdrawal was an arbitrary and

capricious decision and thus did not cure the second likely APA violation previously identified by

the court.  E.g., Invenergy, Clearway, and AES DE's Resp. in Opp'n to Def.'s Mot. to Dissolve

Prelim. Inj., May 7, 2020, ECF No. 163  Shortly thereafter, Plaintiffs filed motions to supplement

their complaints to include the Second Withdrawal.  Pls.' Mot. for Leave to File Suppl. Compls.,

May 8, 2020, ECF No. 170.

        Prior to holding oral argument on those motions, the court issued questions to parties for

written answers.  May 8, 2020, ECF No. 169.  In responding to these questions, the Government

attached two memoranda to its responses to the court's questions.  Mem. from DUSTR Jeffrey D.

Gerrish and General Counsel Joseph Barloon to USTR Robert Lighthizer, Apr. 13, 2020, Attach.

1 to Def.'s Resp. to Ct.'s Questions, ECF No. 172-1; Mem. from DUSTR Jeffrey D. Gerrish and

General Counsel Joseph Barloon to USTR Robert Lighthizer, Apr. 10, 2020, Attach. 2 to Def.'s

Resp. to Ct.'s Questions, ECF No. 172-2 ("Gerrish Memorandum").  The USTR Memoranda

consist of Deputy U.S. Trade Representative Jeffrey D. Gerrish's and U.S. Trade Representative

General Counsel Joseph Barloon's analysis of USTR's authority to withdraw an exclusion, their

analysis of comments received pursuant to the January 2020 Notice, and a recommended decision,

initialed by U.S. Trade Representative Robert Lighthizer.  Id.  The court then held oral argument

and issued Invenergy III in which it decided multiple outstanding motions.  Oral Arg., May 13,

2020, ECF No. 177; 450 F. Supp. 3d 1347.  First, the court denied the Government's motion to

dismiss for failure to join an indispensable party.  Invenergy III, 450 F. Supp. 3d at 1356–57.

Second, the court granted Plaintiffs' motion to supplement their complaints to include the Second

Withdrawal.  Id. at 1357–58.  Third, the court denied the Government's motion to vacate the First

Withdrawal and dismiss the case as moot because the Government had not shown that the First

Withdrawal was moot nor did the court have the authority to vacate the First Withdrawal without

a decision on the merits.  Id. at 1358–60.  Finally, the court denied the Government's first motion

to dissolve the PI because the Government had not proved sufficiently changed circumstances.  Id.

at 1360–64.  Thus, the litigation continued on the basis of USTR's decisions to withdraw the

Exclusion through the First Withdrawal and Second Withdrawal.  The Government appealed the

denial of its first motion to dissolve the PI on August 5, 2020.  Invenergy III, appeal docketed No.

2020-2130 (Fed. Cir. Aug. 5, 2020), ECF No. 240.

    As the litigation proceeded, on June 5, 2020, the Government filed the administrative

record.  ECF Nos. 195, 196.  Plaintiffs subsequently moved to complete the agency record.  Pls.'

Mot. to Complete A.R.  The Government and Defendant-Intervenors responded in opposition on

July 10, 2020.  Def.'s Opp'n to Pls.' Mot. to Suppl. the A.R., ECF No. 210 ("Def.'s Resp. to Mot.

to Complete A.R."); Resp. of Def.-Inters.' to Pls.' Mot. to Complete the A.R., ECF No. 211 ("Def.-

Inters.' Resp. to Mot. to Complete A.R.").

    Further, in response to Invenergy III, USTR published the June 2020 Rescission in which

it "expressly rescind[ed] the [First Withdrawal]."  85 Fed. Reg. at 35,975.  Subsequently, the

Government made its second motion to dissolve the PI.  Def.'s Renewed Mot. to Dissolve PI.

Plaintiffs responded and made a cross-motion to modify the PI.  Pls.' Br.  The Government and

Defendant-Intervenors responded in opposition to the cross-motion.  Def.'s Resp. to Pls.' Mot. to

Modify the PI, July 17, 2020, ECF No. 219 ("Def.'s Br."); Def.-Inters.' Resp. to Pls.' Cross-Mot.

to Modify PI, July 17, 2020, ECF No. 220 ("Def.-Inters.' Br.").  Plaintiffs moved for leave to file

a reply, which the court granted.  Pls.' Mot. for Leave to File Reply, July 21, 2020, ECF No. 226;

Ct.'s Order, July 23, 2020, ECF No. 230.  Plaintiffs then replied to the Government's and

Defendant-Intervenors' responses to their cross-motion to modify the PI.  Pls.' Reply in Support

of Cross-Mot. to Modify PI, July 31, 2020, ECF No. 238 ("Pls.' Reply").  After the court set a date

for oral argument on the outstanding motions, the Government filed its above-mentioned appeal.

On August 5, 2020, Plaintiffs moved to stay further proceedings regarding the PI.  Pls.' Motion to

Stay Further Proceedings Regarding the PI, ECF No. 239 ("Pls.' Mot. to Stay").  The Government

and Defendant-Intervenors responded in opposition.  Defs.' Resp. to Pls.' Mot. for Stay Pending

Appeal, Aug. 8, 2020, ECF No. 243 ("Def.'s Resp. to Mot. to Stay"); Resp. of Q CELLS and

Auxin Solar to Pls.' Mot. to Stay Further Proceedings Regarding the PI, Aug. 7, 2020, ECF No.

242 ("Def.-Inter.'s Resp. to Mot. to Stay").

The court held oral argument via videoconference on August 10, 2020.  Oral Arg., ECF

No. 245.  The parties filed supplemental submissions on August 19, 2020.  Invenergy, Clearway,

and AES DE's Post-Arg. Br. in Supp. of Mot. to Modify the PI, ECF No. 249 ("Invenergy's Suppl.

Br."); Pl.-Inter. SEIA's Post-Arg. Suppl. Br., ECF No. 247; EDF-R's Post-Arg. Br. in Opp'n to

the Gov't's Second Mot. to Dissolve, ECF No. 248 ("EDF-R's Suppl. Br."); Def.'s Post-Hearing

Br., ECF No. 246 ("Def.'s Suppl. Br."); Suppl. Br. of Def.-Inters., ECF No. 250 ("Def.-Inters.'

Suppl. Br.").

## JURISDICTION

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(i) (2012), which

provides that the court "shall have exclusive jurisdiction of any civil action commenced against

the United States, its agencies, or its officers, that arises out of any law of the United States

providing for . . . [the] administration and enforcement" of tariffs and duties.

The court also notes that the Government's pending interlocutory appeal of <u>Invenergy III</u>

denying the Government's first motion to dissolve affects its jurisdiction over parts of this case

involved in the appeal.  The impact of this appeal will be addressed as to each motion individually,

below.

## DISCUSSION

The court addresses three outstanding motions in turn: (1) Defendants' motion to dissolve

the PI, Def.'s Renewed Mot. to Dissolve PI; (2) Plaintiffs' motion to modify the PI, Pls.' Br.; and

(3) Plaintiffs' motion to complete the administrative record, Pls.' Mot. to Complete A.R.  Further,

the court addresses Plaintiffs' motion to stay, Pls.' Mot. to Stay, as it is relevant to each of those motions.

### I.      *Defendants' Renewed Motion to Dissolve the PI and Abandonment of the <u>First Withdrawal</u>*

The Government again asks the court to dissolve the PI.  Def.'s Renewed Mot. to Dissolve PI.  The Government argues that (1) the <u>First Withdrawal</u> is moot, particularly in light of USTR's issuance of the <u>June 2020 Rescission</u>, <u>id.</u> at 8–9; and (2) that the <u>Second Withdrawal</u> constitutes changed circumstances that further warrants dissolution of the PI because of its provision of notice and comment process and reasoned decision, <u>id.</u> at 10–13.  As detailed further below, Plaintiffs oppose dissolution of the PI because the <u>First Withdrawal</u> is not mooted by the <u>June 2020 Rescission</u> and that the <u>Second Withdrawal</u> does not constitute sufficiently changed circumstances to warrant the PI's dissolution.  Pls.' Br. at 7–12.

First, the court will not dissolve the PI because it concludes that it could not do so while the Government's appeal is pending.  Second, even if an appeal were not pending, the court concludes that the Government's motion should be denied because the court grants Plaintiffs' cross-motion to modify the PI to include the <u>Second Withdrawal</u>.  However, noting the Government's <u>June 2020 Rescission</u> and subsequent abandonment of defending the <u>First Withdrawal</u>, the court holds that the <u>First Withdrawal</u> was unlawful on the merits and vacates the agency decision accordingly.

### A.      *The Court Does Not Have Jurisdiction Over the Motion Because of the Pending Interlocutory Appeal.*

Just before the most recent oral argument was held and nearly two months after filing its second motion to dissolve the PI, the Government appealed this court's decision not to grant its first motion to dissolve the PI to the Federal Circuit.  <u>Invenergy III</u>, <u>appeal docketed</u> No. 2020-

2130 (Fed. Cir. Aug. 5, 2020), ECF No. 240.  The Government characterizes its appeal as "a protective notice of appeal" because the "Solicitor General has not yet reached a decision on whether to appeal."  Def.'s Resp. to Mot. to Stay at 4.

USCIT Rule 62(c)[2] states, "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."  The Government argues that this rule does not apply to orders that refuse to dissolve a PI, such as its appeal of Invenergy III.  Def.'s Resp. to Mot. to Stay at 4 ("Congress recognized that orders 'refusing to dissolve or modify injunctions' are appealable as of right, 28 U.S.C. § 1292(a)(2), yet the [c]ourt's Rule omitted such orders among the situations in which parties may seek injunctions pending appeal.").  Regardless, USCIT Rule 62.1 allows the court to deny or contingently rule on a motion for relief that is barred by a pending appeal.  Rule 62.1(a) states, "[i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would  grant  the  motion  if the court of appeals remands for that purpose or that the motion raises a substantial issue."

The Supreme Court stated in Griggs v. Provident Consumer Discount Co. that it is "generally understood that a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously.  The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  459 U.S. 56, 58 (1982)

---

[2] The court's rules are modeled on the Federal Rules of Civil Procedure and USCIT Rule 1 notes that "[t]he court may refer for guidance to the rules of other courts."

(citations omitted).  The Federal Circuit has stated that "[o]rdinarily, the act of filing a notice of appeal confers jurisdiction on an appellate court and divests the trial court of jurisdiction over matters related to the appeal."  Gilda Indus. Inc. v. United States, 511 F.3d 1348, 1350 (Fed. Cir. 2008).   This interpretation is further supported by the rationale of the rule, which the Federal Circuit has described as "promot[ing] judicial economy and avoid[ing] the confusion and inefficiency that might flow from putting the same issue before two courts at the same time."  Id. at 1359 (internal quotation omitted).  However, the Federal Circuit, in the context of post-appellate mandate issuance, also stated that "district courts possess broad equitable authority to modify injunctions . . . particularly under . . . circumstances where it is done to preserve the status quo while motions affecting that injunction are under advisement."  Amado v. Microsoft Corp., 517 F.3d 1354, 1358 (Fed. Cir. 2008).  Other Circuits have also interpreted the Griggs principle in the context of interlocutory appeals to limit the jurisdiction of district courts while there is an appeal pending over a PI to maintaining the status quo of the parties involved.  See Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc., 204 F.3d 867, 880 (9th Cir. 2000) ("A district court lacks jurisdiction to modify an injunction once it has been appealed except to maintain the status quo among the parties."); Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546, 578 (5th Cir. 1996) (citing Coastal Corp. v. Texas Eastern Corp., 869 F.2d 817, 819–20 (5th Cir. 1989)) ("We have held, however, that the authority granted by Rule 62(c) does not extend to the dissolution of an injunction.  In addition, we have held that the district court's power to alter an injunction pending appeal is limited to 'maintaining the status quo.'"); Lewis v. Tobacco Workers' Int'l Union, 577 F.2d 1135, 1139 (4th Cir. 1978) (quoting Fed. R. Civ. P. 62(c)); Ideal Toy Corp. v. Sayco Doll Corp., 302 F.2d 623, 625 (2d Cir. 1962) (stating that Rule 62(c) "permits modification of injunction orders during the pendency of an appeal.  But this rule is described as

'merely expressive of a power inherent in the court to preserve the status quo where, in its sound discretion, the court deems the circumstances to justify.'") ("[T]he power given to the district court through FRCP 62(c) . . . only applies to allow the district court to make provision for the 'security of the rights of the adverse party'"). Furthermore, any action taken pursuant to Rule 62(c) "may not materially alter the status of the case on appeal." Nat. Res. Def. Council v. Southwest Marine, Inc., 242 F.3d 1163, 1166 (9th Cir. 2001) (citation omitted). See also Ortho Pharmaceutical Corp. v. Amgen, Inc., 887 F.2d 460, 464 (3d Cir. 1989) (stating that district court may modify a PI to alter the status quo to "preserve the integrity" of the appeal). Thus, these cases indicate that any jurisdiction retained by the court during the pendency of the Government's appeal of the court's denial of its first motion to dissolve the PI is limited to preserving the case on appeal and preserving the status quo of the parties. However, the court may, pursuant to Rule 62.1, stay consideration of the motion, deny the motion, or state that it would grant the motion on remand of the issue, or state that the motion raises a substantial issue.

The court concludes that a ruling on the Government's renewed motion that dissolves the PI would interfere with the case on appeal. For these reasons the court concludes that it does not retain the jurisdiction to dissolve the PI while the appeal is pending. However, for the reasons stated below, the court vacates the First Withdrawal on the merits as a deficient rulemaking and modifies the PI to explicitly incorporate the Second Withdrawal. Thus, the court denies the Government's renewed motion to dissolve the PI.

## B. *The Court Vacates the First Withdrawal on the Merits.*

At oral argument, the Government, for the first time in this litigation, explicitly confessed error regarding the First Withdrawal. Compare Transcript of Oral Arg. of Aug. 10, 2020 at 9, Aug. 19, 2020, ECF No. 249-1 ("we agree that the [First Withdrawal] did not follow APA notice and

comment procedures.") with Transcript of Oral Arg. of Feb. 12, 2020 at 84, May 8, 2020, ECF

No. 168-3 (answering "No." in response to court's question of "Is the Government confessing

error?").  This confession of error and USTR's publication of the June 2020 Rescission[3] in which

USTR clarified that it has no intention of implementing the First Withdrawal allows the court to

now conclude that the First Withdrawal should be set aside as unlawful decision pursuant to the

APA.  5 U.S.C. § 706(2) (requiring that courts shall "hold unlawful and set aside" agency action

that is found to be "without observance of procedure required by law").  Furthermore, the parties

agree that this course of action is permissible regarding the First Withdrawal.  See EDF-R's Suppl.

Br. at 7 ("the [c]ourt can now vacate the First Withdrawal, but it must do so on the merits, with

substantive decisions with respect to inter alia, jurisdiction, standing, and APA rulemaking

regarding the First Withdrawal"); Def.'s Suppl. Br. at 3 (stating that the court "may 'set aside' the

First Withdrawal" on the basis that "the First Withdrawal did not follow notice and comment

procedures" (citing Virgin Islands Tel. Corp. v. FCC, 444 F.3d 666, 671 (D.C. Cir. 2006)); see

also Def.-Inter.'s Suppl. Br. at 5–6 (providing authority for the court's ability to vacate the First

Withdrawal, but stating that it may vacate without assessing the merits (citing Daimler Truck N.

Am. LLC v. EPA, 737 F.3d 95, 103 (D.C. Cir. 2013); Shell Oil Co. v. EPA, 950 F.2d 741, 765

(D.C. Cir. 1991))).

---

[3] Plaintiffs argue that USTR's June 2020 Rescission is not effective to rescind the First Withdrawal because the court previously held that the First Withdrawal was a rule and that an agency can only rescind a rule through notice and comment rulemaking. Pls.' Br. at 9.  The Government responds that the "[June 2020 Rescission] resolves any uncertainties about USTR's intentions," Def.'s Br. at 16, and, at oral argument, further argued that at most the June 2020 Rescission was an interpretative statement not subject to notice and comment requirements, Transcript of Oral Arg. of Aug. 10, 2020 at 10.  Because the court vacates the First Withdrawal, it need not reach these issues.

For that reason, the court incorporates its analysis in Invenergy I, decides that each of its preliminary conclusions apply to the merits of the First Withdrawal, and concludes that the First Withdrawal must be vacated pursuant to 5 U.S.C. § 706(2) of the APA as an agency action that is not in accordance with the law.  See Nat'l Parks Conservation Ass'n v. Salazar, 660 F. Supp. 2d 3, 5 (D.D.C. 2009) ("[N]otice and comment procedure is not required where a court vacates a rule after making a finding on the merits.") (citing Cement Kiln Recycling Coal. v. EPA, 255 F.3d 855, 872 (D.C.C. 2001)); Ass'n of Private Sector Colleges and Univs. v. Duncan, 681 F.3d 427, 462−63 (D.C. Cir. 2012) (vacating a rule that did not follow APA notice and comment rulemaking procedures).  The court notes that Plaintiffs' claims regarding the Second Withdrawal, including USTR's authority to withdraw exclusions to the safeguard measure, remain for final adjudication on the merits.

## II.    Plaintiffs' Motion to Modify the Preliminary Injunction

In response to the Government's renewed motion to dissolve the PI, Plaintiffs filed a cross-motion to modify the PI to expressly incorporate the Second Withdrawal "to explicitly prevent Defendants from entering into force or making effective the [Second Withdrawal]."  Pls.' Br. at 1. Plaintiffs argue that they remain "likely to succeed on the merits of their challenge to USTR's withdrawal action" because the Second Withdrawal "remains an arbitrary and capricious action lacking sufficient explanation" and that "USTR lacks the authority to withdraw the [June 2019 Exclusion] and violated procedures required by statute to modify a safeguard action."  Id. at 13. The Government responds that a presumption of regularity applies to the Second Withdrawal, Plaintiffs are not likely to succeed on the merits of the challenge to the Second Withdrawal, and that Plaintiffs no longer face irreparable procedural harm as identified in the PI.  Def.'s Br. at 19– 20, 22, 40.  Defendant-Intervenors make similar arguments and also argue that the harm to the

domestic industry caused by the June 2019 Exclusion for bifacial solar modules outweighs any harm to Plaintiffs.  Def.-Inters.' Br. at 2–4, 40–43.

The court concludes that it retains jurisdiction over modification of the PI despite the Government's appeal and that the PI should be modified in order to preserve the status quo during the pendency of the appeal and until final resolution of this case on the merits.  Thus, the court grants Plaintiffs' cross motion.

### A.    Jurisdiction Over this Motion Because of the Pending Interlocutory Appeal

First, as a threshold matter, the court concludes that it retains jurisdiction over this motion despite the Government's pending appeal.  The caselaw is clear that a court may exercise continuing supervision over a PI while an interlocutory appeal is pending to the extent necessary to maintain the status quo.  See Amado, 517 F.3d at 1358 ("district courts possess broad equitable authority to modify injunctions, . . . particularly under . . . circumstances where it is done to preserve the status quo while motions affecting that injunction are under advisement."); Prudential Real Estate Affiliates, 204 F.3d at 880 ("A district court lacks jurisdiction to modify an injunction once it has been appealed except to maintain the status quo among the parties."); Sierra Club, 73 F.3d at 578 ("We have held, however, that the authority granted by Rule 62(c) does not extend to the dissolution of an injunction.  In addition, we have held that the district court's power to alter an injunction pending appeal is limited to 'maintaining the status quo.'") (citation omitted).  The Government and Defendant-Intervenors also acknowledge this authority.  See Def.'s Resp. to Mot. to Stay at 5 (explaining that "in [Sierra Club], the appeals court held that the district court was authorized to modify an injunction that had been appealed" (citing 73 F.3d at 578)); Def.-Inters.' Resp. to Mot. to Stay at 3 ("Thus, the district court retains jurisdiction during the pendency of an appeal to act to preserve the status quo.") (citations omitted).

Plaintiffs here ask the court to modify the injunction in order to explicitly incorporate the Second Withdrawal in acknowledgement of USTR's actions subsequent to the court's issuance of the PI last December and because they claim that the Second Withdrawal is similarly flawed.  Pls.' Br. at 2–3.  For that reason, they argue, modification is necessary to avoid the inequity of the imposition of a new agency action with the same effect as the enjoined First Withdrawal and with at least one of the same deficiencies the court identified in the PI -- a lack of reasoned explanation. Id. at 3.  The court concludes that it retains jurisdiction over this motion despite the Government's appeal because Plaintiffs seek modification in order to further preserve the status quo of the case while their claims are decided on the merits.  The court will not stay decision on this motion and proceeds to the question of whether the status quo would be preserved by modification of the PI.

### B.    Modification of PI

As the court noted in Ad Hoc Shrimp Trade Action Committee v. United States, 32 CIT 666, 670, 562 F. Supp. 2d 1383, 1388 (2008), in order for the court to modify a PI, the moving party must show (1) "a change in circumstances of the parties from the time the injunction would issue that would make the modification necessary"; and (2) continuation of the unmodified PI would be inequitable.  Id. at 670.  The first requirement is based on the Supreme Court's decision in Sys Fed'n No. 91 v. Wright, in which it stated that "[t]he source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief."  364 U.S. 642, 647 (1961); see also United States v. United Shoe Machinery Corp., 391 U.S. 244, 252, (1968) (if an injunction has failed to achieve its intended results, the [] court has the power and the duty to modify the order).

Thus, the question before the court is whether modification of the PI is required in order to fulfill its original objective, to avoid inequity to Plaintiffs, and to preserve the status quo while the Government's appeal is pending.  The court concludes that the Plaintiffs have met this burden and modification of the PI is warranted.  Maintaining the status quo requires modifying the PI to explicitly include and enjoin any enforcement of the Second Withdrawal.  The original PI was premised upon the court's conclusion that the First Withdrawal likely violated the APA's requirement of notice and comment and the prohibition on arbitrary and capricious agency decisions.  Invenergy I, 422 F. Supp. 3d at 1286–88.  As stated above, the court notes that the Government now confesses error in relation to the First Withdrawal and the court vacates that decision.  Thus, the PI cannot continue in its current form.  However, because the court concludes that the Second Withdrawal presents changed circumstances that, if implemented, would likely result in the very inequity to the Plaintiffs the PI sought to prevent, modification of the PI is warranted.  The court concludes that the Second Withdrawal is likely arbitrary and capricious and so the court will modify the PI in order to give effect to its purpose -- to shield Plaintiffs from the effects of an agency decision that was undertaken in violation of the APA.

The court disagrees with Plaintiffs that the Second Withdrawal was part of the same unlawful decision to withdraw the Exclusion that was the First Withdrawal.  See, e.g., Pls.' Br. at 2 ("[T]he challenged action is essentially the same.  The [Second Withdrawal] does exactly the same thing as the [First Withdrawal]").  As the court stated in Invenergy II, the January 2020 Notice initiated a separate process to reach a new final decision, independent of the First Withdrawal.  427 F. Supp. 3d at 1407.  Thus, the court left open review of that process and subsequent final decision when directly challenged by Plaintiffs or another interested party.  The court did not at that point rule on the merits of the January 2020 Notice or dismiss the case as to

the First Withdrawal as requested by the Government because to do so would have stripped the

court of jurisdiction before USTR issued a new final decision.  See also Transcript of Oral Arg. of

Feb. 12, 2020 at 31, 35, 56, 83 (all parties expressing concerns and doubts over the court's

jurisdiction over the January 2020 Notice and any subsequent decision at that point in the

litigation).[4]  Neither did the court block USTR from proceeding with the new process as requested

by Plaintiffs because the court had no basis to presume that USTR's new decision would be legally

deficient.  See also Center for Science in the Public Interest v. Regan, 727 F.2d 1161, 1164 (D.C.

Cir. 1984) ("we begin with the established proposition that it is not improper for an agency to

engage in new rulemaking to supersede defective rulemaking."); NAACP, Jefferson County

Branch v. Donovan, 737 F.2d 67, 72 (D.C. Cir. 1984) (same).  The court now exercises jurisdiction

over the Second Withdrawal in light of the challenges in Plaintiffs' amended complaint.  Am.

---

[4] The court notes that at various points the parties have argued about the applicability of SKF USA, Inc. v. United States, 254 F.3d 1022 (Fed. Cir. 2001), to this case.  See, e.g., Pls.' Br. at 8 (arguing that USTR should have sought a remand pursuant to SKF USA); Transcript of Oral Arg. of Feb. 12, 2020 at 45–46 (Government arguing that SKF USA is distinguishable from this case because it was an antidumping case reviewing the retrospective application of duties).  In that case the Federal Circuit stated that "when agency action is reviewed by the courts" an agency may, inter alia, "request a remand, without confessing error, to reconsider its previous position" or "request a remand because it believes that its original decision was incorrect on the merits and it wishes to change the results."  SKF USA, 254 F.3d at 1027–28.  While the Government's arguments about USTR's January 2020 Notice, Second Withdrawal, and June 2020 Rescission seem to fit these descriptions of an agency wishing to change its previously challenged decision, no motion for remand was ever made in this case.  The Government unilaterally proceeded with the January 2020 Notice without asking the court to stay the case pending that new determination and without asking for a voluntary remand.  Therefore, the court proceeded with litigation while USTR undertook this new process.  Contrary to the Government's claim that the court would not have allowed USTR to proceed with the process initiated with the January 2020 Notice if remand were required, Def.'s Br. at 17, USTR decided to undertake this process without the court's guidance or oversight.  Thus, the Government is correct that a remand request was not required to end the First Withdrawal or to come to a new decision to withdraw the June 2019 Exclusion.  However, that the Government chose to ask for forgiveness instead of permission to go forward with this process cannot overcome the court's review of that process while the court retains jurisdiction over the First Withdrawal and the Second Withdrawal.

Compls., May 27, 2020, ECF Nos. 190–94.  Thus, the court is not ignoring the presumption of regularity that the Government argues applies to USTR's decision as a new agency determination. Def.'s Br. at 19–21.  Rather, the court concludes that Plaintiffs sufficiently rebutted this presumption by showing that the Second Withdrawal was likely arbitrary and capricious and that they would suffer from the same procedural harm through a decision that did not comply with APA requirements.

Plaintiffs have shown that the Second Withdrawal is likely arbitrary and capricious under the well-developed caselaw defining what is required of an agency in adequately explaining its determinations, particularly where that determination contradicts previous factual findings.  The court need not reach each of Plaintiffs' challenges to the Second Withdrawal at this preliminary stage, and thus does not reach Plaintiffs' challenges to USTR's statutory authority for withdrawing an exclusion granted pursuant to Presidential Proclamation 9693.

### 1.    Relevance of the Gerrish Memo

First, the court addresses the scope of the agency's decision.  See U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1907 (2020) ("Regents") ("Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation.").  The parties disagree about whether the Gerrish Memo, made public for the first time through a filing by the Government in response to the court's questions, can be considered part of USTR's statement of basis and purpose and adequate explanation of the Second Withdrawal.  The Plaintiffs argue that it cannot be part of the determination because it "was not provided with or even referenced in the [Second Withdrawal]" and thus was a "'ground[] that the agency invoked when it'" acted.  Pls.' Br. at 19 (quoting Regents, 140 S. Ct. at 1907); see also Pls.' Br. at 22–25.  Plaintiffs further highlight the importance of making the explanation of the

decision available to the public so that it may "assess the lawfulness of the [a]gency's action." Id. at 23.  The Government responds that the Gerrish Memo constitutes explanation of the agency decision which the court may review in determining "whether an agency has provided a rational basis, based on the relevant factors, for the conclusion it reached."  Def.'s Br. at 18.  It argues that this is true despite the Gerrish Memo not being published in the Federal Register.  Id. at 18–19.

Precedent indicates that the Gerrish Memo cannot supply the basis and purpose or adequate explanation of the Second Withdrawal.  An agency is required to "incorporate in the rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).  "The purpose of requiring a statement of the basis and purpose is to enable courts, which have the duty to exercise review, to be aware of the legal and factual framework underlying the agency's actions."  Am. Standard, Inc. v. United States, 602 F.2d 256, 269 (Ct. Cl. 1979) (citing Sec. Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 94 (1943) ("Chenery")).  "In addition, inextricably intertwined with the basis and purpose requirement of 5 U.S.C. § 553(c) is the agency's need to respond, in a reasoned manner, to any comments received by the agency that raise significant issues with respect to a proposed rule.  However, the agency need not respond to each comment, and the detail of the agency's response depends upon the subject matter of the regulation and the comments received."  Disabled Am. Veterans v. Gober, 234 F.3d 682, 692 (Fed. Cir. 2000) (citation omitted).  A separate, but related requirement, is that the agency provide adequate and reasoned explanation for its decisions.  See 5 U.S.C. § 706 ("reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) (requiring agencies to provide adequate reasons for their decisions), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); Motor Vehicles Mfrs. Ass'n of U.S. v.

State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("State Farm") (stating the agency "must

examine the relevant data and articulate a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made'" (quoting Burlington Truck

Lines, Inc. v. United States, 371 U.S. 156, 168 (1962))). [5]

        The Supreme Court's recent decision in Regents outlines the principles behind an agency's

adequate explanation of its actions and informs the court's analysis in the instant litigation.  140

S. Ct. 1891.  "It is a 'foundational principle of administrative law' that judicial review of agency

action is limited to 'the grounds that the agency invoked when it took the action.'"  Id. at 1907

(citing Michigan v. EPA, 576 U.S. 743, 758 (2015)).  See also Chenery, 322 U.S. at 196–97 (1947)

(noting that the court reviews "the propriety of [agency] action solely by the grounds invoked by

the agency").  In Regents, the Court rejected a post hoc explanation of an agency's decision in the

form of a memo published nine months after the agency action was announced and held that

explanation of an agency's action must be contemporaneous with its decision.  140 S. Ct. at 1908–

09.  The court noted that the "agency can offer a fuller explanation of the agency's reasoning at

---

[5] Defendant-Intervenors note that the statement of basis and purpose requirement in 5 U.S.C. §
553 is distinct from the prohibition on arbitrary and capricious decision in 5 U.S.C. § 706.  See
Def.-Inters.' Br. at 6–7.  This is true in that the requirements are distinct and have different scopes
depending on the nature of the agency decision.  Compare 5 U.S.C. § 553 (requiring a statement
of basis and purpose for agency rulemaking) with 5 U.S.C. § 706 (providing for judicial review
for arbitrary and capricious agency actions).  However, here, both requirements are applicable,
because as the court previously held, the June 2019 Exclusion was a rulemaking and thus a
withdrawal of that rule is also a rulemaking.  See Invenergy I, 422 F. Supp. 3d at 1283–86.  Further,
these two requirements act in conjunction to form the "hard look" review requirement that courts
impose on decisions through informal rulemaking by agencies.  See, e.g., Catherine Sharkey,
Federalism Accountability: "Agency-Forcing" Measures, 58 Duke L.J. 2125, 2181 (2009) ("[State
Farm] articulates a standard of 'hard look' review in the context of determining whether a
regulation is 'arbitrary and capricious' under § 706 of the APA.  State Farm solidifies previously
articulated agency standards imposed by lower courts (under § 553 of the APA), such as the United
States v. Nova Scotia Food Products Corp.[, 568 F.2d 240 (2d Cir. 1977),] obligation to respond
to significant comments during the notice-and-comment period.") (citations omitted).

the time of the agency action" but that "this route has important limitations." <u>Regents</u>, 140 S. Ct. at 1907–08 (citing <u>Pension Benefit Guaranty Corp. v. LTV Corp.</u>, 496 U.S. 633, 654 (1990)).  In reaching its conclusion, the Court highlighted the importance of agency accountability that is furthered by a contemporaneous explanation of an agency's actions "by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority." <u>Regents</u>, 140 S. Ct. at 1909 (citing <u>Bowen v. Am. Hosp. Ass'n.</u>, 476 U.S. 610, 643 (1986); <u>Christopher v. SmithKline Beecham Corp.</u>, 567 U.S. 142, 155 (2012)) ("Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply convenient litigating positions.").  In sum, the Supreme Court stated, "The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted.  This is not the case for cutting corners to allow DHS to rely upon reasons absent from its original decision." <u>Regents</u>, 140 S. Ct. 1909–10.

The principles outlined in <u>Regents</u> are not new in the realm of administrative law.  As the Supreme Court explained last year, "[t]he [APA's] reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by the courts <u>and the interested public</u>." <u>Dep't of Commerce v. New York</u>, 139 S. Ct. 2551, 2575–76 (2019) (emphasis added).  Further, as the Ninth Circuit explained in the opinion that the Supreme Court affirmed in part in <u>Regents</u>, public accountability for agency action can only be achieved if the electorate knows how to apportion praise for good measures and blame for bad ones. <u>Regents of the Univ. of Cal. v. Dep't of Homeland Sec.</u>, 908 F.3d 478 (9th Cir. 2018) ("<u>Regents 2018</u>") (citing <u>Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.</u>, 561 U.S. 477, 498 (2010)) ("Without knowing the true source of an objectionable agency action, "the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of

pernicious measures ought really to fall.'" (quoting The Federalist No. 70, at 476 (Alexander

Hamilton) (Jacob E. Cooke ed. 1961))).  Quoting then-Professor Kagan, the Ninth Circuit also

noted that "'the degree to which the public can understand the sources and levers of bureaucratic

action' is 'a fundamental precondition of accountability in administration.'"  <u>Regents 2018</u>, 908

F.3d at 499 (quoting Elena Kagan, <u>Presidential Administration</u>, 114 Harvard L. Rev. 2245, 2332

(2001)).  The D.C. Circuit has clearly identified a publication requirement in connection with the

basis and purpose requirement of APA.  <u>See</u> <u>Action on Smoking and Health v. C.A.B.</u>, 713 F.2d

795, 799 (D.C. Cir. 1982) ("[A] basis and purpose statement need not be published 'at precisely

the same moment as the regulations,' [however] the enquiry must be whether the rules and

statement are published close enough together in time so that there is no doubt that the statement

accompanies, rather than rationalizes the rules." (quoting <u>Tabor v. Joint Bd. for Enrollment of</u>

<u>Actuaries</u>, 566 F.2d 705, 711 (D.C. Cir. 1977))).  Accountability concerns have practical effects

on parties impacted by agency rules.  For example, the D.C. Circuit, in <u>Tabor v. Joint Bd. for</u>

<u>Enrollment of Actuaries</u>, explained that the APA also guarantees that parties who are unhappy

with an agency decision or finds error in a decision may petition the agency to reconsider.  566

F.2d at 711 ("the Board's failure to publish a contemporaneous statement of basis and purpose

made it practically impossible to file an intelligent petition for reconsideration.  As a result,

appellants lost a method of challenge less expensive and time-consuming than judicial review; the

Board lost an early opportunity to be apprised of and to correct any errors it might have made.

Each agency shall give an interested person the right to petition for repeal of a rule.").

   Unlike the memo at issue in <u>Regents</u>, the Gerrish Memo is contemporaneous with the

<u>Second Withdrawal</u>.  However, also unlike that memo, it is uncontested that the Gerrish Memo

has never been made publicly available outside this litigation.  <u>See</u> Pls.' Br. at 19; Def.'s Br. at 19;

Def.-Inters.' Suppl. Br. at 9.  The Government characterizes this point as a mere formality that did

not prejudice Plaintiffs' substantial rights.   Def.'s Suppl. Br. at 7 (citations omitted).   "In

administrative law . . . there is a harmless error rule: § 706 of the [APA], 5 U.S.C. § 706, instructs

reviewing courts to take 'due account . . . of the rule of prejudicial error.'  If the agency's mistake

did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and

remand for reconsideration." PDK Lab'ys, Inc. v. US DEA, 362 F.3d 786, 799 (D.C. Cir. 2004);

see also Nat'l Ass'n of Home Builders v. Def. of Wildlife, 551 U.S. 644, 659 (2007) ("Mindful of

Congress' admonition that in reviewing agency action, 'due account shall be taken of the rule of

prejudicial error,' 5 U.S.C. § 706, we do not believe that this stray statement, which could have

had no effect on the underlying agency action being challenged, requires that we further delay the

transfer of permitting authority to Arizona by remanding to the Agency for clarification.").

    The court does not agree that this error did not prejudice interested parties affected by the

Second Withdrawal.  First, Plaintiffs do not encompass the entirety of the interested public.  See

Invenergy's Suppl. Br. at 5 ("Plaintiffs are only a few of the dozens of commenters who supported

maintaining the [June 2019 Exclusion].  Others included small businesses, environmental groups,

and municipalities . . . .").  As Plaintiffs note, "[h]ad Plaintiffs not pursued this litigation, no one

outside of USTR would ever have seen the Gerrish Memo" and "the public still cannot see any of

USTR's . . . reasoning unless they happen to have a PACER account" and find the memo as

attached to the Government's pre-oral argument questions from May or the administrative record

filed in June. Id. at 4.  Second, providing explanation in an internal memorandum does not serve

the APA's mandate that an agency decision be adequately explained, i.e., not arbitrary and

capricious, or the principles of administrative law that require transparency and public

accountability.  An explanation that is never made available to the parties or to the public at large

is not one that can be considered transparent or of use to those who participated outside the

agency.[6] Rather, interested parties cannot understand and thus rebut or correct the rationale behind

a rule that applies to them when that rationale exists only in an internal memo.

Furthermore, the Second Withdrawal does not refer to or cite to any additional documents

that may tip off interested parties to the existence of explanation outside of the Federal Register

notice announcing the decision. See Morton v. Ruiz, 415 U.S. 199, 233 n.27 (1974) (quoting the

House Report accompanying the APA requirement to publish substantive rules, H.R. Rep. No.

1497, 89th Cong., 2d Sess., 7 (1966), which stated that "[a]n added incentive for agencies to

publish the necessary details about their official activities in the Federal Register is the provision

---

[6] The Government cites to several cases in which courts held that publication was not required. Def.'s Br. at 19 (citing Tourus Records Inc. v. DEA, 259 F.3d 731, 738 (D.C. Cir. 2001); Baltimore & Ohio Chicago Terminal Railroad Co. v. United States, 583 F.2d 678, 688 (3d Cir. 1978) ("Baltimore & O.C.T.R.")); Def.'s Suppl. Br. at 6–7 (citing Miller v. Lehman, 801 F.2d 492, 497 (D.C. Cir. 1986); Tabor, 566 F.2d at 709–12 n.14 (D.C. Cir. 1977)). Two of those cases concerned agency adjudications and thus do not apply to rulemakings. See Tourus Records, 259 F.3d at 737 (finding DEA's letter of denial of an application to proceed in forma pauperis in a forfeiture proceeding to be arbitrary and capricious for lack of adequate reasoning); Miller, 801 F.2d at 497 (finding no legal error of Secretary of the Navy's letter of censure in a service record). Unlike rulemakings, adjudications involve agency decisions that apply specifically and retroactively. Invenergy I, 422 F. Supp. 3d at 1285. Rulemakings, by contrast, apply generally and prospectively. Id. The importance of publicly available reasoning is more important in decisions that apply broadly and prospectively rather than decisions that affect one party who would have received the pertinent information from the agency during the course of the adjudication. Notably, the other two cases cited, Tabor and Baltimore & O.C.T.R., did involve rulemakings. However, in Tabor the D.C. Circuit held that a "statement of reasons" for the agency's action submitted during litigation were not part of the agency action to be reviewed for the court for compliance with the APA's § 553 "basis and purpose" requirement. 566 F.2d at 711–12. The court further stated that "the Board's failure to publish a contemporaneous statement of basis and purpose made it practically impossible to file an intelligent petition for reconsideration[, thus,] appellants lost a method of challenge less expensive and time-consuming than judicial review." Id. at 711. Similarly, in Baltimore & O.C.T.R., the Supreme Court held a regulation of the Interstate Commerce Commission ("ICC") to have complied with both APA § 706(2)(A) and § 553(c). 583 F.2d at 684–88. There were no allegations of the ICC's interim or final decisions not being publicly available and the court held that the rule as published in the Federal Register provided the requisite statement of basis and purpose. See id. at 687–88.

that no person shall be adversely affected by material required to be published -- or <u>incorporated</u> <u>by reference</u> -- in the Federal Register but not so published." (emphasis added)).  The court is not holding that an agency may not provide adequate explanation in a document outside of four corners of the Federal Register notice announcing a new agency decision, nor could it in line with APA caselaw.  <u>See, e.g.</u>, <u>Baltimore & Ohio Chicago Terminal Railroad Co. v. United States</u>, 583 F.2d 678, 684–88 (3d Cir. 1978) ("<u>Baltimore & O.C.T.R.</u>") (reviewing the final rule, interim report, and final report of the Interstate Commerce Commission for arbitrary and capricious decision making).  However, the court is stating that adequate explanation of the agency's decision has to be made public somewhere or in some manner allowing interested parties to review and scrutinize it.  USTR did not provide access to its explanation here and thus it cannot be considered as part of the grounds invoked by the agency when it acted.  <u>See</u> <u>Regents</u>, 140 S. Ct. at 1907; <u>Chenery</u>, 322 U.S. at 196–97 (citations omitted).  Requiring that the parties litigate a final agency decision in order to gain knowledge of and access to the agency's rationale wastes judicial resources and delays corrective agency action that would otherwise be addressed by the agency in the first instance.

Finally, the Government and Defendant-Intervenors claim that the Gerrish Memo is reviewable by the court as part of the agency record.  Def.'s Br. at 19 ("The Gerrish Memo is part of the full administrative record that was before the Trade Representative at the time he made his decision.") (internal quotation omitted); Def.-Inters.' Br. at 10 ("[A] reviewing court must take account of the whole administrative record (of which the Gerrish Memo is undeniably a part) under the APA").  However, the need for publication of an agency's explanation of its decision is distinct from the documents that may constitute the record when a decision is challenged and on review by a court.  The record includes everything that is before the agency when it makes its decision,

regardless of what the agency relied on or found persuasive in making its determination.  Ammex,

Inc. v. United States, 23 CIT 549, 554–55, 62 F. Supp. 2d 1148, 1156 (1999).  As the Supreme

Court explained in State Farm, "Congress required a record of the rulemaking proceedings to be

compiled and submitted to a reviewing court, 15 U.S.C. § 1394, and intended that agency findings

under the Act would be supported by 'substantial evidence on the record considered as a whole.'"

463 U.S. at 43–44 (citing S.Rep. No. 1301, 89th Cong., 2d Sess. 8 (1966); H.R.Rep. No. 1776,

89th Cong., 2d Sess. 21 (1966)).  Further, as recently summarized by this court, "[p]rivileged and

deliberative documents reflecting an agency's internal deliberations do not form part of the

administrative record, and, generally, are not discoverable so as to merit a privilege log, unless

there is a showing of bad faith or improper behavior."  JSW Steel (USA) Inc. v. United States, 44

CIT __, __, Slip Op. 20-111 at 14 (citing Stand Up for California! v. U.S. Dep't of Interior, 71 F.

Supp. 3d 109, 122–23 (D.D.C. 2014); Oceana, Inc. v. Ross, 920 F.3d 855, 865 (D.C. Cir. 2019)).

Rather, as the court in JSW Steel stated, "[t]he purpose of limiting review to the record actually

before the agency is to guard against courts using new evidence to convert the arbitrary and

capricious standard into effectively de novo review."  JSW Steel, Slip Op. 20-111 at 14 (quoting

Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009)) (citations

omitted).  Thus, there is a distinction between the public documents in which the agency acts and

explains its actions and the record documents which allow the reviewing court to examine the

record that was before the agency and determine if its final decision was based on substantial

evidence, addressed major issues and evidence that detracted from its conclusion, and whether its

explanation is adequate in light of the information before the agency.  The fact that a detailed

explanation of the agency's action exists somewhere is irrelevant to the question of whether the

agency explained itself to the public when it acted.  See State Farm, 463 U.S. at 43 (listing

examples of situations in which an agency's decision is arbitrary and capricious: (1) when it relies on factors that Congress did not intend for it to consider, (2) when it fails to consider an important aspect of the problem, or (3) when it offers an explanation running counter to the evidence or is implausible to the point where it cannot be ascribed to expertise or a difference in view.).  Thus, because the Gerrish Memo was never made public or referenced in the Second Withdrawal as published in the Federal Register, it cannot form part of the agency's decision or an explanation reviewable by the court for the agency's action.

In sum, the court notes that the Gerrish Memo is not part of USTR's Second Withdrawal and thus the court will not consider it in assessing whether USTR provided adequate basis and purpose and explanation for that decision.

### 2.     The _Second Withdrawal_ Is Likely Arbitrary and Capricious.

Plaintiffs argue that the Second Withdrawal is an arbitrary and capricious agency decision in violation of the APA because: (1) USTR did not adequately explain the reasoning between the facts found and its ultimate conclusion, including by not responding to comments from interested parties, Pls.' Br. at 19–20; (2) USTR did not adequately acknowledge and explain its changed position between the June 2019 Exclusion and the Second Withdrawal, id. at 25–29; (3) USTR failed to consider an important part of the problem -- the economic and social costs of the Second Withdrawal compared to its benefits, id. at 29–36; (4) USTR failed to adequately consider other obvious policy alternatives, id. at 26–40; and (5) the Second Withdrawal is unsupported by the record evidence, id. at 40–47.

The Government and Defendant-Intervenors respond that the Second Withdrawal was not an arbitrary and capricious decision because USTR addressed all material issues and made a decision based on substantial record evidence.  Def.'s Br. at 22–37; Def.-Inters.' Br. at 6–27.

However, the Government, in making those arguments often relied on the Gerrish Memo as providing the required explanation for USTR's decision. See, e.g., Def.'s Br. at 24 (citing Gerrish Memo at 3); Def.'s Br. at 30 (quoting Gerrish Memo); Def.'s Br. at 35 (citing Gerrish Memo at 8, 14); Def.-Inters.' Br. at 19 (citing Gerrish Memo at 14); Def.-Inters.' Br. at 21 (citing Gerrish Memo at 12).   As discussed above, the explanation provided by the Gerrish Memo is not part of the court's analysis of whether the Second Withdrawal was arbitrary and capricious, and thus the following makes no reference to this document.

The APA dictates that a court shall hold unlawful any agency action that is arbitrary and capricious.  5 U.S.C. § 706(2)(A).  The Supreme Court explained this review as: "we determine only whether [the agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.' We may not substitute our judgment for that of [the agency], but instead must confine ourselves to ensuring that [it] remained 'within the bounds of reasoned decisionmaking.'"   Dep't of Commerce v. New York, 139 S. Ct. 2551, 2569 (2019) (first quoting State Farm, 463 U.S. at 43; then quoting Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)).  This also includes addressing significant comments made by interested parties during the notice and comment process in developing its final rule.  Disabled Am. Veterans, 234 F.3d at 692.

Furthermore, when an agency changes its position, the Supreme Court stated that an agency must acknowledge its change and provide a rational explanation for the change.  F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 517 (2009).  There, the Court explained that this does not require an agency to demonstrate that the reasons for the new policy are better than the reasons for the old so long as the agency believes the new reasons to be better.  Id. at 515.  However, the Court acknowledged an exception to this standard where the agency's "new policy rests upon factual

findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account."  Id. at 515 (citations omitted).  See also Perez v. Mortgage Bankers Ass'n, 575 U.S. 92, 106 (2015) ("[T]he APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.").  Similarly, the Court held in Encino Motorcars v. Navarro that an "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  136 S. Ct. 2117, 2120, 2125–26 (2016) (quoting Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005)) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

The court concludes that the Second Withdrawal is likely arbitrary and capricious because USTR failed to adequately explain its reasoning and did not provide an adequate explanation of its change in position between the June 2019 Exclusion and the Second Withdrawal of that exclusion.

The Second Withdrawal is deficient in that it does not respond to certain of Plaintiffs' comments raising significant issues nor does it address evidence that detracts from its conclusion.  First, in response to the January 2020 Notice and request for comments, Plaintiffs submitted comments disputing USTR's authority to withdraw a previously granted exclusion to the President's safeguard measure.  Pls.' Br. at 21; e.g., A.R. 65–67, June 5, 2020, ECF No. 196 (Invenergy's comments to USTR on USTR's authority to withdraw the exclusion); A.R. 38 (EDF-R's comments to USTR on USTR's authority to withdraw the exclusion").  USTR summarizes its authority to grant exclusions as delegated by the President in Proclamation 9693, highlighting that

its authority is limited by "the objectives of the safeguard measures." Second Withdrawal, 85 Fed.

Reg. at 21,498.  However, this statement does not address Plaintiffs' contention that the safeguard

statute itself prevents USTR from withdrawing the exclusion or its comments that the President

did not delegate that authority. See, e.g., A.R. 65–67 (Invenergy's comments); A.R. 38 (EDF-R's

comments).  Second, the Second Withdrawal does not address or explain evidence presented by

Plaintiffs that bifacial solar panels and monofacial solar panels are not substitutable. See, e.g.,

A.R. 711–14 (SEIA's comments on substitutability).  USTR merely concludes, "[b]ifacial solar

panels and monofacial solar panels are substitutes from the perspective of utilities planning solar

generating facilities in locations where both are cost-competitive with conventional forms of

energy." Second Withdrawal, 85 Fed. Reg. at 21,498.  In their comments to USTR, SEIA

explained its position that bifacial and monofacial solar panels have "limited substitutability . . .

in utility-scale versus residential/commercial applications." A.R. 711.  Further, SEIA presented

evidence in support of this claim in the form of many exhibits showing the price, weight, and

energy production capacity differences between bifacial and monofacial solar panels. See A.R.

711–13 (providing citations to exhibits submitted with SEIA's comments).  USTR itself

acknowledges that "[b]ifacial solar panels are expected to offer a 5 to 10 percent improvement in

energy output over a same-size monofacial panel." Second Withdrawal, 85 Fed. Reg. at 21,498.

It is not apparent what evidence or reasoning USTR followed in light of this statement, which

seems to indicate that bifacial solar panels are not interchangeable, and Plaintiffs' evidence to

reach the conclusion that bifacial and monofacial solar panels are substitutable. NMB Singapore

Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("[W]hile its explanations do not have

to be perfect, the path of [an agency's] decision must be reasonably discernable to a reviewing

court.").  These two gaps in USTR's reasoning support at least a preliminary conclusion that the Second Withdrawal is arbitrary and capricious.

The Second Withdrawal is also likely arbitrary and capricious in its failure to explain the change in its position that an exclusion on bifacial solar panels was warranted.  The court notes that USTR did acknowledge its position change between the June 2019 Exclusion and the Second Withdrawal in both the January 2020 Notice and Second Withdrawal.  January 2020 Notice, 85 Fed. Reg. at 4,756 ("USTR is seeking public comment on whether the U.S. Trade Representative should maintain the exclusion of bifacial solar panels from the safeguard measure, withdraw the exclusion, or take some other action within its authority with respect to this exclusion"); Second Withdrawal, 85 Fed. Reg. at 21,497 ("[USTR] established procedures to consider whether to maintain, withdraw, or take some other action with respect to the exclusion of bifacial solar panels from the safeguard measure.").  However, this acknowledgement and USTR's conclusory statements about the impact of the bifacial exclusion do not meet the standard of explaining its change in position as set forth in long-established caselaw on what is required of an agency when it changes its position.  F.C.C. v. Fox, 556 U.S. at 517.  USTR fails to explain what information it received or what facts changed since the issuance of the June 2019 Exclusion that led it to believe that withdraw was the more appropriate action, thus its decision was not adequately reasoned in this respect.  See Encino Motorcars, 136 S. Ct. at 2125–26.  USTR instead states that "[i]mports of bifacial solar panels were rising even before the bifacial exclusion and continued to increase after the exclusion."  Second Withdrawal, 85 Fed. Reg. at 21,498.  USTR explains the impact of bifacial imports by stating, "[b]y disincentivizing domestic producers' production of bifacial solar panels, interfering with their ability to increase sales of monofacial and bifacial products into the utility segment, and having a depressive effect on prices for monofacial solar panels, the bifacial

exclusion is hindering the domestic industry's adjustment to import competition."  Id. at 21,498–99.  However, as explained, the court cannot discern what facts or information have come to USTR's attention since it granted the June 2019 Exclusion that justifies this conclusion in light of the information before USTR when it granted the June 2019 Exclusion.  See June 2019 Exclusion, 84 Fed. Reg. at 27,684 ("Based on an evaluation of the factors set out in the February 14 notice, which are summarized above, the Trade Representative has determined to grant the product exclusions set out in the Annex to this notice").  Defendant-Intervenors state that "[t]he [June 2019 Exclusion] did not elaborate any specific factual findings but summarily stated that USTR would only grant exclusions that did not undermine the objective of the safeguard measure, implying that in granting the [June 2019 Exclusion] it had determined this requirement was met."  Def.-Inters.' Suppl. Br. at 12.  It was not merely a passing inference or implication that allowed USTR to exclude bifacial panels in the June 2019 Exclusion, but its sole basis for this decision after considering evidence placed on the record for a year and a half was that it did not undermine the objectives of the safeguard measure.  June 2019 Exclusion, 84 Fed. Reg. at 27,684 (noting that USTR "would only grant exclusions that did undermine the objectives of the safeguard measure").  Again, the court does not and should not decide that one position is superior to another.  See F.C.C. v. Fox, 556 U.S. at 515.  Rather, the court merely requires transparency from USTR in explaining why it is changing its position on the June 2019 Exclusion.  This justification need not be more than what was provided in granting the June 2019 Exclusion, but some explanation of the change is required given that "its new policy [seems] to rest[] upon factual findings that contradict those

which underlay its prior policy." Id.  USTR failed to provide that explanation in the Second Withdrawal, and thus its decision is likely arbitrary and capricious.[7]

The court does not address the remainder of Plaintiffs' assertions in support of its argument that the Second Withdrawal is arbitrary and capricious.  The court need not decide these claims in deciding this still preliminary motion to modify the PI.  Rather, the court will address these claims upon deciding the merits of Plaintiffs' challenge to the Second Withdrawal.  However, as explained, the court finds sufficient deficiency with the Second Withdrawal to conclude that Plaintiffs' claims that the Second Withdrawal is also arbitrary and capricious are likely to succeed on the merits.  Thus, the Second Withdrawal suffers from at least some of the same flaws as the First Withdrawal.  See Invenergy I, 422 F. Supp. 3d at 1287–88; see also id. at 1265 ("[A]t stake here is whether USTR undertook reasoned decision making to implement the [First Withdrawal], as required by the APA, including provision for meaningful participation by interested parties.").

### 3.   Continuing   Procedural   Irreparable   Harm   Justifies Modification of the PI to Avoid Inequity to Plaintiffs.

The court concludes that the Second Withdrawal is likely arbitrary and capricious. However, this conclusion alone does not justify modification of the PI.  Plaintiffs must also show that there would be inequity in not modifying the PI.  Ad Hoc Shrimp, 32 CIT at 670.  Here, the inequity of not modifying the PI is the prospect that Plaintiffs' would face the same irreparable procedural harm in being subject to an arbitrary and capricious decision as they faced when the court issued the PI enjoining enforcement of the First Withdrawal.

---

[7] The court further notes that, because the Government did not provide record documents showing what factual information USTR relied on in making its June 2019 Exclusion, as discussed below regarding Plaintiffs' motion to complete the administrative record, it is hard at this stage to determine what facts the agency had before it in deciding to withdraw the previously granted exclusion for bifacial solar modules.

As the court explained in <u>Invenergy I</u>:

> The [irreparable harm] inquiry focuses on whether the court must act now to
> prevent a loss that cannot later be remedied.  <u>See, e.g.</u>, <u>CPC Int'l Inc. v. United
> States</u>, 19 CIT 978, 979, 896 F. Supp. 1240, 1242–44 (1995) (irreparable harm
> includes "costs, expenditures, business disruption or other financial losses" that
> plaintiff has "no legal redress to recover in court").  To determine whether an injury
> is irreparable, the court analyzes the magnitude and immediacy of the injury, and
> the inadequacy of future relief.  <u>Queen's Flowers de Colombia v. United States</u>, 20
> CIT 1122, 1125, 947 F. Supp. 503[, 506] (1996).  Harm such as "loss of goodwill,
> damage to reputation and loss of business opportunities are all valid grounds for
> finding irreparable harm."  [<u>Celsis In Vitro, Inc. v. CellzDirect, Inc.</u>, 664 F.3d 992,
> 930 (Fed. Cir. 2012)].  Furthermore, unlike injury for constitutional standing
> purposes, a procedural injury can itself constitute irreparable harm. A procedural
> violation can give rise to irreparable harm justifying injunctive relief because lack
> of process cannot be remedied with monetary damages or post-hoc relief by a court.
> . . .
>
> Therefore, the court concludes that this likely procedural harm is irreparable, and
> thus merits preliminary injunctive relief because they cannot be remedied after the
> [<u>First Withdrawal</u>] goes into effect.  The alleged violation of the APA should be
> further enjoined to avoid the business uncertainty that flows from such a procedural
> violation.  The [<u>First Withdrawal</u>] causes irreparable harm by eliminating the
> business certainty required by the solar industry to plan and develop future projects.

422 F. Supp. 3d at 1290–91.

Plaintiffs face these same irreparable harms from implementation of the <u>Second
Withdrawal</u>.  Being subject to a procedurally flawed and inadequately explained decision would
allow an agency decision to go into effect that also does not address significant comments from
the interested public.  A decision that does not evince meaningful consideration of public
comments is no different than a decision implemented without opportunity for the public to
comment.  In both scenarios, there is the potential that the agency will establish a new status quo
and engender new reliance interests on a decision that did not take account of public input as
required by the APA.  <u>See</u> <u>N. Mariana Islands v. United States</u>, 686 F. Supp. 2d 7, 18 (D.D.C.
2009) (noting that once the regulatory change "has begun operation as scheduled . . . [the agency]
is far less likely to be receptive to comments.").  The APA's notice and comment requirement is

not a pro forma requirement, but a substantive requirement that the agency account for the concerns and opinions of the interested public before implementing or changing its policies.  Thus, if the Second Withdrawal were to go into effect and then later held to provide inadequate response to comments, Plaintiffs would face harms from a procedurally deficient agency decision for which the court would be unable to remedy.  Thus, Plaintiffs' continue to face irreparable harm as a result of USTR's actions and it would inequitable to not modify the PI to include the Second Withdrawal.[8]

In sum, the court concludes that the PI should be modified in order to fulfill its intended purpose and to avoid inequity to Plaintiffs.  The court finds that the Second Withdrawal is likely arbitrary and capricious and lacking a sufficient basis and purpose in accordance with APA requirements because USTR did not address significant comments from Plaintiffs and did not explain the basis for its change in policy between the June 2019 Exclusion and the Second Withdrawal.  The existence of the unpublished, internal Gerrish Memo does not remedy these deficiencies and these deficiencies are not harmless errors.  Therefore, the court grants Plaintiffs' cross-motion to modify the PI to include the Second Withdrawal.

### III.    Plaintiffs' Motion to Complete the Agency Record

Two weeks after the Government filed the administrative record, Plaintiffs filed a motion to complete the record.  Pls.' Mot. to Complete A.R.  Plaintiffs claim that the record as submitted did not include key documents necessary for the court to review both the First Withdrawal and

---

[8] This conclusion does not mean that the court has assumed the same defect from the First Withdrawal but reflects that Plaintiffs have independently shown that the Second Withdrawal would harm them in the same way as First Withdrawal, but for different reasons.  "[N]either the plaintiff nor the court should be subjected to the unnecessary burden of re-establishing what has once been decided."  Sys Fed'n No. 91 v. Wright, 364 U.S. 642, 647 (1961).

Second Withdrawal. Id. at 5.  Specifically, Plaintiffs request that the court order completion of the

record as to four categories:

> (1) All documents, including (but not limited to) any interested party comments, agency memoranda, inter-agency consultations, and ex parte communications, related to the June 13, 2019 determination to exclude bifacial solar modules from the safeguard measure;
>
> (2) All documents, including (but not limited to) any interested party comments, agency memoranda, inter-agency consultations, and ex parte communications, related to USTR's October 9, 2019 determination to withdraw the bifacial solar module exclusion;
>
> (3) All documents, including (but not limited to) any interested party comments, agency memoranda, inter-agency consultations, and ex parte communications, related to the issuance of the January 27, 2020 notice regarding the procedures to reconsider the bifacial module exclusion;
>
> (4) Any other documents prepared by, submitted to, or otherwise possessed by or under the control of USTR pertaining to the bifacial module exclusion or its withdrawal, including (but not limited to) documents related to any meetings, calls, or other communications that USTR had between February 2018 and the April Withdrawal, with members of the solar industry, congressional members or their staff, and/or members of the executive branch regarding the bifacial panel exclusion and subsequent withdrawals.

Id. at 2.

The Government and Defendant-Intervenors responded in opposition to this motion.  The

Government claims that the record it submitted is entitled to a presumption of regularity and that

the record submitted is complete.  Def.'s Resp. to Mot. to Complete A.R. at 7.  The Government

also argues that USTR made the decision to issue the Second Withdrawal on the basis of "a clean

slate" so that any documents before the agency related to its past decisions are irrelevant to the

record on the Second Withdrawal.  Id.  The Defendant-Intervenors make similar arguments and

claim that "Plaintiffs' motion will unnecessarily delay any resolution of the dispute."  Def.-Inters.'

Resp. to Mot. to Complete A.R. at 2.

        In addressing Plaintiffs' motion to complete the record, the court notes that Plaintiffs

characterize their request as completing the record, while the Government argues that Plaintiffs

seek to supplement an already complete record.   The court applies different standards when

deciding whether a record should be completed and when deciding whether a record should be

supplemented.   See, e.g., Giorgio Foods, Inc. v. United States, 35 CIT 297, 300, 755 F. Supp. 2d

1342, 1346 (2011) ("Supplementing the administrative record with outside information is

somewhat distinct from supplementing the record 'upon a showing that the administrative record

is not complete.'" (quoting Advanced Tech. Materials Co. v. United States, 34 CIT 598, 603

(2010))).   While completing the record requires only that the moving party show that the record

filed is not complete, supplementing the record requires the further burden of showing bad faith

by the agency.   Compare Overton Park, 401 U.S. at 419–20 (noting that completion of the record

is required where the produced record "clearly do[es] not constitute the whole record compiled by

the agency") (citations omitted) with Ammex, 23 CIT at 556 (noting that supplementation of the

record is required upon a "strong showing of bad faith or improper behavior" by the agency)

(quotation omitted).   See also JSW Steel, Slip Op. 20-111 at 15.   Here, Plaintiffs moved the court

to order the Government to complete the record because the record did not include all documents

that were before USTR in making its decision on the First Withdrawal and Second Withdrawal.

Pls.' Mot. to Complete A.R. at 2.   Plaintiffs made no allegations of bad faith on the part of the

Government in filing the record.   See id.   Thus, the court decides the motion under the standard of

completing the record.

        As the court explained in Giorgio Foods, the court assumes the record is complete where

it has been certified by the agency.   35 CIT at 300, 755 F. Supp. 2d at 1346.   "In a motion to

complete the administrative record, a party must do more than simply allege that the record is

incomplete.  Rather, a party must provide the [c]ourt with reasonable, non-speculative grounds to believe that materials considered in the decision-making process are not included in the record." Def. of Wildlife v. Dalton, 24 CIT 1116, 1119 (2000) (citations and quotations omitted).  A complete record includes all material directly or indirectly considered by the agency, including evidence presented to the agency that is contrary to its ultimate decision and not relied on by the agency.  See Ammex, 23 CIT at 554–55, 62 F. Supp. 2d at 1155–56 (citations omitted).  This is broader than those documents cited by and relied upon by the agency, but also includes "all materials that might have influenced the agency's decision."  Amfac Resorts LLC v. U.S. Dep't of Interior, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (quotation omitted); see also Thompson v. U.S. Dep't of Labor, 885 F.3d 551, 555 (9th Cir. 1989) ("The whole administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position.") (quotation omitted). Furthermore, because USTR here reconsidered its previous decision, the June 2019 Exclusion, USTR's change in position must be explained in light of the record on which it made its past decision, even if its new decision is based on the same evidence that it previously considered.  See, e.g., Encino Motorcars, 136 S. Ct. at 2122–23 (comparing record and history of original agency decision to that of the agency's new decision); State Farm, 463 U.S. at 52–55 (comparing agency's rationale of rescission with its rationale for its original decision); F.C.C. v. Fox, 556 U.S. at 507–08 (same).  Thus, the parties may develop arguments and the court may review the agency's reconsideration decision only by reviewing the record before the agency at the time of its original both its original decision and its reconsideration.  Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984) ("To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case, and so the APA requires review of the whole

record.") (citations omitted).   See also Giorgio Foods, 755 F. Supp. 2d at 1348 ("[W]hat the ITC directly consulted does not necessarily determine the administrative record.  The records of the underlying investigations necessarily created the environment in which the decision was made by the ITC and were hence indirectly consulted.").

The court agrees with Plaintiffs that the record submitted by the Government on June 5, 2020 is incomplete.  That record was limited to submissions to USTR by interested parties as a result of the January 2020 Notice, reports of the ITC, agency consultations, the Second Withdrawal, and the internal USTR memoranda.  See A.R. (index to public administrative record).  As Plaintiffs note, the record does not include any documents before the agency at the time of the June 2019 Exclusion, "any evidence of inter-agency consultation regarding the exclusion requests, or even the [June 2019 Exclusion] determination."  Pls.' Mot. to Complete A.R. at 8.  Plaintiffs have rebutted the court's presumption that the record is complete by showing that the Government failed to include documents that were both directly relied on by USTR and documents that were before USTR at the time it made the Second Withdrawal and the June 2019 Exclusion, but that it did may not have relied on.[9]  Therefore, the court grants Plaintiffs motion as to the first category and orders that the Government complete the record with documents related to the June 2019 Exclusion of bifacial solar modules.

The court also grants Plaintiffs' motion as to the third category covering documents related to the January 2020 Notice.  As Plaintiffs state, "the [January 2020 Notice] described a number of concerns that USTR had with the Exclusion . . . and those concerns grew from somewhere."  Pls.'

---

[9] The court notes that the Government's original filing of the Administrative Record did not include a certification of completeness by the agency.  See A.R.  However, the Government filed a certification in its response to Plaintiffs' Motion and stated that its omission was inadvertent.  Def.'s Resp. to Mot. to Compl. at Attach. 1, ECF No. 210-1 (Declaration by Dax Terrill); Transcript of Oral Arg. of Aug. 10, 2020 at 99–100.

Mot to Complete A.R. at 12.  The court notes that the record filed by the Government does not

include the January 2020 Notice as published in the Federal Register.  See A.R.  The Government

argued at oral argument that that document was provided to the court through litigation, Transcript

of Oral Arg. of Aug. 10, 2020 at 103, but this omission does support Plaintiffs' contention that the

submitted record is incomplete.  Documents related to the January 2020 Notice would further shed

light on USTR's decision to reconsider its June 2019 Exclusion decision by including documents

that were directly or indirectly considered by agency decision-makers starting at the time they

formally decided to reconsider their past decision.  See Thompson, 885 F.2d at 555.  Therefore,

the court grants Plaintiffs' motion as to the third category and orders the Government to complete

the record with all documents related to the January 2020 Notice.

Further, Plaintiffs request the court to order the Government to complete the record as to

the First Withdrawal and as to a broad fourth category of documents.  Pls.' Mot. to Complete A.R.

at 2.  The court denies Plaintiffs' request as to documents related to the First Withdrawal because,

with this decision, the court vacates the First Withdrawal on the merits as an unlawful agency

rulemaking that was procedurally deficient under the APA.  Further, the court denies Plaintiffs

request as to documents related to the fourth category.  Because the first and third categories suffice

to produce the requisite record documents missing from the record, the court need not grant the

Plaintiffs' request which may encompass documents outside the court's scope of review.

## CONCLUSION

The court vacates the First Withdrawal as an agency decision that should be set aside as

unlawful because it did not comply with the APA requirements as described in Invenergy I.  The

court denies the Government's motion to dissolve the PI because it does not have jurisdiction to

do so pending the Government's appeal and because the court instead modifies the PI.  The court

grants Plaintiffs' cross-motion to modify the PI to reflect the Second Withdrawal and Plaintiffs'

challenge of that decision in their amended complaints.  The court also grants Plaintiffs' motion

to complete the agency record, in part, and denies the motion as to the First Withdrawal and the

fourth category of documents.  The Plaintiffs' motion to stay is denied.

     The court notes that if presented with an adequate record and explanation of USTR's

action, the court could proceed, in accordance with well-established administrative law standards,

to review USTR's decision to withdraw it previously granted exclusion from safeguard duties on

imported bifacial solar modules.  However, various procedural missteps by USTR mean that the

court cannot reach that point now.  As the court has stated,

> The court acknowledges the Government and Defendant-Intervenors' concern that
> domestic industries may face a threat of material injury due to USTR's decision to
> exclude bifacial solar products from safeguard duties.  The court also acknowledges
> the concerns of Plaintiffs (consumers, purchasers and importers of utility-grade
> bifacial solar panels), who oppose safeguard duties that they claim increase the cost
> of bifacial solar panels.

Invenergy III, 450 F. Supp. 3d at 1365 (citations omitted).  The court takes no position on the

efficacy of safeguard duties in providing protection to the domestic solar industry or of a decision

to exclude products from those safeguard duties.  Id.  Once again, the court merely continues to

require the Government to follow its own laws when it acts.

     **SO ORDERED.**

/s/   Gary S. Katzmann
Gary S. Katzmann, Judge


Dated:  October 15, 2020
     New York, New York