# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

_____

| | |
|---|---|
| INVENERGY RENEWABLES LLC, | ) |
| | ) |
| Plaintiff, | ) |
| and | ) |
| | ) |
| SOLAR ENERGY INDUSTRIES | ) |
| ASSOCIATION, CLEARWAY ENERGY | ) |
| GROUP LLC, EDF RENEWABLES, INC., and | ) |
| AES DISTRIBUTED ENERGY INC., | ) |
| | ) |
| Plaintiff-Intervenors, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, OFFICE OF THE | ) |
| UNITED STATES TRADE | ) |
| REPRESENTATIVE, UNITED STATES | ) |
| TRADE REPRESENTATIVE ROBERT E. | ) |
| LIGHTHIZER, U.S. CUSTOMS AND BORDER | ) |
| PROTECTION, and ACTING COMMISSIONER | ) |
| MARK A. MORGAN, | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| HANWHA Q CELLS USA, INC., and AUXIN | ) |
| SOLAR, | ) |
| | ) |
| Defendant-Intervenors. | ) |

Before: Judge Gary S. Katzmann

Court No. 19-00192

## <u>PROPOSED ORDER</u>

Upon consideration of Plaintiff Invenergy Renewables LLC, and Plaintiff-Intervenors Clearway Energy Group LLC, AES Distributed Energy Inc.'s, EDF Renewables, Inc. and Solar Energy Industries Association's Emergency Motion to Modify the Preliminary Injunction or Enter a TRO, and upon due deliberation, it is hereby:

**ORDERED** that the Preliminary Injunction entered in this case on December 5, 2020, and modified on October 15, 2020, to bar the effectiveness or entry into force of the United States Trade Representative's April 2020 Withdrawal of the bifacial panel Exclusion, is hereby further MODIFIED to bar Defendants from entering into effect, enforcing, or modifying the Harmonized Tariff Schedule to reflect, rely, or to achieve the purposes of Presidential Proclamation 10101, insofar as that Proclamation purports to withdraw the June 2019 Exclusion and apply safeguard duties to bifacial solar panels.

Dated: _____          _____

New York, New York                                    Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

_____

INVENERGY RENEWABLES LLC,    )
)
        Plaintiff,    )
   and    )
)
SOLAR ENERGY INDUSTRIES    )
ASSOCIATION, CLEARWAY ENERGY    )
GROUP LLC, EDF RENEWABLES, INC., and    )
AES DISTRIBUTED ENERGY INC.,    )
)    Before: Judge Gary S. Katzmann
        Plaintiff-Intervenors,    )    Court No. 19-00192
)
        v.    )
)
THE UNITED STATES, OFFICE OF THE    )
UNITED STATES TRADE    )
REPRESENTATIVE, UNITED STATES    )
TRADE REPRESENTATIVE ROBERT E.    )
LIGHTHIZER, U.S. CUSTOMS AND BORDER    )
PROTECTION, and ACTING COMMISSIONER    )
MARK A. MORGAN,    )
        Defendants,    )
)
   and    )
)
HANWHA Q CELLS USA, INC., and AUXIN    )
SOLAR,    )
)
        Defendant-Intervenors. )
_____ )

## EMERGENCY MOTION TO MODIFY PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, ENTER A TEMPORARY RESTRAINING ORDER

Plaintiffs Invenergy Renewables LLC, and Plaintiff-Intervenors Clearway Energy Group

LLC, AES Distributed Energy Inc., EDF Renewables Inc., and the Solar Energy Industries

Association (together, Plaintiffs) hereby respectfully move the Court to modify its preliminary

injunction ("PI"), entered on December 5, 2019 (ECF No. 114) and modified on October 15,

2020 (ECF Nos. 252, 253), to bar Defendants from entering into effect, enforcing, or modifying

the Harmonized Tariff Schedule to reflect, or otherwise from taking action to impose safeguard tariffs on bifacial solar panels pursuant to the President's *Proclamation to Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells*, 85 Fed. Reg. 65,639 (Oct. 16, 2020) ("2020 Proclamation").

As set forth in the attached Memorandum of Law, Plaintiffs contend that the existing PI already would prohibit any withdrawal of the Exclusion from taking effect, whether or not as a consequence of the 2020 Proclamation.[1] In any event, the obvious deficiencies in the 2020 Proclamation, including its failure to comport with the requirements of the 1974 Trade Act, justify modifying the injunction to explicitly prohibit any application of safeguard duties on bifacial panels to occur pursuant to the 2020 Proclamation. In the alternative, in order to "preserve the status quo . . . until final resolution of this case on the merits," Oct. 15, 2020 PI Opinion (ECF No. 252) at 18, Plaintiffs respectfully request that the Court enter a Temporary Restraining Order to prevent the 2020 Proclamation from becoming effective, and safeguard duties from being imposed on October 25, 2020, and set a schedule for more comprehensive briefing on the lawfulness of the 2020 Proclamation.

---

[1] This court's decision on the show cause motion supports that view, as the Court declined to halt the government's second process addressing the Exclusion because the initiation of that process alone did not "modify the HTSUS" or "constitute a final decision to implement the previous or *any new withdrawal* of the Exclusion of bifacial solar panels." *Invenergy Renewables LLC v. United States*, 427 F. Supp. 3d 1402, 1407 (2020) (emphasis added). Until issuance of the 2020 Proclamation, the government took the same view, repeatedly assuring the Court that it would not impose tariffs on bifacial panels until the Court lifted its PI. *E.g.,* Tr. of Hearing on Mot. to Show Cause (Ex. A) at 43 ("The PI enjoined amendment of the harmonized tariff schedule to start collecting deposits of duties on entries of bifacial panels, and that . . . will remain in place so long as there's no final judgment in this case."); Opp. to Show Cause Mot. (ECF No. 139) at 12-14 ("Nothing in the USTR's notice inviting comments enforces or makes effective the withdrawal. . . Invenergy is entitled to the certainty of USTR's compliance with the preliminary injunction order, which the Court and the parties have received.").

Plaintiffs respectfully request that the Court order Defendants to respond to this Motion no later than October 22, 2020. Otherwise it is unreasonable to expect the Court to decide whether relief is warranted before the 2020 Proclamation becomes effective on October 25, 2020. While Plaintiffs regret having to request an expedited decision, it is a problem of the government's own making, having chosen to implement the 2020 Proclamation a mere 9 days after it was published in the Federal Register, and 13 days after Defendants first informed the Court and Plaintiffs of its existence. Plaintiffs have proceeded as quickly as reasonably practicable to assess this new withdrawal action, to supplement their Complaints, and to draft the instant motion for temporary relief from the Proclamation's impending implementation.

Respectfully submitted,

John Brew
Larry Eisenstat
Amanda Shafer Berman
Leland P. Frost
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500

/s/Frances Hadfield
Frances Hadfield
**CROWELL & MORING LLP**
590 Madison Ave, 20th Floor
New York, New York 10022
(212) 803-4040

*Counsel to Invenergy Renewables LLC, Clearway Energy Group LLC, and AES Distributed Energy Inc.*

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street, N.W.

Washington, D.C. 20006
(202) 721-4750
mnicely@akingump.com
*Counsel to SEIA*

/s/ Kevin O'Brien
Kevin M. O'Brien
Christine M. Streatfeild
**Baker & McKenzie LLP**
815 Connecticut Ave, NW
Washington, DC 20006
(202) 452-7000
kevin.obrien@bakermckenzie.com

*Counsel to EDF Renewables, Inc*

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

INVENERGY RENEWABLES LLC,

                   Plaintiff,

     and

SOLAR ENERGY INDUSTRIES
ASSOCIATION, CLEARWAY ENERGY
GROUP LLC, EDF RENEWABLES, INC., and
AES DISTRIBUTED ENERGY INC.,

              Plaintiff-Intervenors,

               v.

THE UNITED STATES, OFFICE OF THE
UNITED STATES TRADE
REPRESENTATIVE, UNITED STATES
TRADE REPRESENTATIVE ROBERT E.
LIGHTHIZER, U.S. CUSTOMS AND BORDER
PROTECTION, and ACTING COMMISSIONER
MARK A. MORGAN,

              Defendants,

     and

HANWHA Q CELLS USA, INC., and AUXIN
SOLAR,

              Defendant-Intervenors.

**Public Version**

Before: Judge Gary S. Katzmann
Court No. 19-00192

## MEMORANDUM OF LAW IN SUPPORT OF
## EMERGENCY MOTION TO MODIFY INJUNCTION
## OR, IN THE ALTERNATIVE, ENTER TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

FACTUAL BACKGROUND ......................................................................................3

    A.    The Solar Safeguard Measure. ....................................................................3

    B.    USTR Excludes Bifacial Panels From Safeguard Measure. ......................4

    C.    Plaintiffs' Claims. .......................................................................................5

    D.    The First PI Decision and USTR's New Withdrawal Action. ...................5

    E.    The Court's Second and Third PI Decisions. .............................................7

    F.    The 2020 Proclamation. ..............................................................................9

STANDARD OF REVIEW .....................................................................................10

I.      THE STANDARD FOR MODIFICATION OF A PI. ...................................10

II.    THE TRO STANDARD .............................................................................12

ARGUMENT ...........................................................................................................13

I.      THE PI SHOULD BE MODIFIED TO BAR THE 2020
       PROCLAMATION FROM BECOMING EFFECTIVE ON OCTOBER
       25 ...............................................................................................................13

    A.    Modifying the PI is Again Necessary to Preserve the Status Quo. ..........14

    B.    Plaintiffs Remain Likely to Succeed on the Merits Because the
        2020 Proclamation Is Unlawful for Many of the Same Reasons as
        USTR's Withdrawal Actions. ...................................................................17

        1.    The 2020 Proclamation Violates Section 204(b)(1)(B) of
          the Trade Act. ...............................................................................19

          (a)    The President Has Not Made the Findings Required
             by Statute to Reduce, Modify, or Terminate a
             Safeguard Measure. ........................................................20

          (b)    The 2020 Proclamation Orders Action that Is Not
             Authorized by Section 204(b)(1)(B). ............................21

         2.    The Trade Act Prohibits the Increase of a Safeguard
          Measure Under Section 204(b)(1). ..............................................24

         3.    The Trade Act Prohibits Re-Imposition of a Safeguard
          Measure Less Than Two Years After It Was Terminated. .............27

         4.    The Trade Act Requires the President to Weigh Social and
          Economic Costs and Benefits Before Imposing or
          Modifying a Safeguard Measure. ................................................29

         5.    The 2020 Proclamation Violates Plaintiffs' Due Process
          Rights. .........................................................................................32

II.    IN THE ALTERNATIVE, THE COURT SHOULD ISSUE A TRO TO

DCACTIVE-56582149.1

PREVENT THE 2020 PROCLAMATION FROM BECOMING
EFFECTIVE ON OCTOBER 25. ....................................................................................34

    A.    As Before, Plaintiffs Face Procedural, Economic, and Other
           Irreparable Harm From Withdrawal of the Exclusion. .......................................36

    B.    The Equities and Public Interest Continue to Favor Enjoining
           Withdrawal of the Exclusion. ...........................................................................41

CONCLUSION...........................................................................................................................42

DCACTIVE-56582149.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1250 24th Street Associates Ltd. Partnership v. Brown*,
    684 F. Supp. 326 (D.D.C. 1988) .........................................................................16

*2910Georgia Avenue LLC v. District of Columbia*,
    234 F.Supp.3d 281 (D.D.C. 2017) ....................................................................32

*Ad Hoc Shrimp Trade Action Comm. v. United States (Ad Hoc Shrimp I)*,
    32 C.I.T. 666 (2008) .........................................................................10, 11, 17

*Ad Hoc Shrimp Trade Action Comm. v. United States (Ad Hoc Shrimp II)*,
    34 C.I.T. 1275 (2010) .......................................................................................11

*Amado v. Microsoft Corp.*,
    517 F.3d 1354 (Fed. Cir. 2008) ...........................................................8, 10, 15, 17

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002) ..........................................................................................26

*Corus Grp. PLC v. Bush*,
    26 C.I.T. 937 (2002), *aff'd in part sub nom. Corus Grp. PLC. v. Int'l Trade
    Comm'n.*, 352 F.3d 1351 (Fed. Cir. 2003) .........................................................12

*Corus Grp. PLC v. Int'l. Trade Comm'n*,
    352 F.3d 1351 (Fed. Cir. 2003) ........................................................................19

*Dart v. United States*,
    848 F.2d 217 (D.C. Cir. 1988) ..........................................................................24

*Dole v. United Steelworkers of America*,
    494 U.S. 26 (1990) ............................................................................................24

*Everett v. City of Tallahassee*,
    840 F.Supp. 1528 (N.D. Fla. 1992) ..................................................................33

*FMC Corp. v. United States*,
    3 F.3d 424 (Fed. Cir. 1993) ..............................................................................12

*FTC v. Mandel Brothers, Inc.*,
    359 U.S. 385 (1959) ..........................................................................................26

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ..........................................................................................32

DCACTIVE-56582149.1

*Granny Goose Foods v. Teamsters*,
415 U.S. 423 (1974)...........................................................................12

*Ill. Pub. Telcoms. Ass'n v. FCC*,
752 F.3d 1018 (D.C. Cir. 2014)...........................................................26

*Invenergy Renewables LLC v. United States*,
427 F. Supp. 3d 1402 (2020) ..........................................................7, 15

*Invenergy Renewables v. United States*,
422 F. Supp. 3d 1255 (CIT 2019)...................................................16, 36

*Keene Corp. v. United States*,
508 U.S. 200 (1993)............................................................................21

*Kentucky Dep't of Corrections v. Thompson*,
480 U.S. 454 (1989)............................................................................32

*King v. Burwell*,
135 S. Ct. 2480 (2015).......................................................................23

*Kuck v. Danaher*,
822 F. Supp. 2d 109 (D. Conn. 2011)................................................33

*Kwo Lee, Inc. v. United States*,
24 F. Supp. 3d 1322 (2014) ...............................................................41

*Laramie v. U.S. Tr.*,
540 U.S. 526 (2004)............................................................................26

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985)..............................................................21

*Massachusetts v. Morash*,
490 U.S. 107 (1989)............................................................................24

*Matthews v. Eldridge*,
424 U.S. 319 (1976)............................................................................32

*Motion Sys. Corp. v. Bush*,
437 F.3d 1356 (Fed. Cir. 2006) (en banc)..........................................19

*Nat'l Wildlife Fed'n v. Burford*,
835 F.2d 305 (D.C. Cir. 1987).......................................................17, 33

*National Ass'n of Manufac*,
2020 WL 5847503, -- F.Supp.3d -- (N.D. Cal. 2020).................18, 19, 31

DCACTIVE-56582149.1

*NEC Corp. v. U.S.*,
    151 F.3d 1361 (Fed. Cir. 1998)............................................................32, 33

*Otter Prods., LLC v. United States*,
    37 F. Supp. 3d 1306 (2014) ........................................................................41

*Perry v. Sinderman*,
    408 U.S. 593 (1972)....................................................................................32

*Pro Edge L.P. v. Gue*,
    411 F. Supp. 2d 1080 (N.D. Iowa 2006)....................................................16

*Roberts v. Sea-Land Services, Inc.*,
    566 U.S. 93 (2012)......................................................................................26

*Russello v. United States*,
    464 U.S. 16 (1983)......................................................................................21

*Safeguard Base Operations, LLC v. United States*,
    140 Fed. Cl. 670 (2018) .............................................................................12

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ........................................................20, 24, 28

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018)........................................18, 21, 24, 28

*SKF USA Inc. v. United States*,
    28 C.I.T. 170 (2004) ...........................................................................14, 17

*Sneaker Circus, Inc. v. Carter*,
    457 F. Supp. 771 (E.D.N.Y. 1978), *aff'd*, 614 F.2d 1290 (2d Cir. 1979)..............................32

*Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*,
    364 U.S. 642 (1961)..........................................................11, 14, 17

*Teters Floral Products Co., Inc. v. United States*,
    586 F. Supp. 960 (Ct. Intl. Trade 1984).....................................................34

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
    768 F.2d 1001 (9th Cir. 1985) ...................................................................14

*U.S. Auto Parts Network, Inc. v. United States*,
    319 F. Supp. 3d 1303 (CIT 2018)...............................................................12

*United States v. Swift & Co.*,
    286 U.S. 106 (1932)....................................................................................14

DCACTIVE-56582149.1

**Statutes**

19 U.S.C. § 2201(a) ..........................................................................................29

19 U.S.C. § 2251, *et seq.*..............................................................................*passim*

19 U.S.C. § 2252................................................................................................3, 26

19 U.S.C. § 2253 ..........................................................................................*passim*

19 U.S.C. § 2253(e)(7)......................................................................................27, 28

19 U.S.C. §2254 ............................................................................................*passim*

Pub. L. 100-418, 102 STAT 1107 (1988).........................................................23

Pub. L. 103-465, 108 STAT. 4809 (1994)........................................................23

**Other Authorities**

83 Fed. Reg. 3,541 (Jan. 25, 2018) .....................................................3, 4, 29, 30

83 Fed. Reg. 6,670 (Feb. 14, 2018) .......................................................................4

84 Fed. Reg. 27,684 (June 13, 2019) ...............................................................*passim*

84 Fed. Reg. 54,244 (Oct. 9, 2019)..................................................................*passim*

85 Fed. Reg. 4,756 (Jan. 27, 2020) ..................................................................6, 14

85 Fed. Reg. 21,497 (Apr. 17, 2020) ..............................................................*passim*

85 Fed. Reg. 65,639 (Oct. 16, 2020)................................................................*passim*

H.R. Rep. 103-316 *reprinted in* 1994 U.S.C.C.A.N. 4040 ...............................25, 28

H.R. Rep. No. 103-826, 131 (1994)...................................................................28

H. Rep. No. 100-576 (1988), *reprinted in* 1988 U.S.C.C.A.N 1547 ..............................23

DCACTIVE-56582149.1

Plaintiffs Invenergy Renewables LLC, and Plaintiff-Intervenors Clearway Energy Group LLC, AES Distributed Energy Inc., EDF Renewables Inc., and the Solar Energy Industries Association ("Plaintiffs") hereby move the Court to modify the preliminary injunction entered by this Court on December 5, 2019, and subsequently modified on October 15, 2020 (the "PI"), to encompass Presidential Proclamation 10101, *Proclamation to Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells*, 85 Fed. Reg. 65,639 (Oct. 16, 2020) ("2020 Proclamation"), which imposes safeguard tariffs on bifacial solar panels. Plaintiffs request that the Court enjoin Defendants from effectuating the 2020 Proclamation, by, among other things, implementing the modifications to the Harmonized Tariff Schedule set forth in the 2020 Proclamation until final judgment is entered in this case. In the alternative, Plaintiffs move the Court to enter a temporary restraining order ("TRO") preventing the entry into force or effectiveness of the 2020 Proclamation, which states that it will become effective October 25, 2020, pending further review by this Court of the lawfulness of that Proclamation and so as to allow the parties to further brief whether the PI should be modified, or a new PI should issue.

## INTRODUCTION

This Court has already found two prior attempts by the government to withdraw the June 2019 bifacial panel Exclusion likely unlawful, and indeed just days ago modified its December 2019 preliminary injunction ("PI") to explicitly bar the government from entering either of those withdrawal actions into effect or from otherwise modifying the HTS until it reached a final decision on the lawfulness of such action. The government nonetheless attempts, yet again, to withdraw the Exclusion, this time via the 2020 Proclamation. In doing so, the government plainly seeks to bypass the Court's review—and to circumvent the Court's PI. Indeed Defendants' counsel informed Plaintiffs and this Court that the modifications set forth in the

2020 Proclamation will become effective on October 25, 2020 regardless of the pendency of the injunction, and that safeguard duties will in fact be imposed and collected on bifacial panels beginning as of that date, and likewise notwithstanding this Court's PI.

The Court should not allow that to happen. First, just as the April 2020 Withdrawal reflected the very same action as the October 2019 Withdrawal, so too does the 2020 Proclamation. Second, the 2020 Proclamation's effort to again withdraw the Exclusion is no less unlawful than the United States Trade Representative's ("USTR's") prior efforts. As discussed further below, here too, the President has failed to follow the requirements and processes set forth in Sections 203 and 204 of the 1974 Trade Act ("Trade Act"), which address when and how a safeguard measure can be imposed, re-imposed, or modified. Indeed, those relevant provisions of Section 203 and 204 in fact bar *any* increase of a safeguard measure, as well as any effort to re-impose a safeguard measure on a given product (here, bifacial solar panels) for at least two years after such measure was terminated in regard to that product (which is exactly what the Exclusion did; it terminated the measure's application to bifacial panels). And by failing to follow these and other statutorily prescribed requirements and procedures, the government has again deprived Plaintiffs of their rights to due process under the Constitution.

The 2020 Proclamation's issuance is for all intents and purposes simply the government's third attempt to take the same action previously enjoined by this Court. Thus, as was true of the April 2020 Withdrawal, it is exactly the kind of change that warrants the existing PI's modification in order to preserve the status quo. Alternatively, Plaintiffs respectfully request that the Court issue a temporary restraining order ("TRO") to prevent the modifications to the HTS made by the 2020 Proclamation from taking effect on October 25, and then allow the parties to

further brief whether the PI should be modified, or a new PI should issue, to address this latest in a string of procedurally improper and substantively unlawful government actions.

## FACTUAL BACKGROUND

The history of this dispute has been narrated in prior filings, as well as this Court's December 5, 2019, May 27, 2020, and October 15, 2020 PI opinions (ECF Nos. 113, 185, & 252 respectively). Plaintiffs highlight below the most relevant parts, including the Court's recent decision modifying the PI to bar entry into force of USTR's April Withdrawal of the Exclusion, and the government's latest attempt to again withdraw the Exclusion: the 2020 Proclamation.

### A.    The Solar Safeguard Measure.

The Trade Act of 1974, 19 U.S.C. § 2251, *et seq.*, authorizes the President to impose discretionary measures, known as "safeguards," to provide relief from serious injury, or a threat of serious injury, to a domestic industry for which foreign imports are a substantial cause. 19 U.S.C. § 2252-53. In doing so, the President must consider factors including the "short- and long-term economic and social costs of the actions . . . relative to their short- and long-term economic and social benefits," as well as "the effect of the implementation of actions under this section on consumers and on competition in domestic markets for articles." 19 U.S.C. § 2253(a)(2). And to the extent that measures are imposed for over one year, the President must "phase down" such measures during the period they are in effect.  19 U.S.C. § 2253(e)(5).

In January 2018, the President imposed a safeguard measure on crystalline silicon photovoltaic (CSPV) cells, "whether or not partially or fully assembled into other products," including monofacial and bifacial solar panel modules for a period of four years. Presidential Proclamation 9693, *To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes*, 83 Fed. Reg. 3541 (Jan. 25, 2018). The President identified

two core statutory considerations as supporting his decision to impose the safeguard measure: the need to "facilitate efforts by the domestic industry to make a positive adjustment to import competition," and a determination that the measure would "provide greater economic and social benefits than costs." *Id*. at 3,542. The President delegated the authority to establish procedures for the "exclusion of a particular product from the safeguard measure" to USTR (*Id*. at 3,541), and to grant such exclusions if "the USTR determines . . . that a particular product should be excluded." *Id*. at 3,543-44.

**B.    USTR Excludes Bifacial Panels From Safeguard Measure.**

In February 2018, USTR published procedures for parties to seek exclusions from the safeguard measure. *Procedures To Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6,670 (Feb. 14, 2018) ("Exclusion Procedures"). "These procedures were silent as to the revision, reconsideration, or withdrawal of exclusions once issued." PI Op. at 6; *id*. at 9 ("The notice did not provide a method for withdrawing an exclusion . . . ."). After more than a year of deliberation, USTR excluded:

> bifacial solar panels [both utility-grade and non-utility grade] that absorb light and generate electricity on each side of the panel and that consist of only bifacial solar cells that absorb light and generate electricity on each side of the cells.

Exclusion of Particular Products From the Solar Products Safeguard Measure, 84 Fed. Reg. 27,684, 27,685 (June 13, 2019) ("Exclusion").

Four months later, USTR reversed course and withdrew the Exclusion. *See Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure,* 84 Fed. Reg. 54,244 (Oct. 9, 2019) ("October Withdrawal"). USTR stated it had received "comments" and "inquiries" critical of the Exclusion, and concluded that the Exclusion "will likely result in significant increases in imports of bifacial solar panels . . . [which] likely will compete with domestically

produced monofacial and bifacial CSPV products in the U.S. market" and thereby "undermine the objectives of the safeguard measure." *Id*. at 54,245

### C.  Plaintiffs' Claims.

Plaintiffs filed their original Complaints in this case seeking injunctive and other relief from the October Withdrawal. Plaintiffs brought claims asserting, *inter alia*, that USTR's action violated the Administrative Procedure Act ("APA") and constitutional due process requirements because it was taken without proper notice to affected parties or an opportunity for them to comment, and further violated the APA because USTR failed to adequately explain its reasons for and support its withdrawal of the Exclusion, thereby rendering that action arbitrary and capricious. Plaintiffs also claimed that USTR lacked authority to withdraw the Exclusion and that the government's withdrawal of the Exclusion violated the procedures and requirements set forth in Sections 203-04 of the Trade Act. *E.g.*, ECF No. 15 (Invenergy's original Complaint).

After USTR issued a second rule attempting to withdraw the Exclusion in April 2020, Plaintiffs moved for leave to supplement their Complaints to incorporate that unlawful action into their existing APA, Trade Act, and due process claims, as well as to include the facts related to that issuance in the Background section of their Complaints. ECF Nos. 160, 161, & 162. The Court granted those first Motions to Supplement on May 27, 2020.

On October 17, 2020, Plaintiffs again moved for leave to supplement their Complaint, this time to incorporate the 2020 Proclamation into their Complaints, and challenge that action through their existing claims. ECF No. 257. That motion remains pending.

### D.  The First PI Decision and USTR's New Withdrawal Action.

This Court issued a preliminary injunction (PI) on December 5, 2019, after extensive briefing of the lawfulness of USTR's October Withdrawal action. *See* PI Op. and Order (ECF No. 113). The Court "enjoin[ed] the government from reversing" the Exclusion in order "to

maintain the status quo until such time as the lawfulness of the Withdrawal is determined by final judgment." *Id.* at 3. The PI enjoined USTR from enforcing or entering the October Withdrawal into effect "from the date of issuance of this order until entry of final judgment as to Plaintiffs' claims against Defendants in this case," and from "making any modifications to the [HTS] that includes or reflects the Withdrawal." *Id*. at 57. The PI also enjoined U.S. Customs and Border Protection ("CBP") from "enforcing or making effective the Withdrawal, or any modifications reflecting or including the Withdrawal." *Id*. Among other things, the Court found a PI necessary "to avoid the business uncertainty" that would result if withdrawal of the Exclusion became effective before the Court determined its legality. *Id.* at 51.

After the Court issued the PI, USTR initiated a new action to again consider withdrawing the Exclusion. *See Procedures To Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 4,756 (Jan. 27, 2020) ("January Notice"). In that Notice, USTR acknowledged that the PI would have to remain in place until after the Court reviewed the results of USTR's administrative process and determined whether it was appropriate to lift the PI. *Id*. at 4,756 ("If the U.S. Trade Representative determines . . . that it would be appropriate to withdraw the bifacial exclusion or take some other action with respect to the exclusion, the U.S. Trade Representative will request that the Court lift the injunction."). Indeed, the government has consistently represented that the existing PI would remain in place until such time as the Court might order that the PI be lifted.[1]

---

[1] *See, e.g.,* Tr. of Hearing on Mot. to Show Cause at 43 (Ex. A) (Mr. Tosini: "The PI enjoined amendment of the Harmonized Tariff Schedule to start collecting deposits of duties on entries of bifacial panels, and that remains in place, and it will remain in place so long as there's no final judgment in this case."); Opp. to Show Cause Mot. (ECF No. 139) at 12-14 ("Nothing in the USTR's notice inviting comments enforces or makes effective the withdrawal of the bifacial panel exclusion contemplated by the Withdrawal Notice . . . Invenergy is entitled to the certainty

Thus, the Court declined to halt the government's second administrative process addressing the Exclusion because the January 2020 Notice alone did not "modify the HTSUS" or "constitute a final decision to implement the previous or *any new withdrawal* of the Exclusion of bifacial solar panels." *Invenergy Renewables LLC v. United States*, 427 F. Supp. 3d 1402, 1407 (2020) (emphasis added).

On April 17, 2020, USTR determined—again—that the Exclusion should be withdrawn. *Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 21,497 (Apr. 17, 2020) ("April Withdrawal"). Importantly, USTR also again recognized that this Court must lift the PI before the government could enter into effect, or modify the HTS to reflect, a withdrawal of the bifacial panel Exclusion. *Id*. ("Withdrawal of the exclusion for bifacial solar panels from application of the safeguard measure will apply to imported panels *if the Court lifts the preliminary injunction . . . .*") (emphasis added).

**E. The Court's Second and Third PI Decisions.**

After issuing the April Withdrawal, the government moved—twice—to dissolve the PI. The Court denied the government's first Motion to Dissolve in a May 27, 2020 Opinion (ECF No. 185). The Court explained "that the Government has not met its burden of showing changed circumstances and resulting inequity in order to justify dissolution of the PI." *Id.* at 24. It rejected the government's argument that, by issuing the April Withdrawal, the government had "cured the sole reason for which the injunctive relief was granted." *Id*. at 10 (quoting Defendants' brief). The Court explained that, without showing that the April Withdrawal was not arbitrary and

_____

of USTR's compliance with the preliminary injunction order, which the Court and the parties have received.").

capricious, "the Government cannot show that circumstances have sufficiently changed . . . nor can it show that inequity would result in the court's continual enforcement of the PI." *Id*. at 26.

After the Court's decision on the government's first motion to dissolve the PI, USTR unilaterally rescinded the October Withdrawal, and then moved again to dissolve the PI. ECF No. 198. But on October 15, 2020, the Court denied the government's second motion to dissolve, and instead granted Plaintiffs' cross-motion to modify the PI to explicitly bar entry into force of, or modification of the HTS to reflect, USTR's second withdrawal of the Exclusion until a final judgment on the merits in this case. *See* ECF Nos. 252 ("Oct. 15 Op.") & 253 ("Oct. 15 Order"). The Court also held that USTR's first withdrawal of the Exclusion in October 2019 "was unlawful on the merits and vacate[d] that decision accordingly." Oct. 15 Op. at 12.

In its October 15 PI Opinion, the Court concluded "that the PI should be modified in order to preserve the status quo . . . until final resolution of this case on the merits." *Id.* at 18. [2] It explained that, because "the [April] Withdrawal presents changed circumstances that, if implemented, would likely result in the very inequity to the Plaintiffs the PI sought to prevent, modification of the PI is warranted." *Id*. at 20. The Court also found that Plaintiffs had shown that the April Withdrawal "was likely arbitrary and capricious and that [Plaintiffs] would suffer from the same procedural harm" as they would have faced had the October Withdrawal entered into effect. *Id*. at 22. Having found that the April Withdrawal was likely arbitrary and capricious, the Court noted that it "need not reach each of Plaintiffs' challenges . . . at this preliminary stage,

---

[2] The Court explained that it retained jurisdiction to modify the PI despite the government's appeal of the Court's denial of the first motion to dissolve the PI "because Plaintiffs seek modification in order to further preserve the status quo of the case while their claims are decided on the merits." *See id.* at 18 (citing, inter alia, *Amado v. Microsoft Corp.*, 517 F.3d 1354, 1358 (Fed. Cir. 2008) ("district courts possess broad equitable authority to modify injunctions, . . . particularly under . . . circumstances where it is done to preserve the status quo while motions affecting that injunction are under advisement")).

and thus does not reach Plaintiffs' challenges to USTR's statutory authority for withdrawing an exclusion . . . ." *Id.*

The Court next found that not modifying the PI to incorporate and bar entry into effect of the April Withdrawal would be inequitable because "Plaintiffs[] would face the same irreparable procedural harm" in being subject to an unlawful decision as they faced when the court issued the PI enjoining enforcement of the October Withdrawal. *Id.* at 37. "Thus, if the Second Withdrawal were to go into effect and then later" found unlawful, "Plaintiffs would face harms from a procedurally deficient agency decision for which the court would be unable to remedy. Thus, Plaintiffs' continue to face irreparable harm as a result of USTR's actions and it would [be] inequitable to not modify the PI . . . ." *Id.* at 39. The Court then "conclude[d] that the PI should be modified in order to fulfill its intended purpose and to avoid inequity to Plaintiffs." *Id.*

## F.    The 2020 Proclamation.

Just days before the Court declined to dissolve the PI for the second time, and instead modified it to bar the April Withdrawal from going into effect, the President issued Proclamation 10101, which purports to (again) withdraw the bifacial panel Exclusion. 85 Fed. Reg. at 65,639. After stating that the domestic industry "has begun to make positive adjustments to import competition," the 2020 Proclamation sets forth the "determination" that "it is necessary to revoke that exclusion and to apply the safeguard tariff to bifacial panels." 2020 Proclamation ¶ 9(a). The 2020 Proclamation then states that it modifies the HTS—exactly what the Court's existing PI prohibits—to impose Section 201 safeguard tariffs on bifacial solar panels as set forth in the attached Annex (which was not actually attached to the Proclamation, but published for the first time in the Federal Register six days later), and that safeguard duties on imports of bifacial solar panels "shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption" on October 25, 2020. 2020 Proclamation ¶¶ (1) & (4). Apparently,

then, the government no longer thinks it is required to stand down from withdrawing the Exclusion until the Court lifts its PI, preferring instead entirely to dispense with this Court's ongoing review of USTR's unlawful attempts to withdraw the Exclusion.[3]

Like USTR's April and October Withdrawal actions, this new attempt to withdraw the Exclusion is unlawful because, among other things, it violates the Trade Act's restrictions on the imposition and modification of safeguard measures and does not comply with the processes prescribed by that Act for such actions. Whether the work of the USTR or the President, withdrawal of the Exclusion, which thereby would re-impose a safeguard tariff on bifacial panels violates Sections 203 and 204 the Trade Act. And just like USTR, the President failed to follow the procedures and requirements for either imposing or modifying a safeguard measure, as discussed further below.

STANDARD OF REVIEW

## I.      THE STANDARD FOR MODIFICATION OF A PI.

The Federal Circuit has explained that "district courts possess broad equitable authority to modify injunctions . . . particularly under . . . circumstances where it is done to preserve the status quo while motions affecting that injunction are under advisement." *Amado v. Microsoft Corp.*, 517 F.3d 1354, 1358 (Fed. Cir. 2008). A party moving to modify a PI must show that a change in circumstances justifies modification as a matter of equity. *See Ad Hoc Shrimp Trade Action Comm. v. United States (Ad Hoc Shrimp I)*, 32 C.I.T. 666, 670 (2008).

---

[3] The Proclamation also unlawfully increases Section 201 tariffs on bifacial solar panels in year four of that measure (February 7, 2021 through February 6, 2022) from 15% to 18%. October 2020 Proclamation ¶ 9(b).

This standard is applied liberally to protect PI movants. The Supreme Court has urged courts to exercise "continuing supervision" over an injunction, and "apply [their] powers" to assist the party that obtained injunctive relief as needed:

> [S]ound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen. The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief.

*Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961). The Supreme Court has also confirmed that "neither the plaintiff nor the court should be subjected to the unnecessary burden of re-establishing what has once been decided." *Id.*

Thus, Plaintiffs' Motion to Modify does not require the Court to revisit, *ab initio*, its prior conclusions that Plaintiffs face irreparable harm and that the equities favor a PI. *See Ad Hoc. Shrimp I,* 32 C.I.T. at 669 (defendants may not "effectively shift the burden to the Plaintiff to reprove the factors for [a PI] that have previously been proven to the court's satisfaction"); *Ad Hoc Shrimp Trade Action Comm. v. United States (Ad Hoc Shrimp II)*, 34 C.I.T. 1275, 1283 (2010) ("[T]he standards for obtaining a preliminary injunction and for modifying a preliminary injunction are not the same" because modification requires only that "circumstances have changed that necessitate modification.") (internal citations omitted). The question now before the Court thus is whether the government's third attempt to withdraw the Exclusion, this time via a Presidential Proclamation, warrants modification of the PI to reflect that act and continue to

protect Plaintiffs from harm until the Court decides once and for all whether withdrawal of the Exclusion—whether by the President or USTR[4]—is lawful.

## II.    THE TRO STANDARD

A temporary restraining order may be entered where necessary to "preserv[e] the status quo and prevent[] irreparable harm" until a preliminary injunction hearing can be held. *Granny Goose Foods v. Teamsters*, 415 U.S. 423, 439 (1974).

The standard for granting a TRO is the same as for a preliminary injunction. *See Safeguard Base Operations, LLC v. United States*, 140 Fed. Cl. 670 (2018). This requires demonstrating that: (1) there is likelihood of success on the merits; (2) without preliminary relief, the movant will suffer irreparable and immediate harm; (3) the public interest would be better served by the requested relief; and (4) the balance of hardships weighs in its favor. *Id.*; *Corus Grp. PLC v. Bush*, 26 C.I.T. 937, 942 (2002), *aff'd in part sub nom. Corus Grp. PLC. v. Int'l Trade Comm'n.*, 352 F.3d 1351 (Fed. Cir. 2003). "No one factor, taken individually, is necessarily dispositive"; a weakness in one area may be "overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). Where plaintiffs make a strong showing on one or more PI factors, they face a lesser burden on the remaining factors. *See, e.g., U.S. Auto Parts Network, Inc. v. United States*, 319 F. Supp. 3d 1303, 1307 (CIT 2018); *One World Techs., Inc. v. United States*, 357 F. Supp. 3d 1278, 1288 (CIT 2018).

---

[4] Defendants suggested during the October 19, 2020 scheduling hearing that USTR's April Withdrawal will become ineffective, and the claims directed at that action become moot, when the 2020 Proclamation becomes effective on October 25, 2020. Not so. Unlike the October Withdrawal, USTR has not rescinded, and the Court has not vacated, the April Withdrawal, so it remains in effect and Plaintiffs' challenges to it remain live. And were the Court to hold the 2020 Proclamation alone unlawful, then the April Withdrawal would remain in place and Plaintiffs' would continue to face harm from its potential implementation.

As discussed in Section II below, if the Court is not prepared to modify the PI before the Proclamation takes effect on October 25, the Court should enter a TRO to preserve the status quo until the parties can further brief and the court can rule on a motion for a modified or new preliminary injunction directed specifically at the 2020 Proclamation, and thereby prevent irreparable harm to Plaintiffs resulting from the government's latest unlawful attempt to withdraw the Exclusion without following proper procedures.

## ARGUMENT

**I.     THE PI SHOULD BE MODIFIED TO BAR THE 2020 PROCLAMATION FROM BECOMING EFFECTIVE ON OCTOBER 25.**

The PI entered by this Court, and previously modified to bar effectiveness or entry into force of the government's April 2020 withdrawal of the bifacial panel Exclusion, should be modified to also bar the effectiveness or entry into force of the 2020 Proclamation, which takes the same substantive action (withdrawing the Exclusion) and is unlawful for many of the same reasons as USTR's prior withdrawal action. Like the April and October Withdrawals, the 2020 Proclamation was issued in derogation of the Trade Act's statutory procedures for issuing or modifying safeguard measures, and in violation of the Act's requirements for taking such action. And as before, that failure to follow the proper statutory processes deprives Plaintiffs of a property interest without due process.

Because the government's third attempt to withdraw the Exclusion represents both a change in circumstances – although in purpose and effect the same action – one no more lawful than its first two efforts, the Court should modify the PI to encompass and enjoin effectiveness of the 2020 Proclamation in order to continue to protect Plaintiffs from harm pending final adjudication of the lawfulness of the government's actions. The 2020 Proclamation is precisely the sort of change that not only justifies but, respectfully, should compel the PI's modification so

as to preserve the status quo until the Court issues final judgment on the lawfulness of withdrawing the Exclusion.

### A. Modifying the PI is Again Necessary to Preserve the Status Quo.

As this Court already has declared in its October 15, 2020 Opinion (ECF No. 252), it undeniably "retains the power to modify or amend preliminary injunctions it has issued, in view of equity and justice" and may "make orders appropriate to preserve the status quo of an injunction . . . ." *SKF USA Inc. v. United States*, 28 C.I.T. 170, 184 (2004); *see also Sys. Fed'n No. 91*, 364 U.S. at 647 ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.") (quoting *United States v. Swift & Co.,* 286 U.S. 106, 114 (1932) (Cardozo, J.)). Modification is available "should circumstances or the positions of the parties change." *SKF*, 28 C.I.T. at 184; *see also Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1030 (9th Cir. 1985) ("When dealing with its equitable powers, a court possesses the intrinsic power to adapt the injunction to meet the needs of a 'new day.'"). There is no question that is the case here, where the President recently issued a Proclamation taking the very same action previously enjoined by this Court—withdrawal of the bifacial panel Exclusion—and re-imposing and increasing a statutory safeguard measure.

The 2020 Proclamation is particularly noteworthy—and modification required—given that the government previously represented to the Court, multiple times, that it would not make a withdrawal of the Exclusion effective, and would not impose safeguard duties on bifacial panels, unless and until the Court lifted its PI. The government so represented when it initiated its second administrative process to consider withdrawing the Exclusion,[5] and again when it issued

---

[5] 85 Fed. Reg. at 4,756 ("If the U.S. Trade Representative determines . . . that it would be appropriate to withdraw the bifacial exclusion or take some other action with respect to the exclusion, the U.S. Trade Representative will request that the Court lift the injunction.").

the April Withdrawal.[6] The government also made such representation in hearings and briefs before this Court.[7] Yet the government has recently informed Plaintiffs and this Court that the 2020 Proclamation, which withdraws the Exclusion and modifies the HTS to impose safeguard duties on bifacial panels, will become effective this coming Sunday, October 25, 2020, despite the extant PI.

Properly construed, the extant PI should be all that is necessary to prevent the 2020 Proclamation's withdrawal of the Exclusion from becoming effective. *See Invenergy Renewables LLC v. United States*, 427 F. Supp. 3d 1402, 1407 (2020) (emphasis added) (holding that the government's initiation of a second administrative process to consider withdrawing the Exclusion did not violate the PI because it did not "modify the HTSUS" or "constitute a final decision to implement the previous or any new withdrawal of the Exclusion of bifacial solar panels") (emphasis added). But as the government had made clear it will no longer honor its prior representations to this Court, modification of the PI is necessary to explicitly incorporate the 2020 Proclamation and bar it from becoming effective despite the fact that this Court has not reached a final decision as to the lawfulness of withdrawing the Exclusion.

As this Court noted less than a week ago, modification is "particularly" appropriate "where it is done to preserve the status quo." October 15 PI Op. at 14 (quoting *Amado v. Microsoft Corp.*, 517 F.3d 1354, 1358 (Fed. Cir. 2008)). And this Court accordingly found less than a week ago that modifying the December 5, 2019 PI to explicitly incorporate the April Withdrawal was necessary to "maintain[] the status quo" until the parties have briefed and the

---

[6] 85 Fed. Reg. at 21,497 ("Withdrawal of the exclusion for bifacial solar panels from application of the safeguard measure will apply to imported panels if the Court lifts the preliminary injunction . . . .").

[7] *See* n.1 supra (quoting government brief opposing, and transcript from hearing on, motion to show cause). Plaintiffs provide for the court's convenience the relevant excerpt of the Transcript, which was prepared based on the Court's recording.

Court has adjudicated Plaintiffs' claims on the merits. *See* Oct. 15 PI Op. at 18, 20. That is no less true now than it was last week, and the government's latest attempt to withdraw the Exclusion—the 2020 Proclamation—should be similarly incorporated into this Court's existing PI and enjoined from entering into force or becoming effective. *See Pro Edge L.P. v. Gue*, 411 F. Supp. 2d 1080 (N.D. Iowa 2006) (modifying PI as requested by plaintiffs to change its duration based on litigation developments and the facts underlying the suit). Otherwise, although the government's clear purpose is to withdraw the Exclusion and to modify the HTS prior to a merits determination by circumventing the PI, to not modify the PI to prohibit this circumvention would be tantamount to its being countenanced.

Indeed, just as when this Court granted modification of the PI to incorporate the April Withdrawal last week, modification of the PI to incorporate the 2020 Proclamation is warranted to effectuate the core purposes of the PI: to "preserve the status quo until final resolution of this case on the merits" (Oct. 15 Op. at 18), and to prevent harms flowing from, *inter alia*, the business uncertainty caused by a sudden imposition of a tariff on bifacial panels. *See id.* at 38 ("Withdrawal causes irreparable harm by eliminating the business certainty required by the solar industry to plan and develop future projects." (quoting *Invenergy I*, 422 F. Supp. 3d at 1290–91)). Modification of the injunction is thus again "necessary to fulfill the original purpose of [the Court's] injunctive order." *1250 24th Street Associates Ltd. Partnership v. Brown*, 684 F. Supp. 326, 329-30 (D.D.C. 1988) (modifying injunction after the Defendants had taken additional legal actions to try to frustrate plaintiffs' project).

While Plaintiffs move in the alternative for a TRO in Section II below in the event that further briefing on whether the PI should be modified would be helpful, Plaintiffs respectfully submit that there is no reason they should have to move for an entirely new PI, particularly given

that the 2020 Proclamation purports to take the very same action that has now been the subject of the litigation before the Court and was directly addressed by the prior PI: withdrawal of the Exclusion. As this Court advised in *SKF*, "the interests of judicial economy weigh against requiring the issuance of a second injunction predicated on the same grounds as the first. . . . No meritorious reason has been put forth by the government for judicial creation of an additional, procedural burden." 28 C.I.T. at 187. Indeed, the Federal Circuit explained in *Amado* that modification of a PI is warranted and within the Court's discretion even simply to allow the Court to consider other pending motions without disrupting the status quo. *See* 517 F.3d at 1358. Thus, at the very least the Court should modify the PI to prevent withdrawal of the Exclusion pursuant to the 2020 Proclamation until it can hold and consider further briefing on the lawfulness of the 2020 Proclamation.

The Court should accordingly modify the existing PI to address and bar effectiveness of the government's latest attempt to withdraw the Exclusion. *Cf. Sys. Fed'n No. 91,* 364 U.S. at 647-52 (it was an abuse of discretion for the lower court to decline to modify an injunction to address a change in the governing law, as equity demanded such modification). As before, the actions of the government again "threaten to harm the cognizable interests" of plaintiffs, making continued and expanded preliminary injunctive relief necessary. *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 314, 324 (D.C. Cir. 1987) (upholding district court's determination that further agency action would irreparably harm the plaintiffs' interests absent preliminary relief).

**B.     Plaintiffs Remain Likely to Succeed on the Merits Because the 2020 Proclamation Is Unlawful for Many of the Same Reasons as USTR's Withdrawal Actions.**

While it is not necessary for Plaintiffs to reprove or the Court to revisit each factor of the four-factor PI analyses when determining whether to modify an injunction, *see Ad Hoc. Shrimp I,* 32 C.I.T. at 669, Plaintiffs recognize that the Court's prior PI decisions were based primarily

on Defendants failure to follow the Administrative Procedure Act (including both the Administrative Procedure Act's procedural requirements, such as its notice and comment requirements, and its substantive requirement that a decision not be arbitrary and capricious). Defendants now attempt to bypass the APA's requirements by issuing a Presidential Proclamation taking the same action. But in doing so the government has—yet again—failed to follow procedural requirements, this time those set forth in Sections 203 and 204 of the Trade Act as regards the timing of, and the findings necessary to issue the Proclamation. The failure to follow statutory process and comply with statutory requirements equally merits relief from this Court. See *National Ass'n of Manufac*, 2020 WL 5847503, -- F.Supp.3d --,at *11 (N.D. Cal. 2020) (preliminarily enjoining Presidential Proclamation that exceeded President's statutory authority to suspend or restrict entry of non-citizens, and violated provisions of the Immigration and Nationality Act).

During the October 19 hearing, Defendants suggested that Plaintiffs' claims regarding the unlawfulness of the President's action under the Trade Act must fail under *Silfab Solar, Inc. v. United States*, 892 F.3d 1340 (Fed. Cir. 2018), where the court rebuffed challenges to the President's initial Section 201 proclamation establishing the solar safeguard measure. But there, the court held that the *ITC'*s failure to comply with its statutory requirements was not reason to set aside the President's subsequent action, nor was any divergence between the ITC's findings and the President's determination. *Id*. at 1347. But those are very different questions from whether the President himself is authorized under, and/or has followed the statute. The court further noted in *Silfab Solar* that "*where the statute authorizes* a Presidential 'determination,' the courts have no authority to look behind that determination to see if it is supported by the record." *Id*. at 1349 (emphasis added). But that is not what Plaintiffs are asking the Court to do. Rather,

Plaintiffs ask the Court to hold the President to the requirements of the statute, and consider whether his action goes beyond that authorized by the statute. There can be no question that this Court has the authority to do so. *See Corus Grp. PLC v. Int'l. Trade Comm'n*, 352 F.3d 1351, 1356 (Fed. Cir. 2003) (review is available to determine whether the President "clear[ly] misconstru[ed]" his statutory authority); *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc) (explaining that courts may consider whether "the President has violated an explicit statutory mandate"); *see also National Ass'n of Manufac*, 2020 WL 2020 WL 5847503, -- F.Supp.3d --,at *11 (N.D. Cal. 2020) ("[u]se of the Presidential Proclamation power cannot eviscerate[ ] the statutory scheme") (internal quotation omitted). And for the reasons below, there is equally little question that the 2020 Proclamation is not consistent with, or authorized by, the Trade Act.

1.  **The 2020 Proclamation Violates Section 204(b)(1)(B) of the Trade Act.**

In the 2020 Proclamation, the President cited Section 204(b)(1)(B) of the Trade Act, 19 U.S.C. § 2254(b)(1)(B), as the relevant provision authorizing him to reduce, modify, or terminate the CSPV safeguard action. 2020 Proclamation ¶ 7. Section 204(b)(1)(B) provides as follows:

> Action taken under section 2253 of this title may be reduced, modified, or terminated by the President (but not before the President receives the report required under subsection (a)(2)(A)) if the President . . . determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition.

The 2020 Proclamation is not authorized by this provision.

The 2020 Proclamation violates Section 204(b)(1)(B) in two ways. First, Section 204(b)(1)(B) predicates any reduction, modification, or termination of a safeguard measure on a finding by the President "that the domestic industry has made a positive adjustment to important

competition."  The President, however, did not make such a finding, and therefore a reduction, modification, or termination of the safeguard measure is not authorized by statute.  Second, Section 204(b)(1)(B) authorizes only trade liberalizing modifications to a safeguard measure.  By taking action that *increases* the restriction on trade, the President acted beyond the authority delegated to him by Congress. This Court should accordingly enjoin the effectiveness of the 2020 Proclamation, which lies beyond the President's delegated power. See *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020) ("'When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority'").

### (a)   The President Has Not Made the Findings Required by Statute to Reduce, Modify, or Terminate a Safeguard Measure.

Section 204(b)(1)(B) plainly requires the President to determine "that the domestic industry *has made* a positive adjustment to import competition" before the President may reduce, modify, or terminate a safeguard measure.  19 U.S.C. § 2254(b)(1)(B) (emphasis added).[8]  The President, however, found in the 2020 Proclamation only that "the domestic industry *has begun to make* positive adjustment to import competition."  2020 Proclamation ¶ 9 (emphasis added). This is not the finding that the statute requires.  The statute requires the positive adjustment to import competition to have already occurred.

If Congress had intended for a reduction, modification, or termination of a safeguard measure to be predicated on a finding that the industry is in the process of adjusting to import competition, it would have used such language.  For example, under Section 203(e)(1)(B), the

---

[8] The statute also requires the President to have received a petition from the majority of the representatives of the domestic industry requesting reduction, modification, or termination of the safeguard measure on the basis that the domestic industry has made a positive adjustment to import competition.  Plaintiffs are unaware of such a petition having been submitted to the President, and to the extent that such a petition does exist, Plaintiffs have never seen it. Hence it is impossible to say whether it sufficiently complies with the statute.

President is authorized to extend the effective period of a safeguard action if the President determines, inter alia, that "there is evidence that the domestic industry *is making* a positive adjustment to import competition." 19 U.S.C. § 2253(e)(1)(B) (emphasis added). Similarly, in Section 204(c), the International Trade Commission is required in certain circumstances to "investigate to determine whether . . . there is evidence that the industry *is making* a positive adjustment to import competition." 19 U.S.C. § 2254(c)(1) (emphasis added). "[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Congress did not use the "is making" language in Section 204(b)(1)(B), despite using that language in Section 203 and elsewhere in Section 204. Instead, Congress used "has made." The President has not made the finding that is actually required under Section 201(b)(1)(B) before taking action under that section, and the 2020 Proclamation therefore reflects "a significant procedural violation, or action outside delegated authority." *Silfab*, 892 F.3d at 1346 (quoting *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985)).

> **(b)     The 2020 Proclamation Orders Action that Is Not Authorized by Section 204(b)(1)(B).**

By imposing safeguard duties on bifacial CSPV modules, the 2020 Proclamation expands the safeguard measure, making it more trade restrictive. Any modification under Section 204(b)(1)(B) of the Trade Act, however, should be trade liberalizing. Notably, Section 204(b)(1)(B) has *never* before been relied upon to justify an increase in the trade restrictiveness of a safeguard measure, because as shown below, the plain text of the findings required under

that Section are to justify only the relaxing of trade restrictions. Because the 2020 Proclamation orders a modification of the measure that is not authorized by the statute, it must be set aside.

Section 204(b)(1)(B), when read in its entirety, makes clear that "modification" must be interpreted as meaning a trade liberalizing modification. As mentioned above, action is authorized under Section 204(b)(1)(B) when the President "determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition." 19 U.S.C. § 2254(b)(1)(B). Thus, action can only be taken after a positive adjustment already has been made.

Section 201(b)(1) provides additional context for this prerequisite. It provides:

> For purposes of this part, a positive adjustment to import competition occurs when
>
> (A) the domestic industry
>
> (i) is able to compete successfully with imports after actions taken under section 2254 of this title terminate, or
>
> (ii) the domestic industry experiences an orderly transfer of resources to other productive pursuits; and
>
> (B) dislocated workers in the industry experience an orderly transition to productive pursuits.

19 U.S.C. § 2251(b)(1) (emphasis added). This provision makes clear that "a positive adjustment to import competition" for purposes of the safeguard statute, including Section 204, occurs when (i) the domestic industry is able to compete with imports without the protection of the safeguard measure, or (ii) the domestic industry has shifted to other pursuits, such that it no longer competes with the imports subject to the measure; meanwhile, the industry's workers

have also transitioned to productive pursuits.[9] Under these circumstances, no increase in the safeguard relief would be justified. It is not at all surprising then that Section 204(b)(1)(B) has never before been relied upon to justify an increase in the trade restrictiveness of a safeguard measure, because the finding required under Section 204(b)(1)(B) logically are meant only to support the relaxing of trade restrictions.

It has long been the policy of the United States to ensure that safeguards, which do not require a finding of unfair trade practices, be degressive and subject to review and termination when no longer necessary. *See, e.g.*, Omnibus Trade and Competitiveness Act of 1988 § 1102(12), Pub. L. 100-418, 102 STAT 1107, 1124 (1988) ("The principal negotiating objectives of the United States regarding safeguards are . . . to ensure that safeguard measures are (i) transparent, (ii) temporary, (iii) degressive, and (iv) subject to review and termination when no longer necessary to remedy injury and to facilitate adjustment."); Uruguay Round Agreements Act § 302(b)(3), Pub. L. 103-465, 108 STAT. 4809, 4936 (1994) (amending Section 203 to require safeguard actions to be phased down during period in which action is in effect).

The notion that a finding that the domestic industry no longer needs safeguard relief to compete with imports would be the basis for *increasing* the level of safeguard relief is an absurd result that could not have been contemplated by Congress. *See King v. Burwell*, 135 S. Ct. 2480, 2494-95 (2015) (rejecting interpretation of Affordable Care Act when it was "implausible that Congress meant the Act to operate in this manner" and explaining that isolated statutory provisions should not be interpreted in a manner that would be "untenable in light of the statute

---

[9] Notably, when this particular provision justifying the reduction, modification, or termination of a safeguard measure was originally introduced, it was specified that a "modification" based on this provision would not include an increase of a measure. *See* H. Rep. No. 100-576 at 687 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N 1547, 1720 (noting that "modify" in this Senate bill originally containing this provision did not allow an increase of the measure). This limitation on "modification" logically follows from the finding that justifies the modification.

as a whole").  The 2020 Proclamation must therefore be set aside as based on a clear misconstruction of the statute and as action outside the authority delegated by Congress.  *See Silfab*, 892 F.3d at 1346; *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020) ("'When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority.'") (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

**2.  The Trade Act Prohibits the Increase of a Safeguard Measure Under Section 204(b)(1).**

Beyond the specific context of Section 204(b)(1)(B) that precludes an increase in the trade restrictiveness of a measure pursuant to that provision, the Trade Act generally does not contemplate that a "modification" under Section 204 would increase the burden on trade.  "The traditional canon of construction, *noscitur a sociis*, dictates that 'words grouped in a list should be given related meaning.'"  *Dole v. United Steelworkers of America*, 494 U.S. 26, 36 (1990) (quoting *Massachusetts v. Morash*, 490 U.S. 107, 114-15 (1989)).  In accordance with this canon, the words "modified" or "modification" in Section 204(b) must be read in light of the surrounding words: "reduced"/"reduction" and "terminated"/"termination."  Reduction and termination are both trade liberalizing actions.  "Modification" should be given a similar interpretation.

That "modification" must be trade liberalizing is further supported by the findings that would justify the modification.  As explained above, the finding under Section 201(b)(1)(B) is effectively a determination that safeguard relief is no longer necessary, which logically would justify a liberalization of trade, rather than an increased restriction on trade.  Meanwhile, Section 204(b)(1)(A) requires a finding that "changed circumstances warrant such reduction, or termination."  19 U.S.C. § 2254(b)(1)(A).  Such changed circumstances can logically support

only a trade liberalizing modification, not one that further burdens trade.[10]  Thus, whether acting

pursuant to Section 204(b)(1)(A) or Section 204(b)(1)(B), the statute requires a finding that

would support lowering, rather that increasing, restrictions on trade.

The Statement as to How the Uruguay Round Agreements Achieve Congressional

Negotiating Objectives accompanying the Uruguay Round Agreements Act explains that the

United States successfully satisfied U.S. negotiating objectives on safeguards by incorporating

concepts from U.S. law into the WTO Agreement on Safeguards:

> The Agreement on Safeguards fully meets Congressionally-
> mandated negotiating objectives by incorporating into the
> Agreement many concepts long included in U.S. safeguards law
> (section 201 of the Trade Act of 1974).  *The Agreement thus
> ensures that all WTO countries will use safeguards rules and
> procedures that are comparable to those applicable in the United
> States*.
>
> In particular, the Agreement ensures that safeguard measures will
> be transparent, temporary, *degressive, and subject to termination
> when they are no longer necessary*.

Statement as to How the Uruguay Round Agreements Achieve Congressional Negotiating

Objectives, H.R. Rep. 103-316, at 1141, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4397(emphases

added).  Among those provisions that the United States successfully negotiated into the WTO

Agreement on Safeguards is Article 7.4, which provides that "the Member applying the measure

*shall progressively liberalize* it at regular intervals during the period of application" and if the

measure is in place for longer than three years, "the Member applying such a measure shall

review the situation not later than the mid-term of the measure and, if appropriate, *withdraw it or*

---

[10] Plaintiffs note that the President does not cite Section 204(b)(1)(A) as the authority for the
2020 Proclamation.  Presumably this is because the findings required under Section 204(b)(1)(A)
would include a finding that a reduction or termination of the measure is warranted.  Moreover,
action under Section 204(b)(1)(A) is also contingent on the President having sought the advice of
the Secretary of Commerce and the Secretary of Labor.  The 2020 Proclamation does not contain
any evidence that the President complied with these additional consultation requirements.

*increase the pace of liberalization*." (Emphasis added.) This is further evidence that Congress at the time the negotiating objectives for the Uruguay Round Agreements were set and when the Uruguay Round Agreements were approved understood that any modification to a safeguard measure would be trade liberalizing.

Indeed, Section 203(e)(5) states that the President "shall phase down" measures that have an effective period for more than one year. 19 U.S.C. § 2253(e)(5). Section 204(b)(1)(B) should be interpreted in a manner that is consistent with these trade liberalizing requirements. *See, e.g., FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959); *Roberts v. Sea-Land Services, Inc.*, 566 U.S. 93, 101 (2012) (statutes should be read in a manner that renders them compatible, not contradictory). Here, however, the 2020 Proclamation seeks to "increase" tariffs, and this is contrary to the plain terms of Section 204(b)(1)(B). The term "increase" does not appear anywhere in Section 204(b)(1)(B), and cannot be written into the statute. *See e.g., Laramie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) and *Ill. Pub. Telcoms. Ass'n v. FCC*, 752 F.3d 1018, 1023 (D.C. Cir. 2014) (nothing may be added to the text of a statute). Further, Congress could have used the term "increase" measures in Section 204(b)(1), as it has consistently used this term throughout other parts of the statute, but it did not. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[I]t is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); s*ee also,* 19 U.S.C. § 2252(a)(4)(c)(President may "increase" duties for provisional relief); 19 U.S.C. § 2252(e)(2)(A)(ITC may recommend "increased" duties as a safeguard measure); 19 U.S.C. § 2253(a)(3)(A)(President may impose "increased" duties as a safeguard measure). In short, Defendants are unlawfully attempting to broaden the scope of

Section 204(b)(1)(B) in violation of basic rules of statutory construction.Because Section 204(b)(1)(B) does not authorize the President to "increase" duties, the 2020 Proclamation is a clear violation of the statute.

Counsel for Defendants suggested during the status conference held on October 19, 2020 that Plaintiffs are seeking to read the word "modify" out of the statute, because it would be rendered redundant of "reduce" or "terminate." This is not true. In addition to the amount of relief, safeguard relief can also be provided in various forms. *See* 19 U.S.C. § 2253(a)(3). Modifying the form of relief may be trade liberalizing, without necessarily reflecting a reduction or termination of the original action taken. For example, if the President had imposed a duty rate of 25 percent under Section 203(a)(3)(A), he could modify that measure by imposing a tariff rate quota provided for in 203(a)(3)(B) and allowing a certain amount of imports duty free and subjecting the above-quota amount to a 25 percent duty. This would be a trade liberalizing modification of the measure that does not involve a reduction or termination of the additional duty rate. Similarly, if the President imposed quantitative restrictions (such as an absolute quota on the volume of subject imports), then the President could modify the safeguard measures by lessening the quota restrictions. Holding that the 2020 Proclamation violates the safeguard statute because it increases the burden on trade would not read the term "modification" out of the statute.

**3.    The Trade Act Prohibits Re-Imposition of a Safeguard Measure Less Than Two Years After It Was Terminated.**

The 2020 Proclamation's reapplication of safeguard duties to bifacial solar modules violates Section 203(e)(7) of the Trade Act, 19 U.S.C. § 2253(e)(7). Section 203(e)(7) provides that if an article has been subject to increased duties pursuant to a safeguard measure for more

than 180 days (like bifacial CSPV modules were[11]), then no new safeguard action can be taken

with respect to that article for a period of two years.  The Statement of Administrative Action

accompanying the Uruguay Round Agreements Act explains that Section 203(e)(7) is intended to

"limit[] the provision of new relief in respect of a product for which import relief was provided

previously."  Statement of Administrative Action to Accompany the Uruguay Round Agreements

Act ("SAA"), H.R. Rep. 103-316, at 293, *reprinted in* 1994 U.S.C.C.A.N. at 4266; *see also* H.

Comm. on Ways & Means, H.R. Rep. No. 103-826, 131 (1994) (House Committee on Ways and

Means Report reflecting same understanding of Section 203(e)(7)).  Bifacial modules are "a

product for which import relief was provided previously," and the two-year waiting period in

Section 203(e)(7) to impose relief with respect to that product applies.[12]  The 2020 Proclamation,

however, orders the application of an increased rate of duty to bifacial CSPV modules only

sixteen months after safeguard duties were terminated with respect to bifacial CSPV modules, in

violation of Section 203(e)(7).  The re-imposition of safeguard duties on CSPV modules must be

set aside as a violation of the procedures prescribed by the safeguard statute and as action outside

of delegated authority.  *See Silfab*, 892 F.3d at 1346; *Sierra Club v. Trump*, 963 F.3d at 891.

---

[11] Bifacial CSPV modules were subject to an increased rate of duty for roughly sixteen months, from February 7, 2018 through June 12, 2019 – i.e., 491 days.

[12] Defendant-Intervenors have previously argued in this litigation that Section 203(e)(7) is limited to the same scope of merchandise as what was covered by a prior safeguard measure. Adopting Defendant-Intervenor's proposed interpretation of Section 203(e)(7) would create a loophole that could be easily exploited.  For example, under Defendant-Intervenors' interpretation, the domestic industry would be able to seek relief for all CSPV solar modules immediately upon the expiration of the safeguard measure, as long as the requested relief excludes cells not incorporated into modules; the specific definition of the "article" would differ from the scope of the article covered by the current safeguard measure.  The Court should not presume that Congress intended for the limitation in Section 203(e)(7) to be skirted by parties making slight modifications to the definition of the article for which safeguard relief is sought. Rather, the Court should hold that if a particular product was included within the scope of a safeguard measure, once the safeguard measure is removed from that product, safeguard duties cannot be reapplied to that product without complying with the time restrictions in Section 203(e)(7), which is consistent with the plain language of the statute and the SAA.

**4.  The Trade Act Requires the President to Weigh Social and Economic Costs and Benefits Before Imposing or Modifying a Safeguard Measure.**

The 2020 Proclamation unlawfully fails to satisfy a crucial statutory requirement. In order to impose a safeguard measure, the 1974 Trade Act requires the President to find not only that such measure will assist the domestic industry in making a positive adjustment to import competition, but *also* that the measure's benefits are not exceed by its social and economic costs. *See* 19 U.S.C. § 2201(a). The President cannot impose safeguards – through Proclamation or otherwise – unless he makes both predicate findings and considers the 10 additional factors set forth by Congress in 19 U.S.C. § 2253(a)(2), which state, among other things, that the President *shall* take into account "the short-and long-term economic and social costs of the actions authorized . . . relative to their short- and long-term economic and social benefits."

Despite this clear statutory command, the 2020 Proclamation nowhere considers the economic and social costs of re-imposing safeguard measures for bifacial solar panels, much less concludes that the benefits outweigh its costs. It simply states that the Exclusion impairs the efficacy of the safeguard measures and withdraws the Exclusion without any finding whatever as to the measure's benefits relative to its social and economic costs. *See* 2020 Proclamation at ¶ 9(a), (b). Hence, the President lacked the authority to institute safeguard the safeguard measure on bifacial solar panels.

The government may argue, as it has previously, *see* Def's Post-Hearing Brief at 9 (May 15, 2020), that the President is not obligated to reweigh the social costs and benefits of these new safeguard measures on bifacial solar panels, having already done so in the President's initial, January 25, 2018, proclamation. *See* Proclamation 9693, 83 Fed. Reg. at 3541. Not so.

First, Proclamation 9693 made a finding that the benefits of the safeguard measures announced therein outweighed the costs, and more importantly, acknowledged that the President

could only "reduce, modify or terminate" those safeguard measures if he first determines that such measures are necessary "to make a positive adjustment to import competition *and* to provide greater economic and social benefits than costs. *Id*. (emphasis added). The President correctly stated the statutory limitation on his authority to reduce, modify or terminate safeguard measures then; he should not be excused from those statutory requirements now.

Second, the President cannot evade his statutory obligation to consider the social and economic costs and benefits of imposing a safeguard under Sections 201 and 203 by simply excluding a certain product from the measure when first promulgated under those sections and then imposing the same measures on the initially excluded products by using Section 204 to modify the measure and thereby ignore the second of the statute's two objectives. Otherwise the President would have almost unfettered ability to use his authority under Section 204 to adopt new safeguard measures on whichever products and at whatever level the President deemed appropriate, notwithstanding the fact that Congress clearly intended the President to consider the factors in Sections 201 and 203 prior to issuing new safeguard measures.[13]

Indeed, the Parties agree[14] that had the President desired to include bifacial solar panels in his initial safeguard measures, he would have first had to conclude that the economic and social costs of such measures do not outweigh the benefits. 19 U.S.C. § 2253(a)(2). Likewise USTR itself (on delegated authority) acknowledged that it was prohibited from granting the Exclusion unless it first concluded that the benefits of the Exclusion did not outweigh the social

---

[13] If the President's authority under Section 204 was unfettered, the President could simply declare that he was imposing safeguard measures on all solar photovoltaic cells other than bifacial panels under Section 203 after consideration of the requisite factors, and then *the very next day* use his authority under Section 204 to impose safeguard measures on bifacial panels without ever having to consider the social and economic costs and benefits of such measures as required under Sections 201 and 203.

[14] *See* Def's Post-Hearing Br. (ECF No. 246) at 11 (Aug. 19, 2020).

and economic costs – otherwise the Exclusion could not have been granted in violation of this statutory objective -- which means the only extant decision of the United States government is that the benefits of excluding bifacial solar panels from the safeguard measures *outweigh the costs of including them under the safeguard measure*. *See* 84 Fed. Reg. at 27,684-85 (explaining that USTR "would only grant exclusions that did not undermine the objectives of the safeguard measure" and then granting exclusion for bifacial solar panels). The 2020 Proclamation was therefore not only required to weigh the costs and benefits if it intended to adopt new safeguard measures on bifacial panels lest the President completely evade the statutory requirements of Sections 201(a) and 203(a)(2), but the President was required to reverse the earlier decision of the USTR that the benefits of the Exclusion in fact outweighed the costs should it be withdrawn.

Having failed to make such findings, the 2020 Proclamation is not only statutorily deficient but is inconsistent with the government's existing position that the benefits of the Exclusion outweigh its costs. This is yet another reason to enjoin the effectiveness of the 2020 Proclamation, just as the district court did in *NAM* after finding that:

> The Presidential finding in the text of the Proclamation, such as it is, is not supported . . . although its stated purpose is to aid the domestic economy…, the Proclamation completely disregards both economic reality and the preexisting statutory framework. Furthermore, without any consideration of the impact on American firms and their business planning, the Proclamation abruptly changed the scope of … policy in the United States. … This lack of predictability necessary for basic business governance and planning is contrary to the stated purpose of promoting American business

2020 WL 5847503 at *13. The same is true here. By failing to make findings as to the costs and benefits of withdrawing the Exclusion and re-imposing the safeguard measure on bifacial panels without assessing the impacts on the domestic economy and solar industry broadly, the President has both violated the statute and contravened the stated purpose of the 2020 Proclamation itself.

## 5. The 2020 Proclamation Violates Plaintiffs' Due Process Rights.

The 2020 Proclamation's failure to abide by the statutory requirements in Sections 203 and 204 of the Trade Act deprived Plaintiffs of their property interest in the Exclusion without due process of law in violation of the Fifth Amendment. *See Matthews v. Eldridge,* 424 U.S. 319, 332-33 (1976). To prevail on this claim, Plaintiffs must show that there has been (i) a deprivation, (ii) of a property interest, (iii) without due process of law. *2910Georgia Avenue LLC v. District of Columbia*, 234 F.Supp.3d 281 (D.D.C. 2017).

First, Plaintiffs have a property interest in the Exclusion. It is well-established that entities have a property interest in benefits conferred by the government which create a legitimate claim to entitlement, *see Goldberg v. Kelly*, 397 U.S. 254 (1970), and that interested parties, in particular, may be entitled to due process prior to being deprived of their property interests under U.S. import laws and the Trade Act. *See NEC Corp. v. U.S.,* 151 F.3d 1361, 1370 (Fed. Cir. 1998); *Sneaker Circus, Inc. v. Carter*, 457 F. Supp. 771, 785 (E.D.N.Y. 1978), *aff'd*, 614 F.2d 1290 (2d Cir. 1979) ("A decision under [Section] 201(b) [of the Trade Act] will affect the rights and property interests of the interested parties."). The Exclusion created a legitimate entitlement to rely on bifacial panels continuing to be excluded from the President's safeguard measures, particularly as the Trade Act does not permit the President to reimpose safeguard measures for at least two years after it was terminated. *Cf. Perry v. Sinderman*, 408 U.S. 593 (1972) (holding that a teacher had a property interest in their re-employment when rules and understandings might justify his entitlement to tenure). Furthermore, when a statute confers "substantive limitations on [the President's] discretion" to act – as it does in Sections 203 and 204 of the Trade Act – the government can create a property interest which can only be abridged upon "a finding that the relevant criteria [in the statute] have been met." *Kentucky Dep't of Corrections v. Thompson*, 480 U.S. 454, 462 (1989). By

conditioning withdrawal of the Exclusion on satisfaction of certain prerequisites, the Trade Act created a property interest in the Exclusion which could only be deprived by first proceeding through the statutorily-required process. As before, the government's actions "threaten to harm [Plaintiffs'] cognizable interests." *Nat'l Wildlife Fed'n*, 835 F.2d at 324.

As set forth above, the 2020 Proclamation failed to satisfy those criteria, and in so doing deprived Plaintiffs of the process to which they are entitled. *Kuck v. Danaher*, 822 F. Supp. 2d 109, 149-50 (D. Conn. 2011) ("a failure to follow statutory procedures can rise to the level of a due process violation"); "*Everett v. City of Tallahassee,* 840 F.Supp. 1528, 1543 (N.D. Fla. 1992) (same). Those and other statutory limitations – such as permitting the President to take action upon receipt of a petition from a "majority of the representatives of the domestic industry" requiring a reduction, modification or termination of safeguard measures; prohibiting the government from reimposing safeguard measures for two years; and conditioning the President's adoption of safeguard measures on finding that the costs of such measures do not exceed the benefits – are the *exact* processes and requirements which Congress intended to protect interested parties, like Plaintiffs, from commercial whiplash and arbitrary deprivation of their property interests. *See NEC Corp.,* 151 F.3d at 1370 ("an importer may be entitled to procedural due process regarding the resolution of disputed facts involved in a case of foreign commerce when the importer faces a deprivation of 'life, liberty, or property' by the Federal Government.").

The President issued the 2020 Proclamation without taking into account any of these perquisites despite Plaintiffs relying on those statutory protections in pursuing their business interests. Some Plaintiffs, for instance, relied on the aforementioned two-year wait period as assurance for entering into long-term contracts for the purchase of bifacial solar panels, and

made business decisions with the understanding that their property interest would be abridged only if the government ultimately reversed its prior conclusion that the costs of the Exclusion do not outweigh its benefits. And while the President purported to act upon receipt of a petition from the majority of industry requesting a reduction, modification or termination of the safeguard action, Plaintiffs – the parties most impacted by the President's withdrawal of the Exclusion – have *still* not received a copy or evidence of such petition. It should go without saying that there is no way for Plaintiffs to reasonably contest that which they have not seen. By ignoring these substantive limitations on the President's authority under the Trade Act and failing to provide Plaintiffs (and the Court) with the materials requisite to determine whether Plaintiffs' interests unlawfully were being impaired, the 2020 Proclamation deprived Plaintiffs of fundamental protections afforded by Congress and in so doing violated Plaintiffs' due process rights. *See Teters Floral Products Co., Inc. v. United States*, 586 F. Supp. 960, 963 (Ct. Intl. Trade 1984) (recognizing that "neither Congress nor the President may avoid constitutional restraints.").

## II.     IN THE ALTERNATIVE, THE COURT SHOULD ISSUE A TRO TO PREVENT THE 2020 PROCLAMATION FROM BECOMING EFFECTIVE ON OCTOBER 25.

The government, through its lack of notice and unnecessarily compressed time frames, has again forced Plaintiffs to seek emergency relief that restrains the re-application of the Section 201 tariffs on bifacial panels. If the court requires further briefing on whether modification of the PI, or alternatively issuance of a new PI, is appropriate, Plaintiffs request that it at least issue a TRO to prevent the Proclamation from entering into force on October 25 pending such further briefing. The fundamental circumstances underlying the Court's prior grant of the PI remain the same: Plaintiffs are still likely to succeed in their challenges; they still face irreparable harm; and the equities still favor enjoining a withdrawal of the Exclusion until the Court reaches a final

judgment on the merits of Plaintiffs' claims. If Plaintiffs make a strong showing on one or more of these factors, they face a lesser burden on the remaining factors. Thus, entry of a TRO is appropriate if the Court is not prepared to modify the PI to incorporate the Proclamation at this time.

In the event that Plaintiffs request that the Court enter an emergency TRO effective no later than October 24, 2020 to preserve the status quo pending further briefing on the legality of the Proclamation. Given the government's multiple unlawful attempts to withdraw the Exclusion since this litigation began, and given the flaws in the latest action that Plaintiffs have identified, issuance of an emergency TRO is legally and factually warranted and equitable. If the Court is not prepared to modify the PI before October 25, Plaintiffs request that the Court enter a TRO order that:

1. restrains the United States from entering into effect the 2020 Proclamation withdrawing the Exclusion of bifacial solar panels from the Section 201 safeguard measures, including any actions authorized thereunder that would result in any modification to the HTS that includes or reflects any withdrawal of the Exclusion (as the current PI already requires);

2. restrains CBP from collecting tariffs on bifacial solar panels pursuant to the 2020 Proclamation (as the current PI also already requires); and

3. sets a schedule for expedited briefing and a hearing on this Second Motion for a PI.

Such relief is necessary because Plaintiffs will suffer immediate and irreparable harm if the latest unlawful withdrawal of the Exclusion goes into effect prior to the Court addressing the fundamental substantive and procedural issues raised by the 2020 Proclamation, and the equities and public interest favor enjoining withdrawal of the Exclusion pursuant to the 2020 Proclamation—at least until the Court can more fully consider the lawfulness of that action.

**A.      As Before, Plaintiffs Face Procedural, Economic, and Other Irreparable Harm From Withdrawal of the Exclusion.**

Yet again, the government's procedurally improper attempt to withdraw the Exclusion will cause Plaintiffs irreparable harm—if permitted to take effect.  These specific and irreparable harms are the direct result of the government's failure to follow the statutory requirements for re-imposing a safeguard measure; the government's failure to release or disclose the underlying "petition" that triggered the action; the government's unreasonably compressed schedule for implementation; and the government's complete disregard for the Court's PI.

First, this Court has recognized that "a procedural injury can itself constitute irreparable injury." *Invenergy Renewables v. United States*, 422 F. Supp. 3d 1255, 1272 (CIT 2019). "[L]ack of process cannot be remedied with monetary damages or post-hoc relief by a court." *Id.* While the Court's prior findings of irreparable procedural harm rested on Defendants' failure to comply with the procedures set forth in the APA, those findings apply equally to Defendants' failure to comply with the statutory procedures for re-imposing or modifying a safeguard measure, and their concomitant failure to provide due process before depriving Plaintiffs of a property interest. And the Proclamation also causes irreparable procedural harm as a result of the manner in which it was issued, which gave Plaintiffs and other interested parties almost no time to take action to  prepare for and ameliorate its impacts before it went into effect.

The President announced this latest attempt to withdraw the Exclusion on a Saturday night (October 10, 2020) with a stated effective date of a mere 15 days later (October 25, 2020). This effective date was set without regard to publication in the Federal Register, which did not occur until Friday, October 16, 2020. Meanwhile, although the October 10, 2020 proclamation referenced an "Annex" that contained the details of how the Proclamation would be implemented, such Annex was not made available until publication of the Proclamation in the

*Federal Register*, just ten days before the Proclamation's effective date. The government's actions left interested parties with less than ten days' notice on the imposition of tariffs that could jeopardize past and future investments and plans to continue investing in American energy production.

Furthermore, as discussed in Section I.B above, the 2020 Proclamation does not comply with the Trade Act's statutory procedures and requirements, and the resulting procedural harm cannot be effectively remedied after an improper proclamation goes into effect. As this Court found before, once withdrawal of the Exclusion goes into effect, it would be difficult, if not impossible, to thereafter require the government (whether the President or USTR) to meaningfully make the findings and faithfully follow the processes required by the statutes.

But the irreparable harm that Plaintiffs face from withdrawal of the Exclusion in the near term goes beyond purely procedural harm. First, the 2020 Proclamation fails to provide any accommodations for imminent imports that are subject to contractual commitments and wholly failed to allow interested party participation or comment. This oversight fundamentally harms Plaintiffs in the short term, as explained in the supplemental declarations submitted by EDF and Invenergy. *See* Second Suppl. Decl. of James P. Resor ISO Motion to Modify PI or For TRO ¶¶ 5-6, 14-15. (attached as Exhibit C) ("Resor 2nd Suppl. Decl."); Third Suppl. Decl. of Arthur S. Fletcher ("Fletcher 3rd Supp. Dec.") ¶¶ 3, 5-11. For example, Mr. Fletcher explains that, if the Exclusion is withdrawn at the end of this month, Invenergy would suffer significant business disruption and unrecoverable financial losses {█████████████████████████.}. Fletcher 3rd Supp. Dec. ¶ 8. These harms are irreparable, including because an entity such as Invenergy, which is not the importer of record, has no way of recovering the price increase

resulting from the imposition of the safeguard measure through monetary damages at the end of this suit should it prevail.

Indeed, this litigation already is replete with sworn declarations, live witness testimony, data and comments to USTR and other documentation that demonstrates the irreparable harm Plaintiffs would face were the status quo not to be maintained, starting with Plaintiff Invenergy's October 21, 2019 Motion for a TRO, ECF No. 14. As demonstrated in detail in the Affirmations of Arthur S. Fletcher, ECF Nos. 13-2, 49-3, Invenergy will suffer various types of irreparable harm, including loss of business opportunities, goodwill, and customers. EDF-R also provided a sworn declaration on November 7, 2019 (ECF No. 67-2), describing similar harms to its business and quantifying the impact of the re-imposition of duties, including where EDF-R acted as the importer of record. In finding that a PI was appropriate, the Court relied on Plaintiffs' testimony that withdrawal of the Exclusion would significantly disrupt existing contracts, employment levels, and lead to significant financial losses, lost business opportunities, diminished reputation and customer goodwill, and costly business disruptions. PI Op. at 50.

On June 26, 2020, Plaintiffs EDF and Invenergy provided supplemental declarations from Jamie P. Resor, the Chief Executive Officer of EDF-R's subsidiary, EDF Renewables Distributed Solutions, Inc., ("Resor Supp. Decl."), as well as a Second Supplemental Affirmation from Invenergy's Arthur S. Fletcher, ("Second Fletcher Supp. Aff."). In those declarations, Plaintiffs explained that they would continue to face irreparable harm from any near-term withdrawal of the Exclusion. *See* Resor Supp. Decl. ¶¶ 3, 5 ███████████████████

███████████████████████████████████████████

███████████████████████ ); *see also* Second Fletcher Supp. Aff. ████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ }

Invenergy also explained in its prior PI papers that it had {████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ }. *See* Fletcher Aff., ¶¶ 9-23. Because solar

projects take years to design, finance, and develop, *id*. at ¶ 10, the majority of the bifacial

modules needed to complete the solar projects slated for completion in upcoming years

have not yet been imported. *See e.g.*, Fletcher Aff. at Ex. 4 (summarizing contracts and expected

delivery dates of bifacial modules); Fletcher Supp. Aff. at Exs. 7-14; Granger Decl. (Doc. 58-3)

¶¶ 14-20 (████████████████████████████████████████████████████████

████████████████████████ ); Rubin Decl. ¶¶ 13-18 (Doc. 90-3) (████████████

████████████████████████████████████ ).

What was true last December, and again this past summer, remains true today. If the

Court allows the 2020 Proclamation to go into effect, it will immediately "increase . . . the price

of bifacial panels, and therefore Plaintiffs' costs in purchasing and producing energy with

bifacial panels." PI Op., ECF No. 113 at 51. Notably, EDF is an importer and has product that

would be subject to the Proclamation arriving in the U.S. imminently, including {████████

████████████████████████████████████████████████████████████████

████████ }, that are subject "to previously-made contractual obligations[.]" Resor 2nd Suppl.

Decl. at ¶ 6, 8. EDF has quantified these commitments and estimates an impact of $ {████████

████████████████████████████████████████████ } Id. at ¶ 8. And

EDF's imminent and irreparable harms are not solely related to increased costs. In fact, {████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████ } based on the 2020 Proclamation, and therefore faces immediate and considerable risk and threatened impairment of its ability to proceed. Resor 2nd Suppl. Decl. at ¶¶ 6-9.

Invenergy, too, faces immediate irreparable harm from the disruption of ongoing projects and the loss of new business opportunities if the Exclusion is withdrawn effective October 25 – ███████████████████████████████████ }. Fletcher 3rd Supp. Dec. ¶ 8. There is thus no question that, like EDF, Invenergy, too, would continue to still face the same economic, reputational, and other types of harm already established. *See* PI Op. at 51-52 ("A PI is therefore needed to maintain the status quo and avoid the losses in connection with a lack of business certainty that may cause irreparable harm. . . . Invenergy's business, reputational, and procedural harms are irreparable because they cannot be remedied if the Withdrawal is implemented.").

Furthermore, the lack of availability of bifacial modules from U.S. producers, discussed in prior briefs, exacerbates the irreparable harm caused by withdrawing the Exclusion because there is very little domestic module production directed at the utility sector. This Court has recognized that this fact elevates the importance of the Exclusion to Plaintiffs' businesses and ongoing projects, while limiting any claimed harm to domestic producers who do not produce Utility-Grade Bifacial Modules. *See* May 27 Op. at 4.

Finally, the 2020 Proclamation threatens current negotiations for significant Power Purchase Agreements ("PPAs") that were underway when the 2020 Proclamation was announced and are intended to be finalized in the next few weeks. As a result of the 2020 Proclamation,

serious business uncertainty surrounds these negotiations, causing numerous cascading and adverse impacts. *Otter Prods., LLC v. United States*, 37 F. Supp. 3d 1306, 1315 (2014) (citing *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1326 (2014)).

Thus, if the Court does not agree that the existing PI should be immediately modified to encompass withdrawal of the Exclusion pursuant to the 2020 Proclamation, it should enter a TRO barring imposition of safeguard duties on bifacial panels pursuant to the 2020 Proclamation for further briefing on whether to modify the PI or issue a new PI, so as to avoid irreparable procedural, economic and reputational harm to Plaintiffs.

**B.     The Equities and Public Interest Continue to Favor Enjoining Withdrawal of the Exclusion.**

As this Court found for the second time on October 15, the balance of equities continues to tip decidedly in favor of Plaintiffs, who have now been forced to address multiple improper attempts by the government to eliminate the Exclusion.  As before, there is a strong public interest in requiring the government to adhere to the law.  This includes not only serious and fundamental concerns with respect to the statutory basis and procedural irregularities in the 2020 Proclamation but also a strong public interest in the government abiding by Court orders.  This Court has consistently and clearly stated that it has jurisdiction over the iterations of the withdrawal of the Exclusion, and its jurisdiction continues here as to the 2020 Proclamation. The government represented to the Court and the public that it would not impose duties on bifacial panels until after it requested—and obtained—a lifting of the PI.  It has neither sought nor obtained such permission. Yet as a result of the government's latest actions, Plaintiffs face duties upon import in a mere five days after having reasonably relied on the government's representation.  The government should not be rewarded for its actions, and for these reasons the

equities and public interest weigh even more heavily in favor of preventing implementation of the 2020 Proclamation.

Plaintiffs propose a schedule for this motion to proceed expeditiously, and it would be manifestly inequitable to allow the government to avoid proper procedures and carrying out a withdrawal of the Exclusion through an unlawful proclamation. In contrast to the severe and irreparable harm that Plaintiffs face, there is very little prejudice, if any, to Defendants if this Court delays the onset of tariffs to allow briefing to proceed such that the Court can determine the legality of the 2020 Proclamation. On the other hand, great harm would be incurred not merely by Plaintiffs, but by the domestic economy were the injunction not to apply to the 2020 Proclamation – damages such as job losses, decreased construction of renewable, clean and economic energy generation due to the increased unavailability of efficient modules, interference with ongoing solar generation projects, and discouragement of new ones. *See* Resor Supp. Decl. ¶¶ 5, 15-18. As this Court previously found, the PI serves the critical purpose of maintaining the status quo while the Court adjudicates whether the government's actions are procedurally deficient or otherwise unauthorized and unlawful, which provides Plaintiffs, their suppliers, and their customers with "the business certainty required by the solar industry to plan and develop future projects." PI Op. at 51-52; *see also* Resor Supp. Decl. at 20; Fletcher Aff., ¶¶ 8-40. Such relief continues to be necessary to protect Plaintiffs from the unlawful 2020 Proclamation.

## CONCLUSION

For all these reasons, the Court should modify the PI to bar implementation of the 2020 Proclamation, to explicitly prohibit Defendants from effectuating any withdrawal of the Exclusion until the Court enters final judgment on the merits of Plaintiffs claims. In the alternative, if the Court is not prepared to modify the PI before October 25, Plaintiffs respectfully request that the Court enter a TRO preventing Defendants from imposing the solar safeguard

measure on bifacial panels, pending further briefing on whether to modify the PI or issue a new

PI.

Dated: October 20, 2020

Respectfully submitted,

John Brew
Larry Eisenstat
Amanda Shafer Berman
Leland P. Frost
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500


/s/ Frances Hadfield

Frances Hadfield
**CROWELL & MORING LLP**
590 Madison Ave, 20th Floor
New York, New York 10022
(212) 803-4040

*Counsel to Invenergy Renewables LLC, Clearway Energy Group LLC, and AES Distributed Energy Inc.*

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street, N.W.
Washington, D.C. 20006
(202) 721-4750
mnicely@akingump.com
*Counsel to SEIA*


/s/ Kevin O'Brien
Kevin M. O'Brien
Christine M. Streatfeild
**Baker & McKenzie LLP**
815 Connecticut Ave, NW
Washington, DC 20006
(202) 452-7000
kevin.obrien@bakermckenzie.com

*Counsel to EDF Renewables, Inc*

## CERTIFICATE OF COMPLIANCE

I, Frances Hadfield, at Crowell & Moring LLP, who is responsible for the foregoing brief, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with Chambers Procedure 2, as it contains 13,838 words.

/s/ Frances Hadfield

Dated: October 20, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October, 2020, that I served a true copy of the foregoing in Court No. 19-00192 through the Court's electronic filing system.


/s/ Frances Hadfield

Exhibit A

1  to, in certain situations, withdraw an exclusion?

2  MR. TOSINI: USTR has assuming -- we're staying

3  in APA land right here, and under the APA, agencies

4  have inherent authority to reconsider their decisions.

5  The President can certainly under -- direct USTR to

6  implement exclusions and also to withdraw exclusions,

7  but that's not even necessary in this case. What's

8  necessary in this case is the APA -- is the USTR's

9  inherent authority.

10  The third question involves USTR's authority to

11  even withdraw the rule, and the most important thing

12  to keep in mind here is that this is a determination

13  that should be made by USTR in the first instance. We

14  agree that USTR did not provide APA notice and comment

15  procedures when it withdrew the exclusion.

16  But this is exactly the sort of thing, whether

17  the agency has authority to take a particular action

18  that an agency should look at in the first instance,

19  and that certainly is something that the notice

20  envisions parties providing. It asks for party's

21  views and it ask that those views be supported by

22  evidence, and it also says, well, if a party does not

23  provide evidence to support a view, then USTR could

24  draw inferences from that. It doesn't reject

25  submissions as Plaintiff's counsel said earlier.

1  And one of those views is certainly going to be,

2  from at least one of the parties, that USTR lacks

3  authority to withdraw an exclusion once it's been put

4  in place. It's almost a Humpty Dumpty rule, you can

5  never put it back together, and that's something that

6  USTR should address in the first instance.

7  Now the effect of the notice on the status quo,

8  the fourth question, it maintains the status quo

9  provided by the PI. The PI enjoined amendment of the

10  harmonized tariff schedule to start collecting

11  deposits of duties on entries of bifacial panels, and

12  that remains in place, and it will remain in place so

13  long as there's no final judgment in this case.

14  That's why we made it abundantly clear in our motion

15  that we want the original withdrawal vacated, so that

16  it has no legal affect whatsoever.

17  We also noted in our brief that relief provided

18  by USTR would be prospective. The Plaintiffs

19  speculate that the relief might not be prospective, it

20  might be retroactive. First, that presumes that a

21  certain outcome of the proceeding, and second, that's

22  something that should be addressed in the course of a

23  new proceeding, if such an event ever occurred.

24  THE COURT: Question 5?

25  MR. TOSINI: Question 5, why does the notice

1  resolve all or nearly all of the Plaintiff's concerns?

2  Well, because it resolves --

3  THE COURT: And you heard what Mr. Brew said,

4  nearly all.

5  THE COURT: Well, nearly all is that the notice

6  itself does not resolve what USTR's analyses of any

7  comments regarding authority to undertake this action.

8  And so the notice itself doesn't resolve that by

9  putting in place procedures. When USTR does issue a

10  final decision, it will resolve that question one way

11  or the other, and then all questions will be resolved

12  either to the satisfaction or dissatisfaction of

13  Plaintiffs.

14  And in our brief, we cited Eurodif, which is

15  analogous to this situation. In that case, the

16  Supreme Court looked at Commerce's authority to impose

17  antidumping duties on uranium that was imported

18  pursuant to certain transactions. So it was really

19  the agency looking to determine -- looking at its own

20  authority over particular imports and the Supreme

21  Court held that Chevron's Step 2 deference applied in

22  that case.

23  Number 6, given the Court's finding that USTR

24  likely violated the APA in the first instance, is it

25  permissible for the Court to oversee USTR's choice of

1  remedy, and the Court cites Mendoza. And the answer

2  in this particular case is no. In Mendoza, the Court

3  characterized the situation as quote, "fairly unique".

4  The Training and Employment Guidance Letters, which

5  are called TEGLs by the Labor Department, were fairly

6  unique according to the Court, and those guidelines in

7  the letters had been in place for over 20 years. So

8  the Court looked at that particular fact situation and

9  said, in that case, we're going to supervise. And in

10  any event, the Court in -- the Court also vacated the

11  old guidance in its order, so it granted a motion to

12  vacate in that regard, and the motion to vacate, or

13  the vacatur of the TEGL letters went into effect at

14  the time the agency issued its new regulations.

15  Here, we're asking you to vacate immediately.

16  And the other two cases that are really relevant to

17  this particular question are Perez v. Mortgage Bankers

18  and Vermont Yankee, two Supreme Court cases which

19  basically demonstrate that the agencies possess

20  authority to impose whatever procedural requirements

21  are allowed by the APA, and there's no requirement

22  that anything beyond those procedures necessary under

23  the APA be imposed on an agency.

24  Question 7, was the Government required to

25  request a remand, and the Plaintiff's site SKF, which

Exhibit B
Public Version

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

INVENERGY RENEWABLES LLC,

                    Plaintiff,

      and

SOLAR ENERGY INDUSTRIES
ASSOCIATION, CLEARWAY ENERGY
GROUP LLC, EDF RENEWABLES, INC., and
AES DISTRIBUTED ENERGY INC.,

              Plaintiff-Intervenors

              v.

THE UNITED STATES, OFFICE OF THE
UNITED STATES TRADE
REPRESENTATIVE, UNITED STATES
TRADE REPRESENTATIVE ROBERT E.
LIGHTHIZER, U.S. CUSTOMS AND BORDER
PROTECTION and ACTING COMMISSIONER
MARK A. MORGAN,

              Defendants,

      and

HANWHA Q CELLS USA, INC., and AUXIN
SOLAR,

              Defendant-Intervenors.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

PUBLIC VERSION

Before: Judge Gary S. Katzmann
Court No. 19-00192

## THIRD SUPPLEMENTAL AFFIRMATION
## OF ARTHUR S. FLETCHER

Exhibit C
Public Version

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE GARY S. KATZMANN**

| | |
|---|---|
| INVENERGY RENEWABLES LLC,<br>     Plaintiff,<br><br>SOLAR ENERGY INDUSTRIES ASSOCIATION, EDF RENEWABLES, INC., CLEARWAY ENERGY GROUP LLC, and AES DISTRIBUTED ENERGY INC.,<br>     Plaintiff-Intervenors,<br><br>    - *against* -<br><br>UNITED STATES, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, UNITED STATES TRADE REPRESENTATIVE ROBERT E. LIGHTHIZER, U.S. CUSTOMS AND BORDER PROTECTION, and ACTING COMMISSIONER MARK A. MORGAN,<br>     Defendants,<br><br>HANWHA Q CELLS USA, INC.,<br>     Defendant-Intervenor. | Case No.: 19-00192<br>**FILED UNDER SEAL** |

**SECOND SUPPLEMENTAL DECLARATION OF JAMES P. RESOR**