IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE

_____

|  |  |  |
|---|---|---|
| INVENERGY RENEWABLES LLC, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     and | ) | |
| | ) | |
| SOLAR ENERGY INDUSTRIES ASSOC., | ) | Court No. 19-00192 |
|     Plaintiff-Intervenor, | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| UNITED STATES, *et al.*, | ) | |
|     Defendants, | ) | |
| | ) | |
|     and | ) | |
| | ) | |
| HANWHA Q CELLS USA, INC., | ) | |
|     Defendant-Intervenor. | ) | |

_____

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO AMEND THE COURT'S PRELIMINARY INJUNCTION OR FOR A TEMPORARY RESTRAINING ORDER

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

TARA K. HOGAN
Assistant Director

STEPHEN C. TOSINI
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 616-5196

October 23, 2020             Attorneys for Defendant United States

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 2

STATEMENT OF FACTS ...................................................................................... 3

    I.      Presidential Proclamation 9693 Action And USTR Procedures............................ 3

    II.     Court Proceeding And *April Withdrawal* .............................................. 4

    III.    *Proclamation 10101*:  Presidential Section 204 Determination ............................ 5

ARGUMENT ......................................................................................................... 7

    I.      Standard Of Review................................................................................ 7

          A.      Requirements For A TRO........................................................ 7

          B.      Review Of Presidential Action .............................................. 8

    II.     Modification Of The PI To Maintain The *Status Quo* Is Unwarranted Because The PI Was Based On An Entirely Different Statutory Scheme Involving A Different Deciding Official .................................. 9

    II.     Plaintiffs Cannot Establish A Likelihood Of Success On The Merits ....................................................................................... 12

          A.      The President Did Not Violate The Safeguard Statute ............................ 13

                1.      USTR's Exclusion Of Bifacial Panels Did Not Result in a "Termination" Of The "Action" Under Section 203(c)(7) .......................................................... 13

                2.      The President's Restoration Of Safeguard Duties On Bifacial Panels Was A Permissible Modification Under Section 204(b)(1)(B)........................................... 17

                3.      The President's Findings Satisfied The Prerequisites For Exercising Authority Under Section 204(b)(1) ..................... 21

          B.      Plaintiffs Possess No Constitutionally Protected Interest In Importation That Would Merit Extra-Statutory Procedures And Thus Their Due Process Claims Must Fail ....................................... 23

    IV.    Plaintiffs Cannot Demonstrate Immediate, Irreparable Harm Before A Decision Can Be Rendered ................................................ 24

V.     The Balance Of Hardships And Public Interest Weigh In Favor Of
       Denial.................................................................................................................. 27

VI.    Plaintiffs Should Be Required To Post Security In The Event That
       An Injunction Is  Entered..................................................................................... 29

CONCLUSION.....................................................................................................................30

**<u>TABLE OF AUTHORITIES</u>**

## CASES

*Abbott Labs. v. Sandoz, Inc.*,
   544 F.3d 1341 (Fed. Cir. 2008) ............................................................................................... 25

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*,
   751 F.2d 1239 (Fed. Cir. 1985) ............................................................................................... 24

*Amado v. Microsoft Corp.*,
   517 F.3d 1353 (Fed. Cir. 2008) ............................................................................................... 11

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001) ................................................................................................. 7

*Arjay Assocs., Inc. v. Bush*,
   891 F.2d 894 (Fed. Cir. 1989) ................................................................................................. 23

*Associated Dry Goods Corp. v. United States*,
   515 F. Supp. 775 (Ct. Int'l Trade 1981) ................................................................................. 30

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002) ................................................................................................................. 17

*Bd. of Trustees of the Univ. of Ill. v. United States*,
   289 U.S. 48 (1933) ................................................................................................................... 23

*Brown v. Gardner*,
   513 U.S. 115 (1994) ................................................................................................................. 16

*Buttfield v. Stranahan*,
   192 U.S. 470 (1904) ................................................................................................................. 23

*Corica v. Ragen*,
   140 F.2d 496 (7th Cir. 1944) ................................................................................................... 30

*Corus Group PLC v. Bush*,
   217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) .......................................................................... 26

*Corus Grp. PLC v. Int'l. Trade Comm'n*,
   352 F.3d 1351 (Fed. Cir. 2003) ................................................................................................. 8

*Dole v. United Steelworkers of America*,
   494 U.S. 26 (1990) ................................................................................................................... 17

*Estado de Sinaloa, A.C. v. United States*,
   389 F. Supp. 3d 1386 (Ct. Int'l Trade 2019) .......................................................................... 26

ii

*F.T.C. v. H. N. Singer, Inc.*,
    668 F.2d 1107 (9th Cir. 1982) ........................................................................ 11

*Fed. Sav. & Loan Ins. Corp. v. Dixon*,
    835 F.2d 554 (5th Cir. 1987) .......................................................................... 11

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ....................................................................................... 24

*In re Estate of Ferdinand Marcos, Human Rights Litig.*,
    25 F.3d 1467 (9th Cir. 1994) .......................................................................... 11

*Invenergy Renewables LLC v. United States*,
    422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ................................................ *passim*

*J. Conrad LTD v. United States*,
    457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020) .................................................... 7

*Kemet Elec. Corp. v. Barshefsky*,
    969 F. Supp. 82 (Ct. Int'l Trade 1997) ............................................................. 7

*Kwo Lee, Inc. v. United States*,
    24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014) .................................................... 24

*LEGO A/S v. ZURU Inc.*,
    799 Fed. App'x 823 (Fed. Cir. 2020) ............................................................. 29

*Maple Leaf Fish Co. v. United States*,
    762 F.2d 86 (Fed. Cir. 1985) ..................................................................... 8, 23

*McKinney v. U.S. Dep't of Treasury*,
    799 F.2d 1544 (Fed. Cir. 1986) ...................................................................... 12

*Motion Sys. Corp. v. Bush*,
    437 F.3d 1356 (Fed. Cir. 2006) ........................................................................ 8

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*,
    357 F.3d 1319 (Fed. Cir. 2004) ...................................................................... 10

*Nat'l Wildlife Fed'n v. Burford*,
    835 F.2d 305 (D.C. Cir. 1987) ....................................................................... 12

*Otter Prods., LLC v. United States*,
    37 F. Supp. 3d 1306 (Ct. Int'l Trade 2014) ............................................. 7, 8, 24

*Pro Edge L.P. v. Gue*,
    411 F. Supp. 2d 1080 (N.D. Iowa 2006) ........................................................ 11

*Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*,
  970 F.2d 552 (9th Cir. 1992) ........................................................... 11

*Russello v. United States*,
  464 U.S. 16 (1983) ...................................................................... 16

*S.J. Stile Assoc. v. Snyder*,
  646 F.2d 522 (C.C.P.A. 1981) ......................................................... 26

*Shandong Huarong*,
  122 F. Supp. 2d ......................................................................... 24

*Silfab Solar v. United States*,
  296 F. Supp. 3d 1295 (Ct. Int'l Trade 2018) ......................................... 29

*Silfab Solar, Inc. v. United States*,
  892 F.3d 1340 (Fed. Cir. 2018) ................................................. *passim*

*SKF USA Inc. v. United States*,
  316 F. Supp.2d 1322 (Ct. Int'l Trade 2004) .......................................... 11

*St. Assocs. Ltd. P'ship v. Brown*,
  684 F. Supp. 326 (D.D.C. 1988) ....................................................... 11

*Sumecht NA, Inc. v. United States*,
  331 F. Supp. 3d 1408 (Ct. Int'l Trade 2018) ............................... 7, 24, 26

*Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*,
  364 U.S. 642 (1961) ..................................................................... 11

*U.S. Ass'n of Importers of Textiles & Apparel v. U.S. Dep't of Commerce*,
  413 F.3d 1344 (Fed. Cir. 2005) .................................................... 8, 10

*United States v. George S. Bush & Co.*,
  310 U.S. 371 (1940) ....................................................................... 8

*United States v. Swift & Co.*,
  286 U.S. 106 (1932) ..................................................................... 11

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ..................................................................... 23

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ..................................................................... 28

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................. *passim*

*Withrow v. Larkin,*
  421 U.S. 35 (1975) ......................................................................................... 24

*Zenith Radio Corp. v. United States,*
  710 F.2d 806 (Fed. Cir. 1983) ............................................................... 24, 26

# STATUTES

5 U.S.C. § 553 ....................................................................................................... 4

19 U.S.C. 2252(b)(2) ........................................................................................... 22

19 U.S.C. § 1505 ................................................................................................. 25

19 U.S.C. § 2251 ................................................................................................... 3

19 U.S.C. § 2251(a) ...................................................................................... 14, 22

19 U.S.C. § 2252(b)(1)(A) ................................................................................. 14

19 U.S.C. § 2253(a)(1) ........................................................................................ 14

19 U.S.C. § 2253(c)(7)(A) .................................................................................. 13

19 U.S.C. § 2254 ................................................................................................. 25

19 U.S.C. § 2254 ........................................................................................... *passim*

# RULES

USCIT Rule 65(c) ................................................................................................ 29

# FEDERAL REGISTER NOTICES

*Proclamation 10101, To Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other* Products),
  85 Fed. Reg. 65,639 (Oct. 16, 2020) ................................................................1

*Procedures to Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure,*
  83 Fed. Reg. 6,670-72 (USTR Feb. 14, 2018) (*Exclusion Procedures*) ......................................3

*Withdrawal of Bifacial Solar Panels Exclusion to the Solar*
*Products Safeguard Measur*e,
   84 Fed. Reg. 54,244-45 (USTR Oct. 9, 2019) (*October Withdrawal*) ........................................4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully*
*Assembled Into Other Products: Monitoring Developments in the Domestic*
*Industry Institution and Scheduling Notice for the Subject Investigation*,
   84 Fed. Reg. 37674 (Aug. 1, 2019)...............................................................................6

## MISCELANEOUS

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other*
   *Products: Monitoring Developments in the Domestic Industry*,
   ITC Pub. 5021 (Feb. 2020)......................................................................................... 6

*Proclamation 10101, To Further Facilitate Positive Adjustment to Competition*
*From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not*
*Partially or Fully Assembled Into Other* Products),
  85 Fed. Reg. 65,639 (Oct. 16, 2020)............................................................................1

*Procedures to Consider Additional Requests for Exclusion of Particular Products*
*From the Solar Products Safeguard Measure*,
  83 Fed. Reg. 6,670-72 (USTR Feb. 14, 2018) (*Exclusion Procedures*) ......................3

*Withdrawal of Bifacial Solar Panels Exclusion to the Solar*
*Products Safeguard Measur*e,
  84 Fed. Reg. 54,244-45 (USTR Oct. 9, 2019) (*October Withdrawal*) ........................4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully*
*Assembled Into Other Products: Monitoring Developments in the Domestic*
*Industry Institution and Scheduling Notice for the Subject Investigation*,
  84 Fed. Reg. 37674 (Aug. 1, 2019)................................................................................6

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
_____
                                                    )
INVENERGY RENEWABLES LLC,                            )
            Plaintiff,                               )
                                                    )
        and                                         )
                                                    )
SOLAR ENERGY INDUSTRIES ASSOC.,                      )        Court No. 19-00192
            Plaintiff-Intervenor,                   )
                                                    )
        v.                                          )
                                                    )
UNITED STATES, *et al*.,                             )
            Defendants,                              )
                                                    )
        and                                         )
                                                    )
HANWHA Q CELLS USA, INC.,                            )
            Defendant-Intervenor.                   )
_____)

## **<u>ORDER</u>**

Upon review of plaintiff's motion for a temporary restraining order and to amend the

Court's preliminary injunction, defendants' response, and all other pertinent papers, it is hereby

ORDERED that the motion is denied.


Dated: _____                                _____
        New York, NY                                        JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
_____
                                                    )
INVENERGY RENEWABLES LLC,                           )
          Plaintiff,                                )
                                                    )
     and                                            )
                                                    )
SOLAR ENERGY INDUSTRIES ASSOC.,                     )     Court No. 19-00192
          Plaintiff-Intervenor,                     )
                                                    )
     v.                                             )
                                                    )
UNITED STATES, *et al.*,                            )
          Defendants,                               )
                                                    )
     and                                            )
                                                    )
HANWHA Q CELLS USA, INC.,                           )
          Defendant-Intervenor.                     )
_____)

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO AMEND THE COURT'S PRELIMINARY INJUNCTION OR FOR A TEMPORARY RESTRAINING ORDER

Pursuant to Rule 65 of the Rules of the Court and this Court's scheduling order dated

October 21, 2020, defendants respectfully submit this response in opposition to the motion to

amend the Court's preliminary injunction or, alternatively, for a temporary restraining order

(TRO)[1] filed by plaintiffs (Mot.) seeking to enjoin the implementation of *Proclamation 10101,*

*To Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline*

*Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other* Products),

85 Fed. Reg. 65,639 (Oct. 16, 2020).  There is no basis for this Court to modify the existing

---

[1]  The Court's scheduling order directed us to respond to the plaintiffs' combined motion
on an expedited basis.  Should the Court further entertain plaintiffs' requests, or circumstances
warrant a supplemental response, we respectfully request the opportunity to more fully respond.

preliminary injunction to encompass entirely separate action taken by the President. Further, plaintiffs cannot establish the requirements necessary for a temporary restraining order or other extraordinary injunctive relief against Proclamation 10101.

## **INTRODUCTION**

At its October 19, 2020, conference with the parties, the Court emphasized that it has not yet addressed the substance of plaintiffs' claims, which include challenges to USTR's finding that its previous exclusion of bifacial panels from the safeguard measure on solar products was undermining the objectives of the safeguard measure. The Court has enjoined USTR and U.S. Customs and Border Protection (CBP) from taking action to effectuate the withdrawal of the exclusion based solely on its preliminary conclusion that USTR's determination violated the procedural requirements of the Administrative Procedure Act (APA).

Plaintiffs have now moved to supplement their complaints to include a challenge to Proclamation 10101 and to bar the entry into force of its provisions. This Court has not yet assumed jurisdiction over any challenge to Proclamation 10101. Nonetheless, plaintiffs contend that the Court can enjoin the President's action because it "is unlawful for many of the same reasons as USTR's prior withdrawal action." Mot. 13. The Court now has before it a new determination, by the President, under a different statutory authority than that on which USTR relied, which is not subject to the procedural requirements of the APA that this Court has found lacking with respect to USTR's actions.

Moreover, the standard of review of Presidential action is narrower than review of agency action. Given these distinct differences both in the actions challenged, the different procedures governing those actions, and the differing standards of review, the Court should exercise caution before sweeping Proclamation 10101 into the scope of the existing preliminary injunction.

Moreover, plaintiffs have failed to meet the four traditional factors necessary to warrant separate injunctive relief against the President's action here.

**STATEMENT OF FACTS**

Assuming the Court's familiarity with the facts of this case, we provide a brief overview.

**I.      Presidential Proclamation 9693 Action And USTR Procedures**

To address the serious injury to the domestic solar industry caused by increased imports, the President implemented a "safeguard measure" under Section 201 of the Trade Act of 1974 (19 U.S.C. § 2251, *et seq.*) (section 201) through *Proclamation 9693*, 83 Fed. Reg. 3,541 (Jan. 23, 2018). *Proclamation 9693* established tariffs on imports of solar products and delegated to USTR authority to grant the "exclusion of a particular product from the safeguard measure" if "the USTR determines, after consultation with the Secretaries of Commerce and Energy, that a particular product should be excluded." *Id.* ¶ 12. As in Proclamation 10101, the President set the effective date of *Proclamation 9693* to be 15 days after he signed the proclamation. *Id.* at Annex I.

Subsequently, USTR published procedures for interested persons to seek exclusions from the safeguard measure. *Procedures to Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6,670-72 (USTR Feb. 14, 2018) (*Exclusion Procedures*). The *Exclusion Procedures* established that USTR would provide opportunity to comment on exclusion requests. *Id.*

Certain interested persons requested exclusion of "bifacial" solar panels, which consist of cells that convert sunlight into electricity on both the front and back of the cells. *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1268 (Ct. Int'l Trade 2019) (*Invenergy I*). After USTR granted the exclusion, certain domestic producers of solar products objected,

arguing the exclusion would cause harm by allowing increased imports, and requested that

USTR withdraw the exclusion.  USTR did not publish a notice that it was considering

withdrawal of the exclusion.  *Id*.  USTR ultimately determined to withdraw the exclusion.

*Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measur*e, 84

Fed. Reg. 54,244-45 (USTR Oct. 9, 2019) (*October Withdrawal*)).

## II.   Court Proceeding And *April Withdrawal*

Invenergy Renewables LLC, a purchaser of imported bifacial panels for installation in

utility-scale solar projects, moved for a preliminary injunction to enjoin the *October Withdrawal*.

The Court granted a preliminary injunction on December 5, 2019, holding that Invenergy

had satisfied the four factors for preliminary injunctive relief.  With regard to the likelihood of

success factor, the Court reasoned that USTR's exclusion decisions under Section 201, including

the decision to withdraw an exclusion, constituted rulemaking subject to the Administrative

Procedure Act (APA), 5 U.S.C. § 553, because "[t]he President delegated the authority to USTR

to decide its procedures for the implementation of exclusions [and] USTR then published its

procedures in the Federal Register, inviting 'interested persons to submit comments identifying a

particular product for exclusion from the safeguard measure and providing reasons why the

product should be excluded.'"  *Invenergy I*, 422 F. Supp. 3d at 1285 (quoting *Exclusion*

*Procedures*, 84 Fed. Reg. at 6,671).  The Court held that USTR did not follow certain APA

procedures and, thus, plaintiffs possessed a likelihood of success on the merits in their challenge

to the *October Withdrawal*.

USTR subsequently sought to correct the procedural deficiencies identified in the Court's

order and issued a Federal Register notice seeking "public comment on whether [he] should

maintain the exclusion of bifacial solar panels from the safeguard measure, withdraw the

exclusion, or take some other action within his authority with respect to this exclusion."

*Procedures To Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 4,756 (USTR, Jan. 27, 2020) (*January Notice*). USTR identified the criteria for determining whether to retain, withdraw, or take other action with respect to the bifacial exclusion, set forth a schedule for interested persons to submit comments and rebuttal comments to USTR, and allowed for the submission and protection of business confidential evidence during the proceeding. *Id*. at 4,757.

USTR published the final results of that notice and comment proceeding in the Federal Register. *Determination on the Exclusion of Bifacial Solar Panels from the Safeguard*, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) ("*April Withdrawal*"). In response to plaintiffs' request to set aside the *April Withdrawal*, among other things the Court amended its preliminary injunction "to preserve the *status quo* during the pendency of the appeal and until final resolution of this case on the merits." *Invenergy Renewables LLC v. United States*, slip op. 20-144, 18 (Ct. Int'l Trade Oct. 15, 2020) (*Invenergy IV*).

### III.  *Proclamation 10101*:  Presidential Section 204 Determination

When the President has taken a safeguard measure to address serious injury to the domestic industry under section 201, section 204 directs the International Trade Commission (ITC) to monitor developments with respect to the domestic industry-protected by a safeguard. Accordingly, prior to the filing of this suit, the ITC instituted a monitoring proceeding under section 204(a)(2) of the Trade Act for the purpose of preparing a mid-term report to the President and the Congress. *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry Institution and Scheduling Notice for the Subject Investigation*, 84 Fed. Reg. 37,674 (Aug. 1, 2019).

Pursuant to statutory requirements, the ITC held a public hearing and accepted written submissions from interested parties. *Id.* at 37,675. The ITC issued its report on February 7, 2020. Among other findings, the ITC found that the "exclusion of bifacial CSPV modules from the safeguard measure have delayed and diluted the remedial effects of the intended relief and hampered its efforts to restart CSPV cell production." *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry*, ITC Pub. 5021 (Feb. 2020) at p.7.

After receipt of the report required under subsection (a)(2)(A)), the President is authorized to reduce, modify, or terminate an action taken under section 203. 19 U.S.C. § 2254(b)(1). On October 10, 2020, the President signed *Proclamation 10101*, pursuant to Section 204(b)(1)(B) of the Trade Act of 1974, 19 U.S.C. § 2254(b)(1)(B). The President concurred with the ITC's findings. 85 Fed. Reg. at 65, 640 ¶ 6. The President also stated that he had received a petition "from a majority of the representatives of the domestic industry with respect to each of the following modifications." *Id.* ¶ 9. The President found that the "domestic industry has begun to make positive adjustment to import competition, shown by the increases in domestic module production capacity, production, and market share." *Id.*

Invoking his authority under 19 U.S.C. § 2254(b)(1)(B)) to "reduce, modify, or terminate an action taken under section 203 of the Trade Act when the President determines that the domestic industry has made a positive adjustment to import competition," the President determined:

> (a)     that the exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in *Proclamation 9693* in light of the increased imports of competing products such exclusion entails, and that it is

necessary to revoke that exclusion and to apply the
safeguard tariff to bifacial panels; [and]

(b)     that the exclusion of bifacial panels from application of the
safeguard tariffs has impaired the effectiveness of the 4-
year action I proclaimed in *Proclamation 9693*, and that to
achieve the full remedial effect envisaged for that action, it
is necessary to adjust the duty rate of the safeguard tariff
for the fourth year of the safeguard measure to 18 percent.

85 Fed. Reg. at 65,640.  The President set October 25, 2020 as the effective date for these

modifications to the safeguard measure covering certain solar products.  *Id*. at 65,641.

## ARGUMENT

## I.     Standard Of Review

### A.     Requirements For A TRO

The standard for obtaining a temporary restraining order is virtually the same as the

standard for a preliminary injunction.  *See, e.g., Kemet Elec. Corp. v. Barshefsky*, 969 F. Supp.

82, 84 (Ct. Int'l Trade 1997) (citations omitted).  To obtain preliminary relief, a party must

establish each of four elements:  "(1) that it will be immediately and irreparably injured; (2) that

there is a likelihood of success on the merits; (3) that the public interest would be better served

by the relief requested; and (4) that the balance of hardship on all the parties favors the

[movant]."  *Otter Prods., LLC v. United States*, 37 F. Supp. 3d 1306, 1314 (Ct. Int'l Trade 2014)

(citation omitted); *see also Winter  v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20-21 (2008).

Plaintiffs must show that each prong of the test is "likely."  *Winter*, 555 U.S. at 20, 21; *see J.

Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1374 (Ct. Int'l Trade 2020) (observing that

a "sliding scale standard" that "relaxes the necessary showing of irreparable harm to something

less than a likelihood is "no longer viable").  The plaintiff's failure to demonstrate any of the

four factors compels the denial of injunctive relief.  *Winter*, 555 U.S. 7 (denying injunctive relief

solely on basis of public interest); *Sumecht NA, Inc. v. United States*, 331 F. Supp. 3d 1408, 1412 (Ct. Int'l Trade 2018), *aff'd*, 923 F.3d 1340 (Fed. Cir. 2019) (failure to demonstrate immediate irreparable harm compels rejection of preliminary injunction); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (plaintiff cannot be granted preliminary relief "unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm.") (emphasis in original) (citation omitted); *Otter*, 37 F. Supp. 3d at 1316.

Importantly, the Court must assure itself of its own jurisdiction before it can grant any injunctive relief. *See U.S. Ass'n of Importers of Textiles & Apparel v. U.S. Dep't of Commerce*, 413 F.3d 1344, 1348 (Fed. Cir. 2005). Here, the Court has not yet granted plaintiffs' requests to supplement their complaints to encompass counts challenging *Proclamation 10101*, which is an entirely new and separate action by a different official (the President), acting under a different statutory authority (section 204).

### B.    Review Of Presidential Action

As with challenges to other presidential determinations, "'[t]he President's findings of fact and the motivations for his action are not subject to review.'" *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1349 (Fed. Cir. 2018) (quoting *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 88 (Fed. Cir. 1985)). Indeed, "'the judgment of the President . . . on the facts . . . is no more subject to judicial review . . . than if Congress itself had exercised that judgment.'" *Id*. (quoting *United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940)).

The circumstances when a presidential action may be set aside are "limited." *Id*. at 1346. The Court may review "to determine whether the President 'clear[ly] misconstru[ed]' his statutory authority." *Id*. (quoting *Corus Grp. PLC v. Int'l. Trade Comm'n*, 352 F.3d 1351, 1356

(Fed. Cir. 2003)); *see also id.* ("[C]ourts may consider whether "the President has violated an explicit statutory mandate.'") (quoting *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (*en banc*)). But, "'[f]or a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority.'" *Id.* (quoting *Maple Leaf Fish*, 762 F.2d at 89).

## II. Modification Of The PI To Maintain The *Status Quo* Is Unwarranted Because The PI Was Based On An Entirely Different Statutory Scheme Involving A Different Deciding Official

At the outset, we respectfully object to plaintiffs' suggestion, Mot. 15, that we made representations to the Court that no withdrawal of the bifacial exclusion would take effect until the conclusion of this suit. Mot. 20. To be sure, and as the cited transcript page makes clear, we made representations on behalf of USTR that USTR would not implement a withdrawal of the bifacial exclusion. However, the President's proclamation is the result of a separate statutory process, emanating from a different authority that Congress explicitly required in section 201 proceedings. We never represented that the President would withhold issuance of a midterm proclamation, or decline to use his authority under section 204 to take action in response to congressionally-mandated ITC issue midterm reports. 19 U.S.C. § 2254(a). The plaintiffs implicitly concede that this Court's preliminary injunction order did not affect or enjoin the *President* from acting under wholly separate authority. The new basis for assessing safeguard duties arises, not because the United States has acted in derogation of the preliminary injunction, as plaintiffs intimate, but because of an entirely separate action taken by the President based on statutory authority to take action following the ITC's midterm review. That separate procedure is authorized by statute and was commenced before this suit was filed.

Nonetheless, plaintiffs request that this Court modify the existing preliminary injunction to encompass Presidential action taken pursuant to distinct statutory authority, without considering the traditional four factors for injunctive relief. Mot. 14-17. We do not challenge the Court's inherent authority to modify a preliminary injunction "in order to preserve the *status quo* while motions affecting that injunction are under advisement." *Invenergy IV*, slip op. 20-144 at 18 (citation omitted). Nonetheless, it would be inappropriate to do so here.

The most recently amended preliminary injunction was premised solely on the Court's preliminary conclusion that USTR violated certain APA procedures in issuing the *April Withdrawal. See*, *e.g*., *Invenergy IV*, slip op. at 31. Because of the similarity of the procedural deficiencies the Court identified between the *April Withdrawal* and the *October Withdrawal* (on which the original preliminary injunction was based), the Court found it appropriate to continue the preliminary injunction, notwithstanding the Court's simultaneous *vacatur* of the *October Withdrawal. Id*. at 16-18.

Plaintiffs seek to preserve the *status quo* so that the Court can review the *April Withdrawal.* Mot. at 15-16. But the reasoning for the *April Withdrawal* is no longer the sole basis or authority for safeguard duties on bifacial products in light of *Proclamation 10101*. Because Proclamation 10101 provides an additional and wholly distinct basis for applying the safeguard duties to bifacial products, plaintiffs' likelihood of success on their challenge to the Proclamation cannot rest on their challenge to the USTR's prior actions. *See*, *e.g*., *US-AITA*, 413 F.3d at 1347 (explaining that "the movant's evidence and arguments must actually be weighed against those of the non-movant to determine whether the movant's likelihood of success meets the applicable standard"); *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd*., 357 F.3d 1319, 1325 (Fed. Cir. 2004) (in patent case, Court must address whether the "infringement claim will likely

withstand [defendant]'s *defenses* to infringement and challenges to the validity") (emphasis added). Further, any procedural defects that the Court has preliminarily identified in the *April Withdrawal* cannot be imputed to *Proclamation 10101*. The President is not subject to the same APA requirements the Court found applicable to USTR's actions. And the procedures that led to *Proclamation 10101* are entirely different from the procedures that led to the original exclusion or to the *April Withdrawal*. Accordingly, the Court cannot enjoin the President's proclamation absent determining that plaintiffs have demonstrated each of the four factors with respect to their challenge to that separate action.

None of the cases that plaintiffs rely upon sanction the relief they seek: an injunction of wholly new action taken by the President, without first determining that all four injunctive factors are met. Each of the cases is thus inapplicable to the circumstances here. *See SKF USA Inc. v. United States*, 316 F. Supp.2d 1322 (Ct. Int'l Trade 2004) (duration of consent statutory injunction under 19 U.S.C. § 1516a(c)(2)); *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 651 (1961) ("modify[ing] the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives."); *United States v. Swift & Co*., 286 U.S. 106, 115 (1932) ("All the parties to the consent decree concede the jurisdiction of the court to change it."); *Amado v. Microsoft Corp*., 517 F.3d 1353, 1358 (Fed. Cir. 2008) (extending duration of stay of permanent injunction by seven days to resolve post-judgment motions); *Pro Edge L.P. v. Gue*, 411 F. Supp. 2d 1080, 1091 (N.D. Iowa 2006) (modifying preliminary injunction to cover period of time former employee was in breach of non-compete agreement); *1250 24th St. Assocs. Ltd. P'ship v. Brown*, 684 F. Supp. 326, 329 (D.D.C. 1988) (amending PI to account for continued "harassment"); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 318 (D.C. Cir. 1987) (assessing traditional four factors). Rather, the Court must thoroughly assess whether

the plaintiffs are entitled to injunctive relief because "'the authority to issue a preliminary injunction rests upon the authority to give final relief.'" *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 560 (9th Cir. 1992) (quoting *F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982)); *see also In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1477 (9th Cir. 1994); *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987) (same) (citations omitted).

## II.      Plaintiffs Cannot Establish A Likelihood Of Success On The Merits

The plaintiffs' separate request for a temporary restraining order should also be denied. Plaintiffs cannot demonstrate a likelihood of success on the merits of their challenge to Proclamation 10101.[2]

At the outset, as the plaintiffs recognize, the Court has no authority to "look behind" a Presidential determination "to see if it is supported by the record." Mot. 18 (citing *Silfab Solar*, 892 F.3d at 1349). Thus, the President's factual statements and conclusions are not subject to judicial review, including:

•       that imported bifacial panels are "competing products" with domestically produced panels, and that these imports have increased as a result of the exclusion;

•       "the exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness" of the safeguard action;

---

[2] Although we recognize that the Court held otherwise in *Invenergy I*, we continue to disagree that downstream customers for imported goods possess standing to challenge actions related to import transactions for which the customers lack any privity with the United States. *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1549 (Fed. Cir. 1986). For the same reasons that we objected to plaintiffs' standing to challenge the *October Withdrawal*, plaintiffs also lack standing to challenge Proclamation 10101.

•       "the exclusion of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the four-year action" proclaimed by the President.

Proclamation 10101, 85 Fed. Reg. at 65,640.

The narrow legal question is whether section 204 authorizes the President to modify the safeguard measure to address the serious threat to its effectiveness established by these findings. Plaintiffs make three arguments that the President violated the safeguard statute. None show that the President exceeded his statutory authority or committed a significant procedural violation in issuance of Proclamation 10101.

### A.      The President Did Not Violate The Safeguard Statute

Plaintiffs' argument that the revocation of the bifacial exclusion impermissibly increased the safeguard measure fails on multiple grounds. Plaintiffs erroneously contend that the exclusion of bifacial panels constituted a "termination" action under section 203(c)(7). They further err as both a legal and factual matter in arguing that the President's action constituted an impermissible modification under section 204(B)(1)(B).

### 1.      USTR's Exclusion Of Bifacial Panels Did Not Result in a "Termination" Of The "Action" Under Section 203(c)(7)

Plaintiffs contend that revocation of the exclusion violated section 203(c)(7). That statute precludes the President from taking new presidential action on "an article" immediately after termination of "an action" covering that article under section 203. Mot. 27-28. The statute provides:

> If an article was the subject of an action under subparagraph (A), (B), (C), or (E) of subsection (a)(3), no new action may be taken under any of those subparagraphs with respect to such article for—
>
> > (i) a period beginning on the date on which the previous action terminates that is equal to the period in which the previous action was in effect, or

(ii) a period of 2 years beginning on the date on
which the previous action terminates,

whichever is greater.

19 U.S.C. § 2253(c)(7)(A).

The "article" is the group of imported products as defined in the ITC's serious injury

determination, and the "action" is defined by the President, and may apply different remedies for

different products that fall within the definition of the "article."    Plaintiffs' argument is

premised on misidentifying the statutory "article" as bifacial panels, rather than the CPSV cells

subject to the safeguard measure.  The term "article" as used in section 203 refers back to the

foundational authority of section 201, which states:

> If the [ITC] determines under section 2252(b) of this title that *an
> article* is being imported into the United States in such increased
> quantities as to be a substantial cause of serious injury, or the
> threat thereof, to the domestic industry producing an article like or
> directly competitive with the imported article, the President, in
> accordance with this part, shall take all appropriate and feasible
> action within his power which the President determines will
> facilitate efforts by the domestic industry to make a positive
> adjustment to import competition and provide greater economic
> and social benefits than costs.

19 U.S.C. § 2251(a) (emphasis added).  Similarly, section 202(b)(1)(a) directs the ITC "to

*determine whether an article* is being imported into the United States in such increased quantities

as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry

producing *an article like or directly competitive with the imported article*."  19 U.S.C.

§ 2252(b)(1)(A) (emphasis added).  Section 203(a)(1) instructs the President, upon receipt of an

affirmative determination of serious injury, to "take all appropriate and feasible action within his

power which the President determines will facilitate efforts by the domestic industry to make a

positive adjustment to import competition and provide greater economic and social benefits than

costs." 19 U.S.C. § 2253(a)(1). Section 203(a) specifies that the action may include a "duty," "tariff-rate quota," or "quantitative restriction" on "the article." Thus, the "article" that "was the subject of an action under subparagraph (A), (B), (C), or (E) of subsection (a)(3)," is the *group* of products that the ITC found were imported in increased quantities, such that they were a substantial cause of serious injury to the domestic producers of a like or directly competitive product.

In this case, the ITC determined that "crystalline silicon photovoltaic cells (whether or not partially or fully assembled into other products) are being imported into the United States in such increased quantities as to be a substantial cause of serious injury to the domestic industry producing *an article* like or directly competitive with *the imported article*." USITC Report at 1 (ECF No. 13-2) (Invenergy Compl., Brew Dec., Ex. A). The ITC further specified that its finding of serious injury applied to a single "like product" consisting of "domestically manufactured CSPV cells, whether or not partially or fully assembled into other products." *Id*. at 13.[3] In proclaiming the safeguard, the President adopted the ITC's definition of the article subject to the determination. *Proclamation 9693*, 83 Fed. Reg. at 3,541.

The "action" taken with respect to "an article" may apply differently to subcategories of products within that "article." For example, there is a tariff on modules and a tariff-rate quota TRQ on imports of cells, such that the first 2.5 gigawatts enter duty-free, and any excess is subject to the same duty as imported modules. This does not mean that the safeguard measure is

---

[3] In its most detailed description of the imports subject to its investigation, the ITC refers to "the imported articles under investigation." USITC Report at 12. This passage is merely descriptive, and does not represent a finding of multiple "articles" for purposes of Section 201. In any event, the list does not treat bifacial panels as constituting an "article" distinct from the others subject to the investigation.

"terminated" with respect to cells imported within the 2.5 gigawatt tariff-free quantity. They remain subject to the "action," albeit with a different tariff rate than other products.

Because the "article" in question was all CSPV products covered by the ITC's injury determination, USTR's exclusion of bifacial panels did not terminate the "action" with respect to that "article," and did not trigger the limitations of section 203(c)(7). The exclusion meant only that bifacial panels – like solar cells within the TRQ – would not be required to pay the additional safeguard duties so long as the exclusion remained in force.

The terminology adopted in *Proclamation 9693* confirms this conclusion. In recital 12 of the Proclamation, the President states that if the conditions set out in section 204(b)(1) exist, "I shall reduce, modify, or *terminate* the action established in this proclamation accordingly." 83 Fed Reg. at 3,542. The President did not delegate this authority. Instead, he authorized the Trade Representative to "*modify* the HTS provisions created by Annex 1 to this Proclamation to *exclude* such particular product from the safeguard measure." 83 Fed. Reg. at 3,544 (emphasis added). This distinction between "terminate" and "exclude" signifies that they have different meanings. As with statutes, "[w]here [the President] includes particular language in one section of a [proclamation] but omits it in another section of the same Act, it is generally presumed that [the President] acts intentionally and purposely in the disparate inclusion or exclusion." *Brown v. Gardner*, 513 U.S. 115, 120 (1994) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Finally, treating each "exclusion" as "terminating" a safeguard measure with respect to the "article" covered by the exclusion would create the absurd result of authorizing multiple mini-ITC investigations of separate subsets of the original "article." Products excluded from the safeguard measure at the time of its original adoption would be eligible for a new safeguard

measure on February 2020.  The six products excluded in September, 2018, would be eligible on

September 19, 2020.  *See Exclusion of Particular Products From the Solar Products Safeguard

Measure*, 83 Fed. Reg. 47,393 (USTR Sept. 19, 2018).  And bifacial panels would be eligible on

June 13, 2021.  Congress did not intend such a piecemeal approach to the protections of the

safeguard statute.

        2.       **The President's Restoration Of Safeguard Duties On Bifacial Panels Was A Permissible Modification Under Section 204(b)(1)(B)**

Plaintiffs further contend that section 204(b)(1)(B) allows only further "liberalization" of

a safeguard measure, and that the restoration of the duties on bifacial panels violated this

requirement because it "would increase the burden on trade."  Mot. 24 (citing 19 U.S.C.

§ 2254(b)(1)(B)).  This argument fails because section 204(b)(1)(B) explicitly allows

"modification" *in addition to* "reduction" or "termination."  To read "modification" as applying

only to actions that reduce the burden on trade would make modification coterminous with

reduction, and therefore superfluous.  This argument also fails because the President's

modification did not "increase" the safeguard measure – it merely restored the original coverage

of bifacial panels, as originally contemplated.

As noted, plaintiffs' invocation of 204(b)(1)(B) as a limitation on the Proclamation 10101

would read out of the statute the reference to "modification."  Ignoring the canon of construction

that seeks to avoid surplusage, plaintiffs instead cite the canon of statutory construction that

"words grouped in a list should be given related meaning," to support their reading of

"modification."  Mot. 24 (citing *Dole v. United Steelworkers of America*, 494 U.S. 26, 36

(1990)).  However, plaintiffs concede "it is a general principle of statutory construction that

when 'Congress includes particular language in one section of a statute but omits it in another

section of the same Act, it is generally presumed that Congress acts intentionally and purposely

in the disparate inclusion or exclusion." Mot. 26 (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002). They fail to recognize that this point rebuts their "words grouped in a list" argument.

In addition to plaintiffs'' failure to give meaning to the word "modification," that term appears only in subparagraph (B) of paragraph 204(b)(1) and not in subparagraph (A). According to Plaintiffs' own argument, the omission of the term "modification" from subparagraph (A) and inclusion in subparagraph (B) is an intentional act by Congress that carries meaning. The logical meaning here is that when the conditions specified in subparagraph (B) exist, the President may make a "modification" that neither reduces nor terminates the measure.

The structure of section 204 confirms this conclusion. It begins by calling for the ITC to "monitor developments with respect to the domestic industry, including the progress and specific efforts made by workers and firms in the domestic industry to make a positive adjustment to import competition." 19 U.S.C. § 2254(a)(1). The use of words "progress" and "specific efforts" are instructive, indicating the expectation that during the planned duration of the safeguard measure, the domestic industry will be moving toward a complete "positive adjustment to import competition." Subsection (b) applies only when, at the midpoint of the expected duration of the measure, the ITC issues a report on its monitoring. In this context, the three options under section 2254(b)(1) correspond to three possible situations that may arise at the midpoint of the measure: (1) the domestic industry has unexpectedly completed its adjustment to import competition, such that "termination" is appropriate; (2) the domestic industry's "progress" is better than expected, such that import restrictions remain necessary, subject to an appropriate "reduction"; and (3) the domestic industry has made some progress, but

a "modification" to the measure is necessary to complete its adjustment to import competition. This common sense reading gives meaning to all parts of the statute.

This analysis highlights the flaw in plaintiffs' argument that "the finding under Section 201(b)(1)(B) is effectively a determination that safeguard relief is no longer necessary." Mot. 24. The provision of "reduction" or "modification" of the safeguard measure imply that import restrictions *remain* necessary, albeit with some change. And, the statutory instruction for the ITC to report at the measure's midpoint on the industry's "progress" and "efforts" to make a "positive adjustment" would be superfluous if the President could take action only when the industry had completed its positive adjustment. Reading the statute in that way would deprive the President of the flexibility accorded by the statute to adjust a safeguard measure to account for changes in the situation faced by the industry – and the express reference to "modification" in addition to "reduction" or "termination" emphasizes that Congress intended to confer sufficient flexibility on the President to respond to the evolving situation as appropriate.

Plaintiffs cite the Statement as to How the Uruguay Round Agreements Achieve Congressional Negotiating Objectives accompanying the Uruguay Round Agreements Act as evidence that "modification" as it appears in section 204(b)(1)(B) must mean a decrease. Mot. 25. This is the wrong legislative history. The Uruguay Round Agreement did not add the relevant provision to section 204(b). Instead, the text already existed, and remains unchanged to this day, as Congress added section 204 and the relevant provision with the Omnibus Trade and Competitiveness Act of 1988.

In any event, plaintiffs' proffered legislative history is unavailing even on its own terms. It merely reflects Congress's understanding, as of 1994, that section 201 provides for safeguard measures that are "transparent, temporary, degressive, and subject to termination when they are

no longer necessary." Statement as to How the Uruguay Round Agreements Achieve

Congressional Negotiating Objectives, H.R. Rep. 103-316, at 1141, *reprinted in* 1994

U.S.C.C.A.N. 4040, 4397. Section 203(e)(5) achieves this objective by providing that "[a]n

action described in subsection (a)(3)(A), (B), or (C)" – meaning an additional duty, a TRQ, or a

quantitative measure – "that has an effective period of more than 1 year shall be phased down at

regular intervals during the period in which the action is in effect." The solar safeguard measure

achieved this by lowering the additional duty on solar modules and on out-of-quota solar cells

each year on the anniversary date of the safeguard measure's entry into force. *Proclamation

9693*, 83 Fed. Reg. 3,542.

   USTR's granting of the bifacial exclusion was not part of this phase-down, as it did not

happen at one of the regular intervals. It was instead an exercise of discretion granted by the

President to exclude "products" from the application of the safeguard measure that the Trade

Representative determined, after consultation with the Secretaries of Commerce and Labor,

"should be excluded." *Id*. at 3,543-44. As plaintiffs concede, the Trade Representative

exercised this discretion with respect to bifacial panels in determining that the exclusion "did not

undermine the objectives of the safeguard measure." Mot. 31.

   In *Proclamation 10101*, the President determined that "the exclusion of bifacial panels

from application of the safeguard tariff has impaired and is likely to continue to impair the

effectiveness of the action I proclaimed in *Proclamation 9693* in light of the increased imports of

competing products such exclusion entails." *Proclamation 10101*, 85 Fed. Reg. at 3542.

Plaintiffs do not dispute the accuracy or validity of this determination, nor could they. The

President accordingly revoked the exclusion granted by USTR, reapplying the safeguard measure

to bifacial panels. This action complied with section 203(e)(5) by applying the reduced, phased-down, rate of 20 percent, and not a higher rate.

Plaintiffs interpret section 203(e)(5) as creating a ratchet whereby any modification to any aspect of a safeguard measure, even if erroneous or counterproductive, is locked in place, and cannot be removed. But section 203(e)(5) does not operate in that way. It applies on an overall basis to an "action" in the form of additional duties, a TRQ, or a quantitative restriction, and requires only reductions "at regular intervals." As plaintiffs concede, section 203(e)(5) does not prohibit replacement of one form of a measure with another, such as a TRQ in place of a tariff, or a quantitative restriction in place of a TRQ. Mot. 27.[4] Thus, section 204(b)(1) gives the President flexibility to adjust a safeguard measure after receipt of the ITC's midterm report as long as the modified "action" continues to phase down at regular intervals.

### 3. The President's Findings Satisfied The Prerequisites For Exercising Authority Under Section 204(b)(1)

In addition to their arguments that the President exceeded his authority under section 204(b)(1)(B), plaintiffs also contend that the President failed to make the findings necessary for invoking that authority. These contentions have no merit.

The President may reduce, modify, or terminate a measure if he determines that "the domestic industry has made a positive adjustment to import competition." 19 U.S.C. § 2254(b)(1)(B). Plaintiffs argue that "the statute requires the positive adjustment to import competition to have already occurred." Mot. 20. If that were the case, the safeguard measure would have served its purpose, and further maintenance of import restrictions would no longer

---

[4] Plaintiffs assert that the new form of a measure would have to be more "liberalizing" than the original form. Mot. 27. There is no support for this assertion. Nothing in section 204(b)(1) precludes a "modification" that resulted in a measure equally restrictive as initially implemented when viewed on an overall basis.

serve the remedial objectives of section 201.  The explicit authorization to "modify" or "reduce" the safeguard measure reflects congressional intent that the President exercise this authority when a positive adjustment has to some extent occurred, but is not yet complete, and continuation of the measure in reduced or modified form will facilitate the industry's positive adjustment to import competition.  The President's finding that "the domestic industry has begun to make a positive adjustment to import competition" falls squarely within this scenario, and justifies a reduction or modification that the President considered necessary to complete the adjustment.  *Proclamation 10101*, 85 Fed. Reg. at 65,640.

Plaintiffs also maintain that section 204 requires an express statement that the President weighed social costs and benefits of any reduction, modification, or termination.  Mot. 29-31. They cite sections 201(a) and 203(a)(2), which direct the President to consider the economic and social costs and benefits in making the initial decision to impose a safeguard measure.  However, those same provisions make clear that this is an inquiry *additional* to the evaluation of whether the measure will facilitate the industry's positive adjustment to import competition.  *See* 19 U.S.C. 2251(a) ("the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs"); 19 U.S.C. 2252(b)(2) ("the President shall consider . . . (D) the probable effectiveness of the actions . . . to facilitate positive adjustment to import competition; [and] (E) the short- and long-term economic and social costs of the actions . . . relative to their short- and long-term economic and social benefits").  Thus, the absence of a reference to economic and social costs and benefits in section 204(b)(7) means that the President is not required to reweigh the overall costs and benefits before reducing, modifying, or terminating a safeguard measure.

The President already determined in *Proclamation 9693*, 83 Fed. Reg. 3,542, that the economic and social benefits of the solar safeguard measure outweighed the economic and social costs. Section 204 does not require him to repeat this analysis in the course of a section 204 midterm review. And in any event, the President determined in *Proclamation 10101* "that the exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in *Proclamation 9693*." 85 Fed. Reg. at 65,640. In sum, the President concluded that the bifacial exclusion had "impaired," *id.*, action previously taken to "facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs" and corrected this impairment. *Proclamation 9693*, 83 Fed. Ref. at 3,542. Accordingly, there is no "clear misconstruction of the governing statute." *Maple Leaf Fish*, 762 F.2d at 89.

### B.    Plaintiffs Possess No Constitutionally Protected Interest In Importation That Would Merit Extra-Statutory Procedures And Thus Their Due Process Claims Must Fail

Plaintiffs contend that the President violated their due process rights by not disclosing the petitions from the domestic industry cited in *Proclamation 10101*. Although section 204 provides that the ITC "shall hold a hearing at which interested persons shall be given a reasonable opportunity to be present, to produce evidence, and to be heard." 19 U.S.C. § 2254(a)(3), section 2254(b) contains no requirement of notice and comment on the part of the President. Plaintiffs possess no right to any particular procedure beyond that afforded by statute, which the President followed to the letter. *See, e.g., Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 548 (1978) (no right to particular procedures beyond those called for by statute). Accordingly, plaintiffs are not likely to succeed in showing a "significant procedural violation" that would warrant the Court's interposition.

In the absence of any statutory violation, plaintiffs seek to elevate their desire for additional procedure to a constitutional level. However, plaintiffs lack any constitutionally protected right to import merchandise (or for others to import merchandise) at a particular rate of duty. Accordingly, plaintiffs' allegations of a due process violation are likely to fail. Mot. 32-34. *See*, *e.g*., *Bd. of Trustees of the Univ. of Ill. v. United States*, 289 U.S. 48, 57 (1933) ("The Congress may determine what articles may be imported into this country and the terms upon which importation is permitted. No one can be said to have a vested right to carry on foreign commerce with the United States."); *Buttfield v. Stranahan*, 192 U.S. 470, 497-98 (1904); *Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 896 (Fed. Cir. 1989) ("It is beyond cavil that no one has a constitutional right to conduct foreign commerce in products excluded by Congress.") (citations omitted)); *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1250 (Fed. Cir. 1985).

The essence of plaintiffs' argument is that the Court should graft APA procedural requirements onto presidential action. Of course, the President is not subject to the APA. *See Franklin*, 505 U.S. at 801 (holding that, "[a]s the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."). Accordingly, plaintiffs are unlikely to succeed in their due process argument

## IV. Plaintiffs Cannot Demonstrate Immediate, Irreparable Harm Before A Decision Can Be Rendered

A plaintiff seeking a preliminary injunction must also demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Moreover, the injury must be likely to occur "before a decision on the merits can be rendered." *Id*.; *accord, e.g., Withrow v. Larkin*, 421 U.S. 35, 43 (1975).

To meet its "extremely heavy burden" of establishing irreparable injury, *Shandong Huarong*, 122 F. Supp. 2d at 146, plaintiffs must offer more than "speculative" evidence; they must demonstrate that they face an "immediate and viable" threat of irreparable harm. *Otter*, 37 F. Supp. 3d at 1315 (quoting *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1326 (Ct. Int'l Trade 2014)); *Sumecht*, 331 F. Supp. 3d at 1412 (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)).

Plaintiffs first claim that they will suffer procedural harm that will be irreparable. Mot. 36. Plaintiffs invoke this Court's first opinion, in which the Court found irreparable procedural injury in the form of a lack of notice and opportunity to comment on the *October Withdrawal*. *See Invenergy I*, 422 F. Supp. 3d at 1272. That finding of irreparable injury was tied to the Court's finding that APA notice-and-comment rulemaking was required. *Id.* at 1287. Here, as we have explained in Section III, the process that plaintiffs demand (disclosure of petitions submitted to the President, advance notice, some "grace period" beyond the 15 days between the proclamation and the effective date) is not required when the President exercises his authority to modify a safeguard measure under Sections 201 and 203 of the Trade Act. Whatever the scope of "irreparable procedural injury" that is sufficient to enjoin official action, it does not stretch so far as to encompass purported injuries from being deprived of procedures the law does not require.

Similarly, Plaintiffs' allegations that the President has not complied with the *substantive* requirements of 19 U.S.C. § 2254 do not create an irreparable procedural injury. Mot. 36-37. To accept this theory would be to conflate the separate requirements of showing a likelihood of success on the merits and an irreparable injury. Legal errors are the very type of harm that the Court can redress at the conclusion of litigation. Should the Court agree with plaintiffs that the

President did not comply with a statutory mandate, the Court may order that the "presidential action . . . be set aside." *Silfab Solar*, 892 F.3d at 1346. Interest accompanies the return of duties deposited. 19 U.S.C. § 1505. Plaintiffs' allegations of legal error are not irreparable injuries.

Finally, on their claims of economic harm, plaintiffs have not shown that they will "suffer irreparable injury *during the pendency of the litigation*." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1349 (Fed. Cir. 2008) (emphasis added). Rather, their continuing claims of economic harm stem from the imposition of the safeguard duties themselves and from their conduct of business while operating under the benefit of the preliminary injunction.

To support their most recent request for injunctive relief, representatives of Invenergy and EDF Renewables Distributed Solutions, Inc. repeat many of the same allegations of irreparable harm they first alleged: that they might end up paying more for imported bifacial products, that there is business uncertainty, that payment of the duties will affect ongoing negotiations, and that they may not be able to pass along the cost of the duties to others. ECF No 263-2 (Fletcher Dec. ¶ 8); ECF No. 263-3 (Resor Decl. ¶¶ 6-8). If the Court considers that the duration of a temporary restraining order is only 14 days, USCIT R. 65, payment of duties during this short time period is hardly "'a viable threat of serious harm which cannot be undone.'" *Sumecht*, 331 F. Supp. 3d at 1412 (citation omitted).

Even if the Court considers the time to fully resolve plaintiffs' claims on the merits, plaintiffs have not alleged that they will go out of business, or that they do not have the resources to pay the safeguard duties. "[T]he mere threat of an adverse economic impact" cannot establish irreparable harm because it would "effectively create a per se irreparable harm rule in similar challenges-a result likely contrary to the extraordinary nature of the remedy." *Corus Group PLC*

*v. Bush*, 217 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2002). Rather, plaintiffs must show a

"presently existing actual threat" before a preliminary injunction can issue. *Zenith*, 710 F.2d at

809 (citing *S.J. Stile Assoc. v. Snyder*, 646 F.2d 522, 525 (C.C.P.A. 1981)).

Moreover, the business uncertainty and disruption that Invenergy and EDF cite appear to

be part and parcel of the nature of the solar industry. Those uncertainties are appropriately borne

by plaintiffs. *See, e.g., Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v.

United States*, 389 F. Supp. 3d 1386, 1400 (Ct. Int'l Trade 2019) (explaining that "[t]he court

finds that Plaintiffs' evidence concerning lost sales is supported by mere generalized statements

as to trends in the industry and estimated percentages of growers, importers, and exporters

affected, and that Plaintiffs' evidence regarding lost sales is unspecific and inconclusive as to the

immediate, irreparable harm Plaintiffs will suffer absent injunctive relief.").

Lastly, plaintiffs' claims of harm stem not from having to pay the safeguard duties during

the pendency of litigation, but from the prospect of having to pay safeguard duties *at all*. *E.g.,*

Fletcher Decl. ¶ 8; Resor Decl. ¶ 8. Plaintiffs do not identify any action they have taken during

the past ten months, during the duration of the preliminary injunction, to limit losses in the event

that USTR's withdrawal of the bifacial exclusion was sustained by this Court, or withdrawn

under separate authority, despite USTR's authority to "modify or terminate" an exclusion.

*Proclamation 9693*, Addendum ¶ 18(d). That is not a reasonable business assumption, and

certainly not one for which the public and the domestic solar industry should bear the burden.

The Court should find that plaintiffs have failed to establish immediate irreparable injury.

**V.      The Balance Of Hardships And Public Interest Weigh In Favor Of Denial**

The balance of hardships does not weigh in plaintiffs' favor, nor is it in the public interest

to enjoin the collection of safeguard duties on bifacial solar panels. Absent collection of deposits

of the safeguard duties, the domestic solar industry, whose interests the safeguard measure serves, will be harmed. The harm identified by the domestic industry is exactly the type of harm that section 201 was enacted to remedy. The President determined "the exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in Proclamation 9693 in light of the increased imports of competing products such exclusion entails." *Proclamation 10101*, 85 Fed. Reg. at 65640. Plaintiffs have not challenged this determination, which further specifies the harm posed by continuation of the bifacial exclusion.

Plaintiffs' claim that the balance of equities weighs in their favor also overlooks the harm to the United States in the form of lost revenue if the Court grants its request. Mot. 41. Because neither the importers nor the manufacturers of all merchandise subject to the proposed TRO have been identified, CBP cannot track the subject entries during the period covered by any injunction. If CBP is enjoined from effectuating the President's determination to remove the exclusion of bifacial solar panels "that absorb light and generate electricity on each side of the panel and that consist of only bifacial solar cells that absorb light and generate electricity on each side of the cells" from the scope of subheading 9903.45.25, HTSUS, then such products would continue to be entered under subheading 8541.40.60. Because subheading 8541.40.60 covers more than just the specific bi-facial solar panels at issue, CBP cannot readily identify imports of merchandise covered by the exclusion.

Accordingly, if the plaintiffs do not succeed in their legal challenge, such that it turns out that bifacial solar panels entered during the pendency of any modified injunction or temporary restraining order should have been subject to the safeguard measure, the United States may be

unable to recover the duties lawfully owed.  Just as importantly, the domestic solar industry will not receive the intended benefit of the safeguard measure.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  The public consequences of an injunction against collection of safeguard duties are the continued weakening, or indeed, disappearance, of the domestic solar industry.  By contrast, the public interest is served by a viable solar industry in the United States that is capable of designing and manufacturing the full panoply of solar products that will only become more prevalent over the next generations.

## VI.  Plaintiffs Should Be Required To Post Security In The Event That An Injunction Is Entered

Before the Court may award injunctive relief, "the movant [to] give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  USCIT Rule 65(c).  Just as it did in its original application for a preliminary injunction, Invenergy fails to address this security requirement.  Moreover, the Court should reconsider the present $1 security, which is manifestly inadequate to cover the harm to the domestic solar industry and the United States that would be caused by a wrongful injunction.  As explained above, insufficient security "'could expose the government to the risk of being unable to collect safeguard duties owed once the entries are liquidated should it ultimately prevail in this litigation.'"  *Silfab Solar*, 892 F.3d at 1345 (quoting *Silfab Solar v. United States*, 296 F. Supp. 3d 1295, 1319 (Ct. Int'l Trade 2018)).

Should the Court enjoin the collection of safeguard duties, we respectfully request that the Court require the plaintiffs to post a bond with the Court, in an amount sufficient to cover all safeguard duties on imports of bifacial products should the United States prevail.  We request the

opportunity to demonstrate what an appropriate amount of security would be. *E.g., LEGO A/S v. ZURU Inc*., 799 Fed. App'x 823, 837–38 (Fed. Cir. 2020) ("The party against whom a preliminary injunction is sought has the burden of establishing the amount of a bond necessary to secure against the wrongful issuance of the injunction.").  We also request that, should the Court enjoin application of Proclamation 10101 (which it should not), the Court require plaintiffs to identify entries of bifacial solar products so that CBP may recover safeguard duties in the event that the Courts sustain the proclamation.

Adequate security is critical because a temporary injunction should not "permit[] one party to obtain an advantage by acting, while the hands of the adverse party are tied . . . ." *Corica v. Ragen*, 140 F.2d 496, 499 (7th Cir. 1944).  Absent sufficient security, plaintiffs will in effect obtain the ultimate relief requested, duty-free entries of bifacial solar products, without any recourse by the United States or the domestic solar industry.  That is, the Court's order would have the effect of granting plaintiffs "all the advantages which would be obtained as a result of a final favorable adjudication of the controversy."  *Associated Dry Goods Corp. v. United States*, 515 F. Supp. 775, 780 (Ct. Int'l Trade 1981).

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' request for a TRO and modification of the PI.

Respectfully Submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/  TARA K. HOGAN
Assistant Director

/s/  STEPHEN C. TOSINI
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 616-5196

October 23, 2020                    Attorneys for Defendant United States

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 9,167 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Stephen C. Tosini