## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| INVENERGY RENEWABLES LLC,<br><br>*Plaintiff*,<br><br>and<br><br>SOLAR ENERGY INDUSTRIES<br>ASSOCIATION, *et al.*,<br><br>*Plaintiff-Intervenors*,<br><br>v.<br><br>UNITED STATES, *et al.*,<br><br>*Defendants*,<br><br>HANWHA Q CELLS USA, INC., and AUXIN<br>SOLAR,<br>*Defendant-Intervenors*. | **NON-CONFIDENTIAL<br>VERSION**<br><br><br>Court No. 19-00192 |

## DEFENDANT-INTERVENORS
## HANWHA Q CELLS USA, INC.'S AND AUXIN SOLAR, INC.'S RESPONSE TO
## PLAINTIFFS' EMERGENCY MOTION TO MODIFY PRELIMINARY INJUNCTION

John M. Gurley
Diana Dimitriuc Quaia
Taniel E. Anderson
Friederike S. Görgens
Aman Kakar
Jessica R. DiPietro
Russell A. Semmel

Arent Fox LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6301

*Counsel for Hanwha Q CELLS USA, Inc. and
Auxin Solar*

October 23, 2020

<h1 style="text-align:center"><u>TABLE OF CONTENTS</u></h1>

<strong>Page(s)</strong>

I.    INTRODUCTION ........................................................................................................1

    A.    Summary of Argument ...............................................................................2

    B.    Statement of Facts .....................................................................................4

II.    JURISDICTION .......................................................................................................8

III.    STANDARD OF REVIEW.......................................................................................9

    A.    Legal Standard for Review of Presidential Action.................................9

    B.    Standard of Review for Modification of a PI .......................................11

    C.    Standard of Review for TRO ..................................................................13

IV.    PLAINTIFFS HAVE NOT MET THEIR BURDEN TO WARRANT MODIFICATION OF THE PRELIMINARY INJUNCTION .........................................13

    A.    Plaintiffs Misstate the Status Quo Ante..................................................13

    B.    Plaintiffs Are Unlikely to Succeed on the Merits..................................16

        1.    The Proclamation Does Not Violate Section 204(b)(1)(B). ....................16

            a.    The President Has Made the Findings Required by Statute .........16

            b.    Section 204(b)(1)(B) Does Not Restrict Modification of the Safeguard Measure from Increasing the Measure .......................17

        2.    The Trade Act Does Not Prohibit the Increase of a Safeguard Measure Under Section 204(b)(1). ..........................................................19

        3.    The Proclamation Does Not "Re-Impose a Safeguard Measure After Termination"—It Modifies the Existing Safeguard Measure. ........23

        4.    The President Is Not Required to Weigh Social and Economic Costs and Benefits Before Modifying a Safeguard Measure. .................26

        5.    The Proclamation Does Not Violate Plaintiffs Due Process Rights........28

            a.    There is no protected property interest in importing bifacial panels at a particular duty rate.......................................................28

            b.    Even if Plaintiffs possess a protected property interest, they were afforded sufficient procedural protections...........................31

    C.    Plaintiffs Cannot Demonstrate Irreparable Harm...................................31

        1.    Procedural Harm.......................................................................................32

        2.    Economic, Financial and Competition Harm ...........................................34

            a.    EDF...............................................................................................35

            b.    Invenergy .....................................................................................36

    D.    The Balance of Equities Clearly Tips in Favor of Not Modifying the PI ...........38

i

E. The Public Interest Strongly Disfavors the Modification of the PI ...................... 40

V. PLAINTIFFS MUST POST A SIGNIFICANT BOND .................................................... 42

A. Security Is a Mandatory Requirement for Injunctive Relief ............................... 42

B. The Court Should Set a More Than Nominal Bond ............................................. 43

VI. CONCLUSION ............................................................................................................. 45

AFDOCS/23040931.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  32 CIT 666 (2008) ................................................................................................ 12

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  34 CIT 1275 (2010), *aff'd*, 420 F.App'x 962 (Fed. Cir. 2011) .............................. 12

*AIIS v. United States,*
  8 CIT 314 (1984) .................................................................................... 10, 32, 35

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
  526 U.S. 40 (1999) ............................................................................................... 28

*Arjay Assocs., Inc. v. Bush,*
  891 F.2d 894 (Fed. Cir. 1989) ............................................................................. 29

*Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.,*
  249 U.S. 134 (1919) ............................................................................................. 43

*Bomont Indus. v. United States,*
  638 F.Supp. 1334 (CIT 1986) .............................................................................. 36

*Chemlawn Servs. Corp. v. GNC Pumps, Inc.,*
  823 F.2d 515 (Fed. Cir. 1987) ............................................................................. 43

*Conn. Steel Corp. v. United States,*
  30 CIT 1658 (2006) .............................................................................................. 31

*Cont'l Serv. Grp. v. United States,*
  772 F.App'x 986 (Fed. Cir. 2018) ........................................................................ 14

*Corus Grp. PLC v. Bush,*
  26 CIT 937 (2002), *aff'd in part* 352 F.3d 1351 (Fed. Cir. 2003)..................... 35, 37

*Cosco Home & Office Prods. v. United States,*
  28 CIT 2043 (2004), *aff'd,* 158 F.App'x 284 (Fed. Cir. 2005) ............................. 29

*Dalton v. Specter,*
  511 U.S. 462 (1994) ..................................................................................... 9, 10, 11

*Elkem Metals Co. v. United States,*
  25 CIT 186 (CIT 2001).................................................................................... 32, 35

iii

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........................................................................ 3, 9

*Gilda Indus., Inc. v. United States*,
446 F.3d 1271 (Fed. Cir. 2006) ...................................................... 29, 30

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
174 F.3d 411 (4th Cir. 1999) .......................................................... 43, 45

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
882 F.2d 797 (3d Cir. 1989) ................................................................ 43

*Int'l Custom Prods., Inc. v. United States*,
791 F.3d 1329 (Fed. Cir. 2015) .................................................. 28, 29, 30

*Int'l Fresh Trade Corp. v. United States*,
26 F.Supp.3d 1363 (CIT 2014)...................................................... 32, 40

*Invenergy Renewables LLC v. United States*,
422 F.Supp.3d 1255 (CIT 2019), ECF 113 ...............................passim

*Invenergy Renewables LLC v. United States*,
450 F.Supp.3d 1347 (CIT 2020)................................................. 7, 9, 13

*Invenergy Renewables LLC v. United States*,
No. 19-00192, Slip Op. 20-144 (CIT Oct. 15, 2020) ............................ 7

*Litton Sys., Inc. v. Sundstrand Corp.*,
750 F.2d 952 (Fed. Cir. 1984) ............................................................ 14

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985) ........................................... 10, 19, 20, 21

*Massachusetts v. Morash*,
490 U.S. 107 (1989) ............................................................................ 25

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) (per curiam)....................................................... 13

*MCI Telecomm. Corp. v. AT&T*,
512 U.S. 218 (1994) ............................................................................ 20

*Md. Dept. of Hum. Res. v. U.S. Dept. of Agric.*,
976 F.2d 1462 (4th Cir. 1992) ............................................................ 43

*Michael Simon Design, Inc. v. United States*,
609 F.3d 1335 (Fed. Cir. 2010) .......................................................... 10

iv

*Motions Sys., Inc. v. Bush*,
  437 F.3d 1356 (Fed. Cir. 2006) (en banc) ............................................................9

*NEC Corp. v. United States*,
  151 F.3d 1361 (Fed. Cir. 1998) .....................................................................30, 31

*Nereida Trading Co. v. United States*,
  34 CIT 241 (2010) ................................................................................................29

*Norwegian Nitrogen Prods. Co. v. United States*,
  288 U.S. 294 (1933) .............................................................................................30

*Olim v. Wakinekona*,
  461 U.S. 238 (1983) .............................................................................................29

*Reid v. Dep't of Commerce*,
  793 F.2d 277 (Fed. Cir. 1986) ..............................................................................25

*Rosie D. by John D. v. Baker*,
  958 F.3d 51 (1st Cir. 2020) ..................................................................................11

*Salazar by Salazar v. D.C.*,
  896 F.3d 489 (D.C. Cir. 2018) .............................................................................11

*Sampson v. Murray*,
  415 U.S. 61 (1974) ...............................................................................................34

*Shandong Huarong Gen. Grp. Corp. v. United States*,
  24 CIT 1279 (2000) ..............................................................................................31

*Shree Rama Enter. v. United States*,
  21 CIT 1165 (1997) ........................................................................................32, 35

*Silfab Solar, Inc. v. United States*,
  296 F.Supp.3d 1295 (CIT 2018) ......................................................21, 22, 40, 44

*Silfab Solar, Inc. v. United States*,
  892 F.3d 1340 (Fed. Cir. 2018) .....................................................................passim

*Sys. Fed'n No. 91 Ry. Emp. Dep't, AFL-CIO v. Wright*,
  364 U.S. 642 (1961) .............................................................................................12

*Takeda Pharm. U.S.A., Inc. v. Mylan Pharm. Inc.*,
  967 F.3d 1339 (Fed. Cir. 2020) ...........................................................................11

*Timken Co. v. United States*,
  666 F.Supp. 1558 (CIT 1987) ..............................................................................36

v

*United States v. George S. Bush & Co.,*
  310 U.S. 371 (1940) ...............................................................................................9, 10, 11

*W.R. Grace & Co. v. Loc. Union 759, Int'l Union of United Rubber, Cork,*
  *Linoleum & Plastic Workers of Am,*
  461 U.S. 757 (1983) ..........................................................................................................43

*Winter v. NRDC,*
  555 U.S. 7 (2008) ..........................................................................................................2, 13

*Zepeda v. INS,*
  753 F.2d 719 (9th Cir. 1983) ..............................................................................................8

**Statutes**

19 U.S.C. § 2251 ..................................................................................................................38

19 U.S.C. § 2251(b)(2) ........................................................................................................18

19 U.S.C. §§ 2251, *et seq.* ...........................................................................................passim

19 U.S.C. § 2252(h) ............................................................................................................25

19 U.S.C. § 2252(h)(1) ........................................................................................................26

19 U.S.C. §§ 2253(a)(1)(A) ..................................................................................................2

19 U.S.C. §§ 2253(a)(3)(I) ...................................................................................................2

19 U.S.C. § 2253(a)(3) ..................................................................................................20, 23

19 U.S.C. § 2253(d)(1) ........................................................................................................33

19 U.S.C. § 2253(e)(5) ..................................................................................................18, 22

19 U.S.C. § 2253(e)(7)(B) ...................................................................................................24

19 U.S.C. § 2254(b)(1) ........................................................................................................21

19 U.S.C. § 2254(b)(1)(A) ..................................................................................................21

19 U.S.C. § 2254(b)(1)(B) .............................................................................................17, 27

**Executive & Administrative Determinations Authorities**

CBP Ruling HQ 966254, Re: Protest 3004-03-100027 (Oct. 3, 2003) ........................24

*Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products)*, Inv. No. TA-201-75, USITC Pub. 4739, Vol. I, at 6 (Nov. 2017) .......................................5, 7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry*, Inv. No. TA-201-075, USITC Pub. 5021 (Feb. 2020) ...........................................8, 19, 33, 38

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry Institution and Scheduling Notice for the Subject Investigation*, 84 Fed. Reg. 37674 (USITC Aug. 1, 2019) .................................................................7

*Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 21497, 21498......................................7, 9

*Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27684, 27685 (June 13, 2019)............................................6, 7, 38, 39

*Procedures to Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 4756-58 (USTR Jan. 27, 2020)...............................................................................7

*Proclamation to Facilitate Positive Adjustment to Competition From Imports of Certain Steel Products, Proclamation 7529 of March 5, 2002*, 67 Fed. Reg. 10551 (Mar. 7, 2002)..........................................................................................33

*Proclamation to Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells, Proclamation 10101 of October 10, 2020*, 85 Fed. Reg. 65639 (Oct. 16, 2020) ................................. passim

*Proclamation to Further Facilitate Positive Adjustment to Competition From Imports of Large Residential Washers, Proclamation 9979 of January 23, 2020*, 85 Fed. Reg. 5125 (Jan. 28, 2020)...............................................................33

*Rescission of the October 2019 Withdrawal of the Bifacial Solar Panels Exclusion From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 35975 (USTR June 12, 2020) .....................................................................................................7

*To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes, Proclamation 9693 of Jan. 23, 2018*, 83 Fed. Reg. 3541 (Jan. 25, 2018).......................................passim

*To Modify the Quantitative Limitations Applicable to Imports of Wheat Gluten*, 65 Fed. Reg. 34897, 34899 (May 31, 2000)...............................................................22

AFDOCS/23040931.1

*Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54244 (USTR Oct. 9, 2019) ............................................................ 6, 7

**Other Authorities**

11A Charles Alan Wright et al., Federal Practice & Procedure § 2954 (2d ed. 1995) ................................................................................................................ 45

H. Comm. on Ways & Means, H.R. Rep. No. 103-826 (1994) .................................................. 24

S. Rep. No. 100-71 (1987) .......................................................................................................... 18

Uruguay Rounds Agreement Act, Statement of Administrative Action, H.R. Rep. 103-316, 1994 U.S.C.C.A.N. 4060 .......................................................................... 22, 24, 25

**Court Rules**

CIT Rule 6(a)(1) ....................................................................................................................... 9

CIT Rule 7(d) ........................................................................................................................... 9

CIT Rule 65(c) ...................................................................................................................... 42, 43

AFDOCS/23040931.1

)
INVENERGY RENEWABLES LLC, )
) **NON-CONFIDENTIAL**
*Plaintiff*, ) **VERSION**
)
and )
)
SOLAR ENERGY INDUSTRIES )
ASSOCIATION, *et al.*, )
) Court No. 19-00192
*Plaintiff-Intervenors*, )
)
v. )
)
UNITED STATES, *et al.*, )
)
*Defendants*, )
)
HANWHA Q CELLS USA, INC., and AUXIN )
SOLAR, )
*Defendant-Intervenors*. )
)

**DEFENDANT-INTERVENORS**
**HANWHA Q CELLS USA, INC.'S AND AUXIN SOLAR'S RESPONSE TO**
**PLAINTIFFS' EMERGENCY MOTION TO MODIFY PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

The heart of Plaintiffs' argument is that Congress gave the President a one-way ratchet to

fix problems with international trade. After imposing safeguards, Plaintiffs argue the President

can ***only lower*** tariffs or make pro-importation adjustments. And if an improper or undesirable

exclusion is granted by a subordinate, it is carved in stone, and the President cannot rectify it.

That would be a counterintuitive way to design a trade regime and it is manifestly not the regime

Congress enacted. Congress gave the President broad authority and discretion in Section 201 by

legislating that the President "shall take all appropriate and feasible action within his power" and

allowing "any other action which may be taken by the President under the authority of law and

1

which the President considers appropriate and feasible." 19 U.S.C. §§ 2253(a)(1)(A), (a)(3)(I). In the context of a mid-term review, the President can modify his initial action, and he is authorized to "take such additional action . . . as may be necessary to eliminate any circumvention of any action previously taken." *Id.* § 2254(b)(1), (b)(2). Section 201 says nothing that prevents the President from addressing an exclusion  he determines is undermining the effectiveness of a safeguard. Against this backdrop, Plaintiffs' invitation for this Court to second-guess Congress and the President's fact-finding with strained statutory interpretations and novel limits on executive power should be rejected.

Not only are Plaintiffs' arguments on infirm ground, but Plaintiffs seek the "'extraordinary remedy'" of a brand-new injunction (disguised as a modified injunction) ***without*** a mandatory bond. *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018) (quoting *Winter v. NRDC*, 555 U.S. 7, 24 (2008)). This is an invitation to reversible error. Earlier preliminary injunctions ("PI") were granted for Administrative Procedures Act ("APA") deficiencies that are simply not present here. The Court should decline Plaintiffs' request for a bond-free PI or Temporary Restraining Order ("TRO") on issues that are not properly in this lawsuit, that should be considered by a three-judge panel, and where executive deference is at its high-water mark.

### A.    Summary of Argument

This case involves a challenge to actions taken by the President of the United States pursuant to Section 201, 19 U.S.C. §§ 2251, *et seq. See Proclamation to Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells, Proclamation 10101 of October 10, 2020*, 85 Fed. Reg. 65639 (Oct. 16, 2020) ("*Proclamation 10101*").  Plaintiffs gloss over critical distinctions between agency action and Presidential action, between claims subject to judicial review under the APA and claims that are

2

not reviewable under the APA, between an exclusion process by the USTR and action by the President following mid-term review. *See* Mot. at 2, 9-10, ECF 263. "{T}he unique constitutional position of the President," requires non-APA review of actions by the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992).

Plaintiffs are purchasers, developers of solar projects and U.S. importers of solar modules, including bifacial modules that were originally subject to the safeguard measures, were excluded from the safeguard by USTR in June 2019, and have had the exclusion revoked by the President in *Proclamation 10101*, effective October 25, 2020. Plaintiffs seek a PI or (alternatively) a TRO and to prevent the enforcement of *Proclamation 10101* with regard to their imports of bifacial solar modules. A PI is an extraordinary remedy that is not warranted here because Plaintiffs fail to establish any of the four factors required: (1) likelihood of success on the merits; (2) irreparable harm in the absence of immediate relief; (3) balance of equities weighs in favor of relief; and (4) the injunction serves the public interest.

First, Plaintiffs have not demonstrated a likelihood of success on the merits. They challenge actions taken by the President pursuant to his authority under Section 201 and his executive powers in matters of international trade. Unlike Plaintiffs' APA claims in the litigation to date, these claims involve decisions by the President that are not subject to judicial review under the APA. The statute commits to the discretion of the President the decision on how to modify safeguard measures following a mid-term review process to ensure that safeguard relief is effective and fulfills the remedial purpose for which it was ordered in the first place. Judicial review of such presidential action very limited. Even if judicially reviewable, *Proclamation 10101* implements trade policy decisions that fit precisely within the President's constitutional and statutory authority and duty. Plaintiffs also do not have a protected property

interest in the bifacial exclusion improvidently granted by the USTR. Even if they did, they received all the process that was due.

Second, Plaintiffs' claims of procedural harm are unavailing. The remaining allegation of irreparable harm boils down to financial harm, but financial loss alone is generally not considered to be irreparable. Other alleged irreparable harm, such as economic harm, competition harm and lost business opportunities is highly speculative and does not meet the standard for injunctive or emergency relief.

Third, as Plaintiffs face no immediate irreparable injury, they face no hardship in the absence of a TRO or a PI. Granting the PI modification would result in lost revenue to the United States. It would also impose hardship on Defendant-Intervenors, as it would preserve a gaping loophole in the safeguard—the fundamental purpose of which is to provide relief to a seriously injured domestic solar manufacturing industry—that will continue to impair the effectiveness of the time-limited remedy ordered by the President. And unlike Plaintiffs, who can be made whole via refunds of duties, because the safeguard is time-limited, harm to Defendant-Intervenors from injurious imports permitted via injunctive relief cannot be remedied; lost days without the safeguard can never be reclaimed.

Fourth, the United States, Defendant-Intervenors, and the public in general have a "strong interest in protecting the revenue of the United States and in assuring compliance with the trade laws." For all these reasons, the Court should deny Plaintiffs' motion for a TRO and to modify the preliminary injunction.

### B. Statement of Facts

Section 201 authorizes temporary relief for domestic industries seriously injured by increased imports. A precondition to the President's determination to impose such relief, known as a "safeguard," is a determination by the International Trade Commission ("Commission" or

4

"ITC") under § 2252(b) that "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article …." *Id.* § 2251(a). After receiving a petition seeking Section 201 relief against certain crystalline silicon photovoltaic products ("CSPV Products"), the Commission instituted an investigation in May 2017. *Crystalline Silicon Photovoltaic Cells (Whether or not Partially or Fully Assembled into Other Products)*, Inv. No. TA-201-75, USITC Pub. 4739, Vol. I, at 6 (Nov. 2017). The Commission made an affirmative determination, unanimously concluding that CSPV Products were being imported into the US in such increased quantities as to be a substantial cause of serious injury to the domestic CSPV industry, and provided recommended remedies to facilitate efforts by the domestic industry and its workers to make a positive adjustment to import competition. *Id.* at 1-3, 5.

On January 23, 2018, the President issued *To Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled Into Other Products) and for Other Purposes, Proclamation 9693 of Jan. 23, 2018*, 83 Fed. Reg. 3541 (Jan. 25, 2018) ("*Proclamation 9693*"), which announced his decision to impose a safeguard measure with respect to imports of certain CSPV Products to address the serious injury to the domestic solar industry caused by increased imports. *Proclamation 9693* established a four-year tariff on CSPV solar modules and a tariff-rate quota ("TRQ") on CSPV cells, with the tariff rate on modules and above-quota cells beginning at 30 percent in the first twelve-month period and decreasing by five percentage points in each subsequent twelve-month period until the expiration of the safeguard on February 6, 2022. *Id.* at 3542, ¶ 8, and at 3548-49, Annex I, at 4-5. *Proclamation 9693* excluded certain products from

the safeguard, but not bifacial modules. *Id.*, Annex I, Note 18(c)(ii)–(iii). The President advised that he would take further action, if appropriate and feasible, to enable the domestic industry to adjust to import competition, and to provide greater economic and social benefits than costs. *Id.* at 3542-43, ¶ 12. He also advised that he would reduce, modify, or terminate the action established by the Proclamation if he determines that the statutory conditions for such action are met. *Id.*

Proclamation 9693 also authorized the USTR to establish and publish in the Federal Register procedures for requests for "exclusion of a particular product from the safeguard measure," and to modify the HTS provisions created by Annex I of *Proclamation 9693* if, "after consultation with the Secretaries of Commerce and Energy," the USTR determined that a "particular product should be excluded" from the safeguard measure. *Id.* at 3543-44. The USTR granted certain exclusion requests on June 13, 2019, including a request to exclude from the safeguard measures bifacial solar modules that consist only of bifacial solar cells. *Exclusion of Particular Products From the Solar Products Safeguard Measure*, 84 Fed. Reg. 27684, 27685 (June 13, 2019) ("*Exclusion*"). Subsequently, USTR ultimately determined to withdraw the Exclusion. *See Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure*, 84 Fed. Reg. 54244 (USTR Oct. 9, 2019) ("*First Withdrawal*"). In *Invenergy I*, the Court held that USTR had engaged in APA rulemaking in both granting and then withdrawing the *Exclusion*, that the *First Withdrawal* likely violated APA rulemaking requirements, and that procedural harm under the APA was a key element supporting preliminary injunctive relief. *See Invenergy Renewables LLC v. United States*, 422 F.Supp.3d 1255, 1291 (CIT 2019) ("*Invenergy I*"), ECF 113. The Court ordered a nominal "bond with the court, in the amount of $1.00." *Id.* at 1295.

AFDOCS/23040931.1

In response to the Court's ruling, USTR initiated a new process to consider whether to maintain, modify, or terminate the Exclusion. *See Procedures to Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 4756-58 (USTR Jan. 27, 2020). On April 17, 2020, USTR issued its determination that the Exclusion is undermining the objectives of the safeguard measure provided in *Proclamation 9693. Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 21497, 21498 ("*Second Withdrawal*"). On May 27, 2020, the Court, among other things, permitted the Plaintiffs to supplement their complaints to challenge the *Second Withdrawal* as well. *See Invenergy Renewables LLC v. United States*, 450 F.Supp.3d 1347 (CIT 2020) ("*Invenergy III*").

On June 12, 2020, the USTR rescinded the *First Withdrawal. See Rescission of the October 2019 Withdrawal of the Bifacial Solar Panels Exclusion From the Safeguard Measure on Solar Products*, 85 Fed. Reg. 35975 (USTR June 12, 2020) ("*Rescission*"). The Government moved to dissolve the preliminary injunction based on the *Rescission*. Defs.' Mot. to Dissolve PI (June 12, 2020), ECF 198. On October 15, 2020, among other orders, the Court denied Defendants' motion to dissolve the PI, vacated the *First Withdrawal*, and granted Plaintiffs' cross-motion to modify the PI to include the Second Withdrawal. *See Invenergy Renewables LLC v. United States*, No. 19-00192, Slip Op. 20-144 (CIT Oct. 15, 2020) ("*Invenergy IV*"), ECF 252, and Judgment, ECF 253. No bond was mentioned.

Meanwhile, on July 25, 2019, the ITC had instituted a monitoring proceeding to prepare the mid-term report. *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry Institution and Scheduling Notice for the Subject Investigation*, 84 Fed. Reg. 37674 (USITC Aug. 1, 2019).

AFDOCS/23040931.1

The report noted that "there have been a number of significant developments" in the "domestic industry for CSPV products," including an expanded U.S. module industry, "changes in import volumes, and generally decreased prices." *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry*, Inv. No. TA-201-075, USITC Pub. 5021, at 1 (Feb. 2020) ("*Monitoring Report*"). For CSPV modules, imports were higher in the first half of 2019, compared with the first half of 2018. *Id.* The Commission found that global production and capacity has significantly increased for both CSPV cells and CSPV modules. *Id.* at I-13 n.50, I-21, II-10. The Commission later issued a report on the probable economic effect of increasing the level of the TRQ. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Advice on the Probably Economic Effect of Certain Modifications to the Safeguard Measure*, Inv. No. TA-201-075, USITC Pub. 5032 (Mar. 2020) ("*Supplemental Report*")).

After taking into account the information provided in the Commission's reports, and the positions of the majority of the representatives of the domestic industry, and acting under authority vested in him "by the Constitution and the laws of the United States, including but not limited to sections 203, 204, and 604 of the Trade Act" (*Proclamation 10101*, 85 Fed. Reg. at 65640), the President issued *Proclamation 10101* modifying the safeguard action. The President determined that "it is necessary to revoke that exclusion and to apply the safeguard tariff to bifacial panels." *Id.*, ¶ 9(a). *Proclamation 10101* was published in the *Federal Register* on October 16, 2020. Plaintiffs now move to modify the PI to cover *Proclamation 10101*.

## II.    JURISDICTION

The relief Plaintiffs seek is premature. The Court lacks jurisdiction to grant Plaintiffs an injunction or TRO against *Proclamation 10101* because no complaint challenging it is before the Court. *See Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983) ("A federal court may issue an

injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim."). On Saturday, October 17, Plaintiffs moved for leave to file Second Supplemental Complaints to enlarge the scope of this case to challenge *Proclamation 10101* (*see* ECF 257), but the Court has not granted leave because those motions have not been fully briefed. Under Rules 6(a)(1) and 7(d), responses are due Monday, November 9 in the absence of an expedited briefing schedule, which the Court has not ordered. This issue is of paramount importance and should be addressed before any ruling on Plaintiffs' Motion can be made.

This Court faced the same scenario earlier this month when Plaintiffs first sought to modify the PI to enjoin the Second Withdrawal. The Court understood that only "in light of the challenges in Plaintiffs' amended complaint," which challenged the *Second Withdrawal*, could "{t}he court now exercise{} jurisdiction over the *Second Withdrawal*." *Invenergy IV*, Slip Op. 20-144, at 21; *see Invenergy III*, 450 F.Supp.3d at 1359. In the same way, the Court must first favorably dispose of Plaintiffs' motion to supplement their complaints to include *Proclamation 10101* before granting any relief requested in this Motion.

Put simply, this Motion is unripe.

## III.     STANDARD OF REVIEW

### A.     Legal Standard for Review of Presidential Action

The judiciary has a limited role in reviewing Presidential action, particularly when such action has been committed to his discretion.  *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 474 (1994) ("But longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President."); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."); *United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940); *Motions Sys., Inc. v. Bush*, 437 F.3d 1356,

1359 (Fed. Cir. 2006) (en banc); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985); *AIIS v. United States*, 376 F.Supp.3d 1335 (CIT 2019), *aff'd*, 806 F.App'x 982 (2020). In the context of Section 201, the Federal Circuit explained that "{f}or a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Silfab*, 892 F.3d at 1346 (alteration in original) (citation omitted). These "are limited circumstances when a presidential action may be set aside if the President acts beyond his statutory authority, but such relief is only rarely available." *Id.*

Judicial review of the President's actions in matters that are committed to his discretion is particularly limited when related to foreign affairs. *See George S. Bush*, 310 U.S. at 379. The President's "findings of fact and motivations for his action"—judgment calls—taken pursuant to Section 201, *et seq*, "are not subject to review." *Maple*, 762 F.2d at 89 (citation omitted). The Federal Circuit has explained that the trade statute "does not implicitly or explicitly limit the President's discretion in a way that would render the President's actions reviewable for exceeding his authority." *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1340-41 (Fed. Cir. 2010) (defining contours of when the court will and will not permit judicial review in discretionary international trade matters in the context of the HTSUS modifications). Rather, the Federal Circuit has found "no review when the statute authorized the President to 'provide import relief . . . unless the President determines that provision of such relief is not in the national economic interest of the United States.'" *Silfab*, 892 F.3d at 1349 (citation omitted).

"The actions of the President cannot be reviewed under the APA because the President is not an 'agency' under that Act." *Dalton*, 511 U.S. at 476; *see also AIIS*, 376 F.Supp.3d at 1341 ("More importantly, for purposes of this case, the APA did not expand judicial review to include review of matters committed to presidential discretion." (citations omitted) (footnote omitted)).

AFDOCS/23040931.1

Ultimately, "{f}or the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains." *George S. Bush*, 310 U.S. at 380.

## B.    Standard of Review for Modification of a PI

Plaintiffs misstate the standard of review. Plaintiffs ask this Court, in effect, to issue a new preliminary injunction— "'an extraordinary remedy never awarded as of right,'" *Takeda Pharm. U.S.A., Inc. v. Mylan Pharm. Inc.*, 967 F.3d 1339, 1345 (Fed. Cir. 2020)—against a new action ordered by the President in exercise of his delegated trade and foreign affairs authority. Despite the extraordinary nature of that request, Plaintiffs maintain that the standard governing their motion should be "applied liberally" and that this Court need not "revisit" its findings regarding irreparable injury and the balance of equities. Mot. at 11.  Plaintiffs are wrong at each step.

First, the standard governing modification of a preliminary injunction does not apply here.  Plaintiffs are seeking a *new* injunction based on a *new* action (*Proclamation 10101*) issued not by USTR, but by the President.  This Court previously granted a preliminary injunction based on USTR's likely procedural violations of the APA (*Invenergy I*, 422 F.Supp.3d at 1291), but the APA does not apply to the President or presidential decisionmaking.  *See Dalton*, 511 U.S. at 476. Yet, Plaintiffs now ask this Court to enjoin the President based on a new legal claim that he, in a new action (*Proclamation 10101*), exceeded his substantive delegated authority under the Trade Act.  Plaintiffs are thus seeking a new injunction against a new decisionmaker based on a new legal theory.  Plaintiffs may not dress their new request as a modification.  *Cf. Salazar by Salazar v. D.C.*, 896 F.3d 489, 498 (D.C. Cir. 2018) ("Courts may not, under the guise of modification, impose entirely new injunctive relief.  That practice would end run the demanding standards for obtaining injunctive relief in the first instance{.}"); *Rosie D. by John D.*

*v. Baker*, 958 F.3d 51, 57 (1st Cir. 2020) ("modification cannot be used to sidestep the demanding requirement needed to get an injunction in the first place").

Second, even under the standards governing modification of a PI, Plaintiffs misstate their burdens. While it is true that "{a} party moving to modify a PI must show that a change in circumstances justifies modification as a matter of equity," Mot. 10 (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 32 CIT 666, 670 (2008) *("Shrimp I")*), that does not relieve Plaintiffs of the need to establish each of the four elements required to support a preliminary injunction against *Proclamation 10101*. Plaintiffs do not contest that, even under their preferred standard, they need to demonstrate that they are likely to prevail on their new legal theories. Plaintiffs argue, however, that the Court need not "revisit, *ab initio*, its prior conclusions that Plaintiffs face irreparable harm and that the equities favor a PI." Mot. 11. That is incorrect. This Court's prior finding of irreparable injury was specifically tied to a finding of a likely APA procedural violation and corresponding "procedural harm." *Invenergy I*, 422 F.Supp.3d at 1291. The APA does not apply to the President, and thus that theory of harm has no bearing on Plaintiffs' claims challenging *Proclamation 10101*. Plaintiffs must establish irreparable injury anew. Similarly, because Plaintiffs now seek injunctive relief against the President, as opposed to USTR, the balance of equities must be considered again—and the equities weigh decidedly against enjoining *Proclamation 10101*.[1]

---

[1] None of the cases cited by Plaintiffs supports a different result. In *Shrimp I*, the court denied a motion to modify an injunction that would have effectively required "a rehearing of its prior determination." 32 CIT at 669. In *Ad Hoc Shrimp Trade Action Comm. v. United States*, 34 CIT 1275 (2010), *aff'd*, 420 F.App'x 962 (Fed. Cir. 2011), the court denied a motion to be excluded from a preliminary injunction based on a decision appealed to the Federal Circuit. *Id.* at 1283. And in *Sys. Fed'n No. 91 Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642 (1961), the Supreme Court emphasized the need to be mindful of changes in law or facts that can overcome *res judicata* policies. 364 U.S. at 647. Here, there are no *res judicata* concerns and requiring

### C. Standard of Review for TRO

The standard for granting a TRO is the same as the four-part test for a PI, in which the movant must show "(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest." *Silfab*, 892 F.3d at 1345 (citation omitted). A PI "is an extraordinary remedy." *Winter*, 555 U.S. at 24 (citation omitted). It should be granted only upon a clear showing that the movant is entitled to the relief requested. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

Plaintiffs claim that if they make a strong showing on one or more PI factors, they face a lesser burden on the remaining factors. Mot. at 12. This sliding scale theory is no longer valid. A three-judge panel clarified that in the context of a PI, "the failure to establish a likelihood of irreparable harm *is* dispositive. Insofar as the sliding scale standard relaxes the necessary showing of irreparable harm to something less than a likelihood, that standard is no longer viable after *Winter*." *J. Conrad LTD v. United States*, 457 F.Supp.3d 1365, 1374 (CIT 2020). Plaintiffs have not demonstrated that they are likely to succeed on the merits.

## ARGUMENT

### IV. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO WARRANT MODIFICATION OF THE PRELIMINARY INJUNCTION

#### A. Plaintiffs Misstate the Status Quo Ante

Plaintiffs argue that modifying the PI (and entering a TRO) is necessary to preserve the status quo. *See* Mot. at 14. The problem is that they misrepresent when the correct date of the "status quo" to extend the period of duty-free importation. In adjudicating requests for injunctive

---

Plaintiffs to satisfy the four-factor test would not demand a rehearing of prior determinations. The Court's previous PI decisions involved the APA, not whether it would be equitable to enjoin the President's *Proclamation 10101* under Plaintiffs' new legal theories.

AFDOCS/23040931.1

relief, "{t}he status quo to be preserved is that state of affairs existing immediately before the filing of the litigation, ***the last uncontested status which preceded the pending controversy***." *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984) (emphasis added); *see also Cont'l Serv. Grp. v. United States*, 772 F.App'x 986, 994 (Fed. Cir. 2018) (quoting *Litton*). Here, nobody contests the President's safeguard action issued with *Proclamation 9693* back in 2018. But the parties do contest whether there should be an exemption for bifacial panels. Therefore, the last uncontested status which preceded the present controversy was the 18-month period between January 28, 2018 (when *Proclamation 9693* issued) and June 13, 2019 (when USTR granted the disputed Exclusion). The intervening activity by USTR (i.e., granting an exclusion on June 13, 2019 and withdrawing it on October 9, 2019 and again on April 17, 2020) is hotly contested.

Plaintiffs' selection of the post-exclusion period as the status quo ignores the fact that the Exclusion (and its withdrawal) are both disputed. And now that the President has taken action with *Proclamation 10101*, erasing USTR's disputed Exclusion, it makes no sense to define the status quo as the short, four-month period after one of USTR's intervening actions (exclusion) but not the other intervening actions (withdrawals).

Plaintiffs' motive in defining the status quo as a four-month period in the middle of a four-year safeguard is transparent: use the judiciary to give foreign competitors an advantage with a loophole the size of Texas while running out the clock on the safeguards. The timeline below shows how short the exclusion period (in red) was compared to the overall safeguard period. Cherry-picking a contested period when conditions were highly favorable for Plaintiffs violates the Federal Circuit's guidance. The only time when all parties agree there were no disputes was ***before*** USTR's exclusion. That is the only undisputed status quo ante.



There was a 16-month period when the safeguards applied to bifacial panels (January 2018–June 2019). That entire time, tariffs were collected at 25–30%. Plaintiffs survived. It strains credulity to argue (as Plaintiffs now do) that after the Exclusion, the universe changed and Plaintiffs can now claim reliance interests so deeply entrenched that a restoration of the true status quo ante would result in irreparable harm.

Plaintiffs' reliance on litigation conduct and post-lawsuit USTR statements is unavailing. The time for evaluating reliance interests and harm is not **_after_** the lawsuit, but **_before_** it. If Plaintiffs chose to rely on a temporary, preliminary injunction to make business decisions with no contingencies, they cannot use that nearsightedness as a justification for continued use of a mistaken status quo period and as support for new claims of irreparable harm. The "business uncertainty caused by a sudden imposition of a tariff on bifacial panels" is a contingency for which Plaintiffs should have prepared. Mot. at 16. Indeed, the imposition of tariffs on bifacial panels cannot come as a surprise given USTR's consistent efforts to correct actions based on mistaken facts and withdraw the Exclusion. Feigned surprise is not enough to undo Presidential

AFDOCS/23040931.1

action that could be seen from miles away. Indeed, Plaintiffs knew that the Exclusion could be rescinded and expected to get no more than a few months' mileage from the PI.[2]

## B. Plaintiffs Are Unlikely to Succeed on the Merits

### 1. The Proclamation Does Not Violate Section 204(b)(1)(B).

Plaintiffs claim that the Proclamation violates Section 204(b)(1)(B) in two ways. First, because Section 204(b)(1)(B) predicates that the President find that the domestic industry has made a positive adjustment to import competition before modifying a safeguard measure and allegedly he did not so. Second, because 204(b)(1)(B) allegedly does not authorize the President to take actions to increase safeguard restrictions. Mot. at 20. Neither is true.

#### a. The President Has Made the Findings Required by Statute

Section 204(b)(1)(B) provides that the President may modify an existing safeguard measure after determining "that the domestic industry has made a positive adjustment to import competition." Plaintiffs' claim that the President did not make such a determination hinges on the tense of the verb "to make." Mot. at 20. In a tortured attempt to create a viable argument, Plaintiffs argue that the President found only "the domestic industry *has begun to make* positive adjustment to import competition." *Id*. Plaintiffs intentionally change the sentence structure to make it appear as if the sentence ends after the portion cited. But the sentence does not end as Plaintiffs cited to this Court. *Id.* The complete sentence states:

> I have determined that the domestic industry has begun to make positive adjustment to import competition, *shown by the increases in the domestic module*

_____

[2] As early as May 29, 2020, Plaintiff-Intervenor SEIA **publically admitted** that the exclusion had its days numbered: "'I expect that the exclusion will remain in place … a month to a few months. Unfortunately, the government seems committed to reinstating the terms' of the tariff to apply to bifacial panels . . . ." **Exhibit 1** (quoting "John Smirnow, vice president of market strategy and general counsel for the Solar Energy Industries Association"). Plaintiffs' statement that they relied on a long-term exclusion "in pursuing their business interests" (Mot. at 33) is flatly contradicted by Smirnow's statement that companies should "get those modules into the U.S. before tariffs go into place." *Id.*

> *production capacity, production, and market share.*

*Proclamation 10101* ¶ 9 (emphasis added).

The second, emphasized clause states that adjustment to import competition *has already occurred*. The fact that "a positive adjustment" has been made is clear in the language of the Proclamation: increases in capacity, production, and market share have already occurred. The statute cannot reasonably be construed to mean that *all* conceivable positive adjustments must occur before the President may act.

      **b.**     **Section 204(b)(1)(B) Does Not Restrict Modification of the Safeguard Measure from Increasing the Measure**

The President's authority to act under Section 204(b)(1)(B) is based solely on receipt of the Commission's "report required under" Section 204(a)(2) and his own determination, "after a majority of the representatives of the domestic industry submits . . . a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition. 19 U.S.C. § 2254(b)(1)(B). *Proclamation 10101* squarely identifies both qualifications as the basis for the President's determination. *See* ¶ 9 ("After taking into account the information provided in the ITC's reports, and after receiving a petition from a majority of the representatives of the domestic industry with respect to each of the following modifications . . . ."). Plaintiffs' claims to the contrary, advocating that "{a}ny modification under Section 204(b)(1)(B) of the Trade Act . . . should be trade liberalizing," because, according to Plaintiffs, that is the only reasonable reading of the statue, are not supported by the statute. Mot. at 21.

Plaintiffs go beyond the statutory text, suggesting that if the domestic industry has made an adjustment to import competition, it would make no sense to modify the safeguard in other way then to "liberalize" it. *Id.* Plaintiffs' preferred reading of the statue is not what Section

204(b)(1)(B) actually says. The statute quite clearly allows for "modification" of the safeguard measures after the Commission's midterm review. As discussed further below, "modification" does not preclude an "increase," nor is a modification to the safeguard measures contrary to the statutory requirement to "phase down" measures lasting longer than 1 year. *See* 19 U.S.C. § 2253(e)(5). The statute is silent with respect to how safeguard actions are to be "phased down," but the legislative history is clear. The President need not further explain his determination and the Court does not have the authority to "look behind" the President's determination. *See Silfab*, 892 F.3d at 1349 ("{W}here the statute authorizes a Presidential 'determination,' the courts have no authority to look behind that determination to see if it is supported by the record.").

Next, Plaintiffs again argue that "action can only be taken after a positive adjustment has been made." Mot. at 22. The President has clearly stated that this criterion under Section 204(b)(1)(B) has been met. *See Proclamation 10101* ¶ 9 (explaining how the domestic industry has positively adjusted to import competition). A positive adjustment is not a fixed event in time, but a continuous process throughout the term of the safeguard. The "domestic industry may be considered to have made a positive adjustment to import competition even though the industry is not the same size and composition as the industry at the time the investigation was initiated." 19 U.S.C. § 2251(b)(2).

Legislative history also describes the "opportunities and incentives for petitioners to demonstrate to the Commission and the President the efforts made by the firms and workers in the industry to compete more effectively with imports." S. Rep. No. 100-71 at 51 (1987). At the time, the Senate Committee envisioned the "development and consideration of the {adjustment} plan{s} and commitments from industry members as a dynamic and ongoing process, throughout the import relief proceedings." *Id.* Plaintiffs construe the mid-term review as a statutory cul-de-

18

sac for the President allowing him only two choices: find a positive adjustment (no need for modification), or find insufficient adjustment (modification not allowed). If Congress intended such a binary structure, they would have written it.

It is reasonable or consistent with the statute for the President to determine that import relief is still necessary, albeit modified, if the industry "has been making a positive adjustment," considering the adjustment process was always intended to be "dynamic and ongoing." The "Commission collected information concerning the progress and specific efforts made by workers and firms to make a positive adjustment to import competition." *Monitoring Report* at 6-7. The President made a determination on the facts provided in the Commission's reports in *Proclamation 10101* that the industry is making the necessary adjustments to warrant modification under Section 204(b)(1)(B). *See Proclamation 10101* ¶ 9.

The Commission's review of industry developments, and the President's subsequent analysis of the Commission's review, is highly factual. The President's "findings of fact and the motivations for his action are not subject to review." *Maple*, 762 F.2d at 89 (citation omitted); *Silfab*, 892 F.3d at 1349.

> ### 2.     The Trade Act Does Not Prohibit the Increase of a Safeguard Measure Under Section 204(b)(1).

Plaintiffs' argument that Defendant cannot increase safeguard measures pursuant to Section 204 relies on legislative history that supposedly indicated that the term "modification" is not meant to encompass an increase in duties or other trade restrictions. *See* Mot. at 25. Plaintiffs argue that the "statute requires a finding that would support lowering, rather than increasing, restrictions on trade." Mot. at 25. There is no indication that the word "modify" is limited to "lowering," particularly when the word "reduce" is already included within the

statutory construct. Instead, the President acted within "the very broad discretion" accorded to him. *See Maple*, 762 F.2d at 89.

Plaintiffs concede (as they must) that Section 204(b) gives the President broad discretion in the amount and form of such relief. *See* Mot. at 27 ("In addition to the amount of relief, safeguard relief can also be provided in various forms." Under Section 204(b)(1), "{a}ction taken under section 2253 of this title may be reduced, modified, or terminated by the President." The options available to the President under Section 203(a)(3) are vast:

> (A) proclaim an increase in, or imposition of, any duty on the imported article;
> (B) proclaim a tariff-rate quota on the article;
> (C) proclaim a modification or imposition of any quantitative restriction on the importation of the article into the United States; . . .
> (I) take any other action which may be taken by the President under the authority of law and which the President considers appropriate and feasible for purposes of paragraph (1).

19 U.S.C. § 2253(a)(3). "Paragraph (1)" allows the President to "take all appropriate and feasible action within his power which the President determines swill facilitate efforts by the domestic industry to make a positive adjustment to import competition."

§ 2253(a)(1)(A).

Plaintiffs argue that the "the words 'modified' or 'modification' in Section 204(b) must be read in light of the surrounding words: 'reduced'/'reduction' and 'terminated'/'termination.'" Mot. at 24. "Modify" must also be given its proper meaning, which is not limited to a decrease or an increase, but is the opposite of "fundamental." *See MCI Telecomm. Corp. v. AT&T*, 512 U.S. 218, 228 (1994) ("'Modify,' in our view, connotes moderate change."); *see also id.* at 225 ("The word 'modify' . . . has a connotation of increment or limitation."). Neither definition precludes "increase."

Giving each word life and meaning, "modification" is not the same as "reduction" or "termination." Plaintiffs try to avoid violating this canon by cooking up a novel definition of "reduce" as applying only to duty rate decreases. *See* Mot. at 27. But the statute contains no such crabbed definition,[3] and Congress did not delegate the interpretation and application of these terms to the Plaintiffs, but rather to the President in the first instance. Section 204(b)(1) requires only that "{a}ction taken under section 2253 of this title may be reduced, modified, or terminated by the President (but not before the President receives the report required under subsection (a)(2)(A)) if the President" determines "changed circumstances warrant such reduction, or termination; **or**" the President determines "such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition." 19 U.S.C. § 2254(b)(1).[4]

The statute specifically delegates the ability to "modify" the safeguard actions to the President. In particular, the statute provides the President the ability to "modify" in Section 204(b)(1)(B), where it clearly does not in 204(b)(1)(A), which does only provide for "reduction, or termination." *Id.* The President's actions are in accordance with the statute and it is not within the Court's purview to consider the President's motivations behind the specific modification. *See Maple*, 762 F.2d at 89; *Silfab*, 892 F.3d at 1349 (explaining that the Court cannot "look behind" the President's factual determinations); *Silfab Solar, Inc. v. United States*, 296

---

[3] Indeed, Section 204(b)(1)(A) (meant to liberalize trade) would make no sense under Plaintiffs' proposal. The President would not be able to adjust quotas or take other trade-liberalizing actions that Plaintiffs argue fall within the "modification" bucket because that subsection allows only for "reduction, or termination." 19 U.S.C. § 2254(b)(1)(A). "Modification" is missing from Section 204(b)(1)(A) because it is a two-way tool allowing trade liberalization or restriction.

[4] Plaintiffs make the extraordinary assertion that even though Congress deleted a definition of "modification" that would have precluded an increase of a measure, the Court should revive the discarded language. Mot. at 23 n.9. Congress's decision controls.

F.Supp.3d 1295, 1313 (CIT 2018) ("Moreover, the President was under no obligation to explain in the Proclamation why his decision either did or did not accord with past practice.").

Plaintiffs highlight that the legislative history also calls for "progressive liberalization," arguing that "any modification to a safeguard measure would be trade liberalizing." Mot. at 26. Plaintiffs cite to the language in the WTO Agreement on Safeguards, Article 7.4, which is inapposite. *See, e.g.*, *Dillinger France S.A. v. United States*, 350 F.Supp.3d 1349, 1367-68 (CIT 2018) (explaining that U.S. law is independent from adverse WTO decision). It is the statute that is binding, and the statute allows the President to "reduce, modify, or terminate." Although successfully negotiating the Agreement on Safeguards, "thus ensur{ing} that all WTO countries will use safeguards rules and procedures that are comparable to those applicable in the United States," SAA, H.R. Rep. 103-316, at 1141, 1994 U.S.C.C.A.N. at 4262, neither the statute nor the Agreement on Safeguards "specify the degree of such liberalization." *Id.*, H.R. Rep. 103-316 at 958, 1994 U.S.C.C.A.N. at 4263. Indeed, the President's actions in this case to "achieve the full remedial effect envisaged for" the safeguard actions is not unprecedented. President Clinton, pursuant to Section 204(b)(1)(A) of the Trade Act, determined to modify the safeguard measures in *Wheat Gluten* to "include in the action imports of wheat gluten the product of Poland," which were previously excluded from the safeguard measures. *See To Modify the Quantitative Limitations Applicable to Imports of Wheat Gluten*, 65 Fed. Reg. 34897, 34899 (May 31, 2000) (*Proclamation 7241 of May 26, 2000*, ¶ 4).

Section 203(e)(5) of the statute states that safeguard actions with "an effective period of more than 1 year shall be phased down at regular intervals during the period in which the action is in effect." 19 U.S.C. § 2253(e)(5). The President did phase down the total safeguard measures in the fourth year: entries of subject merchandise are currently subject to 20%

22

safeguard tariffs through February 6, 2021. *See Proclamation 9693*, 83 Fed. Reg. at 3548. With *Proclamation 10101*, entries of subject merchandise will be subject to 18% safeguard tariffs during the period from February 7, 2021, through February 6, 2022. *Proclamation 10101* ¶ 9.b ("{A}nd to achieve the full remedial effect envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent.").

### 3. The Proclamation Does Not "Re-Impose a Safeguard Measure After Termination"—It Modifies the Existing Safeguard Measure.

Plaintiffs claim that the *Proclamation 10101* violates Section 203(e)(7) of the Trade Act, 19 U.S.C. § 2253(e)(7) because no new safeguard action can be taken with respect to bifacial CSPV modules for a period of two years after the previous action terminates. Mot. at 27-28. Plaintiffs' assertion that the *Proclamation 10101* was a new safeguard action is factually and legally incorrect. *Proclamation 10101* is a modification of an existing safeguard action and not a new safeguard action. Plaintiffs seek to persuade the Court that the plain statutory language which covers "an article" is not controlling and instead asks the Court to examine whether bifacial CSPV modules are a "product for which import relief was provided previously." Plaintiffs' preferred test is not supported by the statute or the legislative history and therefore should be rejected.

Under Section 203(e)(7)(ii) of the Trade Act, if "an article" was the subject of an action under subparagraphs (A), (B), (C) or (E) of Section 203(a)(3), no "new action" can be taken under any of those subparagraphs for 2 years after the termination of the initial action. 19 U.S.C. § 2253(e)(7). Section 203(a)(3) allows the President to take several actions related to "the imported article" or "the article." *Id.* § 2253(a)(3). Therefore, the "article" is defined in reference to the action taken by the President under Section 203(a)(3). The President took action under Section 203(a)(3) in *Proclamation 9693* and specified the article upon which the action was

taken in paragraph 6 of the proclamation. *Proclamation 9693* ¶ 6. Bifacial CSPV modules were

not specifically listed in paragraph 6 of *Proclamation 9693* but were included in CSPV products

because they contained the article which was subject to the President's action, CSPV cells.

*Proclamation 10101* modifies what is included in "the article" subject to the President's action

but does not change "the article" on which the President took action under *Proclamation 9693* .

    The articles in paragraph 6 of *Proclamation 9693* remain subject to the President's

action under Section 203(a)(3) even after the *Proclamation 10101*. For Section 203(e)(7)(ii) to

apply, the previous action by the President must terminate. *Proclamation 10101* does no such

thing, and in fact references *Proclamation 9693* as the action underlying the modification.

*Proclamation 10101* ¶¶ 1, 9(a)-(b). Plaintiffs' argument that the *Proclamation 10101* violated

Section 203(e)(7)(ii) is invalid because *Proclamation 9693* has not been terminated and

therefore Section 203(e)(7)(ii) cannot apply to *Proclamation 10101*. USTR has previously

amended exclusions and such amendment was found to not violate Section 203(e)(7). CBP

Ruling HQ 966254, Re: Protest 3004-03-100027 (Oct. 3, 2003) (finding that USTR's decision to

change exclusion to quota did not violate the time limits set forth in 19 U.S.C. § 2253(e)(7)(B)).

Therefore, Plaintiffs could not have a reliance interest or expectation that bifacial CSPV modules

could not be covered again by the safeguard action.

    Plaintiffs ask the Court to ignore the fact that the statute speaks to "the article" in Section

203(e)(7)(ii) and instead asks the Court to look the SAA to find that Section 203(e)(7)(ii) covers

"a product" and not "article." Plaintiffs' reliance on the SAA is misplaced. The SAA states that

paragraph 7 was added to Section 203(e) to limit "the provision of new relief in respect of a

product for which import relief was provided previously." SAA, H.R. Rep. 103-316, at 293,

1994 U.S.C.C.A.N. at 4266; *see also* H. Comm. on Ways & Means, H.R. Rep. No. 103-826, 131

24

(1994). The SAA goes on to explain that "{t}hese limitations parallel those in current section 202(h)." SAA, H.R. Rep. 103-316, at 963, 1994 U.S.C.C.A.N. at 4266. Although the SAA uses the word "product" the statute consistently uses the word "article" to define the imported items subject to the safeguard investigation. Section 203 and 204. The term "article" as used in Section 203 is not ambiguous and does not require the Court to refer to the legislative history to determine its meaning. *Reid v. Dep't of Commerce*, 793 F.2d 277, 281 (Fed. Cir. 1986) (if the express language of the statute is plain and unequivocal on its face, there is no need to resort to the legislative history underlying the statute) (citation omitted)).

The SAA also stated that the aim of paragraph 7 was to be consistent with Section 202(h) that was in place at that time. Section 202(h)(2) mirrors the language in Section 203(e)(7)(ii) and states that "{n}o new investigation shall be conducted with respect **to an article** that is or has been the subject of an action under section 2253(a)(3)(A), (B), (C), or (E) of this title if the last day on which the President could take action under section 2253 of this title in the new investigation is a date earlier than that permitted under section 2253(e)(7) of this title." 19 U.S.C. § 2252(h) (emphasis added). The SAA makes it clear that when paragraph 7 was added to Section 203(e) it was understood to apply to "an article" and not a product because that was the word that was used in the statute and it was used again when paragraph 7 was added. *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989) (courts must interpret a statute as a whole). The Court should reject Plaintiffs' argument that legislative history should trump the statute and that Section 203(e)(7)(ii) should be read to include a word and concept that is inconsistent with the rest of the statutory scheme for Safeguard Investigations which focuses on the "article."

Plaintiffs argue that using the plain meaning of the language in the statute would lead to a loophole where the domestic industry would be able to bring another safeguard action after a

safeguard measure expires by simply changing the specific definition of an "article" to be slightly different than the previous definition. Mot. at 28 n.12. Plaintiffs' concerns are unfounded. Section 202(h)(1) prohibits an investigation with respect to "the same subject matter as a previous investigation under this part, unless 1 year has elapsed since the Commission made its report to the President of the results of such previous investigation." 19 U.S.C. § 2252(h)(1).

In sum, the Court should reject Plaintiffs' claims that the *Proclamation 10101* violates Section 203(e)(7) of the Trade Act because the *Proclamation 10101* merely modifies a previous action by the President and does not terminate and the original safeguard action that was taken under *Proclamation 9693* .

      **4.**      **The President Is Not Required to Weigh Social and Economic Costs and Benefits Before Modifying a Safeguard Measure.**

Plaintiffs argue that the Proclamation "unlawfully fails to satisfy a crucial statutory requirement." Mot at 29. Plaintiffs allege that the President failed to make a purportedly required finding under the Trade Act that the economic and social benefits of a modification to the safeguard are not exceeded by its costs. *Id*. There is no such statutory requirement. Plaintiffs' argument must be rejected because Plaintiffs are trying to superimpose the requirements of Sections 201 and 203 on the President's action by erroneously claiming that the Proclamation "re-imposes" a safeguard measure on bifacial modules. As Defendant-Intervenors demonstrate above in Section IV.B.3, the Proclamation does not "re-impose a safeguard measure after termination." The Proclamation modifies the existing safeguard measure on CPSV Products and therefore the applicable statutory requirements are in Section 204(b).

The President cites to Section 204(b) titled "Reduction, Modification, and Termination of Action" in the Proclamation. He specifically refers to Section 204(b)(1)(B) which provides:

     Action taken under section 2253 of this title may be reduced, modified, or terminated by the President (but not before the President receives the report

26

required under subsection (a)(2)(A)) if the President…determines, after a majority of the representatives of the domestic industry submits to the President a petition requesting such reduction, modification, or termination on such basis, that the domestic industry has made a positive adjustment to import competition.

19 U.S.C. § 2254(b)(1)(B).

Nowhere in this provision is there mention of economic and social costs and benefits or any requirement for the President to weigh these costs and benefits. This in contrast to Sections 201 and 203 where such a requirement is imposed. For example, Section 201(a) provides:

If the . . . Commission . . . determines . . . that an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article, the President, in accordance with this part, shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and *provide greater economic and social benefits than costs*.

*Id.* § 2251(a) (emphasis added).

Similarly, Section 203(a)(1)(A) provides:

After receiving {the report of the Commission} containing an affirmative finding regarding serious injury, or the threat thereof, to a domestic industry, the President shall take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and *provide greater economic and social benefits than costs*.

*Id.* § 2253(a)(1)(A) (emphasis added).

Section 204 simply does not include language requiring the weighing of economic and social benefits like Sections 201 and 203 do. Plaintiffs' argument is not supported by the plain language of the statute. The statutory obligations on the President under Section 204(b)(1)(A) and (B) are clear; reweighing all of the initial factors prior to initially imposing the safeguard is not among them. The Plaintiffs' argument must fail.

27

Plaintiffs further rely on an irrelevant passage from the President's 2018 *Proclamation 9693* , and omit the relevant portion.  The full statement is:

> If I determine that further action is appropriate and feasible to facilitate efforts by the domestic industry to make a positive adjustment to import competition and to provide greater economic and social benefits than costs, *or if I determine that the conditions under section 204(b)(1) . . . are met,* I shall reduce, modify, or terminate the action established in this proclamation accordingly.

*Proclamation 9693*, ¶ 12 (emphasis added).

Plaintiffs quote only the first phrase, which refers to additional potential *initial* safeguard actions, but do not quote the italicized phrase, which is referencing the mid-term review process.

Plaintiffs go on to knock down a straw man, conjuring up elaborate hypotheticals about evading the statute under a different set of facts, and calling into question the rather pedestrian implication that allowing product and country exclusions does not ossify them forevermore; rather, what is granted based on particular findings of fact can be reversed when those facts change or were proven incorrect.  Here, the President imposed the safeguard tariffs on products that included bifacial panels; delegated authority to the USTR to determine if a product should be excluded; and then concluded, based on the findings in the required report, that the Exclusion has impaired the effectiveness of the safeguard, and it is necessary to revoke the Exclusion.  The President followed the statute.

### 5. The Proclamation Does Not Violate Plaintiffs Due Process Rights.

#### a. There is no protected property interest in importing bifacial panels at a particular duty rate.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015) ("*ICP*") (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).  This is because "{p}rocess is not an end in itself.  Its

constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

Laboring to identify a constitutional protected property interest, Plaintiffs assert that they possess a property interest in the Exclusion amounting to "a legitimate entitlement to rely on bifacial panels continuing to be excluded from the President's safeguard measures." Mot. at 32. But as this Court and the Federal Circuit have emphasized, "{i}t has long been settled that executive actions involving foreign trade … do not constitute the taking of property without due process of law." *Gilda Indus., Inc. v. United States*, 446 F.3d 1271, 1284 (Fed. Cir. 2006); *see also Nereida Trading Co. v. United States*, 34 CIT 241, 248 (2010) (noting "the longstanding recognition that importers lack a protected interest in the future importation of goods at a particular tariff rate"); *Cosco Home & Office Prods. v. United States*, 28 CIT 2043, 2051 (2004) ("Due process is not applicable to the case at bar because there is no right to import in trade cases."), *aff'd*, 158 F.App'x 284 (Fed. Cir. 2005). Indeed, even the complete prohibition of a particular import does not implicate due process protections. *See Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 896 (Fed. Cir. 1989) ("It is beyond cavil that no one has a constitutional right to conduct foreign commerce in products excluded by Congress.").

The Federal Circuit has explained that importers like some of the Plaintiffs (much less downstream purchasers like other Plaintiffs) lack a property interest in prior tariff rates. In *ICP*, Customs reclassified a product that the plaintiff imported without notice or comment after five years at the previous classification, resulting in a tariff increase of almost 2400% on all pending and future imports. 791 F.3d at 1332–33. Customs subsequently liquidated a series of the plaintiff's entries at the new, higher rate, imposing $28 million in duty liability, and the plaintiff (which was by then on the "brink of bankruptcy") challenged the requirement that it pre-pay

those duties before filing suit as violative of the Due Process Clause of the Fifth Amendment. *Id.* at 1333–35. In rejecting the plaintiff's claim that it possessed a property interest in the prior classification, the Federal Circuit explained that "the Constitution does not provide a right to import merchandise under a particular classification or rate of duty, or even afford a protectable interest to engage in international trade." *Id.* at 1337.

In *Gilda*, the Federal Circuit rejected an importer's claim that inclusion of the products it imported on a list of retaliatory tariffs implicated a protected property right. *Gilda*, 446 F.3d at 1284. The court reiterated that "'{n}o one has a legal right to the maintenance of an existing rate or duty,'" and that, consequently, "the retention of Gilda's imports on the retaliation list did not deprive Gilda of a property interest as to which it was entitled to additional procedural protections as a matter of constitutional due process." *Id.* (quoting *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 318 (1933)).

Here, too, Plaintiffs' claims—which challenge the President's recent decision to revoke the Exclusion and modify the tariff rate in the fourth year of the safeguard—amount to no more than an assertion that Plaintiffs are entitled to procedural due process in adjusting the duty applicable to most such imports. *See Proclamation 10101* § A(1). Given the Federal Circuit's recognition that even a 24-fold increase after six years at a lower duty rate does not suffice to create a protected property interest, *ICP*, 791 F.3d at 1335, Plaintiffs' four-month understanding that the products they import would be excluded—extended by this Court's order to sixteen months—is plainly insufficient to grant them such an interest.

Plaintiffs point to nothing that displaces this binding precedent. They rely on *NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998), but that case (which significantly predates *ICP* and *Gilda*) did not establish that due process protects importers' property interests in the

exclusion of their products from a safeguard action. In *NEC*, a foreign manufacturer that sought to sell supercomputers to a federal agency was assessed a 454% dumping duty following a Commerce Department antidumping investigation. *See id.* at 1367. Because a domestic competitor initiated the investigation and collaborated with Commerce Department staff, the plaintiff alleged the Commerce Department lacked neutrality and had prejudged its liability. *Id.* Although the court observed in *dicta* that "an importer *may* be entitled to procedural due process regarding the resolution of disputed facts involved in a case of foreign commerce," the court ultimately explained that it "need not decide" whether the neutral decision making requirement was grounded in the relevant statutory scheme or the Fifth Amendment. *Id.* at 1370, 1371 (emphasis added).

> **b.** **Even if Plaintiffs possess a protected property interest, they were afforded sufficient procedural protections.**

Even if Plaintiffs possessed a property interest in the Exclusion, they have been afforded all the process that was constitutionally due. Plaintiffs base their asserted procedural due process violation entirely on the President's purported failure to follow the *statute's* procedural requirements. *E.g.*, Mot. at 32 (arguing that President's purported "failure to abide by the statutory requirements in Sections 203 and 204" resulted in due process violation); *see Conn. Steel Corp. v. United States*, 30 CIT 1658, 1669 (2006) ("To the extent that domestic producers … have a constitutionally protected interest in antidumping investigations, the governing statute and applicable regulations set out the parties' procedural rights."). Plaintiffs' due process claim thus fails for the same reasons that its statutory argument fails. Unless Plaintiffs can prevail on their statutory argument, there is no conceivable due process violation.

### C. Plaintiffs Cannot Demonstrate Irreparable Harm

A plaintiff "bears an extremely heavy burden" to establish irreparable harm. *Shandong*

*Huarong Gen. Grp. Corp. v. United States*, 24 CIT 1279, 1282 (2000). "Irreparable injury is harm for which there exists no adequate remedy at law." *Elkem Metals Co. v. United States,* 25 CIT 186, 192 (CIT 2001). Importantly, irreparable harm may not be speculative. *See AIIS v. United States*, 8 CIT 314, 318 (1984).

As an initial matter, Plaintiffs Clearway and AES have provided no evidence of irreparable harm, should the Proclamation go into force, as scheduled. References to affidavits claiming economic losses, provided *last year* should not be given any weight by this Court. Mot. at 39 (citing Granger Decl. (ECF 58-3) (discussing Clearway contracts); Rubin Decl. (ECF 90-3) (discussing AES contracts)). The Court cannot grant emergency relief to Plaintiffs that have entirely failed to make any showing of irreparable harm. Affidavits from interested parties may be considered "weak evidence, unlikely to justify a {PI}." *Shree Rama Enter. v. United States*, 21 CIT 1165, 1167 (1997). *See also Int'l Fresh Trade Corp. v. United States*, 26 F.Supp.3d 1363, 1368 (CIT 2014). *Outdated* affidavits from interested parties fail on their face to meet the standard for injunctive relief.

### 1.    Procedural Harm

Plaintiffs' allegations of procedural harm that damages cannot remedy are completely unfounded. Mot. at 35-36. As discussed above, Plaintiffs have failed to demonstrate that such procedural violations have occurred. Additionally, Plaintiffs claim they also suffered procedural harm as a result of their lack of notice in connection with *Proclamation 10101* and what they term as "unnecessarily compressed time frames." Mot. at 34. Both allegations are belied by the statute and the facts leading to *Proclamation 10101*.

First, the President's decision to revoke the Exclusion was taken in the context of the mid-term review of the safeguard as provided by Section 204. The Commission's report in the monitoring proceeding included information concerning the progress and specific efforts made

32

by workers and firms in the domestic industry to make a positive adjustment to import competition. *See Monitoring Report* at 2. The Commission relied on questionnaire responses from *17 U.S. firms* that accounted for the vast majority of cell and module production, *55 firms* accounting for 83.6% of U.S. imports of cells and modules in 2018, *43 U.S. purchasers* and *46 foreign producers*. *Id*. The Commission received briefs from numerous parties and held a hearing where representatives of Invenergy, SEIA, EDF participated alongside many other witnesses. The impact of the Exclusion was addressed in briefs, at the hearing and in the Commission's Monitoring Report. *See e.g. Monitoring Report* at 7, I-13, I-74. While Plaintiffs complain that they did not have "notice and opportunity," the reality is that they participated in the statutory process, but simply disagree with the President's decisions. Presidential action after the mid-term review is expressly authorized by statute and was foreseeable.

Second, Plaintiffs' complaint that the Proclamation had an effective date of "mere 15 days" is equally unavailing. Mot. at 36. The original safeguard action, *Proclamation 9693*, came into effect 15 days from signature, consistent with the statutory timeframe in Section 203(d)(1):

> Except as provided in paragraph (2), any action described in subsection (a)(3)(A), (B), or (C), that is taken under subsection (a)(1) shall take effect within 15 days after the day on which the President proclaims the action.…

19 U.S.C. § 2253(d)(1); *see also Proclamation 9693*, ¶ (7).

Plaintiffs and their counsel know well that an effective date 15 days after signature of a Presidential Proclamation is the norm. In the safeguard proceedings for *Steel Products* and the monitoring proceeding for *Washers*, the safeguard measures came into effect 15 days after signature. *Proclamation to Facilitate Positive Adjustment to Competition From Imports of Certain Steel Products, Proclamation 7529 of March 5, 2002*, 67 Fed. Reg. 10551 (Mar. 7, 2002); *Proclamation to Further Facilitate Positive Adjustment to Competition From Imports of*

33

*Large Residential Washers, Proclamation 9979 of January 23, 2020*, 85 Fed. Reg. 5125 (Jan. 28, 2020). Plaintiffs also stated they did not know of the existence of the Proclamation until two days after the Proclamation was issued and after Defendants filed their October 12, 2020 Status Report. Mot. at 36. We believe the Court should view this statement with great skepticism as Plaintiffs knew about the possibility of a Proclamation. The Presidential Proclamation was posted on the White House website on October 10, 2020.[5] This is where Proclamations are normally posted—in plain sight for those paying attention.

Plaintiffs argue that the alleged procedural harm itself constitutes irreparable harm. Mot. at 36 citing *Invenergy I* at 1272. However, a panel of three judges of this Court recently stated that " a procedural due process violation does not establish irreparable harm *per se*." *J Conrad*, 457 F.Supp.3d at 1380 (citation omitted). In *J. Conrad*, like here, the plaintiffs claimed procedural harm from the inability to comment on Proclamation 9980, which imposed tariffs on derivative steel products imported by those plaintiffs. The Court found there was no irreparable procedural harm because "the alleged harm to them is the cost of paying additional duties (in the form of cash deposits) imposed by Proclamation 9980, not the inability to comment." *Id.* The same reasoning is compelled by the facts in this case, as the claims of harm are essentially identical. Plaintiffs' allegations of harm from these non-existent procedural violations should be disregarded.

### 2.    Economic, Financial and Competition Harm

An allegation of financial loss alone, however substantial, which is compensable with monetary damages, is not irreparable harm if such corrective relief will be available at a later date. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). In *Severstal Export GMBH v. United*

---

[5] *See Proclamation to Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells* (**Exhibit 2**).

*States*, the Court found irreparable harm based on "evidence of an ongoing loss critical enough to threaten {the plaintiff's} very existence." No. 18-00057, 2018 WL 1705298, at *6 n.7 (CIT Apr. 5, 2018); *Corus Grp. PLC v. Bush*, 26 CIT 937, 944 (2002), *aff'd in part* 352 F.3d 1351 (Fed. Cir. 2003) (the Court considered the argument that "sound business principles would require it to close ... rather than operate at a loss" but finding insufficient evidence of the danger of imminent closure). The Court characterized the situation in *Severstal* as a "close case". Not so here. The financial harm that Invenergy and EDF claim boils down to potential economic loss ([

]) but at no point does either Plaintiff claim that such financial harm is of the severity that would justify injunctive relief.

### a.  EDF

By its own admission, EDF's claims of injury are neither irreparable nor imminent. In fact, EDF claims "imminent" injury from modules that are [

]. Mot. at 39. These modules are nowhere close to [

], so as to justify the emergency relief being sought here. *Id.* (citation omitted). "It is not enough to establish 'a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown." *Shree Rama*, 21 CIT at 1167. This presently existing, actual threat must be "demonstrated by probative evidence" (*AIIS*, 8 CIT at 318 (citation omitted)), not merely "determined by surmise." *Elkem*, 25 CIT at 192 (2001) (citation omitted).

EDF also claims that it will suffer imminent irreparable harm because it is currently [

]

cannot possibly qualify as immediate irreparable harm under this Court's standard. These

speculative and non-specific allegations of harm fail to satisfy the "high burden required to show irreparable harm and that injunctive relief is warranted." *Confederación de Asociaciones Agrícolas del Estado de Sinaloa AC v. United States*, 389 F.Supp.3d 1386, 1403 (CIT 2019). In *Confederación*, the court rejected allegations of irreparable harm where the plaintiffs' "evidence {was} unspecific regarding the nature and consequences of the business disruptions." *Id*. at 1401. The Court explained: "Plaintiffs' business decisions to forgo selling in the United States market, end their growing season, or switch production to other agricultural crops are insufficient evidence to establish irreparable harm in this action."). *Id*. at 1400. Similarly here, the fact that there are [                                        ] weights against a finding of irreparable harm.

### b.      Invenergy

Invenergy claims that it faces immediate irreparable harm from the disruption of ongoing projects and the loss of new business opportunities. Mot. at 40, citing Fletcher 3rd Supp. Dec. ¶ 8. None of these alleged harms are immediate and the claimed harm is purely economic, not raising to the level of irreparable harm. *See Timken Co. v. United States*, 666 F.Supp. 1558, 1560–61 (CIT 1987) (finding that evidence of "dramatic increase" in volume of imports, lower prices, lost sales, "several million dollars in lost revenue," and first quarter losses which surpassed annual operating profits, even if "documented and uncontroverted," failed to establish irreparable harm).

Similarly, Invenergy claims irreparable harm from [
                                                              ]. *Id.* However, these claims of "competitive harm" do not merit emergency relief because the claimed injury is speculative and unspecific.  *See Bomont Indus. v. United States,* 638 F.Supp. 1334, 1339 (CIT 1986) (finding that evidence of competitive difficulties, decline in sales, and net losses "fail{ed}

36

to support the thesis that lack of suspension of liquidation during the pendency of th{e} action w{ould} cause the plaintiff irreparable injury").

Invenergy claims that the lack of availability of bifacial modules from U.S. producers exacerbates the irreparable harm caused by withdrawing the Exclusion. Mot. at 40. To be clear, there is no shortage of bifacial panels. Plaintiffs can source bifacial panels from their supplier of choice without any limitation; however, they are not entitled to import bifacial panels that the President has found are impairing the safeguard measures ***duty-free***.

Both Invenergy and EDF, along with other solar developers, had already started using bifacial modules *prior to* the June 2019 Exclusion. Those projects were negotiated and developed when safeguard tariffs were at their highest (30% to 25%), including:

- Invenergy's Southern Oak Solar Project, a 224 MW project in Georgia built with Chinese bifacial modules *began in 2018* for *completion in 2019*. This is just one of Invenergy's many U.S projects incorporating bifacial modules.[6]

- In *May 2019*, EDF purchased ***1.8 gigawatts*** of bifacial modules from Canadian Solar. [7]

Invenergy's and EDF's claims that projects are not economically viable without duty-free bifacial panels seem far-fetched based on these purchases of bifacial modules before the Exclusion.

In conclusion, there is no imminent threat of irreparable injury at this time, and issuance of a PI would be altogether improper. "Failure of an applicant to bear its burden of persuasion on irreparable harm is ground to deny a {PI}, and the court need not conclusively determine the other criteria." *Corus*, 26 CIT at 942 (citation omitted).

---

[6] *See* **Exhibit 3.**
[7] *See* **Exhibit 4.**

AFDOCS/23040931.1

Plaintiffs have long known that the Exclusion would likely go away. If these companies have entered into contracts based on the assumption that the Exclusion would last throughout the remaining time of Section 201 relief, then they have acted recklessly and harm done is caused by their own actions.[8]

### D. The Balance of Equities Clearly Tips in Favor of Not Modifying the PI

Safeguard measures offer temporary protection to a domestic industry that has suffered serious injury from massive imports so that the industry can adjust to import competition. 19 U.S.C. § 2251. Yet entities *other than* the domestic industry—the group Congress intended to protect with the safeguard statute—have been benefiting from the *Exclusion* for 16 months, which amounts to a third of the remedy period granted to the domestic industry under the safeguard. More than 16 months have passed in which the safeguards have been partially ineffective because the Government was unable to withdraw the Exclusion. For the last year, the domestic industry has been forced to compete, with no additional protections, against imports of bifacial solar panels that the Commission and the President have determined are injuring the industry.

The Commission's *Monitoring Report* describes developments to the domestic industry, caused by increased imports, decreased prices, and increased global capacity. *Monitoring Report* at 1-3 (explaining developments in the domestic industry). The *Supplemental Report* further explained the limitations to the effect of the current safeguard measures, contemplating that bifacial modules have "a price advantage over module imports covered by the safeguard measure

---

[8]  Again Plaintiffs have long been on notice the Exclusion would go away. Utility Drive reported as follows: **"Despite the current uncertainty in the litigation timeline, this creates time for companies that made business decisions based on the tariff exemption "to get those modules into the U.S. before the tariffs go into place," Exhibit 1** (quoting John Smirnow, vice president of market strategy and general counsel for SEIA).

. . . ," and "their relative cost competitiveness with monofacial modules." *Supplemental Report* at ES-5 (finding that imports of "bifacial modules are projected to gain a large share of total demand . . . ."). After taking into account the information provided in the ITC's reports, and the positions of the majority of the representatives of the domestic industry, on October 10, 2020, the President issued *Proclamation 10101* modifying the safeguard action. Among the actions in the proclamation, the President determined that "it is necessary to revoke that exclusion and to apply the safeguard tariff to bifacial panels." *Proclamation 10101* ¶ 9.(a). In modifying the safeguard, the President acted as explicitly authorized by statute.

The relief Plaintiffs are seeking is relief from the possibility of having to reimburse their suppliers for tariffs paid on imports of bifacial solar modules. It is purely a monetary consideration. Conversely, for Defendants and Defendant-Intervenors this is a matter of ensuring that the domestic industry is afforded the protections that Congress envisioned for them. The expansion of the PI to cover *Proclamation 10101* would be inequitable. The domestic industry's operations have been impacted such that harm to the industry would be profound if the Proclamation is enjoined. Decreases in production, shipment and employment are directly attributable to the *Exclusion*. What should have been a four-year safeguard effectively became a 16-month safeguard (February 2018 – June 2019) followed by the significantly impaired measure that persists to this day. The domestic industry has been forced to compete with these increased imports and lower prices, while attempting to open or reopen facilities employing thousands of U.S. workers. Considering these reports, consistent with the statute, the President issued *Proclamation 10101*, which restores the relief promised by Section 201 and allows the domestic industry to appropriately adjust to imports of bifacial modules. Without this protection, the harm to the domestic industry will continue to be dire, and if the modification be enjoined,

39

the documented harm to domestic producers cannot be later remedied once we win on the merits, given the time limited duration of a safeguard.

### E. The Public Interest Strongly Disfavors the Modification of the PI

Engrained in the public interest prong when considering whether to enjoin *Proclamation 10101*—a presidential action *explicitly authorized by statute* to protect the domestic solar industry—is the public interest in the protection of the domestic industry from injurious imports and assuring compliance with the trade laws. *Int'l Fresh*, 26 F.Supp.3d at 1371.

The Court has now stated twice that it is not making a decision on the "merits of the Government's action seeking to withdraw the exclusion from safeguard duties," *Invenergy IV*, Slip Op. 20-144, at 4, and "whether bifacial solar panels should be excluded from Section 201 safeguard duties is not a question for this court." *Invenergy I*, 422 F.Supp.3d at 1292. In coming to such conclusions however, the Court has employed a narrow view of the public interest factor, finding that the only public interest issue the Court should evaluate is "one of process and fidelity to the law." *Id.* We think this narrow reading is incorrect. The President's actions in *Proclamation 10101* were based on the process set forth by the statute and are explicitly authorized by statute. We believe there is no open question of process and fidelity to the law with the respect to the President's action. As the Court has acknowledged whether the domestic industry is actually being injured, or has been injured, by reason of imports is not a question for the Court to answer—that role has been delegated to the Commission and the President by statute.

Defendant-Intervenors request that the Court follow the standard set forth in *Silfab*, 296 F.Supp.3d 1295 (2018) and affirmed by the Federal Circuit, 892 F.3d 1340 (2018). In that case plaintiffs argued that the public interest is "served by ensuring that the {Executive}

40

complies with the law" and the CIT denied Plaintiffs' request for a PI to enjoin a Presidential

Proclamation from subjecting plaintiffs products to safeguard measures, since implementing an

injunction with only nominal bond or reliance on plaintiffs' existing continuous bonds could

expose the government to risk of being unable to collect safeguard duties owed should it

ultimately prevail, and any concern about impact that safeguard duties could have on jobs in

domestic industry was matter of public policy beyond scope of judicial review in plaintiffs'

action.

For the Plaintiffs, the most serious possible injury would be the unknown and speculative

financial harm incurred by potentially having to reimburse their importer suppliers for the

safeguard tariffs paid on entries. Plaintiffs claim "great harm would be incurred . . . by the

domestic economy were the injunction not to apply to the *Proclamation 10101*—damages such

as job losses, decreased construction of renewable, clean and economic energy generation due to

the increased unavailability of efficient modules, interference with ongoing solar generation

projects, and discouragement of new ones." Mot. at 42. What evidence is there before the Court

that these events will occur other than mere speculation? Plaintiffs characterize the effect of the

Presidential Proclamation—ensuring bifacial solar panels are subject to the safeguard tariffs—as

a prohibition against importation. It is not. There is no limitation on importation; importers are

only required to pay tariffs on such imports to protect the domestic industry from injury as

contemplated by the safeguard statute. There is also no evidence that the possibility that these

tariffs will suddenly bankrupt Plaintiffs. To the contrary, there is ample evidence that Plaintiffs

are financially thriving at the expense of the domestic industry,[9] while seeking to distract this

---

[9] **Exhibit 1.**

Court from the effects that enjoining the Proclamation would have on the public interest at issue here: the survival of domestic solar manufacturing and undermining adherence to trade laws.

## V. PLAINTIFFS MUST POST A SIGNIFICANT BOND

If the Court grants Plaintiffs' request for a TRO or PI, Defendant-Intervenors respectfully request that a sufficient security be required. The nominal $1 bond previously entered by the Court does not serve the purpose of an injunction bond—namely, to compensate non-moving parties for the harm suffered during the injunction period if the movant loses on the merits. Here, that harm likely exceeds several million dollars in missed tariffs and harm to domestic manufacturers.

If the Government eventually prevails on the merits in this litigation, then the Exclusion was wrongly kept in place. Without the Exclusion, the Government would have collected many months of tariffs, and Defendant-Intervenors would have had the protection needed to bolster domestic production without competition from duty-free imports. Lacking a reasonable bond, even if the Government prevails on the merits, there will be no mechanism to recover lost tariffs and the duty-free deluge of imports will have already decimated the domestic industry development. Granting an injunction with no bond pushes the Government and Defendant-Intervenors off the plane without a parachute. It is also an invitation to reversible error. If Plaintiffs end up losing on the merits (or the Federal Circuit dissolves the PI), there is no way to make the Government and Defendant-Intervenors whole again without a meaningful bond.

### A. Security Is a Mandatory Requirement for Injunctive Relief

The CIT Rule governing PIs and TROs makes security mandatory: "The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." CIT R. 65(c) (emphasis added). Courts

42

have interpreted this language as mandatory. *E.g.*, *Chemlawn Servs. Corp. v. GNC Pumps, Inc.*, 823 F.2d 515, 516 (Fed. Cir. 1987) (vacating PI because "{n}o findings of fact and conclusions of law were issued at that time, nor was a security bond required as mandated by Rule 65(c)"); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) ("In view of the clear language of Rule 65(c), ***failure to require a bond upon issuing injunctive relief is reversible error***." (emphasis added)); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 (3d Cir. 1989) (reversing preliminary injunction in part because the district court did not require movant to post a bond).

Security is mandatory because "{a} party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond." *W.R. Grace & Co. v. Loc. Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am*, 461 U.S. 757, 770 n.14 (1983).

### B.     The Court Should Set a More Than Nominal Bond

Defendant-Intervenors request that the Court require Plaintiffs to post a bond to secure the amount of safeguard duties that would be owed on anticipated entries made by their suppliers. The bond amount must be "proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." CIT R. 65(c). "Equity recognizes the restitutionary 'principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby.'" *Md. Dept. of Hum. Res. v. U.S. Dept. of Agric.*, 976 F.2d 1462, 1482-83 (4th Cir. 1992) (quoting *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 145 (1919)). Here, equity demands more than a nominal bond because $1 is nowhere near enough to pay the lost tariffs for the Government and economic harm to Defendant-Intervenors.

Allowing Plaintiffs to post a bond less than the full safeguard duties on anticipated entries by their suppliers would be a grave injustice. Since June 13, 2019 when Exclusion was granted, Plaintiffs have enjoyed a windfall of tens of millions of dollars while their suppliers have been importing massive quantities of bifacial panels duty-free. Requiring security through an adequate bond fairly balances the Government's interests in securing the duties that may be owed and Defendant-Intervenors' interests in the integrity of the safeguard with Plaintiffs' interests, while the PI motion is decided.

This Court and the Federal Circuit have previously considered the need for a bond in a case involving the exact same safeguard. *See Silfab*, 296 F.Supp.3d at 1295. In *Silfab*, Canadian solar panel manufacturers "sought a {PI} to bar the enforcement of presidentially imposed tariffs on solar products" under *Proclamation 9693. Silfab,* 892 F.3d at 1342. The *Silfab* plaintiffs (like Plaintiffs here) asked for a nominal bond. Both courts criticized that request: "As to the public interest factor, the CIT expressed concern that the nominal bond requested 'could expose the government to the risk of being unable to collect safeguard duties owed once the entries are liquidated should it ultimately prevail in this litigation.'" *Id.* at 1345 (quoting 296 F.Supp.3d at 1319). This Court denied the PI and the Federal Circuit affirmed. Therefore, this Court is not writing on a blank slate. The issue of whether a nominal bond is appropriate has been rejected by Chief Judge Stanceu and the Federal Circuit. There is no reason to reach a divergent result here.

If the Court decides to enter a TRO or a PI, Defendant-Intervenors respectfully request leave to submit briefing on the appropriate amount of the bond.[10] If the Government prevails on the merits (or the Federal Circuit dissolves the injunction), the nominal bond currently imposed

---

[10] The Seventh Circuit noted that it makes sense to adjudicate whether to grant a TRO or PI before considering the bond amount. *Mead*, 201 F.3d at 887 (reversing preliminary injunction and commenting that bond amount of one million dollars was inadequate).

AFDOCS/23040931.1

by the Court will simply not account for the harm caused by the PI or TRO. A $1 bond will amount to a windfall for Plaintiffs regardless of this litigation's outcome. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) ("'{T}he judge usually will fix security in an amount that covers . . . the ***complainant's unjust enrichment*** caused by his adversary being improperly enjoined or restrained.'" (quoting 11A Charles Alan Wright et al., Federal Practice & Procedure § 2954, at 292 (2d ed. 1995) (emphasis added)).

## VI.    CONCLUSION

For these reasons, Hanwha Q CELLS USA, Inc. and Auxin Solar Inc. respectfully request that the Court deny Plaintiffs' emergency motion to modify the preliminary injunction.

Respectfully submitted,

**/s/ John M. Gurley**
John M. Gurley
Diana Dimitriuc Quaia
Taniel E. Anderson
Friederike S. Görgens
Aman Kakar
Jessica R. DiPietro
Russell A. Semmel

Arent Fox LLP
1717 K Street, NW
Washington, DC  20006
Tel: (202) 857-6301

October 23, 2020

*Counsel for Hanwha Q CELLS USA, Inc. and Auxin Solar*

# CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chamber Procedures of this Court, that the foregoing **DEFENDANT-INTERVENORS HANWHA Q CELLS USA, INC.'s AND AUXIN SOLAR, INC.S RESPONSE TO PLAINTIFFS' MOTION TO MODIFY PRELIMINARY INJUNCTION** contains 13,998 words, excluding the tables of contents and authorities, and counsel's signature block, as calculated by Microsoft Word.


 **/s/ John M. Gurley**
John M. Gurley

AFDOCS/23040931.1

**Exhibit List**

| Exhibit | Description |
|---------|-------------|
| Exhibit 1 | *US solar developers get reprieve on bifacial panel prices as judge rejects USTR move on tariffs*, Utility Dive (May 29, 2020) |
| Exhibit 2 | *Proclamation to Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells,* White House (Oct. 10, 2020) |
| Exhibit 3 | *LONGi Solar To Supply Bifacial PERC Solar Modules For Invenergy LLC's 224 MW DC/160 MW AC Southern Oak Solar Project 'Largest Bifacial+Tracker Power Generation Project' In US*, TaiYang News (Feb. 26, 2019) |
| Exhibit 4 | *Canadian Solar Secures Its Largest Order as Bifacial Modules Gain Traction*, Greentech Media (May 29, 2019) |

# EXHIBIT 1



**BRIEF**

# US solar developers get reprieve on bifacial panel prices as judge rejects USTR move on tariffs

By Iulia Gheorghiu

Published May 29, 2020

**Dive Brief:**

- A federal court on Wednesday gave the U.S. power sector more time to purchase two-sided solar panels by foreign manufacturers without subjecting them to the tariffs that have been in place for imported solar cells and modules since January 2018.

- Judge Gary Katzmann of the U.S. Court of International Trade rejected an administration attempt to remove the tariff exemption for the more efficient two-sided, or bifacial, modules, finding the government did not "sufficiently" justify the change to the exemption. The U.S. Trade Representative (USTR) strongly disagreed with the recent ruling, saying the exemption needs to be removed to protect domestic solar manufacturers.

- "Litigation will continue and I expect that the exclusion will remain in place ... a month to a few months. Unfortunately, the government seems committed to reinstating the terms" of the tariff to apply to bifacial panels, John Smirnow, vice president of market strategy and general counsel for the Solar Energy Industries Association, told Utility Dive.

### Dive Insight:

Domestic solar manufacturers have called for revoking the existing tariff exclusion for the more efficient solar panels, although developers want time to purchase the two-sided panels at lower prices based on business decisions made after the Trump administration created a full exemption from the tariffs for the bifacial modules in June 2019.

"The solar industry and the jobs it represents are important to this country, and USTR will take all necessary and appropriate steps to ensure that its safeguard relief is effective," the USTR wrote on Wednesday.

The solar tariffs were set for four years, beginning in 2018, and President Donald Trump can decide to extend them or cut them short. After the bifacial exemption was granted last July, the USTR revoked it in October, but the U.S. Court of International Trade reinstated the exemption by the end of the year as solar companies argued they had not been given an opportunity to comment on USTR's move.

The USTR accepted public comments on the exemption through February 2020 before asking the ITC to remove it in April.

But Judge Katzmann ruled Wednesday that "the Government has not met its burden of showing changed circumstances and resulting inequity in order to justify dissolution of the" preliminary injunction against removing the exemption.

Through the ruling, the judge did not rule on the merits of the tariff exemption. "Instead, the court merely continues to require the government to follow its own laws when it acts," Katzmann wrote.

Two-sided photovoltaic (PV) panels are more efficient, which has led to rapid uptake in the last year, according to Chris Deline, a researcher at the National Renewable Energy Laboratory. Wood Mackenzie reported global bifacial PV capacity was set to double in 2019 to over 5 GW, according to its first bifacial market report, and 21 GW of capacity are expected by 2024.

"Many of these bifacial modules are being deployed globally into the utility-scale market, due to bifacial PV's ability to improve energy capture without requiring significant changes to mounting, wiring or balance-of- plant components," Deline told Utility Dive via email.

In the U.S., developers of large projects in the 500 MW to 600 MW range moved to use bifacial modules after the exemption was issued, Smirnow said, which "were entered into based on the government's [earlier] decision to grant exclusion" for bifacial modules.

"The utility-scale market is often more price-sensitive than the rooftop [solar] market, such that lower all-in module cost allows more proposed projects to pencil out, assuming adequate module supply," Deline said.

But while U.S. solar developers have won a reprieve with the court's decision, they face other challenges.

Regarding module supply, Smirnow said that an earlier manufacturing halt in China due to COVID-19 would impact the supply of bifacial modules, which companies are trying to acquire before the litigation wraps up.

Katzmann directed the parties to submit a schedule for how the case should proceed by June 17.

Despite the current uncertainty in the litigation timeline, this creates time for companies that made business decisions based on the tariff exemption "to get those modules into the U.S. before the tariffs go into place," Smirnow said.

# EXHIBIT 2



**PROCLAMATIONS**

# Proclamation to Further Facilitate Positive Adjustment to Competition From Imports of Certain Crystalline Silicon Photovoltaic Cells

**ECONOMY & JOBS**

Issued on: **October 10, 2020**



★ ★ ★

1.  On January 23, 2018, pursuant to section 203 of the Trade Act of 1974, as amended (the "Trade Act") (19 U.S.C. 2253), I issued Proclamation 9693, which imposed a safeguard measure for a period of 4 years that included both a tariff-rate quota (TRQ) on imports of certain crystalline silicon photovoltaic (CSPV) cells, not partially or fully assembled into other products, provided for in subheading 8541.40.6025 of the Harmonized Tariff Schedule of the United States (HTS) and an increase in duties (safeguard tariff) on imports of CSPV cells exceeding the TRQ and imports of other CSPV products, including modules provided for in subheading 8541.40.6015 of the HTS. I exempted imports from certain designated beneficiary countries under the Generalized System of Preferences from the application of the safeguard measure.

2.  On February 7, 2020, the United States International Trade Commission (ITC) issued its report pursuant to section 204(a)(2) of the Trade Act (19 U.S.C. 2254(a)(2)), on the results of its monitoring of developments with respect to the domestic solar industry (ITC, Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Monitoring Developments in the Domestic Industry, No. TA-201-075 (Monitoring)).  In its report, the ITC found that, following imposition of the safeguard measure, prices for CSPV cells and modules declined in a manner consistent with historical trends but were higher than they would have been without the safeguard measure.

3.  With respect to CSPV cells, the ITC found that imports increased following imposition of the safeguard measure and that major domestic CSPV cell producers ceased production, leading to declines in domestic CSPV cell production capacity and production.

4.  With respect to CSPV modules, imports initially declined but rose in the first half of 2019 compared with the first half of 2018.  Additionally, the ITC found that multiple CSPV module producers opened production facilities in the United States, particularly in the first half of 2019, leading to increases in domestic CSPV module production capacity, production, and market share.

5.  On March 6, 2020, the ITC issued an additional report pursuant to a request from the United States Trade Representative under section 204(a)(4) of the Trade Act (19 U.S.C. 2254(a)(4)), regarding the probable economic effect on the domestic CSPV cell and module manufacturing industry of modifying the safeguard measure to increase the level of the TRQ on CSPV cells from the current 2.5 gigawatts (GW) to 4.0, 5.0, or 6.0 GW (ITC, Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products: Advice on the Probable Economic Effect of Certain Modifications to the Safeguard Measure, No. TA-201-075 (Modification)).  In its report, the ITC advised that increasing the TRQ would help to continue growth in solar module production but that expanded access to imported cells not subject to safeguard duties would put downward pressure on prices for United States cells.

6.  The ITC also found that the exclusion of bifacial modules from the safeguard measure will likely result in substantial increases in imports of bifacial modules if such exclusion remains in effect, and that such modules will likely compete with domestically produced CSPV products in the United States market.  Furthermore, the ITC found that the benefits to domestic CSPV module producers from an increase in the TRQ would likely be limited if the bifacial module exclusion remained in place.  According to the ITC, bifacial modules are likely to account for a greater share of the market in the future and can substitute for monofacial products in the various market segments, such that exempting imports of bifacial modules from the safeguard tariff would apply significant downward pressure on prices of domestically produced CSPV modules.

7.  Section 204(b)(1)(B) of the Trade Act (19 U.S.C. 2254(b)(1)(B)) authorizes the President, upon petition from a majority of the representatives of the domestic industry, to reduce, modify, or terminate an action taken under section 203 of the Trade Act when the President determines that the domestic industry has made a positive adjustment to import competition.

8.  Section 204(c)(1) of the Trade Act (19 U.S.C. 2254(c)(1)) authorizes the President to request that the ITC investigate whether action under section 203 of the Trade Act continues to be necessary to prevent or remedy serious injury and whether there is evidence that the domestic industry is making a positive adjustment to import competition.  Section 204(c)(3) of the Trade Act (19 U.S.C. 2254(c)(3)) establishes the date by which the ITC will transmit the report on its investigation, unless the President specifies a different date.

9.  After taking into account the information provided in the ITC's reports, and after receiving a petition from a majority of the representatives of the domestic industry with respect to each of the following modifications, I have determined that the domestic industry has begun to make positive adjustment to import competition, shown by the increases in domestic module production capacity, production, and market share.  In addition, I have made the following further determinations:

(a)  that the exclusion of bifacial panels from application of the safeguard tariff has impaired and is likely to continue to impair the effectiveness of the action I proclaimed in Proclamation 9693 in light of the increased imports of competing products such exclusion entails, and that it is necessary to revoke that exclusion and to apply the safeguard tariff to bifacial panels;

(b)  that the exclusion of bifacial panels from application of the safeguard tariffs has impaired the effectiveness of the 4-year action I proclaimed in Proclamation 9693, and that to achieve the full remedial effect envisaged for that action, it is necessary to adjust the duty rate of the safeguard tariff for the fourth year of the safeguard measure to 18 percent.

10.  Section 604 of the Trade Act (19 U.S.C. 2483) authorizes the President to embody in the HTS the substance of the relevant provisions of that Act, and of other acts affecting import treatment, and actions thereunder, including the removal, modification, continuance, or imposition of any rate of duty or other import restriction.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, acting under the authority vested in me by the Constitution and the laws of the United States, including but not limited to sections 203, 204, and 604 of the Trade Act, do proclaim that:

(1)  In order to modify the action applicable to imports of CSPV cells under HTS subheading 8541.40.6025 and other CSPV products such as modules under HTS subheading 8541.40.6015,

subchapter III of chapter 99 of the HTS is modified as set forth in the Annex to this proclamation.

(2)   The United States Trade Representative is authorized to exercise my authority under section 204(c)(1) and (3) of the Trade Act to request that the ITC investigate whether action under section 203 of the Trade Act continues to be necessary to prevent or remedy serious injury and whether there is evidence that the domestic industry is making a positive adjustment to import competition, and to specify a different date for the ITC to transmit its report.

(3)   Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

(4)   The modifications to the HTS made by this proclamation, including the Annex hereto, shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time 15 days after the date of this proclamation, and shall continue in effect as provided in the Annex to this proclamation, unless such actions are earlier expressly reduced, modified, or terminated.  One year from the termination of the safeguard measure established in this proclamation, the U.S. note and tariff provisions established in the Annex to this proclamation shall be deleted from the HTS.

IN WITNESS WHEREOF, I have hereunto set my hand this tenth day of October, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fifth.

DONALD J. TRUMP

# EXHIBIT 3

**TAIYANG**NEWS

ALL ABOUT SOLAR POWER

## Business

Home » Business » Modules Supply » LONGi

LONGi Bifacial Modules For 224 MW US Project

# LONGi Solar To Supply Bifacial PERC Solar Modules For Invenergy LLC's 224 MW DC/160 MW AC Southern Oak Solar Project 'Largest Bifacial+Tracker Power Generation Project' In US

05:01 AM (Beijing Time) - 26. February 2019


Picture5

| KEY TAKEAWAYS |
| --- |

- Chinese solar module manufacturer LONGi Solar has said it will supply its bifacial PERC solar modules for a solar power project in Mitchell County, Georgia, US

- It calls the project the 'largest bifacial+tracker power generation project' in the US

- The project is expected to complete by the end of 2019, and is contracted to sell electricity to Georgia Power

China's LONGi Solar will supply its bifacial PERC modules for a 224 MW solar power project in the US. The modules will be supplied for the Southern Oak Solar Project of Invenergy LLC.

With 224 MW DC/160 MW AC capacity, the Southern Oak Solar Project will mount LONGi modules on single axis trackers and TrueCapture control system of NEXTracker. Project construction is being undertaken by RES (Renewable Energy Systems). LONGi says it is the 'largest bifacial+tracker power generation project' in the US and will be built in Mitchell County, Georgia.

Already under construction since September 2018, the project is expected to be complete by the end of 2019 when it is supposed to generate clean electricity for more than 30,000 homes. In the first year of its operation the plant is expected to generate more than $12 million as income for the local economy.

Invenergy will sell power generated by this project to Georgia Power.

The Chinese vertically integrated solar module manufacturer says its monocrystalline PERC panel comes with low degradation and effective anti-PID characteristics. At the beginning of the year, LONGi announced a 24.06% conversion efficiency for its mono-PERC solar cell (**see** LONGi 24.06% Efficiency PERC Cell World Record).

In January 2018, a 100 MW solar installation came online in China's Qinghai province with 71 MW of bifacial module capacity and was touted as the 'world's largest bifacial solar project' (**see** 71 MW Bifacial Solar Project In China).

Project developers are now quickly waking up to the potential of bifacial solar. In November 2018, Canadian Solar bagged a 10 MW bifacial solar module deal for Neighborhood Power's 4 PV projects in Oregon, US (see Canadian Solar Gets Bifacial Module Deal). TaiyangNews has published a Bifacial Solar Technology Report, providing an overview on the technology.



**Anu Bhambhani**

Anu Bhambhani is the Senior News Editor of TaiyangNews

Write, follow the author.  

---

©TaiyangNews 2015. All rights reserved.

**TAIYANG**NEWS

# EXHIBIT 4

**SOLAR (/ARTICLES/CATEGORY/SOLAR)**

## Canadian Solar Secures Its Largest Order as Bifacial Modules Gain Traction

EDF Renewable Energy will buy 1.8 gigawatts of modules from Canadian Solar as the Investment Tax Credit phases down, in a sign that developers are growing more comfortable with two-sided solar technology.

**KARL-ERIK STROMSTA**

**MAY 29, 2019**



*Playing the rebound.*

Canadian Solar announced a 1.8-gigawatt module order from EDF Renewables North America on Wednesday, the largest in its history, in a deal analysts say points to the utility solar market's looming pivot toward bifacial technology.

Canadian Solar says it will supply a mixture of its bifacial and traditional modules to multiple EDF projects across the U.S., Canada and Mexico through 2023, as the U.S. federal Investment Tax Credit (ITC) phases down.

Bifacial modules, which generate more electricity than traditional modules by absorbing sunlight on their backside, represent a sliver of the overall solar market today. But many in the industry expect them to catch on quickly over the next few years, helping to lower the levelized cost of solar power as developers and investors grow more comfortable (https://www.greentechmedia.com/articles/read/bifacial-or-bust-engineering-solar-financings-for-the-future) with the technology.

"The agreement demonstrates our confidence in the bifacial module technology to support our robust pipeline of contracted projects over the next five years," Tristan Grimbert, president and chief executive of EDF Renewables North America, said in a statement.

There were just 3.1 gigawatts of bifacial modules installed globally at the end of 2018, or less than 1 percent of the worldwide total, according to Ben Gallagher, senior solar analyst at Wood Mackenzie Power & Renewables.

Even as momentum builds (https://www.greentechmedia.com/articles/read/bifacial-solar-modules-inch-toward-the-mainstream) for the technology, bifacial modules are expected to account for just under 5 percent of global solar installations this year, Gallagher said. "But this announcement from EDF is a clear indication that in the near term, bifacial will make up a much more substantial portion of PV installations, especially here in the U.S."

Demand for bifacial modules is expected to grow as more projects are completed using the technology, establishing a track record investors can point to. Among other projects underway, Invenergy is building a 160-megawatt solar array in Georgia using bifacial modules supplied by China's Longi, due for completion later this year.

Canadian Solar launched its bifacial modules onto the market a year ago, claiming they can generate 30 percent more power than conventional modules under the right conditions.

EDF's order is the single largest in Canadian Solar's 18-year history, said chief executive Shawn Qu. The vertically integrated company — which is a large developer through its Recurrent subsidiary in addition to its manufacturing business — shipped 6.6 gigawatts of modules in 2018, and has guidance of up to 7.8 gigawatts this year.

EDF Renewables North America, the San Diego-based unit of France's EDF group, is among the largest developers of both wind and solar capacity in the U.S.

EDF's order comes as U.S. solar developers are finalizing their strategies for dealing with the step-down of the ITC, which will fall from 30 percent for projects qualified in 2019 to 10 percent for large-scale projects qualifying in 2022 and onward.

Developers have two options for qualifying projects in a given year: They can start construction, or they can "safe-harbor" a project by spending 5 percent of its total cost, often by stockpiling modules. Since being given favorable guidance (https://www.greentechmedia.com/articles/read/irs-issues-favorable-tax-credit-guidance-for-new-solar-projects) by U.S. tax authorities, most developers are aiming to safe-harbor their entire contracted pipelines, according to WoodMac.

In anticipation of steeper prices for high-efficiency modules in the quarters and years ahead, some developers may look to sign big procurement deals along the lines of EDF's — a strategy many U.S. wind developers adopted as their main tax credit began phasing down. WoodMac expects the global PV module market to tighten significantly in late 2019.

The looming ITC step-down is already driving orders in the U.S. market, Canadian Solar's Qu said.

"As the U.S. market recovers from the uncertainties brought by Section 201 tariffs and rushes to meet the step-down of the Investment Tax Credit deadline, we are seeing a significant rebound of demand in the U.S. solar market, which impacts module supply across the entire region."

About us (/about)

Advertising (/about/advertise)

Careers (/about/jobs)

Contact (/about/contact)

m   A Wood Mackenzie Business (https://www.woodmac.com/)

Â© 2020 Greentech Media or its affiliated companies. All rights reserved.

SITEMAP (/SITEMAP)          TERMS & CONDITIONS (/ABOUT/TERMS-OF-USE)          PRIVACY POLICY (/ABOUT/PRIVACY-POLICY)