Slip Op. 21-155

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **INVENERGY RENEWABLES LLC,**<br><br>**Plaintiff,**<br><br>**and**<br><br>**SOLAR ENERGY INDUSTRIES ASSOCIATION, CLEARWAY ENERGY GROUP LLC, EDF RENEWABLES, INC. and AES DISTRIBUTED ENERGY, INC.,**<br><br>**Plaintiff-Intervenors,**<br>**v.**<br><br>**UNITED STATES OF AMERICA, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, UNITED STATES TRADE REPRESENTATIVE KATHERINE TAI, U.S. CUSTOMS AND BORDER PROTECTION, and ACTING COMMISSIONER OF U.S. CUSTOMS and BORDER PROTECTION TROY A. MILLER,**<br><br>**Defendants.** | **Before: Judge Gary S. Katzmann**<br>**Court No. 19-00192** |

## OPINION

[The court grants Plaintiffs' motion for judgment on the agency record and vacates the Second Withdrawal.]

Dated:  November 17, 2021

Amanda Shafer Berman and John Brew, Crowell & Moring LLP, of Washington, D.C. and New York, N.Y., argued for Plaintiff Invenergy Renewables LLC and Plaintiff-Intervenors Clearway Energy Group LLC and AES Distributed Energy, Inc.  With them on the joint briefs were Larry Eisenstat and Frances Hadfield.

Matthew R. Nicely and Daniel M. Witkowski, Akin, Gump, Strauss, Hauer & Feld LLP, of Washington, D.C., argued for Plaintiff-Intervenor Solar Energy Industries Association.

Christine M. Streatfeild and Kevin M. O'Brien, Baker & McKenzie LLP, of Washington, D.C.,

argued for Plaintiff-Intervenor EDF Renewables, Inc.

Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendants United States of America, Office of the United States Trade Representative, United States Trade Representative Katherine Tai, U.S. Customs and Border Protection, and Acting Commissioner of U.S. Customs and Border Protection Troy A. Miller.  With him on the briefs were Bryan M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director.

Katzmann, Judge:  The court returns to a dispute regarding the United States and the Office of the United States Trade Representative's ("USTR") withdrawal of the previously granted exclusion from safeguard duties on imported bifacial solar modules, duties which in 2018 the President imposed by proclamation to protect domestic industry.[1]  See Proclamation 9693: To Facilitate Positive Adjustment to Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products) and for Other Purposes, 83 Fed. Reg. 3,541 (Jan. 23, 2018) ("Proclamation 9693").  After lengthy preliminary disputes, Plaintiff Invenergy Renewables LLC ("Invenergy"), a renewable energy company, joined by Plaintiff-Intervenors Solar Energy Industries Association ("SEIA"), Clearway Energy Group LLP ("Clearway"), EDF Renewables, Inc. ("EDF-R"), and AES Distributed Energy, Inc. ("AES DE") (collectively, "Plaintiffs"), filed a motion for judgment on the agency record challenging the Determination on the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products, 85 Fed. Reg. 21,497 (USTR Apr. 17, 2020) ("Second Withdrawal"), by Defendants the United States, USTR, U.S. Trade Representative Katherine Tai, U.S. Customs and Border Protection ("CBP"), and CBP Acting Commissioner Troy A. Miller (collectively, "the Government").[2]  Specifically, Plaintiffs contend that the Second Withdrawal

---

[1] For the purposes of this opinion, the terms "solar modules" and "solar panels" are used interchangeably.

[2] Per CIT Rule 25(d), named officials have been substituted to reflect the current officeholders.

should be vacated as a decision issued without statutory authority and without compliance with

the requirements of the Administrative Procedure Act ("APA").   Pls.' Mot. for J. on the

Administrative R., Feb. 5, 2021, ECF No. 302 ("Pls.' Br.").   The Government requests that the

court uphold the Second Withdrawal as in accordance with the Trade Act of 1974, the APA, and

otherwise supported by record evidence.   Defs.' Corr. Resp. to Pls.' Mot. for J. on the

Administrative R., June. 15, 2021, ECF No. 322 ("Defs.' Br.").   The court grants Plaintiffs' motion

and vacates the Second Withdrawal.

## BACKGROUND

The court presumes familiarity with its previous opinions -- (1) Invenergy Renewables

LLC v. United States, 43 CIT __, 422 F. Supp. 3d 1255 (2019) (Invenergy I); (2) id., 44 CIT __,

427 F. Supp. 3d 1402 (2020) (Invenergy II); (3) id., 44 CIT __, 450 F. Supp. 3d 1347 (2020)

(Invenergy III); (4) id., 44 CIT __, 476 F. Supp. 3d 1323 (2020) (Invenergy IV); and (5) id., 44

CIT __, 482 F. Supp. 3d 1344 (2020) (Invenergy V) -- each of which provide additional

information on the factual and legal background of this case.[3]   Information pertinent to this

decision follows.

As the court has noted:

> This case emerges from a debate within the American solar industry between
> entities that rely on the importation of bifacial solar panels and entities that produce
> predominately monofacial solar panels in the United States.   Plaintiffs here, who
> include consumers, purchasers, and importers of utility-grade bifacial solar panels,
> argue that the importation of bifacial solar panels does not harm domestic producers
> because domestic producers do not produce utility-scale bifacial solar panels; they

---

[3] Most recently, the court has also issued a related opinion addressing the issuance of Presidential
Proclamation 10101, Proclamation 10101: To Further Facilitate Positive Adjustment to
Competition from Imports of Certain Crystalline Silicon Photovoltaic Cells (Whether or Not
Partially or Fully Assembled into Other Products), 85 Fed. Reg. 65,639 (Oct. 16, 2020)
("Proclamation 10101"), and that Proclamation's effort to withdraw the exclusion of bifacial solar
panels from safeguards imposed by Proclamation 9693.   See Solar Energy Indus. Ass'n v. United
States, 45 CIT __, Slip Op. 21-154 (Nov. 16, 2021).

> thus oppose safeguard duties that they contend increase the cost of these bifacial solar panels. Domestic producers, however, contend that solar project developers can use either monofacial or bifacial solar panels, and thus safeguard duties are necessary to protect domestic production of solar panels. Both sides contend that their position better supports expanding solar as a source of renewable energy in the United States.

Invenergy I, 422 F. Supp. 3d at 1264.

## I.    *The Safeguard Statute*

Through the Trade Act of 1974, Congress provided a process by which the executive branch could implement temporary safeguard measures to protect a domestic industry from the harm associated with an increase in imports from foreign competitors. Trade Act of 1974 §§ 201–04, 19 U.S.C. §§ 2251–54 ("Safeguard Statute"). Section 202 of that the Safeguard Statute dictates that, upon petitions from domestic entities or industries, the International Trade Commission ("ITC") may make an affirmative determination that serious injury or a threat of serious injury to that industry exists. 19 U.S.C. § 2252. Under Section 203, the President may then authorize discretionary measures, known as "safeguards," to provide a domestic industry temporary relief from serious injury. 19 U.S.C. § 2253. The statute vests the President with decision-making authority based on consideration of ten factors. 19 U.S.C. § 2253(a)(2). Safeguard measures have a maximum duration of four years, unless extended for another maximum of four years based upon a new determination by the ITC. 19 U.S.C. § 2253(e)(1). The statute also outlines certain limits on the President's ability to act under this statute, including to limit new actions after the termination of safeguard measures regarding certain articles. See 19 U.S.C. § 2253(e). Further, the safeguard statute mandates that the President "shall by regulation provide for the efficient and fair administration of all actions taken for the purpose of providing import relief." 19 U.S.C. § 2253(g)(1). Finally, Section 204 outlines the process by which the President may modify safeguard measures. 19 U.S.C. § 2254.

## II.      The President's Safeguard Action and Delegation to USTR

In May 2017, pursuant to 19 U.S.C. § 2252(a), Suniva, Inc. ("Suniva"), a domestic solar

cell producer, filed an amended petition with the ITC alleging that certain solar panel cells "are

being imported into the United States in such increased quantities as to be a substantial cause of

serious injury, or threat thereof, to the domestic industry producing an article like or directly

competitive with the imported article."   Crystalline Silicon Photovoltaic Cells (Whether or Not

Partially or Fully Assembled into Other Products) at 6, Inv. No. TA-201-75, USITC Pub. 4739

(Nov. 2017) ("ITC Report").   The ITC then instituted an investigation pursuant to 19 U.S.C. §

2252.  Id.; Procedures to Consider Additional Requests for Exclusion of Particular Products From

the Solar Products Safeguard Measure, 83 Fed. Reg. 6,670 (USTR Feb. 14, 2018) ("Exclusion

Procedures") (citing 19 U.S.C. § 2252).   The scope of its investigation covered certain crystalline

silicon photovoltaic ("CSPV") cells,

> whether or not partially or fully assembled into other products, of a thickness equal
> to or greater than 20 micrometers, having a p/n junction (or variant thereof) formed
> by any means, whether or not the cell has undergone other processing, including,
> but not limited to cleaning, etching, coating, and addition of materials (including,
> but not limited to metallization and conductor patterns) to collect and forward the
> electricity that is generated by the cell.  The scope of the investigation also included
> photovoltaic cells that contain crystalline silicon in addition to other materials, such
> as passivated emitter rear contact cells, heterojunction with intrinsic thin layer cells,
> and other so-called "hybrid" cells ("certain CSPV cells").

Exclusion Procedures, 83 Fed. Reg. at 6,670.  The ITC reached an affirmative determination that

certain CSPV cells "are being imported into the United States in such increased quantities as to be

a substantial cause of serious injury, or threat of serious injury, to the domestic industry producing

a like or directly competitive article," Proclamation 9693, 83 Fed. Reg. at 3,541, and referred its

findings and recommendations to the President on November 13, 2017.  ITC Report at 1, 7.

Pursuant to Section 203 of the Safeguard Statute, in 2018 President Trump issued a proclamation, imposing temporary safeguard duties of 30% on certain CSPV cells, to decrease by 5% each year until 2022, at which point the safeguard duties end.  See generally, Proclamation 9693.  The safeguard duties applied to the bifacial solar panels used by Invenergy.  Pls.' Br. at 8.  The President implemented these duties by modifying Chapter 99 of the Harmonized Tariff Scheduled of the United States ("HTSUS").  Proclamation 9693, 83 Fed. Reg. at Annex I.  The President also instructed USTR to publish within thirty days "procedures for requests for exclusion of a particular product" from the safeguard duties in the Federal Register and authorized USTR to make such exclusions after consultation with the Secretaries of Commerce and Energy and publishing a notice in the Federal Register.  Id. at 3,543−44.  The safeguard duties went into effect on February 7, 2018.  Id. at 3,545−49.

USTR then published procedures for exclusion requests in the Federal Register in February 2018.  Exclusion Procedures, 83 Fed. Reg. at 6,670–73.  The notice summarized the scope of the ITC's investigation, the scope of the products covered by Proclamation 9693, and the procedure to request the exclusion of certain solar products.  Id.  USTR invited "interested persons to submit comments identifying a particular product for exclusion from the safeguard measure and providing reasons why the product should be excluded."  Id. at 6,671.  The notice did not provide a method for withdrawal, or otherwise indicate that the exclusions could be withdrawn during the four-year safeguard period.  Id.

Three solar companies, Pine Gate Renewables, Sunpreme, Inc., and SolarWorld Industries GmBH, submitted requests for USTR to exclude the bifacial solar panels at issue here.  Complete Public Administrative Record at 4 (Pine Gate Renewables exclusion request), 48 (SolarWorld exclusion request), 55 (Sunpreme exclusion request) ("Complete P.R."); see also Complete P.R.

418–19 (July 3, 2018 USTR memo identifying the three bifacial panel exclusion requests).  USTR

received forty-eight product exclusion requests and 213 comments responding to these requests.

Exclusion of Particular Products From the Solar Products Safeguard Measure, 84 Fed. Reg. 27,684

(USTR June 13, 2019) ("Exclusion").  After a sixteen-month notice-and-comment process through

which USTR considered requests for exclusions "[b]ased on an evaluation of the factors set out in

the February 14 notice," USTR decided to exclude bifacial solar panels from safeguard duties.  Id.

The Exclusion did not indicate that it would apply temporarily, would require renewal, or could

be withdrawn.  Id.

      Shortly after USTR granted the exclusion request for bifacial solar panels, on June 26,

2019, Suniva, First Solar Inc., and Hanwha Q Cells USA, Inc. ("Q Cells") wrote to USTR to ask

it to reconsider its decision, arguing that the Exclusion would, "in a very short period of time,

undermine the relief afforded by the Section 201 tariffs as imposed by the President on January

23, 2018."  Invenergy's Compl. Ex. H, Oct. 21, 2019, ECF No. 13 (Letter from Suniva, First Solar,

and Q Cells to Ambassador Gerrish, Deputy U.S. Trade Representative (June 26, 2019)).  The

letter referenced a meeting between the parties less than a week prior and included eighteen

attachments for USTR's consideration.  Id.  On October 3, 2019, based on alleged rumors that

USTR was considering rescinding the Exclusion, Invenergy's CEO and thirteen other solar

industry executives wrote to USTR expressing their desire to be heard should USTR plan to take

any additional actions regarding the Exclusion.  Invenergy's Mem. In Supp. of Pls.' Mot. for PI at

5–6, Nov. 1, 2019, ECF No. 57; Defs.' Mot. to Dismiss and Resp. to Invenergy's Mot. for PI at 9,

Nov. 8, 2019, ECF No. 112; Invenergy's Compl. Ex. J (Letter to USTR re: Solar Safeguard Bifacial

Module Exclusion).

Thus, only four months after issuing the Exclusion, USTR published the Withdrawal of Bifacial Solar Panels Exclusion to the Solar Products Safeguard Measure, 84 Fed. Reg. 54,244 (USTR Oct. 9, 2019) ("First Withdrawal"), announcing its decision to withdraw the exclusion for bifacial solar panels, effective October 28, 2019. The First Withdrawal explained that, "[s]ince publication of [the Exclusion] notice, the U.S. Trade Representative has evaluated this exclusion further and, after consultation with the Secretaries of Commerce and Energy, determined it will undermine the objectives of the safeguard measure." Id. Absent intervening court action, the First Withdrawal would have reinstituted safeguard duties on certain bifacial solar panels.

### III.   Litigation History and Subsequent Developments

#### A.   First Withdrawal

Plaintiff Invenergy initiated this case in response to the First Withdrawal. Summons, Oct. 21, 2019, ECF No. 1; Invenergy's Compl., Oct. 21, 2019, ECF No. 13.[4] The Government subsequently moved for, and the court allowed, USTR to delay the effective date of the First Withdrawal to November 8, 2019. Mot. for Leave to Defer Implementation of Withdrawal of Exclusion From Section 201 Duties Until Nov. 8, 2019, Oct. 25, 2019, ECF No. 23; Order, Oct. 25, 2019, ECF No. 29. The court issued a temporary restraining order, Nov. 7, 2019, ECF No. 68, and later a preliminary injunction ("PI"), to enjoin USTR from reinstituting safeguard duties on certain bifacial solar panels through implementation of the First Withdrawal, Invenergy I, 422 F. Supp. 3d at 1294. The court in Invenergy I found that USTR made the decision with only nineteen

---

[4] After the initiation of this litigation, several parties moved to intervene as either Plaintiff-Intervenor or Defendant-Intervenor. The court granted each of these motions, although some were the subject of opposition. See Invenergy I, 422 F. Supp. 3d at 1271–80, Invenergy III, 450 F. Supp. 3d at 1356–57. After the court issued its decision in Invenergy V, Defendant-Intervenors Hanwha Q Cells and Auxin Solar were voluntarily dismissed from this action. Order of Dismissal, Mar. 15, 2021, ECF No. 309.

days' notice to the public, without an opportunity for affected or interested parties to comment, and without reasoned explanation on a developed public record. Id. at 1286–88. The court enjoined USTR from amending the HTSUS to reflect withdrawal of the Exclusion, "until entry of final judgment as to Plaintiffs' claims against Defendants in this case." Id. at 1295. In so ruling, the court held that the First Withdrawal of the Exclusion by the Government likely violated the APA on two grounds: (1) it was a rulemaking without notice and comment, id. at 1286–87; and (2) it was likely an arbitrary and capricious agency decision, id. at 1287–88.

On January 24, 2020, the Government filed a status report notifying the court and the other parties of USTR's publication of "a notice in the Federal Register, requesting interested party comment regarding whether to withdraw the [June 2019 Exclusion] from the safeguard measure pursuant to section 201 of the Trade Act of 1974, 19 U.S.C. § 2251, et seq., for bifacial solar panels contained in [the June 2019 Exclusion]." Defs.' Status Report at 1, ECF No. 131. USTR published the notice in the Federal Register three days later, thereby initiating the comment period. Procedures to Consider Retention or Withdrawal of the Exclusion of Bifacial Solar Panels From the Safeguard Measure on Solar Products, 85 Fed. Reg. 4,756–58 (USTR Jan. 27, 2020) ("January 2020 Notice"). The January 2020 Notice acknowledged the court's PI "enjoining the U.S. Trade Representative from withdrawing the exclusion on bifacial solar panels from the safeguard measure," and noted that "[i]f the U.S. Trade Representative determines after receipt of comments pursuant to this notice that it would be appropriate to withdraw the bifacial exclusion or take some other action with respect to the exclusion, the U.S. Trade Representative will request that the [c]ourt lift the injunction." Id. at 4,756.

In response, Plaintiffs Invenergy, Clearway, and AES DE filed their Motion to Show Cause as to Why the Court Should Not Enforce the Preliminary Injunction, Jan. 30, 2020, ECF No. 132,

alleging that the Government's publication of the <u>January 2020 Notice</u> violated the PI.   The Government responded with a motion to dismiss and vacate the <u>First Withdrawal</u> as moot.  Defs.' Resp. to Invenergy's Mot. to Show Cause and Mot. to Vacate Withdrawal and Dismiss Case as Moot, Jan. 7, 2020, ECF No. 139.   The court ruled exclusively on the Plaintiffs' motion stating, "the Government's [<u>January 2020 Notice</u>] did not violate the text of [the PI] because the [<u>January 2020 Notice</u>] does not (1) implement the [<u>First Withdrawal</u>]; (2) modify the HTSUS; or (3) enforce or make effective the [<u>First Withdrawal</u>] or modifications to the HTSUS related to the [<u>First Withdrawal</u>]."  <u>Invenergy II</u>, 427 F. Supp. 3d at 1407.   The court made clear that "[it] retain[ed] exclusive jurisdiction over the implementation, enforcement, or modification of the [<u>First Withdrawal</u>] until such date as a final judgment is entered in this case."  <u>Id.</u>  The court did not rule on the Government's motion to dismiss at that time because it required further briefing.  <u>Id.</u>

### B.    *Second Withdrawal*

On April 14, 2020, the Government filed another status report to inform the court of the issuance of USTR's <u>Second Withdrawal</u>.  Defs.' Status Report, ECF No. 155.  The <u>Second Withdrawal</u> withdraws the <u>Exclusion</u> of bifacial solar panels from safeguard duties -- the same conclusion as the <u>First Withdrawal</u>.  In that status report, the Government explained that "[i]n response to the [c]ourt's preliminary conclusion that repealing the withdrawal of the exclusion 'requires rulemaking subject to . . . APA notice and comment,' USTR 'opened a public docket,' and received 15 comments regarding the bifacial exclusion and 49 subsequent comments responding to the initial comments."  <u>Id.</u> at 2 (citations omitted).  Further, the Government explained that USTR "based the [<u>Second Withdrawal</u>] on the comments and evidence received." <u>Id.</u>  There, USTR published what it characterized as nine findings in support of its decision to withdraw the <u>Exclusion</u>:

1. Global capacity to produce bifacial solar panels is likely to increase significantly over the next three years.

2. As bifacial solar panel production currently is low in the United States, and the vast majority of bifacial solar panel capacity is foreign, allowing import of bifacial solar panels free of safeguard tariffs disincentivizes U.S. producers from converting existing monofacial production to bifacial production or opening new bifacial production.

3. Imports of bifacial solar panels were rising even before the bifacial exclusion and continued to increase after the exclusion.

4. Demand both globally and domestically for bifacial solar panels is likely to increase significantly for at least the next three years.

5. The cost of producing bifacial solar panels is not more than 10 percent higher than the cost of producing monofacial panels.

6. Bifacial solar panels and monofacial solar panels are substitutes from the perspective of utilities planning solar generating facilities in locations where both are cost competitive with conventional forms of energy.

7. Bifacial solar panels are expected to offer a 5 to 10 percent improvement in energy output over a same-size monofacial panel, and removing the safeguard tariff will enable their sale for prices below those of monofacial panels, which will depress prices for monofacial panels.

8. The proposed TRQ for bifacial solar panels would allow importation of massive quantities of bifacial solar panels and therefore would duplicate the negative effects of the bifacial exclusion.

9. Competition from low-priced imports prevented domestic producers from selling significant quantities of solar panels in the utility segment during the ITC's original investigation period, and low-priced imports of bifacial solar panels due to the exclusion are likely to have a similar effect under current market conditions.

Second Withdrawal, 85 Fed. Reg. at 21,498.

Based on this new decision by USTR, the Government filed its first motion to dissolve the PI. Defs.' Mot. to Dissolve PI, Apr. 16, 2020, ECF No. 156. The Government argued that the Second Withdrawal "cured the sole reason for which the injunctive relief was granted." Id. at 1. Plaintiffs argued that the Second Withdrawal was an arbitrary and capricious decision and thus did

not cure the second likely APA violation previously identified by the court.  See, e.g., Invenergy, Clearway, and AES DE's Resp. in Opp'n to Defs.' Mot. to Dissolve Prelim. Inj., May 7, 2020, ECF No. 163.  Shortly thereafter, Plaintiffs filed motions to supplement their complaints to include the Second Withdrawal.  Pls.' Mot. for Leave to File Suppl. Compls., May 8, 2020, ECF No. 170.

Prior to holding oral argument on those motions, the court issued questions to the parties for written answers.  Ct.'s Letter re: Questions for Oral Arg., May 8, 2020, ECF No. 169.  In responding to these questions, the Government attached two memoranda to its responses to the court's questions.  Mem. from then-DUSTR Jeffrey D. Gerrish and then-General Counsel Joseph Barloon to then-USTR Robert Lighthizer, Apr. 13, 2020, Attach. 1 to Defs.' Resp. to Ct.'s Questions, ECF No. 172-1 ("Lighthizer Decision Memorandum"); Mem. from then-DUSTR Jeffrey D. Gerrish and then-General Counsel Joseph Barloon to then-USTR Robert Lighthizer, Apr. 10, 2020, Attach. 2 to Defs.' Resp. to Ct.'s Questions, ECF No. 172-2 ("Gerrish Memorandum"), (collectively, "USTR Memoranda").  The USTR Memoranda consist of then-Deputy U.S. Trade Representative Jeffrey D. Gerrish's and U.S. Trade Representative then-General Counsel Joseph Barloon's analysis of USTR's authority to withdraw an exclusion, their analysis of comments received pursuant to the January 2020 Notice, and a recommended decision, initialed by then-U.S. Trade Representative Robert Lighthizer.  Id.  Neither memo was ever published in the Federal Register or otherwise made available to the interested public.  Furthermore, the Second Withdrawal made no mention or reference to any other decision documents that would alert the public to the existence of or relevance of the Gerrish Memo to USTR's final decision in the Second Withdrawal.  The court subsequently issued its decision in Invenergy III, in which it decided multiple outstanding motions.  450 F. Supp. 3d 1347.  First, the court denied the Government's motion to dismiss for failure to join an indispensable party.  Id. at

1356–57.  Second, the court granted Plaintiffs' motion to supplement their complaints to include the Second Withdrawal.  Id. at 1357–58.  Third, the court denied the Government's motion to vacate the First Withdrawal and dismiss the case as moot because the Government had not shown that the First Withdrawal was moot nor did the court have the authority to vacate the First Withdrawal without a decision on the merits.  Id. at 1358–60.  Finally, the court denied the Government's first motion to dissolve the PI because the Government had not proved sufficiently changed circumstances.  Id. at 1360–64.  Thus, the litigation continued on the basis of USTR's decisions to withdraw the Exclusion through the First Withdrawal and Second Withdrawal.  The Government appealed the denial of its first motion to dissolve the PI on August 5, 2020.  Invenergy III, appeal docketed No. 2020-2130 (Fed. Cir. Aug. 5, 2020), ECF No. 240.

As the litigation proceeded, on June 5, 2020, the Government filed the administrative record.  Public Administrative Record, ECF No. 196 ("P.R.").  Plaintiffs subsequently moved to complete the agency record.  Pls.' Mot. to Complete A.R., June 19, 2020, ECF No. 201.  Further, in response to Invenergy III, on June 12, 2020, USTR published the Rescission of the First Withdrawal of the Bifacial Solar Panels Exclusion From the Safeguard Measure on Solar Products, in which it "expressly rescind[ed] the [First Withdrawal]." 85 Fed. Reg. 35,975 (USTR June 12, 2020) ("June 2020 Rescission").  That same day, the Government made its second motion to dissolve the PI.  Defs.' Mot. to Dissolve PI, June 12, 2020, ECF No. 198.  Plaintiffs responded and made a cross-motion to modify the PI.  Pls.' Resp. to Defs.' Mot. to Dissolve PI and Cross-Mot. to Modify PI, June 29, 2020, ECF No. 206.  After the court set a date for oral argument on those motions, the Government filed its above-mentioned appeal.

The court decided Invenergy IV on October 15, 2020.  476 F. Supp. 3d 1323.  Noting the Government's June 2020 Rescission and subsequent abandonment of its defense of the First

Withdrawal, the court held that the First Withdrawal was unlawful on the merits and vacated the agency decision accordingly.  Id. at 1340.  There, the court incorporated its analysis in Invenergy I, decided that each of its preliminary conclusions apply to the merits of the First Withdrawal, and vacated the First Withdrawal pursuant to 5 U.S.C. § 706(2) of the APA as an agency action that is not in accordance with the law.  Id.  Furthermore, the court modified the PI to incorporate the Second Withdrawal in order to avoid the "very inequity to the Plaintiffs the PI sought to prevent" and to "to give effect to its purpose -- to shield Plaintiffs from the effects of an agency decision that was undertaken in violation of the APA."  Id. at 1342.  However, the court noted that its conclusion was preliminary, based on a limited record, and reserved judgment of the merits until properly presented to the court.  Id. at 1357.

Concurrent to the court's decision in Invenergy IV, President Trump announced his decision to withdraw by proclamation the Exclusion and his decision to increase duties on certain CSPV cells in year four of the safeguard measure from those duties previously announced. Proclamation 10101.  In response, Plaintiffs filed motions to again supplement their complaints to include Proclamation 10101 and further filed motions to enjoin its enforcement.  Pls.' Mot. for Leave to File Second Suppl. Compls., Oct. 17, 2020, ECF No. 257; Pls.' Emergency Appl./Mot. for Prelim. Inj. Modification or in the Alternative TRO, Oct. 20, 2020, ECF No. 263.  The court temporarily restrained Proclamation 10101 from entering into force so that it could decide Plaintiffs' motions.  Order Granting Mot. for TRO, Oct. 24, 2020, ECF No. 270; Order Extending TRO, Nov. 6, 2020, ECF No. 283.  On November 19, 2020, the court decided Invenergy V, in which it denied both of Plaintiffs' motions.  482 F. Supp. 3d 1344.  Rather, the court concluded that Plaintiffs' challenges to Proclamation 10101 did not demonstrate sufficient changed

circumstances to warrant modification of the PI and that <u>Proclamation 10101</u> was sufficiently distinct so as not to require supplementation of Plaintiffs' complaints. <u>Id.</u> at 1354.[5]

On December 3, 2020, the Government filed the completed administrative record. Complete P.R. Plaintiffs then filed their motion for judgment on the agency record challenging the <u>Second Withdrawal</u>. Pls.' Br. The Government filed its response on March 12, 2021. Defs.' Br. [6] Plaintiffs then replied in support of their motion. Pls.' Reply in Supp. of Mot. for J. on the Administrative R., Apr. 9, 2021, ECF No. 312; <u>see also</u> Pls.' Suppl. Reply in Supp. of Mot. for J. on the Administrative R., June 22, 2021, ECF No. 323. Oral argument on Plaintiffs' motion was held on July 13, 2021. Oral Arg., ECF No. 326. Prior to oral argument, the court issued and the parties responded to questions regarding the case. Ct.'s Letter re: Questions for Oral Arg., June 2, 2021, ECF No. 314; Pls.' Resps. To Ct.'s Questions Regarding Mot. For J. on the Administrative Record, June 11, 2021, ECF No. 319 ("Pls.' OAQ Resps."); Defs.' Resp. to Ct.'s Questions of June 2, 2021, June 11, 2021, ECF No. 318 ("Defs.' OAQ Resps."). As directed by the court, the parties also filed briefs following oral argument. Pls.' Post-Arg. Br. In Supp. of Mot. For J. on the Administrative R., July 20, 2021, ECF No. 330; Defs.' Suppl. Br., July 20, 2021, ECF No. 327.

---

[5] On December 29, 2020, Plaintiffs filed a separate challenge to <u>Proclamation 10101</u>. Compl., <u>SEIA v. United States</u>, No. 20-3941, (CIT Dec. 29, 2020), ECF No. 2. That case was subsequently assigned to this court and is currently under advisement. Order of Assignment, <u>SEIA</u>, No. 20-3941, (CIT Feb. 10, 2021), ECF No. 15.

[6] The Government's response submitted on March 12, 2021 omitted certain portions of that brief. <u>See</u> Defs.' Resp. to Pls.' Mot. for J. on the Administrative R., Mar. 12, 2021, ECF No. 307. On June 9, 2021, the Government moved to file a corrected response brief that included the omitted portions. Mot. for Errata to Corr. Resp. Br., June 9, 2021, ECF No. 316. The court granted that motion and also ordered that Plaintiffs could file a supplemental reply to the corrected brief. Order, June 10, 2021, ECF No. 317. Plaintiffs filed a joint supplemental reply brief on June 22, 2021. Pls.' Suppl. Reply in Supp. of Mot. for J. on the Administrative R., ECF No. 323.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(i), which provides that the court "shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" of tariffs and duties.

The APA requires the courts "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  To survive review under the arbitrary and capricious standard, the agency must have "examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" Dep't of Com. v. New York, 139 S. Ct. 2551, 2569 (2019) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("State Farm")); see also Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) (noting that agencies must provide adequate reasons for their decisions).  Because this case involves a delegation of Presidential statutory authority to an agency, the court also considers the President's delegation of authority for a "clear misconstruction of the governing statute, a significant procedural violation, or action outside [statutorily] delegated authority."  Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985).

## DISCUSSION

After five preliminary opinions on Plaintiffs' challenges to withdrawals of the exclusion for imports of bifacial solar cells from the imposition of safeguard duties, the court at last addresses and enters judgment on Plaintiffs' challenges.  The court concludes that (1) USTR has no statutory

authority to withdraw the Exclusion; and (2) that, in any event, the Second Withdrawal was an arbitrary and capricious agency decision.  The court accordingly grants Plaintiffs' motion and vacates the Second Withdrawal.

## I.       *USTR Had No Statutory Authority to Withdraw an Exclusion Once Granted.*

A threshold requirement to any agency action is statutory or other authority to act. Accordingly, Plaintiffs challenge the Second Withdrawal as outside of USTR's authority. Plaintiffs contend that USTR lack authority to withdraw an exclusion because (1) the statute does not allow exclusions to be withdrawn, Pls.' Br. at 61–64; 72; (2) the President through Proclamation 9693 did not delegate USTR the authority to withdraw exclusions, Pls.' Br. at 69–73; and (3) USTR had no inherent authority to reconsider its decision to grant an exclusion, Pls.' Br. at 73–75.  First, Plaintiffs argue that either USTR's Second Withdrawal was not authorized under Sections 201 and 203 because it exceeded the procedural and substantive limitations on Presidential action under those sections, Pls.' Br. at 62–64, 67–69; or the Second Withdrawal was an unlawful modification of the safeguard measure not in accordance with Section 204, Pls.' Br. at 65–67.  Furthermore, Plaintiffs contend that the President's delegation of authority to USTR in Proclamation 9693 did not include authority to withdraw exclusions, rather the delegation was limited to granting exclusions according to USTR's Exclusion Procedures issued in accordance with the President's directive.  Pls.' Br. at 69–73.  Finally, Plaintiffs argue that USTR had no inherent authority to reconsider its exclusion decisions because the statute does not permit re-imposition of duties or modifications to the safeguard measure outside its modification procedures. Pls.' Br. at 74–75.

The Government contests each of these points and argues that USTR acted within its delegated authority and in accordance with the statute in issuing the Second Withdrawal.  Defs.'

Br. at 53–56.  The Government contends that USTR was not required to comply with the same requirements as the President in acting to withdraw an exclusion.  Defs.' Br. at 54–55.  Further, the Government argues that the Second Withdrawal did not constitute a modification of the safeguard action for purposes of Section 204, but that USTR may nevertheless modify a safeguard action through discrete exclusions and withdrawals of those exclusions.  Defs.' Br. at 54.  The Government also claims that the President granted USTR the authority to modify exclusion decisions and the President's directive to issue the Exclusion Procedures did not reach to modifications of exclusions.[7]  Defs.' Br. at 54, 56.  Finally, the Government relies on the inherent authority of agencies to reconsider their decisions as a basis of authority for the Second Withdrawal.  Defs.' Br. at 55.

     In determining the scope of USTR's authority regarding safeguard exclusions, the court first looks to the safeguard statute.  See Merck Sharp & Dohme Corp. v. Albrecht, 139 S. Ct. 1668, 1679 (2019) (observing that an agency only has the authority that has been delegated to it).  The court notes that the trade power is constitutionally lodged with Congress exclusively, and that Congress can delegate that authority, cabined by "intelligible principles" to the President.  See generally Universal Steel Prods. Inc. v. United States, 44 CIT __, __, 495 F. Supp. 3d 1336, 1359 (2021) (Katzmann, J., concurrence) ("If nothing else, precedent affirms that in enacting such statutes, Congress can restrict the actions of the President in the delegation of its power of trade to the Executive; indeed, the constitutionality of that legislation is informed by restraints on that power."); Am. Inst. for Int'l Steel, Inc. v. United States, 43 CIT __, __, 376 F. Supp. 3d 1335,

---

[7] The court notes the Government's claim that "USTR was not obligated to follow the same procedures in issuing the [Second Withdrawal] that it followed in its February 2018 exclusion procedures."  Defs.' Br. at 56.  Because the court previously and conclusively rejected a similar argument in Invenergy I, 422 F. Supp. 3d at 1283–86, it need not revisit this issue here.

1346–53 (2019) (Katzmann, J., dubitante) (reviewing cases involving challenges to trade legislation raising the question of unconstitutional delegation of legislative power).  Thus, the President's own authority to act, and any subsequent delegation of his authority to USTR, is constrained by Congress's directives on the initiation and implementation of safeguard measures. As a whole, these measures are intended to "facilitate efforts by the domestic industry to make a positive adjustment to import competition" while providing "greater economic and social benefits than costs."  19 U.S.C. § 2251(a).

The President issued Proclamation 9693 pursuant to Section 203.  As noted, Section 203 authorizes the President to take safeguard measures when certain prerequisites are met and further prescribes limitations on those safeguard measures.  19 U.S.C. § 2253.  Specifically, Section 203 limits the duration, nature, and extent of the safeguard measure.  19 U.S.C. § 2253(e).  Relevant here, Section 203 requires that, where the safeguard measure taken is to impose or increase duties on an article that "has an effective period of more than 1 year[, the duties] shall be phased down at regular intervals during the period in which the action is in effect."  Id. § 2253(e)(5). Furthermore, Section 203 states that the President may implement regulations to "provide for the efficient and fair administration of all actions taken for the purpose of providing import relief under this part."  Id. § 2253(g)(1); see also id. § 2253(g)(3) ("Regulations prescribed under this subsection shall, to the extent practicable and consistent with efficient and fair administration, insure against inequitable sharing of imports by a relatively small number of larger importers." (emphasis added)).

Importantly, Section 203 requires that the President, in implementing a safeguard measure, must set a bar for duties imposed, gradually phase down those duties from their initial peak, and,

in accordance with those principles, efficiently and fairly implement the safeguard measure.[8]   This

is the relevant authority given to the President by Congress and as such it confines the scope of the

authority that the President could have delegated to USTR in Proclamation 9693 issued pursuant

to Section 203.   The court notes that Proclamation 9693 is not challenged here or by any other

party to date.   Thus, to the extent that the court examines the President's interpretation of Section

203 as expressed in Proclamation 9693, it is only to discern the scope of the authority delegated to

USTR, as the President can only delegate authority that he already possessed under the safeguard

statute.   For the reasons outlined below, the court concludes that USTR exceeded this statutory

authority in withdrawing the Exclusion.

The Government contends that agencies have inherent authority to reconsider their

decisions, and therefore USTR had inherent authority to withdraw its decision to exclude bifacial

solar panels from the safeguard measure.   Defs.' Br. at 55–56.   The court agrees with the

Government's contention that caselaw supports an agency's inherent authority to reconsider its

decisions.   See, e.g., Tokyo Kikai Seisakusho, Ltd. v. United States, 529 F.3d 1352, 1361–62 &

n.7 (Fed. Cir. 2008) ("TKS").   However, as the Federal Circuit in the TKS decision explained:

> The power to reconsider is inherent in the power to decide.   For this reason, the
> courts have uniformly concluded that administrative agencies possess inherent
> authority to reconsider their decisions, subject to certain limitations, regardless of
> whether they possess explicit statutory authority to do so. . . .   An agency's inherent
> authority to reconsider its decisions is not without limitation, however.   An agency
> cannot, for example, exercise its inherent authority in a manner that is contrary to
> a statute.   Thus, an agency obviously lacks power to reconsider where a statute
> forbids the exercise of such power.   Similarly, in situations where a statute does

---

[8] Although not essential to the court's analysis where, as here, the text itself is clear, the legislative history further reflects Congress's intent to provide for the gradual reduction of tariffs.   Congress has acknowledged that the safeguard statute contains "criteria regarding . . . degressivity (progressive liberalization of safeguard restrictions)," and has explicitly incorporated the statute's focus on degressivity into international agreements on safeguard measures.   See H.R. Rep. No. 103-316, 286, as reprinted in 1994 U.S.C.C.A.N. 4040, 4262.   The statute's goal of gradually reducing safeguards is thus well-established.

> expressly provide for reconsideration of decisions, the agency is obligated to follow
> the procedures for reconsideration set forth in the statute.  The agency must also
> give notice to the parties of its intent to reconsider, and such reconsideration must
> occur within a reasonable time.  Finally, an agency may not reconsider in a manner
> that would be arbitrary, capricious, or an abuse of discretion.  These limitations on
> the exercise of inherent power are uncontroversial . . . .

Id. at 1360–61 (first citing Trujillo v. Gen. Elec. Co., 621 F.2d 1084, 1086 (10th Cir. 1980); then

citing Macktal v. Chao, 286 F.3d 822, 825 (5th Cir. 2002); then citing Bookman v. United States,

453 F.2d 1263, 1265 (Ct. Cl. 1972); then citing Civil Aeronautics Bd. v. Delta Air Lines, Inc., 367

U.S. 316, 329 (1961); and then citing 5 U.S.C. § 706(2)(a)).

Because the court concludes that Section 203 only allows the President to set safeguard

duties at a high mark that then phases down, the court also concludes that the statute does not

permit USTR to withdraw the grant of an exclusion where that withdrawal would result in the

imposition of higher duties on the affected goods.  A withdrawal of an exclusion is not a phasing

down of the imposition of duties as the statute directs.  19 U.S.C. § 2253(e)(5).  The Government,

by contrast, claims that "[w]ithdrawal of an exclusion is not an increase in the rate of duty for

products subject to the safeguard measure," but rather is "merely a reversion to the rate of duty

mandated by the President in Proclamation 9693."  Defs.' Br. at 54.  However, a reversion to a

higher rate of duty is still an increase in the rate of duty for the sub-set of bifacial products covered

by the Exclusion even if it does not increase duties for the entire range of products covered by the

safeguard measure.  In direct opposition to the mandate of the statute that duties be phased down,

a reversion to a higher duty undoes the drastic phasing down of safeguard duties (to zero)

accomplished by granting the exclusion.  19 U.S.C. § 2253(e)(5).  Thus, the statute does not allow

such yo-yoing of duties within a scheme that is tightly limited by Congress in terms of the

substance and duration of safeguard actions that can be taken by the President.

Furthermore, Section 203 requires that regulations that implement safeguard measures, such as the Exclusion Procedures and resulting Exclusion, be "efficient[ly] and fair[ly] administ[ered]".  19 U.S.C. § 2253(g)(1).  Against the backdrop of a statute that as a whole contemplates a phasing down of safeguard relief and only lasts four year (eight years if extended), importers had no notice that an exclusion once granted would -- or even could -- be subject to being withdrawn.  Pls.' Br. at 71–72.  Plaintiffs note that this absence of notice stands in direct contrast to other exclusions granted by USTR from duties imposed pursuant to Section 301 that were subject to renewal, 19 U.S.C. §§ 2411–2420, for unreasonable or discriminatory trade practices, and temporary exclusions granted by the Department of Commerce from national security duties imposed pursuant to Section 232, 19 U.S.C. § 1862.  Id.; Pls.' Suppl. Reply at 4.  Notice is a fundamental fairness requirement.  Furthermore, notice is a limit identified by the Federal Circuit on an agency's ability to reconsider its decision.  TKS, 529 F.3d at 1361.  Therefore, the Second Withdrawal runs afoul of the fair implementation requirement of the statute and inherent to an agency's ability to reconsider any decision.[9]

In short, the court concludes that in deciding to withdraw the Exclusion for bifacial solar panels, USTR exceeded both the authority granted to the President in Section 203 and the authority delegated by the President to USTR in Proclamation 9693.  Thus, the Second Withdrawal does not comply with the safeguard statute and must be vacated.[10]  Whether Section 203 should be revised is a matter for the Congress and not for the court.

---

[9] The parties spend a considerable part of their briefing arguing whether, in Proclamation 9693, the President intended to delegate to USTR the authority to modify exclusion decisions.  The court need not reach those arguments as it concludes the statute does not provide the President the authority to withdraw exclusions from safeguard measures.

[10] The court has considered and does not find persuasive Plaintiffs' other statutory arguments regarding USTR's authority.  See Pls.' Br. at 65–69.

## II.    The <u>Second Withdrawal</u> was Arbitrary and Capricious in Violation of APA Requirements.

Without regard to the court's determination in Section I, above, there exists a second, independent basis for vacating the <u>Second Withdrawal</u> -- USTR's failure to comply with the requirements set forth in the APA.  In modifying the PI to enjoin the <u>Second Withdrawal</u> in <u>Invenergy IV</u>, the court preliminary concluded that Plaintiffs had "show[n] that the <u>Second Withdrawal</u> was likely arbitrary and capricious."  <u>Invenergy IV</u>, 476 F. Supp. 3d at 1343.  In moving for judgment on the agency record, Plaintiffs similarly challenge the <u>Second Withdrawal</u>'s compliance with several APA requirements.  The court now addresses the merits of these claims after, on multiple occasions, addressing certain of these claims preliminarily.  At the start, the court adopts its previous conclusion that its review of the agency's decision for compliance with the substantive requirements of the APA is limited to the <u>Second Withdrawal</u> as published in the Federal Register, which included no reference to the analysis provided in USTR's internal memoranda.  <u>Id.</u> at 1343–48.[11]  The court adopts and expands (1) its preliminary conclusion that USTR's decision inadequately responded to comments by interested parties; and (2) its

---

[11] As detailed above, <u>supra</u>, and addressed in <u>Invenergy IV</u>, two internal memoranda came to light in the course of this litigation, specifically in response to written questions issued to all parties by the court.  USTR Memoranda.  While the Government has consistently relied upon the USTR Memoranda as USTR's explanation of its decision, <u>see, e.g.</u>, Defs.' Br., the court previously held that, because neither memorandum was published, those documents could not be considered part of USTR's final rulemaking decision.  The court's conclusion rested, in part, upon the Supreme Court's decision in <u>Dep't of Homeland Sec'y v. Regents of the Univ. of Cal.</u>, in which the Court reiterated the APA's requirements that "[a]n agency must defend its actions based on the reasons it gave when it acted," including a contemporaneous and public reasoned explanation.  140 S. Ct. 1891, 1909 (2020) ("<u>Regents</u>"); <u>see also</u> <u>Dep't of Commerce v. New York</u>, 139 S. Ct. 2551, 2575 (2019).  The court also rejected the Government's argument that the error was not prejudicial to interested parties.  <u>Invenergy IV</u>, 476 F. Supp. 3d at 1346–47.  Because nothing has changed with respect to the publication of the USTR Memoranda since the court made this preliminary conclusion and because the Government makes no new arguments that would change the court's opinion, it now adopts that conclusion as part of its analysis of Plaintiffs' dispositive motion.

preliminary conclusion that USTR's decision inadequately explained its policy change.  See Invenergy IV, 476 F. Supp. 3d at 1349–52.

> ### A.      USTR's Statement of Basis and Purpose, Including Response to Significant Comments

As part of its hard look review of agency action under the APA, the court must determine whether an agency adequately "incorporate[d] in the rules adopted a concise general statement of their basis and purpose," 5 U.S.C. § 553(c).  See Invenergy I, 422 F. Supp. 3d at 1286 ("Because the Exclusion process constituted rulemaking, so too must the Withdrawal"); Invenergy IV, 476 F. Supp. 3d at 1344 & n.5 (citing Catherine Sharkey, Federalism Accountability: "Agency-Forcing" Measures, 58 Duke L.J. 2125, 2181 (2009)).  This statement allows a reviewing court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did."  State of S.C. ex rel Tindal v. Block, 717 F.2d 874, 886 (4th Cir. 1983) (quoting Gen. Tel. Co. v. United States, 449 F.3d 846, 862 (5th Cir. 1971)).  Further, "[t]he purpose of requiring a statement of the basis and purpose is to enable courts, which have the duty to exercise review, to be aware of the legal and factual framework underlying the agency's actions." Am. Standard, Inc. v. United States, 602 F.2d 256, 269 (Ct. Cl. 1979) (citing Sec. Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 94 (1943) ("Chenery"); Nat'l Welfare Rights Org. v. Mathews, supra, 533 F.2d 637, 649 (1976)).  "Inextricably intertwined with the basis and purpose requirement of 5 U.S.C. § 553(c) is the agency's need to respond, in a reasoned manner, to any comments received by the agency that raise significant issues with respect to a proposed rule" Disabled Am. Veterans v. Gober, 234 F.3d 682, 692 (Fed. Cir. 2000) (overruled on other grounds by Nat'l Org. of Veterans Advocs., Inc. v. Sec'y of Veterans Affs., 981 F.3d 1360 (2020)) (citation omitted).  However, "the agency need not respond to each comment, and the detail of the agency's response depends upon the subject matter of the regulation and the comments received." Id.

"Significant comments are those 'which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule.'" City of Portland v. E.P.A. 507 F.3d 706, 715 (D.C. Cir 2017) (quoting Home Box Office, Inc. v. F.C.C., 567 F.2d 9, 35 n.58 (1977)).

Plaintiffs identify two problems with the Second Withdrawal in connection with this requirement: first, that USTR provided no basis for its conclusions, Pls.' Br. at 19–23; and second, that USTR did not respond to significant comments from interested parties, Pls.' Br. at 33–46. The Government responds that USTR adequately explained its decision to withdraw the Exclusion, Defs.' Br. at 24–8, 29–30; and that, while USTR did not need to address every comment received, it addressed significant comments raised in both the Second Withdrawal and in the USTR Memoranda, Defs.' Br. at 28–50.

First, the court adopts its previous conclusion that USTR provided no more than conclusory statements in the Second Withdrawal that did not meet the basis and purpose requirement of the APA. Invenergy IV, 476 F. Supp. 3d at 1350. As the court earlier explained, the facts relied upon by USTR in reaching the conclusions of the Second Withdrawal are indiscernible in light of record evidence that appears to contradict those conclusions with respect to the substitutability of bifacial and monofacial solar panels. Id.; see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150 (D.C. Cir. 1993) (rejecting an explanation of an agency decision that lacked an explanation of data relied upon). Furthermore, the court notes that Plaintiffs' repeatedly expressed concerns about USTR's statutory authority to withdraw an exclusion both in this litigation and before USTR. See, e.g., SEIA's Compl.; Invenergy's Mot. for PI; Pls.' Resp. to Mot. to Show Cause. Nevertheless, USTR's perceived statutory basis for the Second Withdrawal is not apparent to the court. Invenergy IV, 476 F. Supp. 3d at 1350. While USTR did cite its authority under

Proclamation 9693, USTR did not explain how it concluded that Proclamation 9693 -- which, as

discussed above, only plainly indicates an authority to grant exclusions -- also allowed USTR to

withdraw exclusions once granted.  See 85 Fed. Reg. at 21,498.[12]  Therefore, the court concludes

that USTR's conclusory statements did not constitute an adequate statement of basis and purpose

so as to allow the court to review the "the legal and factual framework underlying the agency's

action[]," Am. Standard, 602 F.2d at 269; see also In re Sang Su Lee, 277 F.3d 1338, 1344 (Fed.

Cir. 2002) ("Conclusory statements such as those here provided do not fulfill the agency's

obligation" to reach reasoned decisions).

Similarly, the court agrees with Plaintiffs that USTR did not address significant comments

as required by the APA's basis and purpose requirement.[13]  Previously, the court noted that the

Second Withdrawal did not include USTR's response to Plaintiffs' comments on significant issues

or to detracting evidence on the following: (1) USTR's authority to withdraw a previously granted

exclusion; and (2) the substitutability of bifacial solar panels and monofacial solar panels.

Invenergy IV, 476 F. Supp. 3d at 1350–52.  The court incorporates those conclusions here.

Furthermore, Plaintiffs contend that USTR erred by not addressing significant comments

on the economic and other costs of withdrawing the Exclusion, Pls.' Br. at 40.  Plaintiffs cite

several comments submitted to USTR on the issue of costs associated with withdrawing the

---

[12] Plaintiffs also claim that USTR failed to include the required "reference to the legal authority" for its rulemaking pursuant to 5 U.S.C. § 553(b)(2).  However, the APA imposes that requirement in connection with the adequacy of the notice of a proposed rulemaking.  As Plaintiffs concede, their harm stems from the Second Withdrawal and not from any deficiency with the January 2020 Notice.  Pls.' OAQ Resps. at 8–10.  Because the court addresses this issue in the context of USTR's compliance with other APA requirements and in the context of the legal question of USTR's authority, it declines to further address this challenge.

[13] The court addresses only those comments raised by Plaintiffs before USTR and not those comments raised by individuals and entities not before the court in this litigation.  See Pls.' Br. at 40–46; see, e.g., Kowalski v. Tesmer, 543 U.S. 125, 129 (2004).

Exclusion, for example comments concerning job losses, P.R. 67, 1632, 715–16, planned solar

projects and the communities where those projects are located, P.R. 64–65, and overall solar

industry impacts, P.R. 715–16.  Plaintiffs also contend that USTR "failed to respond to comments

regarding the lack of domestic production of bifacial solar modules, which commenters explained

necessitates continued access to reasonably-priced bifacial panels manufactured abroad."  Pls.' Br.

at 46–47.  Plaintiffs explain that their comments showed in detail the domestic industry's lack of

production of or plan to produce utility grade bifacial solar panels.  Pls.' Br. at 47 (citing P.R. 54–

56, 696, 703–08, 1611–15, 1918–24, 2477–79).  Thus, they contend that, contrary to USTR's

conclusions, there would be no harm to the domestic industry in allowing the continued exclusion

of utility grade bifacial solar panels from safeguard tariffs.  See Pls.' Br at 47–48.

In the Second Withdrawal, USTR stated that "[a]s bifacial solar panel production currently

is low in the United States, and the vast majority of bifacial solar panel capacity is foreign, allowing

import of bifacial solar panels free of safeguard tariffs disincentivizes U.S. producers" from

increasing bifacial production. 85 Fed. Reg. at 21,498.  However, USTR did not address the impact

that withdrawing the Exclusion would have on the solar energy industry given low domestic

production and the resulting need for bifacial solar imports.  Nor did USTR address the economic

and social impacts that the added tariff burden would have.  This issue was plainly significant in

that the statute itself identifies it as a central consideration to the imposition of safeguard measures.

See 19 U.S.C. § 2253 ("the President shall take into account . . . the short- and long-term economic

and social costs . . . relative to their short- and long-term economic and social benefits and other

considerations relative to the position of the domestic industry in the United States economy");

Catholic Legal Immigr. Network, Inc. v. Exec. Office for Immigr. Rev., 513 F. Supp. 3d 154, 173

(holding an agency decision to be arbitrary and capricious where the agency did not address the

decision's impact on legal service providers of services relevant to the applicable statute).  USTR itself recognized the significance of this issue by requesting comment on that issue in its January 2020 Notice.  85 Fed. Reg. at 4,756.  Thus, it is clear that USTR failed to respond to comments on this significant issue.

In short, USTR did not provide a reasoned explanation or basis and purpose for its Second Withdrawal so that the court could review its conclusions.  It also failed to address significant comments raised by Plaintiffs that if adopted may have changed USTR's decision to withdraw the Exclusion.

### B.      USTR's Consideration and Explanation of Its Policy Change

Separate from the court's conclusion that USTR did not adequately respond to significant comments, the second part of the court's hard-look review is the APA's prohibition on "agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706.  The court previously preliminarily found fault with USTR's lack of an adequate explanation of "its change in position as set forth in long-established caselaw on what is required of an agency when it changes its position."  Invenergy IV, 476 F. Supp. 3d at 1351 (citing F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 517 (2009)).  The court noted that "USTR fail[ed] to explain what information it received or what facts changed since the issuance of the June 2019 Exclusion that led it to believe that withdrawal was the more appropriate action, thus its decision was not adequately reasoned in this respect."  Id. (citing Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125–26 (2016)).

As Plaintiffs summarize, the Second Withdrawal provided no justification for deviation from the facts underlying the Exclusion: "1) that the economic and social benefits outweigh its costs . . . ; 2) that bifacial panels are physically distinct, differentiated and functionally different,

with a higher energy yield that enables special use cases for project feasibility; and 3) that the domestic industry does not have the capacity to supply U.S. demand for bifacial panels, and is not likely to any time in the future."  Pls.' Reply at 13 (citations, alterations, and quotations omitted). Further, the court notes Plaintiffs' contentions that USTR granted the Exclusion based on a record that showed the Department of Energy recommended a bifacial exclusion because of the limited availability of domestically produced bifacial panels that would have a "medium competitive impact."  Pls.' Br. at 30 (quoting Complete P.R. 541–43).  This argument, made based on Plaintiffs' access to the full administrative record, see Invenergy IV, 476 F. Supp. 3d at 1354–56, further supports the conclusion that USTR did not adequately explain its complete about-face on the propriety of the exclusion of bifacial solar panels.  Thus, the court determines that USTR erred by not explaining the basis for its policy change based on its preliminary findings and Plaintiffs' additional contentions.

Plaintiffs also argue that the Second Withdrawal arbitrarily and capriciously omitted USTR's consideration of alternatives to its policy reversal.  Pls.' Br. at 48–49.  Plaintiffs explain that, in their comments in response to USTR's January 2020 Notice, they suggested that USTR could narrow the Exclusion to utility grade bifacial modules, P.R. 52, 694, 1609; impose a requirement in line with international standards for verifying that imports under the Exclusion were truly bifacial modules, P.R. 697, 1609; or impose a tariff rate quota ("TRQ") on imports of bifacial panels imported under the Exclusion, P.R. 698.  Pls.' Br. at 50.  Plaintiffs contend that USTR "failed to even mention [the first two] proposed alternatives, let alone consider them."  Pls.' Br. at 51.  As to the TRQ, Plaintiffs contend that USTR's lone reference to this proposal was conclusory and illogical.  Pls.' Br. at 52.  Finally, Plaintiffs argue that USTR also neglected to consider reliance interests engendered by the issuance of the Exclusion.  Pls.' Br. at 16.

The Government acknowledges that "agencies should consider alternatives raised by commenters pursuant to notice and comment procedures." Defs.' OAQ Resps. at 7. However, the Government notes that the Second Withdrawal addressed the TRQ proposed by Plaintiffs and rejected it. Id.; Defs.' Br. at 42–43. The Government does not address Plaintiffs' reliance argument.

The court concludes that USTR did not adequately address important and "conspicuous issues" to its decision, specifically alternatives "within the ambit of the existing policy" and reliance on the previous policy. Regents, 140 S. Ct. at 1913, 1916 (citations omitted). USTR's failure to even mention two of the proposed alternatives dictates the conclusion that the Second Withdrawal was arbitrary and capricious. Id. ("The rescission memorandum contains no discussion of forbearance or the option of retaining forbearance without benefits . . . That omission alone renders Acting Secretary Duke's decision arbitrary and capricious."). This failure is particularly marked where USTR itself requested comment on several alternatives to a complete withdrawal of the Exclusion, including narrowing the definition of bifacial solar panels excluded or otherwise altering the Exclusion. January 2020 Notice, 85 Fed. Reg. at 4,756. Thus, the Second Withdrawal was an arbitrary and capricious agency decision.[14]

---

[14] The USTR Memoranda did not address significant evidence submitted by Plaintiffs regarding the need for at least a utility grade bifacial panel exclusion, Plaintiffs' proposed alternatives to outright rescission of the Exclusion, and USTR's authority in light of statutory limitations on safeguard actions: all significant issues upon which USTR specifically sought comment. See USTR Memoranda; Pls.' Br. n. 14 (citing P.R. 712, 707, 959–60, 1925–27, 2480, 2482–85) (noting evidence submitted to USTR not discussed in the Gerrish Memo); Pls.' Reply at 7; accord Defs.' Br. at 42–43. Similarly, the USTR Memoranda also did not engage with Plaintiffs' comments regarding the economic and social impacts of withdrawing the Exclusion, rather it merely concluded that the impact on "job losses" was "unclear." Gerrish Memo at 7. This conclusion was also based on consideration of the "perspective of utilities planning solar generating facilities" rather than those that had already planned facilities on the basis of the Exclusion, including solar energy producers such as Invenergy. See Gerrish Memo at 7–8; Pls.' Br. at 8. As Plaintiffs explain, planning utility grade solar energy facilities takes years of planning to obtain necessary

Finally, contrary to the Government's contentions, Defs.' Br. at 26, regardless of whether any party raised USTR's need to comply with basic APA requirements, USTR "retain[ed] a duty to examine key assumptions . . . and . . . justify [those] assumption[s] even if no one objects to it during the comment period." Nat. Res. Def. Council v. E.P.A., 755 F.3d 1010, 1023 (D.C. Cir. 2014). Furthermore, the court declines to require Plaintiffs to have exhausted arguments that USTR comply with basic APA requirements when the applicability of those requirements had already been confirmed by this court -- the same court with continuing jurisdiction over this dispute. See Invenergy I, 422 F. Supp. 3d at 1281–86; Invenergy II, 427 F. Supp. 3d at 1407. To do so would require every party in every instance to remind agencies of basic procedural requirements in every rulemaking, even where there is no indication that an agency intends to skirt those requirements. Such a result should be avoided.

In sum, the court concludes that the Second Withdrawal did not comply with basic APA requirements to provide an adequate explanation to facilitate judicial review and to reach a reasoned decision. Because of these errors, the court must vacate the Second Withdrawal.[15]

### III.   *Vacatur of the <u>Second Withdrawal</u> is the Proper Remedy.*

Finally, the court addresses the parties' dispute about the proper remedy for its conclusion that the Second Withdrawal was not in accordance with the statute and violated the APA. Plaintiffs request that the court vacate the Second Withdrawal. Pls.' Br. at 76. While the Government

---

equipment, permits, land space, financing, and coordination with other energy providers, Invenergy's Mem. In Supp. of Pls.' Mot. for PI at 38, Nov. 1, 2019, ECF No. 57. Regents, 140 S. Ct. 1891, 1913, 1916. Thus, publication of the USTR Memoranda would not rectify the arbitrary and capricious nature of the Second Withdrawal.

[15] Having concluded that the Second Withdrawal suffers from a statutory authority defect and these APA defects, the court need not reach Plaintiffs remaining claims that the Second Withdrawal was not supported by the record evidence. See Pls.' Br. at 53–60.

concedes that vacatur is the appropriate remedy for a decision that the <u>Second Withdrawal</u> is not in accordance with the statute, it also argues that, should the court only find that USTR failed to adequately explain its decision, the court should remand the decision to USTR for further explanation.  Defs.' Br. at 50–51 (citing <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985)).

The court agrees with Plaintiffs that vacatur is the proper remedy.  First, the court's conclusion that USTR lacks statutory or delegated authority to withdraw an exclusion requires vacatur, as all parties agree.  <u>See</u> <u>Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n</u>, 896 F.3d 520, 536 (D.C. Cir. 2018) (holding that where an agency does not comply with the statute, vacatur is the proper remedy); Pls.' Br. at 75–76; Defs.' Br. at 50.  Furthermore, the court's conclusion that the decision was arbitrary and capricious provides an independent reason to vacate the <u>Second Withdrawal</u>.  <u>See</u> 5 U.S.C. § 706(2) (requiring that courts shall "hold unlawful and set aside" agency action that is found to be "without observance of procedure required by law").  While the court agrees with the Government that remand is the usual remedy for inadequately explained decisions, <u>Fla. Power & Light</u>, 470 U.S. at 744; <u>Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs</u>, 145 F.3d 1399, 1409 (D.C. Cir. 1998); <u>Pollinator Stewardship Council v. U.S.E.P.A.</u>, 806 F.3d 520, 532 (9th Cir. 2015), the court nonetheless concludes that remand would be ineffective to remedy the arbitrary and capricious nature of the <u>Second Withdrawal</u>.  In <u>Regents</u>, for example, the Supreme Court found that memoranda which were issued subsequent to an agency's decision, and which relied upon bases not included in the agency's original decision, could not provide adequate grounds for upholding that decision.  140 S. Ct. at 1909–10.  Rather, "[a]n agency must defend its actions based on the reasons it gave when it acted."  <u>Id.</u>  Thus, on remand, USTR would be limited to relying upon the reasoning stated in either the <u>Second Withdrawal</u> or the USTR

Memoranda, both of which omitted any mention of certain significant issues. Moreover, because the President intervened through Proclamation 10101, the court concludes that remand would not be fruitful or appropriate.

The court thus decides that vacatur without remand is the proper remedy and will enter judgment accordingly.

## CONCLUSION

In sum, the court concludes that the Second Withdrawal of the exclusion from safeguard duties on imported bifacial solar modules must be vacated for lack of statutory authority and as arbitrary and capricious. The court reiterates that from the start, this case has not been about the choice between one policy and another regarding imports of solar panels. Nor has it been about whether the statutory scheme should be modified. Those are not matters that fall within the purview of the court, and the court takes no view on the merits of the vigorously contested trade policies advocated by the parties or on the merits of legislative revision. Rather, what are before the court are issues of statutory authority and time-honored processes that must be observed for the administration of justice. Ultimately, for the reasons stated, the actions challenged here cannot be upheld.

Accordingly, the Second Withdrawal is vacated and Plaintiffs' motion for judgment on the administrative record is granted. Defendants are further enjoined from enforcing the Second Withdrawal, whether through modification to the Harmonized Tariff Schedule of the United States or enforcement of duties.

**SO ORDERED.**

/s/  *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: November 17, 2021
        New York, New York